UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
AGENCE FRANCE PRESSE,                         :

                Plaintiff,                  :        10 Civ. 2730 (WHP)

        -against-                            :        MEMORANDUM & ORDER

DANIEL MOREL,                                 :

              Defendant,                  :

        -against-                            :

GETTY IMAGES (US), INC., et al.,             :

              Third-Party                 :
              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/23/10

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Agence France Presse ("AFP") seeks a declaratory judgment that AFP

did not infringe Defendant Daniel Morel's ("Morel") copyrights in certain photographs.  Morel

counterclaims against AFP alleging violations of the Copyright Act of 1976, 17 U.S.C. § 101 et

seq., the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202, and the Lanham Act,

15 U.S.C. § 1125.  Morel also brings similar third-party claims against Getty Images (US), Inc.

("Getty"), CBS Broadcasting, Inc. ("CBS"), ABC, Inc. ("ABC"), Turner Broadcasting System,

Inc. ("TBS"), and unnamed AFP and Getty licensees (collectively, the "Third-Party

Defendants").  AFP and the Third-Party Defendants move to dismiss Morel's counterclaims and

third-party claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  For

the following reasons, that motion is granted in part and denied in part.

-1-

## BACKGROUND

### I. The Haiti Earthquake Photographs

Morel is a professional photojournalist who has worked in Haiti for over twenty-five years. (Daniel Morel's Second Amended Answer, Affirmative Defense & Counterclaims dated June 22, 2010 ("Countercl.") ¶ 44.)  AFP is a French news agency that offers an international photo service to media, primarily newspapers, worldwide. (Countercl. ¶ 45.)  On January 12, 2010, Morel was in Port au Prince, Haiti, when an earthquake devastated the city. He photographed the immediate aftermath. (Countercl. ¶¶ 34, 67-69.)

Although communications with Haiti were disrupted, Morel was able to access the internet that afternoon. (Countercl. ¶ 71.)  Under the username "photomorel," he opened accounts on Twitter, a social networking website, and Twitpic, a third-party application of Twitter. (Countercl. ¶¶ 71-72.)  While Twitter only permits users to post messages up to 140 characters, called "tweets," Twitpic allows users to upload pictures and share them with other users. (Countercl. ¶ 71.)

Twitter and Twitpic are incorporated in different states and have different terms of service. (Countercl. ¶ 71.)  Twitpic's terms of service provide, "By uploading your photos to Twitpic, you give Twitpic permission to use or distribute your photos on Twitpic.com or affiliated sites.  All images uploaded are copyright © their respective owners." (Countercl. Ex. A: Twitpic Terms of Service in effect Jan. 12, 2010 ("Twitpic TOS") at 1-2.)  Although Morel maintains that the Twitter terms of service do not apply to his claims, he quotes portions of them in his counterclaims: "Notwithstanding [sic] the TOS state inter alia, 'you retain your rights to any content you . . . post on or through the services.'" (Countercl. ¶ 72.)

Morel uploaded his photos on Twitpic, posted on Twitter that he had "exclusive earthquake photos," and linked his Twitter page to his Twitpic page. (Countercl. ¶¶ 71-72.) There were no copyright notices on the images themselves, but Morel's Twitpic page included the attributions "Morel" and "by photomorel" next to the images. (Countercl. ¶ 160 & Ex. P: TwitPic page, photomorel.) The Twitpic page also included the copyright notice "©2010 Twitpic Inc, All Rights Reserved." (See Countercl. ¶ 164.) By posting photos on the internet, Morel wanted to break the news of the earthquake, retain his copyrights, and receive credit and compensation for licensing his photos. (Countercl. ¶ 72.)

II.  The Media's Use of Morel's Photographs

A few minutes after Morel posted his photographs, Lisandro Suero ("Suero"), a resident of the Dominican Republic, copied the photographs, posted them on his Twitpic page, and tweeted that he had "exclusive photographs of the catastrophe for credit and copyright." (Countercl. ¶¶ 73-74.) Suero is not a photographer and was not in Haiti during the earthquake. (Countercl. ¶ 73.) Suero did not attribute the photographs to Morel. (See Countercl. Ex. B: Twitpic page of Lisandro Suero.)

Morel's photos were among the first transmitted from Haiti. (Countercl. ¶¶ 35, 70.) The media took notice immediately. That evening, numerous American and foreign news outlets emailed Morel and posted on Twitpic asking to purchase his photos for publication. (Countercl. ¶¶ 75-76 & Ex. C: Emails & postings dated Jan. 12 & 13, 2010.) Four CBS News representatives contacted Morel seeking to purchase his photographs and offering to credit him as author. (Countercl. ¶¶ 198-201.) In addition, five CNN representatives contacted Morel

-3-

complimenting him on his photographs and requesting permission to air them. (Countercl. ¶¶ 221-226.)[1]

Within an hour of Morel's posting, Vincent Amalvy ("Amalvy"), an AFP photo editor, placed a link on his Twitter page to Morel's photographs. (Countercl. ¶ 82.) An hour later, Amalvy posted on Suero's Twitter page inquiring about the photographs Suero posted. (Countercl. ¶ 82.) At 9:41 p.m., Amalvy emailed Morel asking, "do you have pictures?" (Countercl. ¶ 83.) Minutes later and before Morel responded, AFP downloaded thirteen of Morel's photographs of the disaster in Haiti from Suero's Twitpic page. (Countercl. ¶ 84.)

AFP operates an online photo database called Image Forum, which it uses to market and distribute its photographs. (Countercl. ¶¶ 45, 84.) AFP placed Morel's photographs on Image Forum and transmitted them to Getty, an image licensing company. (Countercl. ¶¶ 46, 84.) Pursuant to a partnership agreement, Getty holds exclusive rights to market AFP's images in North America and the United Kingdom. (Countercl. ¶ 46.) Morel's photographs were labeled with the credit line "AFP/Getty/Lisandro Suero," designating AFP and Getty as licensing agents and Suero as photographer. (Countercl. ¶¶ 84, 160 & Ex. E: Published photos.) Getty then licensed Morel's photos to numerous third-party news agencies, including CBS and CNN. (Countercl. ¶¶ 208, 229.)

Morel alleges that in their rush to obtain credit for the photographs, AFP and Getty willfully or recklessly failed to follow standard journalistic practices or use due diligence to verify Suero's authorship and the photographs' authenticity. (Countercl. ¶ 85.) Morel alleges

---

[1] Because TBS operates the CNN networks, Morel brings claims against TBS based on CNN's use of his photographs. (Countercl. ¶ 49.) As TBS does not contest its liability for CNN's actions at this time, this Court assumes the point for the purposes of this motion.

that although there was no reason to believe Suero was in Haiti to take the photographs, AFP and Getty trusted the images' authenticity because they knew Suero "stole" them from Morel, a well-known resident Haitian photographer. (Countercl. ¶ 87.)

Beginning at 5:45 p.m. on January 12, CNN ran a 24-hour broadcast about the disaster in Haiti featuring seven of Morel's photographs. (Countercl. ¶ 228.) Morel alleges that CNN uploaded the pictures from his TwitPic page. (Countercl. ¶ 228.) CNN aired several more of Morel's photographs during Anderson Cooper's report early on January 13. (Countercl. ¶ 228.) Morel alleges that CNN also licensed photographs from Getty and sublicensed them to its affiliate Time, Inc. (Countercl. ¶ 229.)

At 2:06 a.m. on January 13, an AFP employee posted on Morel's Twitter page, "Hi Daniel, great pictures from such a difficult environment. I work for AFP, please e-mail [me]." (Countercl. ¶ 88.) Morel alleges that "at this time, even if not sooner," AFP knew the photographs belonged to Morel and should have issued a "kill," an order removing the images from the Image Forum, deleting them from archives, and instructing AFP's licensees to delete the images. (Countercl. ¶¶ 88, 109.) Thereafter, AFP employees repeatedly tweeted Morel asking him to talk about his pictures. (Countercl. ¶¶ 89-94.)

At 5:30 a.m. on January 13, AFP issued a wire instruction to change the photographer credit from Suero to Morel. (Countercl. ¶ 98.) However, Getty continued to sell licenses to charities, relief organizations, and news outlets that variously credited AFP, Suero, or Morel as the photographer. (Countercl. ¶¶ 100-103.) All images identified AFP/Getty as the authorized source. (Countercl. ¶ 103.)

During the January 13 broadcast of the CBS Evening News with Katie Couric,

-5-

CBS aired four of Morel's photographs without his authorization. (Countercl. ¶¶ 202-203.) CBS also posted several of Morel's photos on its website. (Countercl. ¶¶ 203-206.) According to Morel's third-party claims, CBS licensed certain images from AFP and Getty. (Countercl. ¶ 208.) Morel alleges CBS licensed the images to affiliates over which it has supervision and control. (Countercl. ¶ 209.) The photos remained on the CBS News website until April 2010. (Countercl. ¶¶ 203-204.)[2]

III. <u>The Licensing Disputes</u>

Morel is represented exclusively by Corbis, Inc. ("Corbis"), a photography agency and direct competitor of Getty. (Countercl. ¶ 104.) Corbis acts as Morel's worldwide licensing agent for images he submits to Corbis. (Countercl. ¶ 104.) On January 13, Morel sent his photos to Corbis, which posted them for licensing that afternoon. (Countercl. ¶¶ 105-106.)

On January 14, Corbis emailed Getty asserting exclusive rights to Morel's photos. (Countercl. ¶ 109.) That afternoon, AFP issued a "kill" for the eight images listing Morel as photographer. (Countercl. ¶ 109 & Ex. H: Mandatory Kill dated Jan. 14, 2010.) The "kill" did not include identical images credited to Suero or the five photos never credited to Morel. (Countercl. ¶ 110.) That same day, Amalvy sent an email stating,

> [I]t's very important to find Daniel Morel because we used the photos he put on Twitter and our possibilities of distribution are greater than that of Corbis who claims the photos. We haven't made any commercial use and wait for his agreement. Tell him to call me.

_____

[2] Because Morel and Third-Party Defendant ABC executed a settlement and stipulation of dismissal (<u>see</u> Docket No. 45), this Court need not recite Morel's allegations concerning ABC's use of his photographs.

(Countercl. ¶ 111.)

On January 22, 2010, AFP transmitted Morel's photographs to Corbis. (Countercl. ¶ 114.)  However, according to the counterclaims, AFP and Getty failed to observe or enforce the credit change instruction or the "kill," continued to license and sell Morel's photographs, and "derived a direct financial benefit" as a result.  (Countercl. ¶¶ 147, 153.) Further, AFP and Getty "refused to exercise [their] ability to supervise" their customers or "inform them of their infringing activities."  (Countercl. ¶ 153.)  Thus, licensees including the New York Times, Time Inc., USA Today, Vanity Fair, The Boston Globe, and The Washington Post used Morel's photographs in their publications.  (Countercl. ¶ 153.)

On February 23, 2010, Morel timely submitted his photographs for expedited copyright registration.  (Countercl. ¶ 133.)  On March 1, 2010, Morel's counsel sent a letter requesting that AFP cease and desist from using Morel's photographs and instruct its subscribers to do the same.  (Countercl. ¶ 121.)  Morel's counsel also sent cease-and-desist letters to other news outlets and charities.  (Countercl. ¶ 122.)  Despite these requests, many AFP/Getty licensees persisted in publishing—and, in some cases, continue to publish—Morel's photos, many of which credit Suero as photographer.  (Countercl. ¶¶ 102, 117, 124, 128, 148.)

AFP and the Third-Party Defendants target the same clients and potential licensees as Morel and his representative, Corbis.  (Countercl. ¶ 176.)  Thus, their use of Morel's photographs impaired Corbis' ability to license them, caused losses in licensing revenues, and diluted the value of Morel's intellectual property.  (Countercl. ¶ 120.)  Moreover, Morel alleges that the credit lines deceived customers into thinking that Morel had authorized AFP and Getty to act as his representative and approved their distribution of his photos.  (Countercl. ¶¶ 177-79.)

DISCUSSION

I. Legal Standard

On a motion to dismiss, this Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. Ruotolo v. City of N.Y., 514 F.3d 184, 188 (2d Cir. 2008). Nonetheless, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. "Determining whether a complaint states a plausible claim for relief will be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 296 (S.D.N.Y. 2010). Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010).

In ruling on a motion to dismiss, a "court may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation and citation omitted). "Even where a document is not incorporated by reference, the court may

nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks and citations omitted).

## II. Copyright Claims

### A. Direct Infringement

"To prevail on a claim of copyright infringement, the plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 108-09 (2d Cir. 2001). However, even where both elements are met, the existence of a license is a valid defense to an infringement claim. Tasini v. N.Y. Times Co., Inc., 206 F.3d 161, 170-71 (2d Cir. 2000).

AFP and the Third-Party Defendants assert that (1) they had an express license to use Morel's images, or, alternatively, (2) they were third-party beneficiaries of a license agreement between Morel and Twitter. The parties dispute whether, on a motion to dismiss, this Court may consider the Twitter terms of service and Twitpic login page offered by AFP and the Third-Party Defendants. This Court need not resolve that dispute because, even considering those documents, the movants fail to establish a right to use the photos that would warrant dismissal of Morel's claims.

#### 1. License Defense

"It is a hallmark principle of copyright law that licensors may not sue their licensees for copyright infringement." Jasper v. Sony Music Entm't, Inc., 378 F. Supp. 2d 334, 339 (S.D.N.Y. 2005) (citing U.S. Naval Inst. v. Charter Commc'ns, Inc., 936 F.2d 692, 695 (2d

Cir. 1991)).  Where the dispute turns on "whether a license is held by the accused infringer," the

defendant bears the burden to "com[e] forward with evidence of a license."  Bourne v. Walt

Disney Co., 68 F.3d 621, 631 (2d Cir. 1995).

        The Twitpic login page warns users that "[b]y clicking 'Allow,' you continue to

operate under Twitter's Terms of Service."  (Declaration of Joshua J. Kaufman dated July 22,

2010 ("Kaufman Decl.") Ex. C: Twitpic login page.)  Those terms provide:

> By submitting, posting, or displaying Content on or through the
> Services, you grant us a worldwide, non-exclusive, royalty-free
> license (with the right to sublicense) to use, copy, reproduce,
> process, adapt, modify, publish, transmit, display and distribute
> such content in any and all media or distribution methods . . . .
>
> Tip[:] This license is you authorizing us to make your Tweets
> available to the rest of the world and to let others do the same.  But
> what's yours is yours—you own your content.

(Kaufman Decl. Ex. A: Twitter Terms of Service ("Twitter TOS") at 2-3 (emphasis added).)

Twitter's terms clarify that this license grants "the right for Twitter to make such Content

available to other companies, organizations or individuals who partner with Twitter."  (Twitter

TOS at 3.)  Moreover, the terms note that "[w]e encourage and permit broad re-use of Content."

(Twitter TOS at 4.)  Twitter's terms of service are governed by California law, while Twitpic's

are governed by the laws of Delaware.  (Twitter TOS at 7.)

        By their express language, Twitter's terms grant a license to use content only to

Twitter and its partners.  Similarly, Twitpic's terms grant a license to use photographs only to

"Twitpic.com or affiliated sites."  AFP and the Third-Party Defendants do not claim they are

partners of Twitter or affiliates of Twitpic licensed under the terms of service.  Moreover, the

provision that Twitter "encourage[s] and permit[s] broad re-use of Content" does not clearly

confer a right on other users to re-use copyrighted postings. Rather, that permissive language

stands in contrast to the express, mandatory terms conferring a "license" and "rights" on Twitter.

(See Twitter TOS at 2 ("you grant us a worldwide, non-exclusive, royalty-free license"); Twitter

TOS at 3 ("you agree that this license includes the right for Twitter to make such Content

available to other companies . . . .").) Although courts may find a license on a motion to dismiss

where "[t]he terms of the governing contracts are clear," Jasper, 378 F. Supp. 2d at 339,

Twitter's terms of service do not meet that standard. Accordingly, AFP and the Third-Party

Defendants do not meet their burden to establish that they had a license to use Morel's

photographs.

### 2. Third-Party Beneficiary Status

"California law permits third-party beneficiaries to enforce the terms of a contract

made for their benefit." Principal Mut. Life Ins. Co. v. Vars, Pave, McCord & Freedman, 77

Cal. Rptr. 2d 479, 488 (Cal. Ct. App. 1998). "A contract, made expressly for the benefit of a

third person, may be enforced by him at any time before the parties thereto rescind it." Spinks v.

Equity Res. Briarwood Apartments, 90 Cal. Rptr. 3d 453, 468 (Cal. Ct. App. 2009). To qualify

as a contract beneficiary, "the contracting parties must have intended to benefit that individual,

an intent which must appear in the terms of the agreement." Principal Mut. Life Ins., 77 Cal.

Rptr. 2d at 489. "If the terms of the contract necessarily require the promisor to confer a benefit

on a third person," that person may enforce the benefit. Spinks, 90 Cal. Rptr. 3d at 1022.

The Twitter terms of service "necessarily require[d]" Morel as promisor to confer

certain rights of use on two classes—Twitter's partners and sublicensees. Spinks, 90 Cal. Rptr.

3d at 1022; see Rock River Commc'ns, Inc. v. Univ. Music Grp., Inc., No. 08 Civ. 635 (CAS),

2009 WL 2524863, at *4 & n.3 (C.D. Cal. Aug. 14, 2009) (third party was not a beneficiary of a license agreement where the contract permitted the licensee to assign its rights but third party was not assignee). However, AFP and the Third-Party Defendants do not claim that they were partners or sublicensees; rather, they characterize themselves as "users." Moreover, the fact that Twitter "encourage[s] and permit[s] broad re-use of Content" does not "necessarily require" a Twitpic user to license his photographs to other users. That language is ambiguous and insufficient to establish on the pleadings that Morel "<u>understood</u> that the promisee [Twitter] had [the] intent" to confer a license on other users. <u>Alling v. Univ. Mfg. Corp.</u>, 7 Cal. Rptr. 2d 718, 736 (Cal. Ct. App. 1992) (discussing the third party's "burden of proving that the contracting parties' intended purpose in executing their agreement was to confer a direct benefit on the alleged third party beneficiary"). As such, AFP and the Third-Party Defendants fail to establish that they were intended third party beneficiaries.

   B. <u>Contributory & Vicarious Infringement</u>

         Where "there is a class of primary infringers," a party "may be held liable as a contributory infringer" when, "with knowledge of the infringing activity, [it] induces, causes, or materially contributes to the infringing conduct of another." <u>Matthew Bender & Co., Inc. v. West Publ'g Co.</u>, 158 F.3d 693, 706 (2d Cir. 1998). "[A]ctivities that lead to contributory liability are (i) personal conduct that encourages or assists the infringement; and (ii) provision of machinery or goods that facilitate the infringement." <u>Matthew Bender</u>, 158 F.3d at 706. A party is liable for vicarious infringement if it "had a right and ability to supervise that coalesced with an obvious and direct financial interest in the exploitation of copyrighted materials." <u>Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.</u>, 118 F.3d 955, 971 (2d Cir. 1997).

AFP and Getty move to dismiss the contributory infringement claims against them on the sole ground that there is no primary infringement by reason of license. However, that argument fails because they have not established that a license existed. Moreover, Morel's allegations that AFP and Getty knew the images were his, disregarded his rights, and licensed his images to third parties are sufficient to plead knowledge and inducement of infringement. See Matthew Bender, 158 F.3d at 706; see also 6 William F. Patry, Patry on Copyright § 21.47 (2008) ("If a defendant has knowingly provided the very means by which infringement occurs, the knowledge of the direct infringement will be difficult to deny.").

With respect to vicarious infringement, Morel alleges that AFP and Getty granted licenses to third parties and chose not to enforce the "kill," which sufficiently pleads control of infringing activity. See Dixon v. Atl. Recording Corp., No. 85 Civ. 287 (WCC), 1985 WL 3049, at *3 (S.D.N.Y. Oct. 4, 1985) (control established where defendant had discretion to grant licenses). Morel's assertion that AFP and Getty derived fees from these licenses adequately pleads direct financial benefit. See Dixon, 1985 WL 3049, at *3 (direct financial interest shown where defendant "derive[d] its commission from the royalties that licensees pa[id]"). However, Morel fails to allege facts supporting his claim that CBS and CNN had a direct financial interest in their affiliates' exploitation of his images. See Berry v. Deutsche Bank Trust Co., 632 F. Supp. 2d 300, 305 (S.D.N.Y. 2009) (vicarious infringement claims "fatally flawed" where plaintiff "failed to allege any facts showing" a "direct financial interest"); Broadvision Inc. v. Gen. Elec. Co., No. 08 Civ. 1478 (WHP), 2009 WL 1392059, at *4 (S.D.N.Y. May 5, 2009) (plaintiff "must show more than just a legal relationship between the parent and the subsidiary" to "state a claim for vicarious liability against [the] parent for the actions of its subsidiary").

-13-

III. DMCA Claims

    A. Falsification of Copyright Management Information

        The DMCA prohibits knowingly providing or distributing false copyright

management information ("CMI") with "the intent to induce, enable, facilitate, or conceal

infringement." 17 U.S.C. § 1202(a). The DMCA defines CMI as "any of the following

information conveyed in connection with copies or phonorecords of a work or performances or

displays of a work, including in digital form":

> (1) The title and other information identifying the work, including
> the information set forth on a notice of copyright.
> (2) The name of, and other identifying information about, the
> author of a work.
> (3) The name of, and other identifying information about, the
> copyright owner of the work, including the information set forth in
> a notice of copyright.
> . . . .

17 U.S.C. § 1202(c).

        Morel's allegations that AFP labeled his photos with the credit lines "AFP/Getty/

Daniel Morel" and "AFP/Getty/Lisandro Suero" are sufficient to plead falsification of CMI.

AFP does not contest that those credit lines constitute CMI. Moreover, Morel sets forth a factual

basis for alleging that AFP knew the CMI was false and intended to facilitate infringement. See

Ward v. Nat'l Geographic Soc., 208 F. Supp. 2d 429, 449 (S.D.N.Y. 2002) (the "two

prerequisites" for a § 1202(a) violation are "know[ledge] [that] the copyright management

information is false" and "intent to induce, enable, facilitate or conceal an infringement of any

right under title 17"). Morel alleges that an AFP photo editor viewed his photos before asking

about identical photos on Suero's Twitpic page, and that when Morel failed to respond to the

editor's email, AFP downloaded the pictures from Suero. Morel further alleges that AFP knew

-14-

the photos were his because he is a well-known photographer and AFP had no reason to believe Suero took the photos. However, AFP credited Suero without inquiry.

As to Getty, Morel alleges that even after AFP issued a wire to change the photographer credit from Suero to Morel, Getty continued to license photos crediting Suero. Getty sought to obtain credit for the photographs even though it knew of Morel's reputation and had not investigated Suero's authorship. These allegations sufficiently plead knowledge and intent.

B. Removal of Copyright Management Information

The DMCA prohibits intentionally removing or altering CMI, or distributing CMI knowing it has been removed or altered, "knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b). It is undisputed that there were no copyright notices or other information on the images posted on Morel's Twitpic page and pirated to Suero's Twitpic page. Rather, Morel's Twitpic page included the attributions "Morel" and "by photomorel" next to the images. Further, his Twitter page featuring a link to his Twitpic account contained the names "daniel morel" and "photomorel." (See Countercl. Ex. P: Twitpic & Twitter pages, photomorel.)

This Court rejects the movants' argument that CMI must be removed from the photograph itself to state a claim for removal or alteration of CMI. First, § 1202(b) imposes no such requirement. Moreover, the DMCA defines CMI as information "conveyed in connection with copies" of a work—it does require the CMI to appear on the work itself. 17 U.S.C. § 1202(c). It is implausible that a viewer of Morel's photos would not understand the designations "Morel" and "by photomorel" appearing next to the images to refer to authorship. While the

-15-

location of CMI may go to AFP and the Third-Party Defendants' intent, that fact issue cannot be resolved on a motion to dismiss. See Banxcorp v. Costco Wholesale Corp., --- F. Supp. 2d ----, 2010 WL 2802153, at *10 (S.D.N.Y. July 14, 2010) (noting in denying a motion to dismiss that, "[a]t summary judgment, Defendants will have the opportunity to present evidence that the placement of the CMI either indicated that it did not refer to the [work], or was sufficiently removed to demonstrate that Defendants lacked the intent required to show a violation of the DMCA").

In addition, this Court declines to adopt a narrow construction of the term "CMI"—adopted by the District of New Jersey and offered by the movants—as limited to "a component of an automated copyright protection or management system." IQ Grp. v. Wiesner Publ'g, Inc., 409 F. Supp. 2d 587, 597 (D.N.J. 2006); accord Murphy v. Millennium Radio Grp. LLC, No. 08 Civ. 1743 (JAP), 2010 WL 1372408, at *3 (D.N.J. Mar. 31, 2010). AFP and the Third-Party Defendants argue that notations such as "daniel morel" and "photomorel" are not "technological measures that can control access and reproduction of works," but rather mere "copyright management performed by people" excluded from DMCA protection under IQ Group. 409 F. Supp. 2d at 597.

IQ Group—which was followed by a magistrate judge in this District without analysis—relied heavily on the DMCA's legislative history in limiting the statute's scope. See IQ Grp., 409 F. Supp. 2d at 593-98; see also Silver v. Lavandeira, No. 08 Civ. 6522 (JSR) (DF), 2009 WL 513031, at *2 (S.D.N.Y. Feb. 26, 2009) (report and recommendation applying the IQ Group interpretation, summarily adopted by the district judge, and to which no objection was made). Yet the narrow interpretation on which they rely is directly at odds with the broad

definition set forth in the statutory text itself. See 17 U.S.C. § 1202(c)(1)-(8) (CMI means "any

of the following information conveyed in connection with" a work such as, inter alia, the title of

the work or name of the author or copyright owner). Indeed, while AFP and the Third-Party

Defendants contend that the notations at issue are "merely . . . a means of identifying Morel as

the copyright owner and the source of the imagery," (Defs. Mem. of Law at 19), that

characterization falls squarely within the statutory definition of CMI, which includes "[t]he name

of, and other identifying information about, the author of a work" or "the copyright owner of the

work." 17 U.S.C. § 1202(c)(2)-(3).

Moreover, Judge Castel rejected IQ Group in favor of the express statutory

definition of CMI. Assoc. Press v. All Headline News Corp., 608 F. Supp. 2d 454, 461-62

(S.D.N.Y. 2009) (denying motion to dismiss where defendants removed or altered information

from articles identifying the author and copyright owner). As Judge Castel cogently reasoned,

"[w]hen a statute's language is clear," courts in this Circuit "do not resort to legislative history to

cloud a statutory text" but instead "enforce [the statutory] language according to its terms."

Assoc. Press, 608 F. Supp. 2d at 461-62 (quotations omitted); accord Banxcorp, 2010 WL

2802153, at *9 (following Assoc. Press endorsement of statutory definition); Cable v. Agence

France Presse, No. 09 Civ. 8031 (BMM), 2010 WL 2902074, at *3-4 (N.D. Ill. July 20, 2010)

(same). This Court is persuaded by the reasoning in these opinions and finds that the notations

"Morel," "daniel morel," and "photomorel" fall within the scope of CMI under the plain

language of the statute.

Finally, as to intent and knowledge of infringement, Morel alleges that AFP,

CNN, and CBS representatives contacted him about his photos, copied them without his

-17-

permission, and distributed them with altered CMI. He also alleges that, in disregard of the

credit change instruction, Getty continued to distribute photos crediting Suero or AFP as

photographer. See In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 693 (2d Cir.

2009) (courts must be "lenient in allowing scienter issues . . . to survive motions to dismiss").

Further, Morel attaches several photos that do not credit him and were licensed by AFP/Getty or

aired by CBS and CNN. See Banxcorp, 2010 WL 2802153, at *10 ("Providing an actual

example of the allegedly infringing ad is obviously more than a conclusory allegation.").

Morel's allegations are sufficient to survive a motion to dismiss.


IV. Lanham Act Claims

      The Lanham Act § 43(a)(1) imposes liability for "any false designation of origin,

false or misleading description of fact, or false or misleading representation of fact" that:

> (A) is likely to cause confusion, or to cause mistake, or to deceive
> as to affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval of his
> or her goods, services, or commercial activities by another person,
> or (B) in commercial advertising or promotion, misrepresents the
> nature, characteristics, qualities, or geographic origin of his or her
> or another person's goods, services or commercial activities.

15 U.S.C. § 1125(a)(1)(A)-(B). Claims under section 43(a) are styled as either false

representation under subsection (A) or false advertising under subsection (B). Section 43(a)

targets "actions like trademark infringement that deceive consumers and impair a producer's

goodwill." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 32 (2003). Thus,

section 43(a) forbids, inter alia, "reverse passing off"—when a "producer misrepresents someone

else's goods or services as his own." Dastar, 539 U.S. at 28 n.1, 32.

In Dastar, the Supreme Court admonished that section 43(a) of the Lanham Act—which governs trademarks—cannot be invoked as an end run around the copyright laws or to add another layer of protection to copyright holders. Dastar, 539 U.S. at 33-34 ("[I]n construing the Lanham Act, we have been careful to caution against the misuse or over-extension of trademark and related protections into areas traditionally occupied by patent or copyright." (quotation marks and citation omitted)). The Lanham Act was "not designed to protect originality or creativity"—that is the province of copyright. Dastar, 539 U.S. at 37. Thus, where the good in question is "a communicative product . . . such as a book or . . . a video," the term "origin" refers to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." Dastar, 539 U.S. at 33.

Dastar and its progeny foreclose Morel's Lanham Act claims against AFP and Getty for false representation and false advertising. As to the false representation claim, Morel alleges that the credit lines "AFP/Getty/Daniel Morel" and "AFP/Getty/Lisandro Suero" misrepresented "the source of origin of the [i]conic [i]mages based on the misstatement [that] AFP/Getty [was] the source of the [i]conic images, that it ha[d] the right to license these images in its database, and that Lisandro Suero was the author of the photographs." (Countercl. ¶ 180; see Countercl. ¶¶ 173, 175.) Because photographs are "communicative products" protected by copyright, false designation of their authorship is not cognizable under section 43(a)(1)(A) after Dastar. See 530 U.S. at 33; see also 17 U.S.C. § 202 ("Ownership of a copyright . . . is distinct from ownership of any material object in which the work is embodied.").

Moreover, while Dastar concerned a misrepresentation of origin claim, courts have recognized that its reasoning applies with equal force to bar claims, also brought under

section 43(a)(1)(A), for false representation of "affiliation" between the author and a distributor

of communicative products.  See Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC, 467 F.

Supp. 2d 394, 399 (S.D.N.Y. 2006) (finding that Dastar applies to affiliation claims "where, as

here, one person is the publisher of a novel and the other is the author of the novel, because the

holding of Dastar would be meaningless if a false authorship claim could be recast in this

manner."). This Court agrees with that line of authority. Morel holds copyrights for his

photographs, and his recourse for unauthorized copying, whether through a false claim of

authorship or a false assertion of license, lies in copyright law, not in trademark. See Twelve

Inches Around Corp. v. Cisco Sys., Inc., No. 08 Civ. 6896 (WHP), 2009 WL 928077, at *3-4

(S.D.N.Y. Mar. 12, 2009) (finding the converse to be true in holding that a "misrepresentation of

trademark" claim was not cognizable under the DMCA).

    With respect to the false advertising claim, section 43(a)(1)(B) prohibits

misrepresentations "in commercial advertising or promotion" of "the nature, characteristics,

qualities, or geographic origin" of goods. 15 U.S.C. § 1125(a)(1)(B). Morel's false advertising

claim is premised on AFP and Getty's false statements that they were authorized to distribute the

images and that Suero was the author. (See Countercl. ¶¶ 188, 191.) Yet neither of those

misrepresentations concern "the nature, characteristics, qualities, or geographic origin" of the

photographs. Thomas Publ'g Co., LLC v. Tech. Evaluation Ctrs., Inc., No. 06 Civ. 14212

(RMB), 2007 WL 2193964, at *3 (S.D.N.Y. July 27, 2007) ("[A] failure to attribute authorship

to Plaintiff does not amount to misrepresentation of the nature, characteristics, qualities, or

geographic origin of Defendant's goods."); see also Gurvey v. Cowan, Liebowitz, & Latman,

PC, No. 06 Civ. 1202 (BSJ), 2009 WL 1117278, at *4 (S.D.N.Y. Apr. 24, 2009) (same).

Further, the allegations supporting Morel's false advertising claim are identical to those supporting his false representation claim. The import of <u>Dastar</u> that an author's recourse for unauthorized use is in copyright cannot be avoided by shoe-horning a claim into section 43(a)(1)(B) rather than 43(a)(1)(A). "If authorship were a 'characteristic' or 'quality' of a work, then the very claim <u>Dastar</u> rejected under § 43(a)(1)(A) would have been unavailable under § 43(a)(1)(B)." <u>Antidote</u>, 467 F. Supp. 2d at 400 (rejecting false advertising claim); <u>see also</u> <u>Radolf v. Univ. of Conn.</u>, 364 F. Supp. 2d 204, 222 (D. Conn. 2005) ("[T]hat type of claim, however styled, is barred by the language and holding of <u>Dastar</u>."); <u>Smith v. New Line Cinema</u>, No. 03 Civ. 5274 (DC), 2004 WL 2049232, at *7 (S.D.N.Y. Sept. 13, 2004). Accordingly, Morel's Lanham Act claims fail.

CONCLUSION

For the foregoing reasons, Plaintiff Agence France Presse ("AFP") and Third-Party Defendants Getty Images (US), Inc., CBS Broadcasting, Inc., and Turner Broadcasting System, Inc.'s motion to dismiss Morel's counterclaims and third-party claims is granted in part and denied in part. The motion is granted with respect to Morel's vicarious infringement claims against CBS and TBS, and his Lanham Act claims against AFP, Getty, CBS, and TBS, and those claims are dismissed. The motion is denied with respect to Morel's claims for copyright infringement and DMCA violations against AFP, Getty, CBS, and TBS, and his claims for contributory infringement and vicarious infringement against AFP and Getty, and those claims may proceed.

Dated: December 23, 2010
       New York, New York

                              SO ORDERED:

                              _____
                              WILLIAM H. PAULEY III
                              U.S.D.J.

*All Counsel of Record*

-22-