# EXHIBIT R

CONFIDENTIAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

AGENCE FRANCE PRESSE,

                    Plaintiff,

       -against-   No. 10-CV-2730 (WHP)

DANIEL MOREL,

               Defendant and
               Counterclaim Plaintiff.

       -against-

AGENCE FRANCE PRESSE,

               Counterclaim Defendant,
       -and-

GETTY IMAGES (US), INC., CBS BROADCASTING,
INC., ABC, INC., TURNER BROADCASTING, INC and
(AFP and Getty Licensees does 1 - et al.)

               Third-Party Counterclaim
               Defendants.

------------------------------------------x

DEPOSITION OF KATHERINE CALHOUN
New York, New York
Friday, September 9, 2011

Reported by:
Aydil M. Torres
JOB NO. 1-6241

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 10

Katherine Calhoun

1
2  licensed.  We licensed everything that was in
3  the Getty arsenal sort of speak.
4      Q.  I see.  When you started, where was
5  that arsenal or that repository based?
6      A.  The actual content based?
7      Q.  Yes.
8          Was it on a computer?
9      A.  Yes, yes.
10     Q.  Or computer system?
11     A.  Yes, it was mostly digital.  We
12  would do some deep file, is what we call our
13  archival material, which is generally based
14  in our London warehouse.
15     Q.  At the time that you started --
16  when you accessed the database, did you have
17  information as to where the images
18  originated?
19     A.  Yes, yes.  Of course.
20     Q.  How would that be identified for
21  you at the time that you started as sales
22  manager on the computer system?
23     A.  It would be identified in --
24  usually, what is the image or asset detail
25  page.  So as someone goes on our website --

Page 11

Katherine Calhoun

1
2  and it's true today as well -- if you open up
3  that image it has the -- all the image
4  details shows where it came from.  It's also
5  embedded in the file.
6      Q.  And when you were licensing content
7  to book publishers in your capacity as sales
8  manager, did you take steps to verify that
9  Getty Images had the authority to license
10  that image?
11     A.  Well, in my capacity as sales
12  manager, particularly then, did I personally
13  take those steps, no.
14     Q.  Did you do anything to assure
15  yourself that Getty had the ability to
16  license and the right to license the content
17  that you were licensing to book publishers?
18     A.  No, it wasn't -- it wasn't part of
19  my purview and it wasn't necessary.  By the
20  time the content got to our teams, generally,
21  that -- that had been taken care of.
22     Q.  Okay.  And did you play any role,
23  while you were sales manager, in verifying
24  the permissibility of licensing any of the
25  content?

Page 12

Katherine Calhoun

1
2      A.  No.
3      Q.  How long did you stay as sales
4  manager, as you've described it?
5      A.  Through June of 2007, I think.
6      Q.  And did you assume a different
7  position at that time?
8      A.  Yeah, then I was sales director.  I
9  was sales director, then -- one of two sales
10  directors overseeing the whole media team for
11  North America.
12     Q.  And how long did you hold that
13  position?
14     A.  Well, I held that title for --
15  let's see, then.  Through April of 2010, I
16  think, but the purview changed a bit just
17  with acquisitions and so forth.
18     Q.  I'm sorry, was that April 2007 to
19  April 2010?
20     A.  It was June 2007 to April 2010, I
21  think.
22     Q.  And what did you do in general as
23  sales director?
24     A.  As sales director I, again --
25  initially, I was one of two people that then

Page 13

Katherine Calhoun

1
2  managed the whole media team for North
3  America, so it expanded beyond the six-person
4  group to -- I don't even know how many.
5  Maybe 18 or 20, and then my codirector
6  subsequently left the company to move to
7  Singapore, and I took over the larger
8  purview.
9      Q.  Okay.  When you talk about the
10  media group, at the time that you assumed the
11  position of sales director, what are you
12  referring to?
13     A.  I mean all the dedicated sales
14  teams in Getty that work with media clients
15  or that specialize with media clients.
16     Q.  And what do you mean by "media
17  clients"?
18     A.  In Getty's world, media clients are
19  broadcasters, newspapers, book publishers,
20  still educational clients, magazines, and
21  online.
22     Q.  And was it the media group's job to
23  sell or license content to the entities that
24  you identified?
25     A.  Yes.

4 (Pages 10 to 13)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 18

1           Katherine Calhoun
2       Q.  And was there a typical
3   arrangement?
4           Would there be a contract between
5   Getty and the assigned media client?
6       A.  In some cases.
7       Q.  But not in all cases?
8       A.  Not in all cases.
9       Q.  And typically would such entities
10  pay a monthly fee?
11      A.  A subset of them would.
12      Q.  Is that a majority or less than a
13  majority?
14      A.  Less than a majority.
15      Q.  Okay.  Was there a typical
16  compensation arrangement between Getty and
17  the assigned media clients?
18      A.  Typical, no.
19      Q.  Okay.  Were there some that
20  occurred with greater frequency than others?
21          That is, the contractual
22  relationship, the monthly subscription or
23  payments or anything along those lines?
24      A.  So, sorry, were there some that
25  occurred more frequently?  The "some" is

Page 19

1           Katherine Calhoun
2   what?
3       Q.  Were some arrangements between the
4   assigned media clients and Getty more common
5   than others, that is contract is more
6   typical, but they're not all contracts.  A
7   monthly subscription is typical, but it's not
8   all the case.
9           Is there any typicality at all to
10  the relationship?
11      A.  I would say there is not a lot of
12  typicality.
13      Q.  Okay.  Is this Washington Post one
14  of the entities?
15      A.  It is.
16      Q.  And since June of 2007, has that
17  been an assigned media client?
18      A.  Yes.
19      Q.  And have you had dealings from time
20  to time with people at Getty who have
21  relationships with the people at Wall Street
22  Journal?
23      A.  Yes.
24      Q.  Did you yourself --
25          MR. ROSENFELD:  You said

Page 20

1           Katherine Calhoun
2   Washington Post and then you said
3   Wall Street Journal.
4           MR. BAIO:  Oh, I'm sorry.  I
5   meant -- mean Washington Post.
6           THE WITNESS:  Yes.
7           MR. BAIO:  And I'll stay
8   with the Washington Post.
9       Q.  And did you, since June of 2007,
10  have any dealings with the Washington Post,
11  personally?
12      A.  Yes.
13      Q.  And is the Washington Post, in your
14  view, a significant client of Getty?
15      A.  Yeah.
16      Q.  What, generally, if you can
17  generalize, have been your contacts with the
18  Washington Post people since you assumed the
19  position of director?
20      A.  Generally, in my role it's been
21  working with the salesperson who was assigned
22  to the Washington Post, to get on the phone
23  with them and talk through pricing
24  arrangements, and in some cases, in-person
25  meeting, singular, I think, in-person

Page 21

1           Katherine Calhoun
2   meeting.
3       Q.  Okay.  Do you know what the
4   contractual relationship, if there is one,
5   between Getty Images and the Washington Post?
6       A.  Currently we have an editorial
7   subscription with them, and we have also a
8   component which is a premium access
9   subscription, which is a way for them to
10  access contributor content.
11      Q.  "Editorial subscription," what is
12  that?
13      A.  An editorial subscription, in that
14  case, is in effect a monthly service fee that
15  allows our clients to access and use our
16  wholly owned -- so Getty content created by
17  Getty staffers are wholly owned editorial
18  news, sports and entertainment content, as
19  well as some select image partners.
20      Q.  And who are the select image
21  partners?
22          Is there a list?
23          Are there many?
24      A.  No.  There -- at most, I would say,
25  maybe be 3 to 5.

6 (Pages 18 to 21)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

1           Katherine Calhoun
2       Q.  I see.  Who are they now?
3       A.  In the Washington Post,
4   specifically, now, I can't speak to -- I
5   don't know off the top of my head which sport
6   entities content may be in there but they do
7   have AFP, Agence France Presse.
8       Q.  Are there any others you can think
9   of?
10      A.  No.
11      Q.  Including Washington Post?
12      A.  Not that I know for sure, no.
13      Q.  And do you know, approximately, how
14  many editorial subscription relationships
15  Getty Images has with these access clients?
16      A.  How many editorial --
17      Q.  Assigned clients.  I'm sorry.
18      A.  No.
19      Q.  Is it in the thousands?
20      A.  No, no.
21      Q.  Okay.  An estimate will do.
22      A.  Maybe between 1 and 200 as an
23  estimate.
24      Q.  As a general matter, and I'm sure
25  with exceptions, does that include a lot of

1           Katherine Calhoun
2   the major media outlets in the United States?
3       A.  It would include a lot of the major
4   breaking news outlets in the United States.
5       Q.  Now, you referred to, I think,
6   Getty-generated or Getty-created content in
7   response to my question about what the
8   entities would actually have access to.
9           What were you referring to there?
10      A.  It would be content created by
11  Getty image staff photographers or
12  photographers that we've hired as stringers,
13  sort of speak, where we would own the
14  copyright.
15      Q.  I see.  And is that database of
16  that content, separate and apart from other
17  databases that are available to people who
18  have access to Getty's website?
19      A.  It can be set up so it's separate,
20  yes.
21      Q.  Is it a subset of what's available
22  on the website or is it information and
23  material and product that is not available on
24  the website?
25      A.  No, it's a subset.

1           Katherine Calhoun
2       Q.  Okay.  You also talked about
3   premium access for some subscribers.
4           What is that?
5       A.  Premium access is a pricing
6   agreement arrangement which allows us to
7   offer, in effect, the ease of a subscription
8   to our customers but enables us to have the
9   ability to pay out royalties image by image
10  or asset by asset on the back end.
11      Q.  What does that mean?
12          Pay out royalties to who?
13      A.  To the contributors.  Contributing
14  photographers, filmmakers, and so forth, who
15  have given us that content or who have
16  allowed us to license the content.
17      Q.  And that's -- that content is only
18  available to premium access customers?
19      A.  No, it wouldn't be -- it's not
20  special content that they can only access.
21          Is that what you meant?
22      Q.  Yes.
23      A.  No, it's not.
24      Q.  So it's also available on Getty
25  Images website and has been?

1           Katherine Calhoun
2       A.  That's right.
3       Q.  And then if a Getty Images client
4   or customer uses premium access and acquires
5   the rights to an image that is owned by
6   someone else but licensed to Getty --
7       A.  Licensed by Getty?
8       Q.  Licensed by Getty, okay.  You
9   referred to a royalty stream and payment
10  mechanism.
11          How does that work, in general?
12      A.  To the extent that I know the
13  mechanics of that, it's simply that we pay
14  out a percentage of our sale on that image to
15  the photographer or film maker or what have
16  you, as a royalty.
17      Q.  And what if the -- is it ever the
18  case that the image is not Getty-generated
19  but available on the website to be licensed
20  by clients and there is no royalty paid to
21  the photographer who provided the content?
22      A.  Not Getty-generated, available to
23  be licensed, and there's no royalty paid?
24          Is that what you're asking?
25      Q.  Is there such a thing as that?

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 26

Katherine Calhoun

1
2       Does that happen?
3       A.  There may be cases in acquisitions
4   where we've acquired content and now own it
5   outright, but we weren't -- didn't generate
6   it.
7       Q.  Okay.  But you've had -- you,
8   meaning, Getty Images, have the rights in
9   those --
10      A.  That's right.
11      Q.  In those images?
12      A.  That's right.
13      Q.  Does Getty Images license to third
14  parties, customers and clients, images for
15  which Getty does not have the right to
16  license?
17      A.  No.
18      Q.  In your experience, have you ever
19  learned of a situation where Getty Images was
20  licensing images to customers and it turned
21  out that Getty Images did not have the right
22  to do that?
23      A.  I know of one.
24      Q.  And is that the case that we're
25  talking about here, Daniel Morel?

Page 27

Katherine Calhoun

1
2       A.  Yes, that's right.
3       Q.  Is that the only instance that you
4   know of where Getty was licensing to third
5   parties, customers or clients, product that
6   Getty did not have the right to license?
7       A.  That is the only instance I know of
8   where an image or a set of images was pulled
9   for copyright, for questions around the
10  copyright.
11      Q.  And that's true --
12      A.  And --
13      Q.  I'm sorry.
14      A.  Yeah.
15      Q.  That's true in your history of
16  working at Getty Images?
17      A.  Yeah.  There have been cases where
18  there were some questions on certain content,
19  and we dug into it and worked through them to
20  positive outcome.
21      Q.  Okay.
22      A.  Shall we say.
23      Q.  Were there any instances that you
24  recall where the conclusion was a negative
25  outcome, that is, and leave aside Morel for

Page 28

Katherine Calhoun

1
2   now, as you dug in you found out that Getty
3   didn't have the right to license what it had
4   been licensing?
5       A.  Not, not to the -- not to the
6   phrase you just used, where it turned out
7   Getty didn't have the right, no.
8       Q.  So --
9       A.  Not, not that I recall.  No.
10      Q.  So in that respect, the Morel
11  situation is unique in your experience?
12      A.  In many ways the Morel situation is
13  unique in my experience, yes.
14      Q.  How many ways is it unique?
15      A.  Maybe best not to count.
16      Q.  We'll go through with it as we
17  proceed.
18      Have you on occasion in your
19  capacity --
20      MR. BAIO:  Strike that.
21      Q.  Let me get the rest of your history
22  just to be sure I have it right.  I think we
23  moved up to April 2010, you were sales
24  director of the media group that you
25  identified.

Page 29

Katherine Calhoun

1
2       Did you have a change of position
3   at that point?
4       A.  Yeah, then I just had a promotion
5   to a senior sales director position and...but
6   I think the responsibilities, effectively,
7   were the same.
8       Q.  Did you assume any larger group or
9   larger geographic location as a result of the
10  promotion?
11      A.  No.  I mean, before the promotion
12  our team had been growing, so it's now a team
13  of around 38 across North America and our
14  business has been growing, just by virtue of
15  what's going on in the industry.
16      Q.  Okay.  So in your experience at
17  Getty Images, have you ever been called upon
18  to contact customers or clients of Getty
19  Images and tell them not to use certain
20  images that had been licensed to them?
21      A.  Personally?
22      Q.  Yes.
23      A.  Once for sure, that I remember.
24  Once for sure on -- yeah, once for sure that
25  I remember.

8 (Pages 26 to 29)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 30

Katherine Calhoun
1
2     Q.   What's the once for sure?
3     A.   Would've been on this case talking
4  to the New York Times.
5     Q.   Talking to the New York Times about
6  the Morel images?
7     A.   That's right.
8     Q.   Now, what about within your group,
9  that is -- and let me not even leave it at
10  that.  Let me make it broader.
11        In your experience at Getty Images,
12  have you been involved in any recall of an
13  image?
14     A.   Yes.
15     Q.   And what's your understanding of a
16  recall of an image at Getty Images?
17     A.   Well, let me clarify.  Recall of an
18  image is not a term that we generally use.
19     Q.   Okay.
20     A.   What generally would happen is we
21  pull an image, means you pull it off the
22  website, and there could be a number of
23  reasons for that.
24     Q.   But there usually would be a
25  reason; is that correct?

Page 31

Katherine Calhoun
1
2     A.   Oh, yes.
3     Q.   Some --
4     A.   Yes.
5     Q.   Something causes Getty images to
6  pull the image off its website?
7     A.   That's right.
8     Q.   And has that occurred, so far as
9  you know during your tenure at --
10     A.   Yes.
11     Q.   -- Getty Images?
12        How many times has that happened,
13  if you can identify the numbers?
14     A.   Let me make a distinction.
15        How many times we've actually
16  pulled images off the site?
17     Q.   Yes.
18     A.   That wouldn't necessarily be my
19  decision, so I'm not -- I couldn't give you a
20  number or even an estimate of how often it
21  just happens.  How often we need to contact
22  clients about it?
23     Q.   Yeah.
24     A.   It's very inconsistent and it could
25  happen, I would say, maybe ten times a year,

Page 32

Katherine Calhoun
1
2  at the most, and, like, just, you know...
3     Q.   And they could be for different
4  reasons?
5     A.   Yeah, absolutely.
6     Q.   Let's take this year, just as an
7  example.
8     A.   Okay.
9     Q.   From January 1, and I realize there
10  may be spillover from the year before and,
11  again, general numbers.
12        How many instances are you aware
13  where Getty Images has pulled an image from
14  the website and you or your staff have
15  contacted clients or customers about the
16  image?
17     A.   Maybe three or four.
18     Q.   Do you recall the context of that
19  -- those three or four?
20     A.   Well, about three of them -- well,
21  in the four I'm thinking, they all have to do
22  with either the photographer or the publicist
23  for the person in it, so it's generally a
24  celebrity giving us a hard time about them
25  not liking the photograph, and in certain

Page 33

Katherine Calhoun
1
2  cases the photographers or publicists have
3  approval for high-end portraiture, this is
4  where it has happened most often, and they
5  want us to pull it because they don't like
6  the way their, you know, client --
7     Q.   They look or --
8     A.   -- is being depicted or whatever.
9     Q.   And then in those, let's say, four
10  instances -- there were four that you can
11  recall that occurred during this year?
12     A.   Yeah, not specifically, but I do
13  know there have been three or four portrait
14  sets have been pulled.
15     Q.   Okay.  How was it that you were
16  informed that the image was going to be
17  pulled and you or your staff were to contact
18  clients or customers of Getty Image about
19  that fact?
20     A.   Well, let me be clear.  Of those
21  four, there was only one where our team had
22  to contact their customers.
23     Q.   Okay.  So is it fair to say, just
24  so I have that clear, in the three instances
25  it was pulled off the website, but there was

9 (Pages 30 to 33)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 50

1            Katherine Calhoun
2   report that's in Exhibit 1?
3       A.  Have I seen reports like this,
4   specific to this case?
5       Q.  No, in general.
6       A.  In general, not exactly, no.
7       Q.  Okay.  What is your understanding
8   as to what Exhibit 1 represents?
9       A.  Given the fact that it says
10  "purchases" up here, my understanding is that
11  it represents all the details of the number
12  of a la carte purchases that were made
13  involving this specific set of images in
14  question.
15      Q.  Now, when you say a la carte
16  purchases, what leads you to believe that
17  this document relates to a a la carte
18  purchases?
19      A.  I believe it's simply the
20  designated purchases up here.
21      Q.  You're now looking at Exhibit 2.
22      A.  I'm just comparing them.
23      Q.  Okay, you can.  Take your time.
24      A.  Because it doesn't indicate as --
25  it doesn't indicate the download source as it

Page 51

1            Katherine Calhoun
2   does in Exhibit 2.
3       Q.  If you look on the upper right-hand
4   corner of Exhibit 1 it says "purchases"?
5       A.  Right.
6       Q.  In the upper right-hand corner of
7   Exhibit 2 it says "downloads," do you see
8   that?
9       A.  Right, that's the key distinction.
10      Q.  So they're reflecting, that is
11  Exhibit 1 is reflecting different
12  information, even though there may be some
13  overlap, than what appears in Exhibit 2; is
14  that correct?
15      A.  That's right.
16      Q.  And with that understanding, is
17  there anything about Exhibit 1 that leads you
18  to conclude that it is only reflecting a la
19  carte purchases?
20      A.  Well, to the extent that I'm
21  familiar with it, looking at the list of
22  clients and so forth, I know that these are a
23  la carte clients.
24      Q.  Okay.  And you have --
25      A.  To the extent that they fall in my

Page 52

1            Katherine Calhoun
2   world.
3       Q.  All right.  As we go through this
4   exhibit, if you see that some of the clients
5   or one of the clients is not an a la carte
6   customer, please let me know and you can look
7   at it now.
8       A.  To clarify --
9       Q.  Yes.
10      A.  As I say, I know the ones that are
11  in my world, which would be the assigned
12  North America media team.
13      Q.  Well, let me ask a broader
14  question, does the information that appears
15  in Exhibit 1 identify every instance in which
16  someone or some entity acquired the Morel
17  images from Getty Images at some point in
18  time?
19      A.  Does this reflect every instance
20  where a client acquired?
21      Q.  Yes.
22      A.  Meaning, accessed the images?
23          What do you mean by "acquired"?
24      Q.  I'll mean that it that in the broadest
25  sense, either paid for -- let's take it that

Page 53

1            Katherine Calhoun
2   way, first.
3          They actually paid for the right to
4   use the image.  Does this Exhibit 1 identify
5   every instance in which a customer or a
6   client, a la carte or otherwise, of Getty,
7   acquired for payment the Morel images?
8       A.  No.
9       Q.  Okay.  What is excluded from this
10  chart?
11      A.  Well, to the extent that the images
12  were included in paying subscription clients.
13      Q.  Yes.
14      A.  Those do not appear to be reflected
15  here.
16      Q.  Okay.  So just to be clear, that I
17  understand, perhaps for the record, there are
18  a group of clients that Getty Images has who
19  pay regular subscriptions, correct?
20      A.  That's right.
21      Q.  The subscription payment that they
22  make entitles them to use images that Getty
23  makes available on its website?
24      A.  That's right.
25      Q.  And if any subscription customers

14 (Pages 50 to 53)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 58

Katherine Calhoun

1
2  understand, the results of the work that you
3  did, you and your group for the period
4  thereafter, is reflected in either one of
5  those exhibits to the extent a Getty customer
6  acquired for compensation, for money, the
7  Morel images?
8      A.  Yes.
9      Q.  Let's talk about the Morel images.
10     A.  Okay.
11     Q.  Because I'm using a term.
12         Do you have an understanding of the
13  Morel images that are the subject of the
14  lawsuit?
15     A.  I do.
16     Q.  What is your understanding?
17     A.  My understanding is there were a
18  set of photographs that Mr. Morel took in
19  Haiti on January 12th that are the images
20  that are the subject of this discussion.
21     Q.  And do you have an understanding as
22  to how many images are involved in this
23  lawsuit?
24     A.  Roughly.  I don't have the exact
25  number.

Page 59

Katherine Calhoun

1
2      Q.  What's the rough number?
3      A.  I think between 12 and 18, I think.
4      Q.  When you refer to the Morel images,
5  are you aware that there are identical images
6  that have been identified in some other name?
7      A.  Yes.
8      Q.  What is the other name?
9      A.  Suarez --
10     Q.  Lisandro Suero?
11     A.  Yes, Suero.
12     Q.  What is your understanding about
13  Mr. Suero?
14     A.  About him specifically, I have no
15  understanding.
16     Q.  But you do understand that he
17  didn't take the pictures, correct?
18     A.  I do, and when I said the number of
19  images --
20     Q.  Yes.
21     A.  -- I was referring specifically to
22  the images.
23     Q.  I understand.  So are there --
24  excuse me.
25         MR. BAIO:  Strike that.

Page 60

Katherine Calhoun

1
2      Q.  Irrespective of the name that was
3  used in the credit, you're talking about 12
4  to 18 images?
5      A.  I believe.
6      Q.  Do you know if the Morel images
7  also appeared under any other credit?
8      A.  Aside from Daniel Morel and --
9      Q.  Lisandro Suero.
10     A.  -- Lisandro Suero?
11         I believe there may have been an
12  early time, a brief period when they were
13  identified just as being part of AFP and not
14  with the photographer, slash, source.
15     Q.  Okay.  And the indication there was
16  just AFP, that was the credit, at least
17  that's your understanding?
18     A.  That's right.
19     Q.  And, again, if the images were
20  taken by Mr. Morel but had that credit, are
21  you including them in the definition of Morel
22  images, in your mind?
23     A.  In my mind, yes.
24     Q.  Okay.  And do you believe that
25  irrespective of the credit line that was used

Page 61

Katherine Calhoun

1
2  for the images, Exhibit 1 identifies all of
3  the purchases of the Morel images, leaving
4  aside subscriptions and premium access; is
5  that correct?
6      A.  That's my understanding.
7      Q.  Okay.  And --
8         MR. ROSENFELD:  Just so --
9      just to be clear, we prepared her
10     as a 30-B(6) witness on the topics
11     we discussed which have to do with
12     customer relations, customer
13     notification, and matters having to
14     do with intake of the photos are
15     not within her expertise but I
16     understand you're just sort of
17     setting up to ask about the
18     customer --
19         MR. BAIO:  Yeah, well the
20     30-B(6) and the exchanges that
21     we've had say what they say as to
22     what she knows and what we're
23     asking about but, yes, a lot of
24     this is foundational but she is the
25     witness that's going to testify

16 (Pages 58 to 61)

CONFIDENTIAL

Page 78

Katherine Calhoun

1
2  a new order but a negative one, so it has a
3  later date.
4      Q.  Is there an example of that in
5  here?
6      A.  Yeah, here's row 18.
7      Q.  On the first page of Exhibit 1?
8      A.  That's right.
9      Q.  Yeah.
10     A.  And it's National Geographic dot
11  com under column K, so you see the date is
12  4/7, so April 7th, 2010.
13     Q.  Yes.
14     A.  So that's --
15     Q.  How does that show me the
16  cancellation?
17     A.  It doesn't indicate.  It doesn't
18  indicate here that it's a cancellation
19  because this -- this particular report
20  doesn't include -- oh, no, here it is.  I'm
21  sorry, I'm sorry.  Here it is.  In column D,
22  it's a negative number.
23     Q.  Right.  Well, both columns for
24  National Geographic, 18 and 19, have negative
25  numbers.

Page 79

Katherine Calhoun

1
2      Do you see that?
3      A.  Yes.
4      Q.  Are each of those a cancellation of
5  what's entered and completed on or about
6  April 7, 2010?
7      A.  That's right.
8      Q.  Where is the transaction that's
9  being cancelled on this chart?
10     A.  Oh, here it is.  Here it is.
11     Q.  Which page?
12     A.  Page five of six.
13     Q.  Yes.
14     A.  It's rows -- this is small type, 95
15  and 96.
16     Q.  So rows 95 and 96 show a completed
17  order by National Geographic for two images,
18  two of the Morel images on January 27, 2010,
19  correct?
20     A.  Yup, that's right.
21     Q.  And what rows 18 and 19 tell us is
22  that those transactions were cancelled on
23  April 7, 2010; is that correct?
24     A.  That's right.
25     Q.  And does the minus 75 identify the

Page 80

Katherine Calhoun

1
2  fact that National Geographic received a
3  credit?
4      A.  That's right.
5      Q.  Now, did all entities identified on
6  this list, Exhibit 1, receive a credit for
7  the amounts that they had paid Getty for the
8  licenses used?
9      A.  No.
10     Q.  Did you play any role in deciding
11  whether there would be a reimbursement of
12  entities or individuals who purchased the
13  images a la carte, even though Getty didn't
14  have the right to sell the images?
15         THE WITNESS:  I'm sorry,
16      read me the question -- tell me the
17      question again.
18         (Whereupon, the requested
19      portion was read by the reporter.)
20     A.  Not really.
21     Q.  Who made that decision, if anyone
22  made the decision, that you know?
23     A.  Well, in the decision to decide
24  whether Getty issued a refund?
25     Q.  Yes.

Page 81

Katherine Calhoun

1
2      A.  Actually, in the case of National
3  Geographic dot com, specifically, the
4  individual salesperson -- I guess it was
5  more...it wasn't one specific person.
6      Q.  Okay.
7      A.  That's my quick answer.
8      Q.  All right.  Well, did -- is it fair
9  and accurate to say that Getty Images --
10  someone at Getty Images determined that there
11  would not be an automatic reimbursement to
12  everyone who paid for the Morel images of the
13  amounts that they paid; is that correct, so
14  far as you understand?
15     A.  I actually -- I don't think it's
16  quite an accurate characterization the way
17  you're phrasing it.
18     Q.  Okay.
19     A.  Was there one person who determined
20  there would be no automated -- automatic
21  refunds is what you said?
22     Q.  First I'm asking, I guess, did
23  Getty Images adopt the policy, in connection
24  with the Morel images, that if you bought it
25  from Getty and you gave us money, we're going

21 (Pages 78 to 81)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 82

Katherine Calhoun

1
2  to give you the money back?
3        Was that determination made, so far
4  as you know?
5      A.  As far as I know, there was
6  certainly not a policy adopted, which I think
7  was the phrase you used.
8      Q.  Okay.  So it is not the case that
9  everyone who paid money to Getty for the
10 Morel images got their money back, correct?
11     A.  I believe that's correct.
12     Q.  Okay.  No one ever told you, let's
13 just give all of the people and entities who
14 bought these images from us -- that we should
15 give the money back to them?
16     A.  No one ever told me that, correct.
17     Q.  And you never told anybody that
18 that's what should be done as a matter of
19 customer relations?
20     A.  No.  What we did is we offered all
21 of our customers free imagery as replacements
22 from our wholly owned content.
23     Q.  Who made that decision; that is,
24 Getty Images would make available to people
25 who paid money for the Morel images,

Page 83

Katherine Calhoun

1
2  substitute images from Getty's own product?
3      A.  I did have that discussion with
4  some of our colleagues in Seattle that that
5  would be a good way to address the situation.
6      Q.  With whom did you have that
7  conversation or those conversations?
8      A.  I believe some of our legal team.
9      Q.  Okay.
10     A.  And possibly, possibly someone from
11 sales operations.
12     Q.  And so far as you know, did
13 individuals or entities who had paid money
14 for the Morel images to Getty avail
15 themselves of the opportunity to use
16 substitute product?
17     A.  I believe they did.
18     Q.  Is there anything on this chart
19 that identifies who did and who didn't?
20     A.  No.
21     Q.  How about Exhibit 2?
22     A.  No.
23     Q.  Are there documents that you can
24 secure that would identify those instances
25 where individuals or entities received

Page 84

Katherine Calhoun

1
2  substitute images?
3      A.  Not that I know of.
4      Q.  Okay.  Do you have any idea how
5  many of the entities that had acquired Morel
6  images from Getty availed themselves of the
7  ability to use substitute product?
8      A.  I don't.
9      Q.  Even a range?
10     A.  Not even a range.
11     Q.  Okay.  Let's go back to the chart,
12 Exhibit 1, and proceed to the right, so what
13 is under column the USD sales revenue?
14     A.  That is the amount of revenue that
15 the sale represented in U.S. dollars.
16     Q.  So if it is a positive number,
17 that's how much came in and if it's a
18 negative number it's how much went out?
19     A.  That's right.
20     Q.  From Getty?
21     A.  That's right.
22     Q.  So this first transaction January
23 27, 2010 appears to be a cancellation; is
24 that correct?
25        And I only say that -- I may be

Page 85

Katherine Calhoun

1
2  wrong but it looks like there's a minus sign
3  in front of the dollar amount?
4      A.  I believe.  I can barely tell if
5  that's a minus sign.  It could be a smudge.
6      Q.  And the charts were given to us
7  from Getty Images.
8      A.  Yes.
9      Q.  We're doing the best we can --
10     A.  No, no --
11     Q.  In fact, I found gigantoid paper
12 that I was able to print it on.
13     A.  My understanding is it's a
14 cancellation, yes.
15     Q.  Okay.  The next column, master ID,
16 yet another ID number.
17        Do you know what that is?
18     A.  I do.
19     Q.  What is it?
20     A.  That should be the number
21 identifying the asset, in this case the
22 image.  One --
23     Q.  There's a unique number for each
24 image?
25     A.  It is supposed to be a unique

22 (Pages 82 to 85)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 158

Katherine Calhoun

1
2 they shouldn't use those images?
3     A.  Well, yes.  I mean, it's important
4 to distinguish that a number of the people
5 here in Exhibit 2 or B, are people that are
6 feed clients.
7     Q.  Okay.
8     A.  Generally, it's very rare that you
9 have clients that only access the images
10 through the feed.  They'll access some
11 breaking news image through the feed but they
12 tend to download off the website, as well.
13 Usually to augment or what have you.
14     Q.  But is it fair and accurate to say
15 that an entity that has access to the feed
16 which goes directly into their system, first
17 is that accurate?
18         That is, if I am a subscriber who
19 gets a feed, does it -- does whatever is
20 being fed go automatically into my database
21 or my hard drive or my servers?
22     A.  No.
23     Q.  What actually gets fed into the
24 recipients' databases, if you know?
25     A.  I don't -- I don't know in a way

Page 159

Katherine Calhoun

1
2 that I can answer in detail, no.
3     Q.  Is it -- do they receive anything
4 in a format where they can download it off
5 the feed?
6     A.  They can access it from the feed.
7 If the term "download" is accurate or not, I
8 don't know.
9     Q.  Okay.  And you don't know whether
10 entities that do not appear on Exhibit 2
11 accessed the images through a feed?
12     A.  No, not with any certainty.
13     Q.  Or with any uncertainty?
14     A.  Or with any uncertainty.
15     Q.  And no notification was sent to
16 those entities, that is those who had access
17 to a feed and don't appear on Exhibit 2, to
18 advise them that they shouldn't use in any
19 way the Morel images?
20     A.  No, I didn't say there was no
21 notification.  I said there's no direct
22 personal contact.
23     Q.  Okay.
24     A.  There was a kill notice that went
25 out over the feeds to every feed client who

Page 160

Katherine Calhoun

1
2 had received those images.
3     Q.  And the kill notice said what?
4     A.  My understanding is it said there
5 were issues with the Daniel Morel images, you
6 shouldn't use them.
7     Q.  And who wrote that kill notice, if
8 you know?
9     A.  I have no idea.
10     Q.  Was it AFP or was it Getty?
11     A.  My understanding is it was someone
12 at AFP or people at AFP.
13     Q.  Did Getty communicate that kill
14 notice to any of its customers or clients or
15 subscribers?
16     A.  Separately from that?
17     Q.  Yes.
18     A.  No, I don't think they would've
19 seen a need to.
20     Q.  Was there a follow-up notice that
21 it shouldn't only be Daniel Morel images but
22 it should also be Lisandro Suero images?
23     A.  Not that I know of.
24     Q.  And did anybody at Getty undertake
25 that when it -- when Getty learned that they

Page 161

Katherine Calhoun

1
2 were also the same images under Lisandro
3 Suero's name, if you know?
4     A.  Not that I know of.
5     Q.  You didn't tell anybody they should
6 do that, correct?
7     A.  Correct.  I mean -- correct.
8     Q.  I marked some additional exhibits,
9 and I'd like the reporter to show you what
10 we've marked as Exhibit 3.  I'll ask you some
11 questions about it.  I will ask you to look
12 at Exhibit 3.  I have some questions about
13 it.
14     A.  Yup.
15     Q.  Have you seen this exhibit before?
16     A.  Yes.
17     Q.  And what do you understand it to
18 be?
19     A.  I understand it from my perspective
20 to be the first time I became aware of these
21 -- it included -- where I first became aware
22 of it and checked with Pancho to see if he
23 was aware of it.
24     Q.  In looking at Exhibit 3, which is
25 Bates numbered G-003145 to 148, there is an

41 (Pages 158 to 161)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 174

Katherine Calhoun

1           Katherine Calhoun
2     A.  I think that I sent a communication
3 to Cynthia and Heather confirming that I had
4 spoken to the New York Times, that this was
5 their position, and also Nancy left it that
6 she was going to bring it up with her
7 lawyers.
8     Q.  Do you know how the issue resolved
9 itself?
10     A.  The issue eventually resolved
11 itself where I believe I suggested, look, if
12 you're not going to take the images down at
13 all, then you need to give them a full and
14 accurate credit, including a reference to
15 Corbis, and they did.
16     Q.  How did you describe the full and
17 accurate credit that they should give?
18     A.  I think along the lines I just did
19 to you.
20     Q.  You said it should be Mr. Morel and
21 Corbis?
22     A.  I believe so.
23     Q.  Who told you to do that?
24     A.  I believe in -- I -- I'll tell you,
25 I think there was a back and forth maybe when

Page 175

Katherine Calhoun

1           Katherine Calhoun
2 I told Heather that they were looking into
3 it, and she was talking to her lawyer to see
4 if she would change the credit.  It may have
5 been suggested to me by Heather because I
6 said -- basically, I said, look, if they're
7 going to change the credit, what's the credit
8 it needs to be?
9     Q.  Do you know how the New York Times
10 acquired the image, that is was it through
11 the feed, was it through a subscription, was
12 it through an a la carte download?
13     A.  Off the top of my head, I don't
14 know.
15     Q.  Well, it's -- it's not on any of
16 these lists, is it?
17     A.  Then it was either through a feed
18 or through the photographer.
19     Q.  Through the photographer.  And if
20 the photographer denies it, it had to be
21 through the feed, or it may be something else
22 but --
23     A.  Yes.
24     Q.  And when you were dealing with the
25 New York Times, you believed that they had

Page 176

Katherine Calhoun

1           Katherine Calhoun
2 received it through the feed or through Getty
3 in some way?
4     A.  By the time I personally was
5 dealing with them?
6     Q.  Yeah.
7     A.  I didn't know if it was through us
8 or the photographer.
9     Q.  Did you ask them?
10     A.  Yeah, we did talk about it a bit.
11 Nancy and I, and I think from her the answer
12 was Merki (phonetic).  Understanding, Nancy
13 was not the person that would have originally
14 had access to the contact.
15     Q.  Is the New York Times a subscriber
16 --
17     A.  Yes.
18     Q.  -- of yours?
19     Do they fall within your bailiwick?
20     A.  They do.
21     Q.  Did you have any other
22 conversations with any customers, clients,
23 licensees of Getty Images on the subject of
24 Morel?
25     A.  Not that I recall, not directly.

Page 177

Katherine Calhoun

1           Katherine Calhoun
2     Q.  I'm going to ask you to look at
3 Exhibit 4, which the reporter has marked, and
4 ask you if you have seen that before?
5     Exhibit 4 is two-sided.  The
6 documents I'll give you are mostly two-sided
7 but not entirely.
8     A.  Oh, okay.
9     Q.  Exhibit 4 is an e-mail fragment or
10 two with the Bates numbers G00167071.
11     Have you ever seen this before?
12     A.  Yes.
13     Q.  What is it?
14     A.  It's an e-mail exchange between me
15 and Mark Kushner who's my boss, my manager.
16     Q.  What is his title?
17     A.  Vice president of North American
18 sales.
19     Q.  He says in his e-mail to you, "Oh,
20 boy, that's not good."
21     Do you see that?
22     A.  Yup.
23     Q.  What wasn't good?
24     A.  Well, I believe the fact -- the
25 basic situation, but the thing that would've

45 (Pages 174 to 177)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Katherine Calhoun

1
2  elicited that kind of response was that we
3  need to contact the clients and address any
4  retroactive licenses so any licenses that
5  have already taken place, we have -- by that
6  time we had determined that we had to go work
7  backwards and in effect rescind the licenses
8  and communicate that out to every client.
9      Q.  Do you remember talking to him
10  about that subject?
11      A.  Uh-huh.
12      Q.  Yes?
13      A.  I do.  Sorry.
14      Q.  What do you remember about the
15  conversations that you had with him on that
16  subject?
17      A.  I think my conversations with him
18  were -- first of all, to let him -- to be
19  sure he was aware and give him the
20  background.  Second of all, to let him know
21  that right then I was having a number of
22  conversations with our legal team in Seattle
23  and it was taking up a fair amount of my time
24  so as my manager, I just wanted him to know
25  that this was something I was dealing with

Katherine Calhoun

1
2  and that we were going to have the sales
3  teams, effectively, drop what they were doing
4  to focus on this very soon.
5      Q.  You wrote the e-mail that appears
6  at the top of Exhibit 4 to him; is that
7  correct?
8      A.  That's right.
9      Q.  You write, quote, no --
10      A.  No, that's not good.
11      Q.  Right.  So you didn't think it was
12  good either?
13      A.  No.
14      Q.  Quote, I just sent a bit more
15  details along with the list of clients that
16  downloaded these images.  It's a long list.
17      Do you see that?
18      A.  I do.
19      Q.  What list were you talking about
20  there?
21      A.  That would've been a download list
22  for some of the images that impacted my
23  clients.
24      Q.  When you say some of the images,
25  what do you mean?

Katherine Calhoun

1
2      A.  It was, I think at that point, we
3  hadn't captured in our full reports, I
4  believe, we hadn't captured all of the
5  images, image numbers.
6      Q.  And do you know why it was that you
7  hadn't captured as of March 26, 2010 all of
8  the numbers?
9      A.  No.
10      Q.  Do you know whether it was because
11  they were under Lisandro Suero's name?
12      A.  I honestly don't know.
13      Q.  But there was a list that you had
14  generated and that list itself, according to
15  what you then said to Mr. Kushner, was a long
16  list, correct?
17      A.  Yes.
18      Q.  How long was it?
19      A.  At the very least a few dozen or
20  several dozen clients.
21      Q.  You knew at that point that those
22  clients had downloaded those images, correct?
23      A.  That's right.
24      Q.  Did you personally contact any of
25  those clients at that time?

Katherine Calhoun

1
2      A.  Not at that time, no.
3      Q.  Did you direct anybody to contact
4  them?
5      A.  Not at that time, no.
6      Q.  I would like you to look at what
7  we've marked as Exhibit 5, which is Bates
8  numbered G-001666 to 1667.  Again, two-sided.
9  Look at it.  I'll have a few questions.
10      A.  Yeah.
11      Q.  Have you seen this before?
12      A.  In the original form probably, yes.
13      Q.  Okay.  It's also redacted so I'm
14  not sure what appears beneath your e-mail but
15  if you look at page 1, there appears to be an
16  e-mail from you to Mark Kushner on March 26,
17  2010 at 5:55 p.m.
18      Do you see that?
19      A.  I do.
20      Q.  Do you --
21      A.  Can I point out just one thing
22  that's strange?
23      Q.  Oh, sure.
24      A.  So Mark sent me this e-mail,
25  according to this, Friday March 26th --

46 (Pages 178 to 181)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 186

Katherine Calhoun

1          Katherine Calhoun
2     A.   Not that I know of.
3     Q.   Okay.  You stated on March 26th in
4  your e-mail to Mr. Kushner, quote, Pancho and
5  Adrien are both in the loop on this, as I
6  understand it, AFP is taking responsibility
7  and dealing with the lawyer.
8          Do you see that language?
9     A.   I do.
10     Q.   Who is Adrien?
11     A.   Adrien Murel is the senior vice
12  president for our editorial product, in
13  effect, out of London and he's Pancho's
14  manager.
15     Q.   You understood when you wrote this,
16  or believed that Pancho Bernesconi was, in
17  fact, in the loop on this?
18     A.   Yeah, and by that time I knew that
19  Pancho was in the loop on it.  I talked to
20  him about it.
21     Q.   Okay.  There's then an e-mail above
22  that's from Mr. Kushner to you.
23          Do you see it?
24     A.   Uh-huh.
25     Q.   On March 29th, three days later.

Page 187

Katherine Calhoun

1          Katherine Calhoun
2  "Anything I need to do here while you are
3  away"?
4     A.   Yes.
5     Q.   Do you see that?
6          Did you receive that in the
7  ordinary course of business?
8     A.   I did.
9     Q.   Above there's an e-mail from you to
10  Mr. Kushner where you tell him, "no, thanks.
11  Legal is tweaking the message.  I didn't hear
12  back from them today."
13          What were you referring to?
14     A.   I was referring to our legal
15  department was working hard on what was the
16  exact message or the kind of message that we
17  were going to send out to our clients on this
18  topic.
19     Q.   So far as you know, had a decision
20  been made as of March 29th that Getty Images
21  was, in fact, going to contact its clients?
22     A.   Oh, yes.  I think there was -- a
23  decision had been made, absolutely.  The
24  question was what the message was and some
25  mechanics on how it was going to be

Page 188

Katherine Calhoun

1          Katherine Calhoun
2  accomplished.
3     Q.   When was that decision made that
4  there would be a reach-out to clients, as far
5  as you know?
6     A.   Last -- the last week in March at
7  some point.  I would think somewhere between
8  March 20th and March 25th or so.
9     Q.   So far as you understand, there had
10  been no such decision prior to that at Getty
11  Images?
12     A.   As far as I know.
13     Q.   Again, you mention that, quote,
14  Pancho is up to speed on it, too.
15          Do you see that in your e-mail?
16     A.   Yes.
17     Q.   You believed that when you wrote
18  it?
19     A.   Yeah.
20     Q.   Can you look at the next document
21  which we've marked, which is Exhibit 6, a
22  one-page document Bates Numbered G-000966.
23  Exhibit 6.
24          Have you ever seen this exhibit
25  before?

Page 189

Katherine Calhoun

1          Katherine Calhoun
2     A.   I have.
3     Q.   What is it?
4     A.   It is first an e-mail from Denise
5  Banister on Friday, April 2nd alerting all
6  the global sales leaders, which we referred
7  to earlier today --
8     Q.   Yeah.
9     A.   -- that there is an issue -- of the
10  issue and that they were going to, as we
11  said, load all these activities into CRM the
12  following Monday and that they needed to be
13  responsible for their teams following up.
14     Q.   It says "The background to this
15  request is attached in the e-mail from Ms.
16  Banister."
17          Do you know what that was?
18     A.   I don't.
19     Q.   There then is a chart with a number
20  of -- with a list of numbers.  What do those
21  numbers represent?
22     A.   So that would've been the number of
23  activities by territory.
24     Q.   By "activities," what do you mean?
25     A.   It would've been the number of

48 (Pages 186 to 189)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

1             Katherine Calhoun
2   calls that needed to be made to customers.
3        Q.   And did that list expand beyond 199
4   following April 2, 2010?
5        A.   It did.
6        Q.   What was the final tally?
7        A.   The final tally -- I believe there
8   were another 72 loaded in in June.
9        Q.   What happened in June to lead to
10  the adding of 72?
11       A.   In the intervening time it was
12  discovered that there were still a few more
13  image numbers that had not been pulled in the
14  original report.
15       Q.   And in April of 2010, what steps
16  were taken by Getty Images to identify all of
17  the image numbers?
18       A.   I don't know.
19       Q.   Did you do anything in that regard?
20       A.   Not to identify the image numbers,
21  no.
22       Q.   Who did, if you know?
23       A.   Someone on the editorial content
24  side.
25       Q.   Mr. Kushner then wrote an e-mail to

1             Katherine Calhoun
2   you and others.  Do you see that at the top
3   of Exhibit 6?
4        A.   Yes.
5        Q.   Did you receive that?
6        A.   Yes.
7        Q.   He says, "Guys, just a heads up,
8   this is an important drill we will need to do
9   before the end of next week.  Katie has the
10  info on this but basically there were photos
11  given to us by AFP that they did not have
12  rights to from Haiti."
13            Do you see that?
14       A.   I do.
15       Q.   Did you think it was an important
16  drill?
17       A.   Yes.
18       Q.   And did you think it needed to be
19  done before the end of the next week?
20       A.   Yes.
21       Q.   And what did you understand Mr.
22  Kushner was saying about what had to be
23  completed before the end of next week?
24       A.   Opening up all the CRM
25  opportunities, contacting every client,

1             Katherine Calhoun
2   making contact with every client to make sure
3   that they understood the issue, asking them
4   to remove the images if they were still up on
5   websites or in electronic form and then
6   closing out the activity.
7        Q.   Did you say to anybody in words or
8   substance, if this is AFP's problem, why are
9   we doing this?
10       A.   No.
11       Q.   Did you raise the issue with
12  anybody?
13       A.   No.
14       Q.   Did anybody raise the issue with
15  you, if this is AFP's problem, why are we
16  doing this?
17       A.   No.
18       Q.   I'd ask you to look at the next
19  exhibit, Exhibit 7.  G-001634 to 636.
20       A.   Ah, interesting.
21       Q.   Have you seen any part of Exhibit 7
22  before?
23       A.   Parts of it, yes.
24       Q.   The parts that you haven't seen,
25  the top two e-mails more recent in chronology

1             Katherine Calhoun
2   from Mr. Legon to Mr. Lip Gifford and vice
3   versa?
4        A.   That's right, yeah.
5        Q.   You had not seen them?
6        A.   I had not seen them.
7        Q.   Is that what you thought was
8   interesting?
9        A.   Yes.
10       Q.   What made you think it was
11  interesting?
12       A.   Just that the exchange had
13  happened.
14       Q.   Okay.  There's text below those two
15  e-mail exchanges from you to New York sales
16  media and Brian Novie (phonetic).
17            Do you see that?
18       A.   I do.
19       Q.   Did you write those words?
20       A.   I did.
21       Q.   Did you send this e-mail?
22       A.   I did.
23       Q.   I have some questions about your
24  e-mail.
25       A.   Okay.

49 (Pages 190 to 193)

CONFIDENTIAL

Page 194

Katherine Calhoun
1
2    Q.  Were you accurately trying to
3  convey what you understood about the
4  situation, at the time?
5    A.  I believe I was trying to, yes.
6    Q.  Okay.  You say "AFP is working
7  through this legally on our behalf."
8       What were you conveying with that
9  sentence?
10    A.  I'm sorry, where is that sentence?
11    Q.  After the first paragraph --
12    A.  Oh, yes.  Sorry, yeah.  Simply
13  that, that AFP's legal team was working on
14  sorting out the issues, the implications.
15    Q.  You then go on to state a couple of
16  things.
17       Do you see that language?
18    A.  Yes.
19    Q.  You state "We have indemnified our
20  clients through our standard T and Cs."
21       What did you mean by that?
22    A.  Terms and conditions.
23    Q.  You then state, "That said, to
24  further protect them," all caps, "we need
25  them to remove the images off their website's

Page 195

Katherine Calhoun
1
2  or any internal media grids or content
3  management systems, so that no further uses
4  occur."
5       Do you see that?
6    A.  I do.
7    Q.  Did you believe that at the time?
8    A.  Yes.
9    Q.  And were you communicating that to
10  the sales team, so that they would understand
11  that was the goal?
12    A.  Yes.
13    Q.  And when you referred to their
14  content managing systems, what were you
15  referring to?
16    A.  Some clients have internal
17  databases where they store content that
18  they've already used, not many, but to the
19  extent that they have them and had these
20  images in them, it needed to be removed.
21    Q.  If you look at the last bullet on
22  that page, it's the third dash, quote, for
23  anyone who's downloaded them and had planned
24  to use the images in the future, we can offer
25  some of our incredible wholly owned images

Page 196

Katherine Calhoun
1
2  free of charge as replacements."
3       Do you see that?
4    A.  I do.
5    Q.  Who told you to put that in this
6  missive?
7    A.  Who told me to put that in this
8  missive?
9    Q.  If anybody?
10    A.  I think it was -- again, as we
11  discussed this morning, this was a
12  conversation where we had been talking with
13  our lawyers about what would be a fair way to
14  make our clients whole.
15    Q.  Was it your position at the time
16  when this was being communicated, that Getty
17  Images was not going to give people their
18  money back?
19    A.  No, not necessarily.  No, not
20  necessarily.  Again, using National
21  Geographic as the example, if their feeling
22  was that they were going to go ahead with
23  their project, whatever it was, and not use
24  anything that came from Getty in any way, we
25  would give them their money back.

Page 197

Katherine Calhoun
1
2    Q.  Was that communicated to the sales
3  staff to communicate that to customers?
4    A.  Verbally.  Probably verbally
5  because I know in particular -- I remember in
6  particular having a conversation with Kevin.
7    Q.  Did you think there should be a
8  written statement to that effect to the sales
9  floor so that they would know what they
10  should say to their clients?
11    A.  I don't think I -- I didn't put it
12  in here.  I don't think -- I don't think I
13  thought it was necessary.
14    Q.  If you look at the paragraph on the
15  second page that starts, quote, you recently
16  purchased, do you see that?
17    A.  Yes.
18    Q.  Who drafted that language?
19    A.  Our lawyers in Seattle.
20    Q.  I would ask you to look at the next
21  exhibit, Exhibit 8, a multiple page document.
22  G002395 to 398 with very little language and
23  much redaction.
24       Have you ever seen some version of
25  this document before?

50 (Pages 194 to 197)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 198

Katherine Calhoun

1        Katherine Calhoun
2     A.   Yes.
3     Q.   Do you recall receiving this, at
4  least the top e-mail, from Mr. Kushner on or
5  around the date it bears April 7, 2010?
6     A.   Yeah, yes.
7     Q.   And he's asking you, "any issue
8  that we will not get this done by Friday"?
9        Do you remember that discussion
10 coming up?
11    A.   I do.
12    Q.   What was the "this"?
13    A.   This I'm sure what it was is it was
14 records of our CRM reports that were showing
15 people who had not been -- or any open items,
16 and he would forward that to me and say, any
17 issue that we will not get this done by
18 Friday?
19    Q.   And what was your response?
20    A.   No issues.
21    Q.   You were going to get it done by
22 Friday?
23    A.   That was certainly our intention.
24    Q.   This is Wednesday?
25    A.   That's right.

Page 199

1        Katherine Calhoun
2     Q.   And did you, in fact, get the tasks
3  done by Friday?
4     A.   As I recall, we did.  There may
5  have been a couple -- for the most part, we
6  did.  There may have been one or two hanging
7  out there, but for the most part, we did.
8     Q.   Okay.  Let me ask you to look at
9  Exhibit 9, G-000020.
10       Have you seen Exhibit 9 before?
11    A.   I have.
12    Q.   What is it?
13    A.   Again, this is a status from sales
14 operations that was monitoring the CRM
15 reports and giving us an update on what was
16 still reading as open in the system.
17    Q.   This document says that at least in
18 the United States there were 87 open
19 activities that had to be done by the close
20 of the following day's business?
21    A.   That's right.
22    Q.   What about all the other tasks that
23 were identified, did they also have to be
24 done by the close of business on Friday, if
25 you know?

Page 200

1        Katherine Calhoun
2     A.   Which other tasks?
3     Q.   United Arab Emerates, Portuguese,
4  Switzerland, adding up to 196 in total.
5     A.   I don't know for sure, but I -- I
6  -- it was around the same time period.
7     Q.   And you believe that the 87 items
8  that were outstanding, with perhaps some
9  small exceptions, got accomplished by the
10 next day?
11    A.   I believe they did.  If I also
12 recall one of the issues is that the
13 salespeople had contacted them but they
14 hadn't closed it in CRM.
15    Q.   Okay.  But you believe the contacts
16 were made?
17    A.   I believe so, yeah.
18    Q.   Can you look at the next exhibit,
19 Exhibit 10, multipage document with the Bates
20 numbers G003789 through 91.
21       Have you seen this exhibit before?
22    A.   Yes.
23    Q.   What is it?
24    A.   This is an e-mail from Stewart
25 Brown, who is one of the managers on my team,

Page 201

1        Katherine Calhoun
2  asking about whether we can get thumbnail
3  versions of the images for reference for the
4  clients who we had been contacting.
5     Q.   Okay.  If you look at the document
6  from the back, there appears to be an e-mail
7  from Cynthia Edore to a Gabrielle.
8        Do you see that?
9     A.   Uh-huh.  I do, yes.
10    Q.   April 8th at 11:25 a.m.
11    A.   Yes.
12    Q.   And it informs Gabrielle that he or
13 his company had recently downloaded three
14 images of the Haitian earthquake with
15 numbers.
16       The e-mail then notes, "As you
17 know, Getty Images indemnifies you against
18 any copyright claims that emerge as the
19 result of an image you have obtained and
20 licensed from us."
21       Do you see that?
22    A.   Yes.
23    Q.   Was it your understanding that, in
24 fact, the entity for whom Mr. Gabrielle works
25 or Gabrielle works -- do you know who he is,

51 (Pages 198 to 201)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 202

Katherine Calhoun

1          Katherine Calhoun
2   number 1?
3      A.   I don't.
4      Q.   Okay.  Were there other customers
5   or clients or licensees of Getty Images that
6   had trouble with having a number that doesn't
7   mean anything to them?
8      A.   There were a number, yes.  There
9   were a number of clients, yes.
10     Q.   What did Getty Images do to address
11  those inquiries in April of 2010?
12     A.   Well, I -- it had filtered up to me
13  through a few different sales reps, who had
14  heard this from their clients saying, if you
15  need, I can pull it down right away, but I
16  need to know what image it is, and I can't --
17  either I can't find it quickly.  Usually it
18  was -- they're all very visual people, they
19  couldn't find it quickly from the image
20  number so they asked to be sent a thumbnail
21  as reference because the images were no
22  longer available on our site to be a
23  reference.
24     Q.   What did you do?
25          What did Getty Images do?

Page 203

1          Katherine Calhoun
2      A.   I had communicated internally that
3   we needed these, and there was some
4   hesitation on the part of Getty's legal team
5   because they were concerned this could be
6   construed as a redistribution of the images.
7      Q.   How was it resolved, independent
8   from the debate?
9      A.   I believe it was resolved that --
10  well, they did provide the thumbnails in a
11  grid form so it could be worked -- so it
12  could be used as a reference only to send to
13  the clients so they can identify it very
14  quickly which images they were.
15     Q.   How could they identify it very
16  quickly?
17     A.   Because they could look at it and
18  see.
19     Q.   How would they then go through
20  their own database to find it?
21     A.   They -- the users who made the
22  choice when you get to the individual photo
23  -- when you start the individual photo editor
24  level, they would recognize whether they've
25  used the images or not.

Page 204

1          Katherine Calhoun
2      Q.   Now, on Getty's website there is
3   the ability to search by date and to search
4   by subject matter; is that correct?
5      A.   That's correct.
6      Q.   So that if anyone either at Getty
7   or elsewhere wanted to they could've searched
8   any time after April 12, 2010 for all images
9   of Haiti?
10     A.   No, they -- yes, they could've done
11  such a search but it wouldn't have included
12  Mr. Morel's images because they'd been
13  removed from the site.
14     Q.   No, I'm talking about at the time,
15  that is on --
16     A.   In January.
17     Q.   I'm sorry, in January, yes.
18          In January, if --
19     A.   Yes, they could have, yes.  That's
20  right.
21     Q.   -- they wanted to know, they
22  could've just looked at the images from
23  January 12, 2010 and seen all the images
24  relating to Haiti dated that day?
25     A.   In January, yes, that's correct.

Page 205

1          Katherine Calhoun
2      Q.   Yes.  And do you know if anybody
3   did that?
4      A.   In January?
5      Q.   Yeah.
6      A.   I don't know.
7      Q.   Do you know -- well, do you know
8   today if you put in January 12, 2010 how many
9   images you will hit if you use the word
10  Haiti, and just limit it to that day?
11     A.   I don't know.
12     Q.   Or Haiti earthquake?
13     A.   I don't know.
14     Q.   Do you think it could be thousands?
15     A.   No.
16     Q.   Hundreds?
17     A.   No, not on the 12th, no.  On the
18  13th, yes.
19     Q.   I'm asking about the 12th.
20     A.   Depending on how quickly imagery
21  started moving, not tons.
22     Q.   Getty didn't have anybody on the
23  ground on the 12th, correct?
24     A.   That's my understanding.
25     Q.   Which exhibit do you have in front

52 (Pages 202 to 205)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 206

Katherine Calhoun

1           Katherine Calhoun
2    of you?
3        A.  G-003789.  Oh, sorry.  Exhibit 10.
4        Q.  Exhibit 10.  Done with that.
5           Can you look at Exhibit 11, which
6    the reporter will hand you.  G-009047 to 49.
7        A.  Yes.
8        Q.  What is this?
9        A.  This is a communication between me
10   and my counterpart in the Los Angeles office
11   named Brian Novie (phonetic).
12       Q.  Why were you having this exchange
13   with him?
14       A.  Because Brian had not been involved
15   in all the earlier conversations.  He had
16   just started taking over media clients and he
17   was trying to get some clarification on what
18   we do in the case where a client has already
19   used in effect -- and in effect distributed
20   the product.  In this case, a broadcast
21   through a show.
22       Q.  A broadcast meaning --
23       A.  Television broadcast.
24       Q.  Television show?
25       A.  Yeah.

Page 207

1           Katherine Calhoun
2        Q.  Okay.  You sent the words that are
3    attributable to you and you received what he
4    sent to you, correct?
5        A.  I believe so, yes.
6        Q.  And he in his first e-mail to you,
7    which appears on 9048, says "what do we do if
8    the images were already used in a show"?
9           Do you see that?
10       A.  Yes.
11       Q.  And you responded "We need to
12   capture that not expecting them to take the
13   imagery out of produced shows, but if it's
14   being used standalone on a website it should
15   come down and we can replace it."
16          Do you see that?
17       A.  I do.
18       Q.  Who decided that that would be the
19   directive?
20       A.  Legal.
21       Q.  Did you ever tell anyone that they
22   should do more, that is the imagery should
23   actually be taken out of produced shows,
24   ever, I mean after this?
25       A.  Not that I know of.

Page 208

Katherine Calhoun

1           Katherine Calhoun
2        Q.  Mr. Novie refers, on the first page
3    -- sorry, that's not -- is that from you --
4    the -- it's going out automatically from
5    legal sales?
6        A.  That's from me to Brian, yes.
7        Q.  Okay.  What was going out
8    automatically?
9        A.  It was my understanding then that
10   legal, slash, sales ops was going to send out
11   a follow-up e-mail to every customer
12   automatically following up on our contact.
13          MR. BAIO:  I'm going to ask
14          the reporter to mark as the next
15          exhibit, Exhibit 12, which is a
16          two-page document, G-001848 to 849.
17          (Calhoun Exhibit 12,
18          document, marked for
19          identification, as of this
20          date.)
21       Q.  Have you seen Exhibit 12 before?
22       A.  Yes.
23       Q.  What is it?
24       A.  It is, again, another status report
25   originated by field operations on how things

Page 209

1           Katherine Calhoun
2    were going.
3        Q.  How were things going as of 4:03 on
4    Friday April 9th?
5        A.  They were moving along.  Again, as
6    I said, there were some stragglers.
7        Q.  I think the e-mail below yours --
8    and by the way, did you send this e-mail --
9        A.  Yes.
10       Q.  -- that is the top e-mail, did you
11   receive the information below?
12       A.  I did.
13       Q.  There's a reference to 17 of 49
14   hasn't been touched.  That's in Susan
15   Nomecos' e-mail.
16          Do you see that?
17       A.  That's right.
18       Q.  What was your understanding of what
19   she was saying?
20       A.  That they hadn't been touched in
21   CRM.
22       Q.  What does that mean?
23       A.  This means -- there were two --
24   there were two sort of streams of tasks that
25   were going on.  We had sent the salespeople

53 (Pages 206 to 209)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Katherine Calhoun

1
2     Q.  Have you seen this exhibit in its
3  unredacted form in the past?
4     A.  Yes.
5     Q.  Did you write the e-mail that
6  appears on the first page?
7     A.  Yes.
8     Q.  Why were you asking the -- why were
9  you inquiring about the Haiti images and
10  whether CNN had additional images and your
11  question, quote, are they sure they got them
12  from us?
13     A.  Yeah, my memory is that Gazena
14  Straus (phonetic), who's their account
15  executive, had sent them the e-mail with all
16  the image numbers, and...by the additional
17  images, I think there may have been a
18  reference to additional images.  Well,
19  obviously there clearly was, and we weren't
20  sure -- we weren't completely clear on what
21  they were talking about, so Gazena had come
22  to me asking me the question and I said, you
23  know, we need some clarification, and if
24  they're -- are we sure they're talking about
25  content they had acquired from us.

Katherine Calhoun

1
2     Q.  Did you ever get an answer to that
3  question, particularly, did they get content
4  from someone other than from us?
5     A.  I don't remember.
6        MR. BAIO:  I will ask the
7     reporter to mark as Exhibit 16, a
8     two-page document with the Bates
9     numbers G-009031 to 32.
10        (Calhoun Exhibit 16,
11        document, marked for
12        identification, as of this
13        date.)
14     Q.  Have you seen this document before?
15     A.  Uh-huh.  Yes.
16     Q.  And what is it?
17     A.  Again, this is -- was a status
18  report from -- originating, again, with
19  sales, sales operations at Mark Kushner's
20  request.  Did we get them all done and where
21  are we, so Susan Nomecos in sales operations
22  sent this update, Mark sent it onto us, and
23  then I sent out -- reported to the individual
24  salespeople --
25     Q.  Yes.

Katherine Calhoun

1
2     A.  -- asking if there's an open item,
3  what's going on.
4     Q.  A response from Dave Kelly appears
5  at the top of this exhibit?
6     A.  That's right.
7     Q.  Who is he?
8     A.  He is a salesperson on our team.
9     Q.  Was he on the Huffington Post and
10  Gawker accounts?
11     A.  That's right.
12     Q.  And do you know what the resolution
13  was with the Huffington Post and Gawker?
14     A.  In terms of did they pull them off
15  the sites and so forth?
16     Q.  Yes.
17     A.  Specifically, I don't remember.
18     Q.  Do you know whether Huffington Post
19  and Gawker were subscribers?
20     A.  Huffington Post, yes.  I
21  believe Huffington Post was.
22     Q.  And Gawker?
23     A.  I can't remember.
24     Q.  So if Huffington Post was a
25  subscriber, they should appear on Exhibit 2?

Katherine Calhoun

1
2     A.  That's right.
3     Q.  The list of downloads?
4     A.  That's right.
5     Q.  And Gawker, if it's an ad hoc or
6  what was the phrase again?
7     A.  A la cart.
8     Q.  A la cart.  They should be on
9  Exhibit 1?
10     A.  It should be.  They should be on
11  one of the two, yes.  Gawker may have had a
12  subscription.  I can't remember.
13     Q.  Okay.
14        MR. BAIO:  I'm going to ask
15     the reporter to mark as Exhibit 17
16     a multipage document with the Bates
17     numbers G-008308 to 8312.
18        (Calhoun Exhibit 17,
19        document, marked for
20        identification, as of this
21        date.)
22     Q.  Have you seen this exhibit before,
23  and if so, can you tell me what it is?
24     A.  Just a minute.
25     Q.  Sure.

55 (Pages 214 to 217)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 218

Katherine Calhoun

1
2    A.  Oh, right, this explains that.
3  Okay.  Yes.
4    Q.  What is it?
5    A.  Okay, so this refers now back to
6  what the issue was, apparently, with CNN, so
7  this was one of the clients that needed
8  thumbnails for a reference, and by the
9  additional images, there were image numbers
10 that didn't have thumbnails attached to them.
11   Q.  What did that mean to you?
12   A.  Just that they got missed when
13 whoever put together this grid put it
14 together.
15   Q.  Do you know from looking at this
16 e-mail who put together the grid?
17   A.  Either from the e-mail or not, I
18 don't know who actually put together the
19 grid.  It was sent to us after legal okayed
20 it, after the issues that we'd already
21 pointed out, and, again, there are quite a
22 few duplicates here.
23   Q.  And did the fact that there were
24 quite a few duplicates cause you any concern?
25   A.  No, the only reason I point out

Page 219

Katherine Calhoun

1
2  that there were quite a few duplicates is it
3  goes back to our earlier conversation where I
4  had assumed it was 12 to 18 images but it was
5  based on looking at the grid without
6  realizing that there were duplicates.
7    Q.  If you look at page 8309, it talks
8  about 28 thumbnails.
9      Do you see that?
10   A.  Yes.
11   Q.  So there were many more than 18
12 thumbnails, right?
13   A.  I guess, yes.
14   Q.  And you write to Nancy Monsen
15 (phonetic), and who is Nancy Monsen?
16   A.  She was in our legal team.
17   Q.  Okay.  You say, "So sorry it's
18 taken me so long to get back to you," and
19 then you identify the issue, in our
20 overarching report.
21     What are you referring to?
22   A.  The report that we had been using
23 to communicate out to clients.  There were
24 image numbers that were included in that
25 report that showed the downloads and so forth

Page 220

Katherine Calhoun

1
2  but that we did not have thumbnails -- when
3  we sent out this grid of thumbnails, we
4  didn't have a visual reference for them.
5    Q.  What does that mean, a "visual
6  reference"?
7    A.  So the thumbnail is a visual
8  reference, so that clients can say, look, I
9  see this image number, show me what it looks
10 like.
11   Q.  Right.
12   A.  They were looking for it, and they
13 didn't find that image number.
14   Q.  They were looking for the image
15 number or the image?
16   A.  They were looking for the visual
17 reference to go with that image number.
18   Q.  The visual reference being a
19 thumbnail?
20   A.  That's right.
21   Q.  Okay.
22        MR. BAIO:  I'll ask the
23     reporter to mark the next Exhibit
24     18, a one-page document, G-008983.
25        (Calhoun Exhibit 18,

Page 221

Katherine Calhoun

1
2     document, marked for
3     identification, as of this
4     date.)
5    Q.  Have you seen this exhibit before?
6    A.  Yes.
7    Q.  Is the bottom of it an e-mail that
8  you sent to the New York sales team on April
9  30, 2010?
10   A.  April 13th.
11   Q.  I'm sorry, April 13th, yes.
12     Is it?
13   A.  It is.
14   Q.  Is this sort of a great-job-guys
15 kind of e-mail?
16   A.  It is.
17   Q.  And you identify at the end of your
18 e-mail, "Let us know if any further questions
19 come up but the issue should be behind us
20 now."
21     Do you see that?
22   A.  I do.
23   Q.  Was the issue behind you?
24   A.  It was not.
25   Q.  What other issues came up after the

56 (Pages 218 to 221)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 222

Katherine Calhoun

1
2  date of this e-mail?
3      A.  Well, one thing that I've already
4  referenced to you is that there were some
5  additional image numbers that were found in
6  June.  That was the biggest issue.
7      Q.  Any other issues that you can think
8  of that arose -- I mean, there's the New York
9  Times that you testified to.
10     A.  The New York Times issue where they
11 wouldn't take it down.  There were a couple
12 of other issues.  I believe there was a
13 handful of websites, say six or seven, where
14 the images appeared that hadn't -- that
15 hadn't shown up on our original download
16 list.
17     Q.  When did that reveal itself?
18     A.  May.  Maybe May.
19     Q.  If you look at the top e-mail from
20 Purdy (phonetic) --
21     A.  Yes.
22     Q.  Ms. Purdy?
23     A.  That's right.
24     Q.  To you on April 13th, she asks, "Do
25 we need to do anything with those clients

Page 223

Katherine Calhoun

1
2  that received the images via the AFP feed?"
3      Do you see that?
4      A.  I do.
5      Q.  Did you respond to that?
6      A.  I'm sure I did.  I can't -- and I
7  don't imagine I would've responded to it
8  without consulting with someone internally
9  about this because it's a valid point.  I
10 don't remember how I responded.
11     Q.  Do you know how it was developed
12 irrespective -- that is did Getty Images
13 contact or do anything with clients that
14 received the images via the AFP feed?
15     A.  I don't believe we did a separate
16 communication specifically to feed clients.
17     MR. BAIO:  I'm going to ask
18     the reporter to mark the next
19     Exhibit as 19, a one-page redacted
20     e-mail, G-009002.
21     (Calhoun Exhibit 19,
22     document, marked for
23     identification, as of this
24     date.)
25     Q.  Did you see Exhibit 19 before?

Page 224

Katherine Calhoun

1
2      A.  Yes.  In the original form, yes.
3      Q.  And the -- who is Mr. Hamlin
4  (phonetic)?
5      A.  Steven Hamlin is a salesperson on
6  our team.
7      Q.  Do you remember receiving from him
8  this e-mail that's at the bottom of the first
9  page?
10     A.  I do.
11     Q.  He was attaching a link from PDN
12 Pulse.
13     Do you know what PDN Pulse is?
14     A.  I do.
15     Q.  Photo District News?
16     A.  That's right.
17     Q.  The article was "Insult to injury,
18 AFP suing photographer it stole photos from."
19     Do you see that?
20     A.  I do.
21     Q.  Do you remember clicking on that?
22     A.  I do.
23     Q.  Was this the first that you learned
24 that Mr. Morel was being sued?
25     A.  I believe it was, yes.

Page 225

Katherine Calhoun

1
2      Q.  And independent from any
3  conversations you had with lawyers, did you
4  discuss that fact with anyone?
5      A.  Possibly.
6      Q.  Do you remember what you said in
7  that regard?
8      A.  I was surprised.
9      Q.  You were surprised that Mr. Morel
10 would be sued?
11     A.  Yes.
12     Q.  Why is that?
13     A.  It was certainly the first instance
14 I had heard of an agency -- this type of a
15 lawsuit that I was aware of.
16     Q.  Where the agency sued the
17 photographer who said that it was his work
18 and it was his work?
19     A.  I didn't say it that way.  I just
20 simply -- where an agency was suing a
21 photographer.
22     Q.  Did anybody tell you, in words or
23 substance, what the hell were they thinking?
24     A.  Not in words, but I think we were
25 surprised.

57 (Pages 222 to 225)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 226

Katherine Calhoun

1
2    Q.  And independent from any
3    conversation you had with lawyers, did you
4    ask what Getty's role was in any of that?
5        A.  I believe I did, and in this
6    specific dynamic, my understanding is that
7    Getty was not playing a role in that.
8        Q.  You determined to pass this on to
9    the people you sent the information to?
10       A.  I did.
11       Q.  Did you have any conversations with
12   Mr. Bernesconi about it?
13       A.  I think I had a conversation with
14   Pancho along the lines I just described to
15   you.
16       Q.  Did he seem to have the same view?
17       A.  I believe so.
18              MR. BAIO:  I'm going to ask
19          the reporter to mark as the next
20          Exhibit 20, a one-pager, G-008980.
21              (Calhoun Exhibit 20,
22              document, marked for
23              identification, as of this
24              date.)
25       Q.  Have you ever seen Exhibit 20

Page 227

Katherine Calhoun

1
2    before?
3        A.  Yes.
4        Q.  Did you receive it at or about the
5    date it bears in May 17th?
6        A.  Yes.
7        Q.  And what did you take away from
8    this when you received this?
9        A.  What did I take away from it?
10       Q.  Yeah.
11       A.  I'm not sure I know what you mean.
12       Q.  Okay.  It says, "I don't believe we
13   were instructed to do anything with the
14   images that were acquired via feed delivery."
15           Is it your understanding that Time
16   Link had acquired it through a feed?
17       A.  Through the feed, right, and as
18   Tori indicated, she had looped in Heather
19   Cameron, again, our legal, so as I said, I
20   don't recall doing anything specifically with
21   the feed customers, and we were deferring to
22   Heather, I think, about whether we needed to
23   have a separate conversation.
24       Q.  Did you have a separate
25   conversation?

Page 228

Katherine Calhoun

1
2        A.  Not, not to my memory.
3        Q.  Did any of this -- did this e-mail,
4    in particular, lead to discussions on whether
5    anything needed to be done about people who
6    acquired the images through a feed?
7        A.  Discussions, not that I recall.  I
8    don't recall in depth discussions after this
9    e-mail.
10       Q.  In light of your role so far in
11   this endeavor, did you think, we better do
12   something about the feeds?
13       A.  I don't remember what I thought.
14       Q.  Do you remember ever thinking, we
15   have to do something about the feeds?
16       A.  Thinking -- I don't recall
17   thinking, we have to do something about the
18   feeds.  I remember thinking, how does this
19   impact feed clients and is it something -- is
20   it something that we need to follow up on.
21       Q.  Okay.
22              MR. BAIO:  I'll ask the
23          reporter to mark as Exhibit 21, a
24          one-pager, G-008984.
25              (Calhoun Exhibit 21,

Page 229

Katherine Calhoun

1
2              document, marked for
3              identification, as of this
4              date.)
5        Q.  Is Exhibit 21 an e-mail exchange --
6    two e-mail exchanges between you and Mr.
7    Kushner?
8        A.  Yes.
9        Q.  And you were communicating to him
10   the following -- on May 17, 2010, quote, the
11   subject is: More Haiti AFP images.
12           Do you see that?
13       A.  I do.
14       Q.  This is an instance where you
15   learned that there were more images that had
16   not --
17       A.  It actually isn't.
18       Q.  Okay.
19       A.  It actually -- I think I probably
20   meant to say more on Haiti AFP images.
21       Q.  I see?
22       A.  Because I don't believe at this
23   point we had discovered the additional
24   images, yet.
25       Q.  Okay.  You state, quote, FYI, I've

58 (Pages 226 to 229)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 230

Katherine Calhoun

1 been working with Heather and Lisa Wilmer
2 today to follow up on the AFP Haiti images
3 issue.  It seems a couple of clients still
4 have the images actively on their sites,
5 doubt it's willful, more that it's something
6 that fell through the cracks.  In any case,
7 two of the clients are Time dot com and MTV.
8 We're following up tomorrow.
9     Do you see that?
10    A.  I do.
11    Q.  Did you ever reach a conclusion as
12 to whether it was willful, that is, that
13 those two entities actually kept the images
14 up willfully?
15    A.  Yes.  I mean, to the extent that
16 you can reach a conclusion about that, we
17 followed up and it was more of an instance
18 where they had missed some of the archive
19 uses.
20    Q.  How did that come to your
21 attention, that it was still up and active?
22    A.  It came to our attention through
23 Heather, I believe, who had either been
24 monitoring these sites or came upon them

Page 231

Katherine Calhoun

1 independently, or she had received a
2 communication from Mr. Morel's lawyers that
3 they had found the websites.
4    Q.  Was Time dot com a subscriber at
5 the time?
6    A.  Yes.
7    Q.  What about MTV?
8    A.  At the time, I believe so.
9    Q.  Okay.  Do you know whether either
10 of those entities had access to -- I'm sorry
11 -- secured the image only through the feed?
12    A.  Time -- MTV I'm almost positive has
13 never had a feed, so they would never have
14 gotten it through the feed.  Time dot com
15 could have.
16    Q.  Okay.  And MTV should be on one of
17 these charts, Exhibit 1 or Exhibit 2,
18 correct?
19    A.  It should.
20        MR. BAIO:  I'll ask the
21     reporter to mark as Exhibit 22,
22     e-mails on a single-page document,
23     G-008985.
24        (Calhoun Exhibit 22,

Page 232

Katherine Calhoun

1     document, marked for
2     identification, as of this
3     date.)
4    Q.  Have you seen this e-mail before --
5 this e-mail series before?
6    A.  Yes.
7    Q.  And do you remember receiving and
8 participating in these communications on the
9 date they bear?
10    A.  Yes.
11    Q.  Does this lead you to conclude
12 that, in fact, Time dot com got the images
13 from the feed?
14    A.  Yes.
15    Q.  And Ms. Purdy wrote to you and Mr.
16 Van Cassel (phonetic), "They got them from
17 the feed, Mark Wyckoff (phonetic) contacted
18 us prior to us alerting clients.  I need to
19 check my sent e-mails but we alerted Heather
20 and I think we followed up with Mark."
21     Do you see that?
22    A.  I do.
23    Q.  Did you ever learn that they didn't
24 get the images from the feed?

Page 233

Katherine Calhoun

1    A.  No.
2    Q.  Did you ever learn --
3    A.  Not that I recall.
4    Q.  If other customers or clients
5 received the images from the feed, that is
6 specifically learning that an entity had
7 received the images through the feed?
8    A.  Not that I recall.  Although, it
9 may have been part of my conversation with
10 the New York Times.
11    Q.  Okay.  Mark Wyckoff, who's that?
12    A.  I assume he's a photo editor at
13 Time dot com.
14    Q.  And it says, "contacted us prior to
15 us alerting clients."
16     Do you see that?
17    A.  I do.
18    Q.  What does that -- does that mean
19 that he contacted Ms. Purdy prior to April,
20 when you started contacting clients?
21    A.  Presumably.  I'm not actually sure
22 what that refers to.
23    Q.  Do you know if she checked her sent
24 e-mails to see and reported to you?

59 (Pages 230 to 233)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

CONFIDENTIAL

Page 238

Katherine Calhoun

1
2  search what was the history with an image.
3  If we can no longer license it, what was the
4  issue?  Was it, you know, do we no longer
5  represent the collection?  Was there a
6  technical problem with the image and so
7  forth.
8      Q.  Okay.  That's a Getty Images
9  database, of sorts?
10     A.  That's right or it's a data base
11 that we use.  It's a software thing that we
12 use, something like that.
13     Q.  That data base stores images, among
14 other things?
15     A.  Or stores data about images, yeah
16 or thumbnails.
17     Q.  Did it store the images, as well?
18     A.  I don't know if it stores the large
19 usable files of an image, but clearly it
20 stores thumbnails.
21         MR. ROSENFELD:  We'll have
22     Chris Isenberg for -- -
23         MR. BAIO:  I thought so.
24     Okay, so I will take that.
25         THE WITNESS:  We'll have

Page 239

Katherine Calhoun

1
2  who?
3         MR. ROSENFELD:  Chris
4     Isenberg.
5      Q.  Will testify about that when we
6  take Mr. Isenberg's deposition.  I mean,
7  that's the -- so we can move off that and
8  save you -- spare you on Mr. T.
9      A.  Okay.
10        MR. BAIO:  Next, 25,
11     document G-008870.
12         (Calhoun Exhibit 25,
13         document, marked for
14         identification, as of this
15         date.)
16     Q.  This is a heavily redacted document
17 but it appears to be an e-mail on the first
18 page to you and on the very last page there
19 is an e-mail that was not redacted.
20     Have you ever seen those two
21 e-mails before?
22     A.  Was this all part of the same
23 chain?
24     Q.  I have no idea.  This was produced
25 to us this way.

Page 240

Katherine Calhoun

1
2      A.  Okay.  All right.
3      Q.  And --
4      A.  Looks strange.  The -- the -- I
5  don't know that I've seen the specific e-mail
6  between Elizabeth and Erika in the past.
7      Q.  What was the -- do you recall the
8  CBS News issue, when you look at the last
9  page?
10     A.  Well, again, the CBS News issue was
11 in one of the very first e-mail exhibits that
12 we have here, which included the exchange
13 between both Jessie Legon and Karen Gifford
14 and the first time it came to my attention --
15 the first way that I learned of this whole
16 issue with Daniel Morel at all was through a
17 CBS News issue.
18     Q.  I see.
19     A.  And, again, at that time, even
20 Jessie had confirmed by March 17th that they
21 had already removed the images.  The other
22 reason it came up, just to clarify, in
23 exchange with Kevin and Jessie, Kevin said,
24 do we have to contact them again.  Jessie
25 said we're a step ahead of the game because

Page 241

Katherine Calhoun

1
2  CBS had already removed them.  So my only
3  guess would be this is somebody at CBS who
4  hadn't been directly involved in the previous
5  conversations, reaching out to her account
6  executive, but why to Erika because Erika
7  doesn't work on CBS News?  So I'm not sure
8  why that would've been or Elizabeth could've
9  been a freelancer that wasn't quite sure.
10     Q.  If you look at the first page,
11 you'll see that it's two days later and
12 Susanne Yeller (phonetic) is involved and
13 she's referring to the newspapers?
14     A.  That's right.
15     Q.  Is there any connection between the
16 two?
17     A.  No.
18     Q.  By this time, now we're on June 4th
19 of 2010, had the additional images shown up?
20     A.  Yes.
21     Q.  And how did they show up?
22     A.  How was it discovered?
23     Q.  Yes.
24     A.  It was discovered because Kevin
25 Gibert, again who is on our sales team, had

61 (Pages 238 to 241)

CONFIDENTIAL

Page 242

1              Katherine Calhoun
2     been talking with Vanity Fair because there
3     was -- one of the images was on Vanity Fair
4     dot com, so he was calling them -- he was
5     talking to them to get them to remove the
6     image and realized that Vanity Fair had not
7     been in the original -- in working with
8     Vanity Fair, and he said, what's the image,
9     they found out it was an image number that
10    hadn't been on the original list.
11        Q.   Just one image?
12        A.   They found just one image, yes.
13        Q.   And then what did you or your team
14    do in response to learning that?
15        A.   I think Kevin sent it to me and
16    then I sent it to sales operations and said,
17    are we sure we got all the image numbers?
18        Q.   What was the response?
19        A.   Presently they had discovered that
20    there were some additional image numbers that
21    hadn't been found or hadn't been captured in
22    the first report.
23        Q.   This was in June of 2010?
24        A.   That's right.
25        Q.   As you sit here, or in your

Page 243

1              Katherine Calhoun
2     capacity as a 30-B(6) witness, do you know
3     why they weren't found sooner?
4         A.   I don't.
5             MR. BAIO:  I'm going to ask
6         the reporter to mark as the next
7         Exhibit 26, a two-page document
8         with the Bates Number G-000810.
9             (Calhoun Exhibit 26,
10            document, marked for
11            identification, as of this
12            date.)
13        Q.   Have you seen this exhibit before?
14        A.   Yes.
15        Q.   What is it?
16        A.   This is an exchange between Cynthia
17    and the Washington Post, which is one of her
18    clients, and he had -- and him confirming
19    that they had removed the pictures.
20        Q.   Prior to June 10, 2010, is it -- is
21    it at least your understanding that the
22    Washington Post had not removed the images
23    from their website?
24        A.   That is my understanding.
25        Q.   And had you been involved in any

Page 244

1              Katherine Calhoun
2     communications or conversations with anyone
3     as to why the Washington Post had not
4     eliminated or taken it off its website?
5         A.   No.
6         Q.   What about in the CRM process, was
7     somebody assigned the job to communicate with
8     them and to accomplish that goal?
9         A.   I would have to double-check.
10        Q.   Well, do you remember being
11    surprised in June of 2010 that images had
12    still been on the Washington Post's website?
13        A.   Do I remember being surprised,
14    specifically.  It didn't -- I wasn't made
15    aware of it, I think, until I got this e-mail
16    which confirmed that they'd been removed, so
17    I was surprised, but also gratified that they
18    were off.
19        Q.   Did you subsequently find out that
20    they had not removed it from their website?
21        A.   Not that I recall.  Not that I
22    recall.
23        Q.   Okay.
24            MR. BAIO:  Next Exhibit, 27.
25        G-010580 through 584.

Page 245

1              Katherine Calhoun
2             (Calhoun Exhibit 27,
3             document, marked for
4             identification, as of this
5             date.)
6         Q.   Have you seen this exhibit before
7     or any part of it?
8         A.   Let's see...no.
9         Q.   The back of it is not a trick, 582
10    really starts with your e-mail reaching out
11    to --
12        A.   The original e-mail.
13        Q.   Yes.
14            Do you remember issues coming out
15    -- coming to your attention in June of 2010
16    that certain clients had not been
17    communicated with that still needed to be,
18    and that's in an e-mail from Novie to Sharon
19    Owen (phonetic).
20            Does that refresh your recollection
21    that there was still a group or some clients
22    who had to be communicated with?
23        A.   That's not part of my recollection,
24    so I'm just trying to make sense of this
25    right now.

62 (Pages 242 to 245)

a02f12fd-7585-45d4-88e5-f4a23b7f0b59

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

AGENCE FRANCE PRESSE,

               Plaintiff,

    v.

DANIEL MOREL,

              Defendant and
              Counterclaim Plaintiff

    v.

AGENCE FRANCE PRESSE,

              Counterclaim Defendant,

  And

GETTY IMAGES (US), INC., CBS
BROADCASTING, INC., ABC, INC., TURNER
BROADCASTING, INC. and (AFP and Getty
Licensees does 1 - et. al).

              Third Party Counterclaim
              Defendants

——————————————————————— x

Case No. 10-cv-2730 (WHP)

ECF Case

**ACKNOWLEDGMENT**

    I, HEATHER CAMERON, hereby certify that I have read the transcript of my testimony

taken under oath in my deposition of July 20 and July 21, 2011; that the transcript is a true,

complete and correct record of my testimony, except for the corrections, if any, noted in the

attached errata sheet, and that the answers on the record as given by me are otherwise true and

correct.

                          HEATHER CAMERON

Sworn and subscribed to before me
this 3rd day of October, 2011.



Notary Public, State of Washington

**Heather Cameron Deposition Corrections**

**Volume I, Tuesday, July 20, 2011:**

Page 24, line 23: should be "Jennifer Walker" instead of "Jennifer Washington"

Page 32, line 6: should be "byline" instead of "buy line"

Page 34, line 24: should be "site" instead of "sight"

Page 51, line 2: should be "general counsel" instead of "general"

Page 52, line 8: should be "It is a " instead of "It a"

Page 56, lines 7, 12, 13: should be "JPEG" instead of "jpg"

Page 71, line 11: should be "asset" instead of "assets"

Page 73, line 22: should be "ask you" instead of "as you"

Page 75, line 20: should be "I will ask our team here to run…" instead of "I'll ask her to run…"

Page 75, line 22: should be "to AFP" instead of "to them"

Page 80, line 9: should be "we don't know that" instead of "we don't that"


**Volume II, Wednesday, July 21, 2011:**

Page 92, line 22: should be "privacy or publicity, employment," instead of "privacy or publicity employment"

Page 93, line 10: should be "the specific image?" instead of "the specific image."

Page 94, line 24: should be "I was not" instead of "I would not"

Page 96, line 25: should be "rubble" instead of "ruble"

Page 97, line 2: should be "buildings" instead of "building"

Page 101, line 9: should be "license" instead of "licensed"

Page 106, line 14: "Objection to form." instead of "Objection to for."

Page 121: line 25: should be "referred to" instead of "referred on"

Page 123, line 16: should be "in the drawer" instead of "to drawer"

Page 124, line 15: should be "initial" instead of "initials"

Page 125, line 3: should be "coming to us" instead of "coming to use"

Page 126, lines 15 and 24: should be "Jeff Gaites" instead of "Jeff Gates"

Page 127, line 6: should be ""Jeff Gaites" instead of "Jeff Gates"

Page 151, line 13: should be "Getty Images' own" instead of "Getty Images own"

Page 155, line 21:  should be "Fensch" instead of "Fansch"



Redacted

-----Original Message-----
From: Katie Calhoun
Sent: Wednesday, March 17, 2010 10:56 AM
To: Pancho Bernasconi
Subject: FW: CBSnews.com Haiti Earthquake images

Are you aware of some issues we're having with Haiti images from a photographer named Daniel Morel? Apparently they came through AFP?

Jesse spoke with heather Cameron about it, and legal is on top of it. But the lawyer for Daniel Morel is contacting our clients directly asking for settlement.

Katie

-----Original Message-----
From: Jesse Legon
Sent: Wednesday, March 17, 2010 10:40 AM
To: Katie Calhoun
Subject: CBSnews.com Haiti Earthquake images

FYI: Cbsnews.com at this time we do not have a deal with this division of CBS...

Jesse Legon | Senior Account Manager | Broadcast & New Media | Images | Footage | Music gettyimages
75 Varick Street, 5th floor, New York, NY 10013 P 646.613.3742 | F 646.613.3734 | M 917.796.2565 | Toll Free: 800.462.4379 jesse.legon@gettyimages.com www.gettyimages.com

-----Original Message-----
From: Turner, Patrick M (CBS Law) [mailto:Patrick.Turner@cbs.com]
Sent: Wednesday, March 17, 2010 10:08 AM
To: Jesse Legon
Cc: Poser, Nicholas E; Siegel, Andrew J
Subject: RE: Daniel Morel January 12, 2010 Haiti Earthquake images

Jesse:
CBS News has an agreement with Getty, part of which are online rights.

1



G003145

However, in this situation it does not appear that Getty was the source of the CBS News images.

Best regards,
Patrick

Patrick Turner
Assistant General Counsel, CBS Law Department
51 West 52 Street, (51W52/31-15), New York, NY 10019, (p) 212.975.2993, (f) 212.975.0112, Patrick.Turner@cbs.com
------------------------------------------------------------------------
CONFIDENTIALITY NOTE:
This email and any attachments is confidential, may be legally privileged and is intended for the use of the addressee only. If you are not the intended recipient, please note that any use, disclosure, printing or copying of this email is strictly prohibited and may be unlawful. If received in error, please delete this email and any attachments and confirm this to the sender.

-----Original Message-----
From: Jesse Legon [mailto:Jesse.Legon@gettyimages.com]
Sent: Wednesday, March 17, 2010 6:24 AM
To: Turner, Patrick M (CBS Law)
Cc: Poser, Nicholas E; Siegel, Andrew J; Stanton, Matthew
Subject: RE: Daniel Morel January 12, 2010 Haiti Earthquake images

I wanted to let you know cbsnews.com and Getty do not have an agreement if you could let me know how they obtained the image?

Sorry for the confusion and appreciate your help.

Jesse

"Turner, Patrick M (CBS Law)" <Patrick.Turner@cbs.com> wrote:

Jesse:
All uses from CBS owned web sites have been removed to my knowledge. Matthew has removed uses from the stations sites.

We are looking at this particular use on CBSNews.com to determine the exact source.

I forwarded you the note from Ms. Hoffman to keep you abreast of any communication.

Best regards,
Patrick

Patrick Turner
Assistant General Counsel, CBS Law Department
51 West 52 Street, (51W52/31-15), New York, NY 10019, (p) 212.975.2993, (f) 212.975.0112, Patrick.Turner@cbs.com
------------------------------------------------------------------------
CONFIDENTIALITY NOTE:

2

G003146

This email and any attachments is confidential, may be legally privileged and is intended for the use of the addressee only. If you are not the intended recipient, please note that any use, disclosure, printing or copying of this email is strictly prohibited and may be unlawful. If received in error, please delete this email and any attachments and confirm this to the sender.


-----Original Message-----
From: Jesse Legon [mailto:Jesse.Legon@gettyimages.com]
Sent: Tuesday, March 16, 2010 7:02 PM
To: Turner, Patrick M (CBS Law)
Cc: Poser, Nicholas E; Siegel, Andrew J; Stanton, Matthew
Subject: Re: Daniel Morel January 12, 2010 Haiti Earthquake images

Patrick,
Thanks I would recommend removing the image from CBS local digital websites. I will follow up with my legal team.

To clarify I noticed the URL below is cbsnews.com and Getty does have an agreement with this division of CBS?

Matt - did your team remove the images from your sites?

Thanks,
Jesse


"Turner, Patrick M (CBS Law)" <Patrick.Turner@cbs.com> wrote:


Jesse:
FYI, we have received the following attached e-mail from Barbara Hoffman, attorney for Daniel Morel today regarding the claim for use of photos of Haiti.

Best regards,
Patrick


Patrick Turner
Assistant General Counsel, CBS Law Department
51 West 52 Street, (51W52/31-15), New York, NY 10019, (p) 212.975.2993, (f) 212.975.0112,
Patrick.Turner@cbs.com<mailto:Patrick.Turner@cbs.com>
-----------------------------------------------------------------------
CONFIDENTIALITY NOTE:
This email and any attachments is confidential, may be legally privileged and is intended for the use of the addressee only. If you are not the intended recipient, please note that any use, disclosure, printing or copying of this email is strictly prohibited and may be unlawful. If received in error, please delete this email and any attachments and confirm this to the sender.

3

G003147

From: Barbara Hoffman [mailto:artlaw@hoffmanlaw.org]
Sent: Tuesday, March 16, 2010 11:21 AM
To: Turner, Patrick M (CBS Law)
Cc: Daniel Morel
Subject: Daniel Morel January 12, 2010 Haiti Earthquake images

Dear Mr. Turner,

Mr. Morel's image continues to appear on the CBS website, as of today.  Although 11 images have been removed, the iconic image continues to remain on the home page.

http://www.cbsnews.com/stories/2010/01/13/world/main6090996.shtml


As previously noted, I would expect to have the results of your internal investigation and a reasonable offer of settlement by tomorrow.

This letter is without prejudice to any rights, legal or equitable, which my client may have and is for settlement purposes only.

Sincerely yours,

Barbara T. Hoffman, Esq.
The Hoffman Law Firm
330 W. 72nd Street
New York, NY 10023
Tel: 212.873.6200
Fax: 212.974.7245
* Please note new email address *
artlaw@hoffmanlaw.org
http://www.hoffmanlawfirm.org


NOTE: This message is intended only for the use of the individual or entity to whom it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

G003148



Redacted

**From:** Stuart Braun
**Sent:** Thursday, April 08, 2010 4:23 PM
**To:** Katie Calhoun
**Subject:** FW: Getty Images Haiti Earthquake Image Recall
**Importance:** High

Who do you think I should talk to about this ... clients say that the number doesn't mean anything to them .. they need a visual

**Stuart Braun | Senior Sales Manager | Media |**

**getty**images
75 Varick Street | New York, NY| 10013
Tel: 646-613-4116 |Fax: 646-613-4511|
www.gettyimages.com
Conceptual. Unique. Surprising. one80.
See our new premium footage collection.
https://secure.gettyimages.com/Music/PumpAudio

**From:** Cynthia Edorh
**Sent:** Thursday, April 08, 2010 3:27 PM
**To:** Stuart Braun; Tori Purdy
**Subject:** FW: Getty Images Haiti Earthquake Image Recall
**Importance:** High

I need thumbnails for these culled images...

**From:** gabrieljohnson1@gmail.com [mailto:gabrieljohnson1@gmail.com] **On Behalf Of** Gabriel Johnson
**Sent:** Thursday, April 08, 2010 2:22 PM

1



G003789

**To:** Cynthia Edorh
**Subject:** Re: Getty Images Haiti Earthquake Image Recall

Cynthia,

Please let me know which videos they are in and the videos will be removed from the website.

Thanks,
Gabe

On Thu, Apr 8, 2010 at 11:25 AM, Cynthia Edorh <cynthia.edorh@gettyimages.com> wrote:

Hi Gabriel,

You recently downloaded 3 images of the Haitian earthquake (95734704,95737370,95739064)

These images are now the subject of a copyright dispute. We have referred this matter to the third party that provided the images to us.

As you know, Getty Images indemnifies you against any copyright claims that emerge as the result of an image you have obtained and licensed from us. In the meantime, to further protect you against any copyright claims, we ask that you remove the images from your website, take down any online use, and remove the images from your internal media grid to prevent any further usage.

If you have used the images in a print product that cannot be pulled, please let us know by writing to nancy.monson@gettyimages.com.

We apologize for any inconvenience and thank you in advance for your cooperation.  Please reply back to this email confirming your receipt of this message.

Thank you,

Cynthia

Cynthia Edorh

2

G003790

Getty Images

75 Varick Street, 5th Floor

New York, NY 10013

Tel  646 613 4548

cynthia.edorh@gettyimages.com

3

G003791



**From:** Brian Novy
**Sent:** Thursday, April 08, 2010 3:55 PM
**To:** Katie Calhoun
**Subject:** Re: harpo - Haiti

Thanks again Katie!

Sent from my iPhone

On Apr 8, 2010, at 12:48 PM, "Katie Calhoun" <katie.calhoun@gettyimages.com> wrote:

> It's going to go out automatically from lega/sales ops to any contact that has downloaded or purchased the imagery. You can just let them know it's being sent from an automated source and they can consider it addressed

Katie Calhoun
Sales Director, Media
**getty**images

One Hudson Square
75 Varick Street, 5th Floor
New York, NY 10013
Phone 646.613.4175
Cell 917.804.9433
Fax 646.613.3601
Toll Free 800.462.4379 x4175

www.gettyimages.com
katie.calhoun@gettyimages.com

**From:** Brian Novy
**Sent:** Thursday, April 08, 2010 3:47 PM
**To:** Katie Calhoun
**Subject:** RE: harpo - Haiti

Sorry another question: even if we had a conversation with the customer, do we also need to send them the official legal e-mail?

1



G009047

**From:** Katie Calhoun
**Sent:** Thursday, April 08, 2010 11:46 AM
**To:** Brian Novy
**Subject:** RE: harpo - Haiti

We just need to capture that. Not expecting them to take the imagery out of produced shows. But if it's being used stand-alone on a website, it should come down and we can replace it.

**From:** Brian Novy
**Sent:** Thursday, April 08, 2010 1:59 PM
**To:** Katie Calhoun
**Subject:** harpo - Haiti

What do we do if the images were already used in a show?

Best, Brian

_____

**Brian Novy**

Director of Sales, West

Getty Images, Inc.

Los Angeles, CA 90048

Direct: 323-202-4220  Cell: 917-848-4646

Email: brian.novy@gettyimages.com

www.gettyimages.com

_____

G009048

3

G009049

**From:** Katie Calhoun
**Sent:** Friday, March 26, 2010 4:56 PM
**To:** Marc Kurschner
**Subject:** RE: AFP/Haiti

No – I just sent you a bit more details, along with the list of clients that downloaded these images. It's a long list.

**From:** Marc Kurschner
**Sent:** Friday, March 26, 2010 5:55 PM
**To:** Katie Calhoun
**Subject:** Re: AFP/Haiti

Oh boy that's not good.





1



G001670



2

G001671

**From:**        Marc Kurschner
**Sent:**        Monday, March 29, 2010 10:37 PM
**To:**          Katie Calhoun
**Subject:**     Re: AFP/Haiti

Ok cool thanks

**From:** Katie Calhoun
**To:** Marc Kurschner
**Sent:** Mon Mar 29 20:15:50 2010
**Subject:** Re: AFP/Haiti
No, thanks. Legal is tweaking the message. I didn't hear back from them today.

We're not planning to communicate out until they have finalized the list and sent to other territories as well.

I'll check in with Nancy Monson again tomorrow and will copy you in case she has any questions. Pancho is up to speed on it too. We touched base on it today

On Mar 29, 2010, at 9:52 PM, "Marc Kurschner" <Marc.Kurschner@gettyimages.com> wrote:

Anything I need to do here while you are away?

**From:** Katie Calhoun
**Sent:** Friday, March 26, 2010 5:55 PM
**To:** Marc Kurschner
**Subject:** FW: AFP/Haiti

Marc,

Fyi, I just copied you on an email on this. Not sure if this has been brought to your attention yet: It seems AFP pulled some Haiti images off of TwitPic and distributed them to us and over our feeds. The photographer is challenging AFP's rights to the images and, in some cases, contacting our clients directly looking for money.

Pancho and Adrian are both in the loop on this. As I understand it, AFP is taking responsibility and dealing with the lawyer.

1



G001666



Redacted

G001667

| From: | Marc Kurschner |
|---|---|
| Sent: | Friday, April 02, 2010 3:12 PM |
| To: | Katie Calhoun; Brian Novy; Justin Weiss |
| Subject: | FW: HAITI EARTHQUAKE IMAGES |
| Attachments: | FW: AFP issue |
| | |
| Importance: | High |

Guys Just a heads up. This is an important drill we will need to do before the end of next week. Katie has the info on this but basically there were photos given to us by AFP that they did not have the rights to from Hati.

---

**From:** Denise Banister
**Sent:** Friday, April 02, 2010 4:07 PM
**To:** Kumi Shimamoto; Jeff Guilbault; Wolfgang Waehner-Schmidt; Mike Harris; Stefano Fantoni; Daniel Gluckmann; Guy Thorneloe; Marc Kurschner; Matthew Richards
**Cc:** Lee Martin; Michael Teaster
**Subject:** HAITI EARTHQUAKE IMAGES
**Importance:** High

Hi

This is a heads up that we are loading a number of activities to CRM on Monday that your sales teams must follow up on as soon as possible by contacting the customer via email, we will provide the template. The background to this request is attached. The number of customers affected by territory is below, the email template will only be in English. Susan Nomecos will send out a note on Monday explaining the process that your teams should follow

Let me know if you have any questions

thx

| country | Total |
|---|---|
| Australia | 3 |
| Canada | 6 |
| France | 1 |
| Germany | 9 |
| Great Britain | 26 |
| Ireland | 3 |
| Italy | 3 |
| Portugal | 1 |
| Switzerland | 1 |
| United Arab Emirates | 1 |
| USA | 145 |
| Grand Total | 199 |


Calhoun
exh.
6
9/8/11  AT

G000966

**From:**                Jesse Legon
**Sent:**              Wednesday, April 07, 2010 8:59 AM
**To:**                  Kevin Gippert
**Subject:**         RE: HAITI EARTHQUAKE IMAGES

No way we are step ahead of the game I sure I hope not....

Jess

**Jesse Legon | Senior Account Manager | Broadcast & New Media |**
Images | Footage | Music
**gettyimages**
75 Varick Street, 5th floor, New York, NY 10013
P 646.613.3742 | F 646.613.3734 | M 917.796.2565 | Toll Free: 800.462.4379
jesse.legon@gettyimages.com
www.gettyimages.com

**From:** Kevin Gippert
**Sent:** Wednesday, April 07, 2010 9:59 AM
**To:** Jesse Legon
**Subject:** FW: HAITI EARTHQUAKE IMAGES

Do we need to contact CBS again ?

**From:** Katie Calhoun
**Sent:** Wednesday, April 07, 2010 9:43 AM
**To:** NY Sales - Media
**Cc:** Brian Novy
**Subject:** FW: HAITI EARTHQUAKE IMAGES

Guys,

We have an issue with some AFP images from Haiti: It seems AFP picked up some images from a photographer named Dan Morel off of TwitPic and distributed them through us as part of what went out over our feeds. The photographer -- who is actually represented by Corbis -- is causing an issue with AFP and in some cases, his lawyer is reaching out directly to our clients insisting they need to pay them. (We know they have called CBS, for example).

AFP is working through this legally on our behalf.

A couple of things:
- We have indemnified our clients through our standard T&Cs. That said, TO FURTHER PROTECT THEM, we need them to remove the images off of their web sites or any internal media grids or content management systems so that no further uses occur.
- If they have used the images in a print product that has already been distributed, we just want to know about it to keep records.
- For anyone who has downloaded them and had planned to use the images in the future, we can offer some of our incredible wholly-owned imagery free of charge as replacements.

1


Calhoun
Exh. 7
9/9/11 AT

G001634

Our plan is to have sales reach out first – ideally by the end of this week – to deliver the message and explain the situation. Once that's done, an automatic email will go out to every contact that downloaded one of these images or purchased them a la carte with the message below (or something very similar).


You recently purchased/downloaded images of the Haitian earthquake (asset IDs _____, _____, _____, etc.). These images are now the subject of a copyright dispute. We have referred this matter to the third party that provided the images to us. As you know, Getty Images indemnifies you against any copyright claims that emerge as the result of an image you have obtained and licensed from us. In the meantime, to further protect you against any claims, we ask that you remove the images from your website or take down any online use, and remove the images from your internal media grid to prevent any further usage. If you downloaded the images via Easy Access, please know you will not be able to license them. If you have used the images in a print product that cannot be pulled, please let us know [Nancy Monson contact information]. We apologize for any inconvenience and thank you in advance for your cooperation.

Please check the list attached for your clients and coordinate with your related Outbound/Inbound colleagues to plan who delivers this communication.

Of course, let me know if you have any questions at all.

Katie

---

**From:** Marc Kurschner
**Sent:** Friday, April 02, 2010 4:12 PM
**To:** Katie Calhoun; Brian Novy; Justin Weiss
**Subject:** FW: HAITI EARTHQUAKE IMAGES
**Importance:** High

Guys Just a heads up. This is an important drill we will need to do before the end of next week. Katie has the info on this but basically there were photos given to us by AFP that they did not have the rights to from Hati.

---

**From:** Denise Banister
**Sent:** Friday, April 02, 2010 4:07 PM
**To:** Kumi Shimamoto; Jeff Guilbault; Wolfgang Waehner-Schmidt; Mike Harris; Stefano Fantoni; Daniel Gluckmann; Guy Thorneloe; Marc Kurschner; Matthew Richards
**Cc:** Lee Martin; Michael Teaster
**Subject:** HAITI EARTHQUAKE IMAGES
**Importance:** High

Hi

This is a heads up that we are loading a number of activities to CRM on Monday that your sales teams must follow up on as soon as possible by contacting the customer via email, we will provide the template. The background to this request is attached. The number of customers affected by territory is below, the email template will only be in English. Susan Nomecos will send out a note on Monday explaining the process that your teams should follow

Let me know if you have any questions

2

G001635

thx

| country | Total |
|---|---|
| Australia | 3 |
| Canada | 6 |
| France | 1 |
| Germany | 9 |
| Great Britain | 26 |
| Ireland | 3 |
| Italy | 3 |
| Portugal | 1 |
| Switzerland | 1 |
| United Arab Emirates | 1 |
| USA | 145 |
| Grand Total | 199 |

3

G001636

**From:**          Marc Kurschner
**Sent:**          Wednesday, April 07, 2010 9:30 PM
**To:**            Katie Calhoun
**Subject:**       Re: Haiti images thumbnails?
**Attachments:**   image001.png

Any issue that we will not get this done by friday?



Redacted

1





Redacted

2

G002396



Redacted

3

G002397



Redacted

4

G002398

**From:** Denise Banister
**Sent:** Thursday, April 08, 2010 9:50 AM
**To:** Katie Calhoun; Josh Rucci; Duncan McIntyre; Jeff Guilbault; Stefano Fantoni; Daniel Gluckmann; Wolfgang Waehner-Schmidt
**Cc:** Caroline B Willis
**Subject:** Haiti Earthquake images

**Importance:** High

Hi

This is what the data looks like today, the 87 open activities need to be properly actioned and closed by E.O.D. tomorrow

thx

| Row Labels | Completed | Open | Grand Total |
|---|---|---|---|
| Australia | | 3 | 3 |
| Canada | 2 | 4 | 6 |
| France | | 1 | 1 |
| Germany | 9 | | 9 |
| Great Britain | | 26 | 26 |
| Ireland | | 3 | 3 |
| Italy | 2 | 1 | 3 |
| Portugal | | 1 | 1 |
| Switzerland | | 1 | 1 |
| United Arab Emirates | | 1 | 1 |
| USA | 55 | 87 | 142 |
| Grand Total | 68 | 128 | 196 |

Thx

1



G000020



Redacted

**From:** Katie Calhoun
**Sent:** Monday, April 12, 2010 6:15 PM
**To:** NY Sales - Media
**Subject:** FW: Getty Images - IMAGE RECALL- Copyright Conflict CRM:09880008

Fyi, some clients had been asking about image ID #s that weren't included in our Haiti thumbnails. Please see below. Seems those were duplicate image IDs.

Katie



Redacted

**From:** Katie Calhoun
**Sent:** Monday, April 12, 2010 2:35 PM
**To:** Nancy Monson
**Subject:** FW: Getty Images - IMAGE RECALL- Copyright Conflict CRM:09880008
**Importance:** High

Nancy,

So sorry it's taken me so long to get back to you! The issue with these images is that the image numbers were included in our over-arching report, but there were no images with those numbers in the thumbnails we sent. So the clients aren't sure what the images looked lilke either.

Katie

**From:** Gesine Stross
**Sent:** Monday, April 12, 2010 10:20 AM
**To:** Katie Calhoun

1



G008308

**Subject:** FW: Getty Images - IMAGE RECALL- Copyright Conflict CRM:09880008
**Importance:** High

CNN...

**From:** Frey, Andrea [mailto:Andrea.Frey@turner.com]
**Sent:** Friday, April 09, 2010 4:19 PM
**To:** Gesine Stross
**Subject:** FW: Getty Images - IMAGE RECALL- Copyright Conflict
**Importance:** High

Hey Gesine –

I see three photo numbers on the lists that don't have thumbnails in the lightbox:

95734878
95734885
95737398

Is it possible to get thumbnails of these images too?

Thanks again!

**Andrea Frey**
**Manager, CNN Rights & Clearances**
**Phone: 212-275-8478**
**Fax: 212-275-0585**
**Cell: 917-886-1683**

**From:** Gesine Stross [mailto:gesine.stross@gettyimages.com]
**Sent:** Thursday, April 08, 2010 6:06 PM
**To:** Frey, Andrea; Schmookler, Lori; Griffith, Paige
**Cc:** Tori Purdy
**Subject:** RE: Getty Images - IMAGE RECALL- Copyright Conflict

The images you used and the thumbnails are below among the 28 thumbnails:

95734704
95734818
95734865
95734878
95734885
95737370
95737394
95737398
95737403
95738439
95738443
95738444
95738446
95738464
95738474

2

G008309



95738439

95738440

95738443

95738444

95738477

95738491

95738495

95738505

95738585

95738589

95738590

95739064

95737370

95737394

95737403

95734704

3

G008310

**gesine** stross | account executive, **media | getty**images | office: 646.613.4543| **fax:** 646.613.4501 | 75 varick street  5th floor. new york. new york 10013

http://www.gettyimages.com/Footage

**Get music now**

---

**From:** Frey, Andrea [mailto:Andrea.Frey@turner.com]
**Sent:** Thursday, April 08, 2010 4:43 PM
**To:** Gesine Stross; Schmookler, Lori; Griffith, Paige
**Cc:** Tori Purdy
**Subject:** RE: Getty Images - IMAGE RECALL- Copyright Conflict

Hi Gesine,
Thanks for this.  Is there any way we can get a description of the photos at issue or copies of the photos?  We don't keep the Getty ID number anywhere internally that we're aware of, so it would be very difficult for us to track these down without more information.  Any info would be greatly appreciated.

Thanks,

**Andrea Frey**
**Manager, CNN Rights & Clearances**
**Phone: 212-275-8478**
**Fax: 212-275-0585**
**Cell: 917-886-1683**

---

**From:** Gesine Stross [mailto:gesine.stross@gettyimages.com]
**Sent:** Thursday, April 08, 2010 4:11 PM
**To:** Schmookler, Lori; Griffith, Paige; Frey, Andrea
**Cc:** Tori Purdy
**Subject:** Getty Images - IMAGE RECALL- Copyright Conflict
**Importance:** High

Hello Lori, Paige and Andrea,

I have been asked by my management to send this letter out to the people associated with the usernames who downloaded the affected images. I thought I should run the situation by you directly.

Various CNN usernames recently downloaded one or more images of the Haitian earthquake:

Greg Christensen – username:  cnnlkl:
95734704,95734818,95734885,95737398,95738443,95738446,95738464,95738474,95739064
Kim Gross – username: cnnweb: 95738446
Kim Gross - username:  cnnvideo:  95734818,95738439
Kim Gross - username:  cnnonlineintl:
95734704,95734818,95734865,95734878,95734885,95737370,95738443,95738444,95738474,95739064
Kim Gross - username:  cnnnewsprod:  95734704,95734818,95737398,95737403,95738446,95738474,95739064
Kim Gross - username:  cnnsiteprod:  95734865,95737394,95738446,95738464
Kim Gross - username:  cnnspecial:  95738474
CNN Interactive - username:  cnnonlinedesign:  95734818,95738444,95738464,95738474,95739064

These images are now the subject of a copyright dispute.  We have referred this matter to the third party that provided the images to us.

4

G008311

As you know, Getty Images indemnifies you  against any copyright claims that emerge as the result of an image you have obtained and licensed from us.  In the meantime, to further protect you against any copyright claims, we ask that you remove the images from your website, take down any online use, and remove the images from your internal media grid to prevent any further usage.

We apologize for any inconvenience and thank you in advance for your cooperation.  Please reply back to this email confirming your receipt of this message.

Sincerely,
~Gesine


**gesine** stross |  account executive, **media** | **getty**images  |  **office:** 646.613.4543 | **fax:** 646.613.4501  | 75 varick street  5th floor. new york. new york 10013

http://www.gettyimages.com/Footage


Get music now

5

G008312

**From:** Tori Purdy
**Sent:** Tuesday, April 13, 2010 9:47 AM
**To:** Katie Calhoun
**Subject:** RE: Haiti pix - great job, guys!!

Do we need to do anything with those clients that received the images via the afp feed?  Time.com  and NTY contacted me as they received letters from Daniel's lawyer.  I forward the emails to Heather Cameron, but have not heard back.  I have not heard anything more from the clients, but just checking....

**From:** Katie Calhoun
**Sent:** Tuesday, April 13, 2010 10:36 AM
**To:** NY Sales - Media
**Cc:** Brian Novy; Marc Kurschner
**Subject:** Haiti pix - great job, guys!!
**Importance:** High

Hey everybody,

Thanks so much for jumping so quickly on the issue with the Haiti images and following up with all the clients. It was a tight turnaround, and you guys were all great!

Let us know if any further questions come up, but the issue should be behind us now.

Katie



1

G008983



**From:** Tori Purdy
**Sent:** Monday, May 17, 2010 10:54 PM
**To:** Larry Van Cassele; Katie Calhoun
**Cc:** Suzanne Weller
**Subject:** Time.com- Haiti Earthquake photos

Yes, I was correct.  Time.com contacted us regarding these photos.  I looped in Heather Cameron, but I don't think we ever heard back.  (see attached emails)

I don't believe we were instructed to do anything with the images that were acquired via feed delivery.  Let us know what we need to do.

Thanks,
Tori



1

G008980



**From:** Marc Kurschner
**Sent:** Monday, May 17, 2010 9:01 PM
**To:** Katie Calhoun
**Subject:** Re: More Haiti AFP images...


Yuk ok.


**From:** Katie Calhoun
**To:** Marc Kurschner
**Sent:** Mon May 17 14:57:36 2010
**Subject:** More Haiti AFP images...
Fyi, I've been working with Heather and Lisa Wilmer today to follow-up on the AFP Haiti images issue. It seems a couple of clients still have the images actively on their sites – doubt its willful, more that it's something that fell through the cracks. IN any case, two of the clients are Time.com and MTV. We're following up tomorrow.

I don't anticipate any big problems, but wanted to let you know.

Katie

1



G008984



Redacted

**From:** Tori Purdy
**Sent:** Monday, May 17, 2010 7:18 PM
**To:** Larry Van Cassele; Katie Calhoun
**Cc:** Suzanne Weller
**Subject:** Re: Daniel Morel/AFP case - need more customer assistance

They gotthem from the feed. Marc Ryckoff contacted us prior to us alerting clients. I need to check my sent emails, but we alerted heather and I think we followed up with marc.

**From:** Larry Van Cassele
**To:** Katie Calhoun; Tori Purdy
**Cc:** Suzanne Weller
**Sent:** Mon May 17 15:14:31 2010
**Subject:** RE: Daniel Morel/AFP case - need more customer assistance
Time was not on the list sent on 4/7 of clients who downloaded the images so I don't know where they got them.

**Larry Van Cassele** | Account Executive, Media | **getty**images | 75 Varick Street, 5th Floor, New York, NY  10013 | P: 646.613.3735 | F: 646.613.3601  | www.gettyimages.com

**From:** Katie Calhoun
**Sent:** Monday, May 17, 2010 5:56 PM
**To:** Tori Purdy; Larry Van Cassele
**Cc:** Suzanne Weller
**Subject:** FW: Daniel Morel/AFP case - need more customer assistance

Tori and Larry:

Heads up: it seems that Time.com is still using some of the Dan Morel Haiti images on their website, and Morel's lawyer has sent a letter to our legal department to that effect. Heather will forward screen grabs.

We'll need to have a conversation with them tomorrow about taking the images off their active websites, as that could conceivably be construed as willful infringement.

More to come tomorrow, but wanted to let you know.

Katie



Redacted

1



G008985



Redacted

2

G008986



**From:** Suzanne Weller
**Sent:** Friday, June 04, 2010 10:36 AM
**To:** Katie Calhoun
**Cc:** Justin Thompson
**Subject:** RE: Earth Quake Photos used by CBS

The Hearst newspapers (San Antonio Times, Houston Chronicle, and the St. Louis Dispatch) were notified on May 18th and they were removed from their sites the same day.



Redacted



G008870



2

G008871



3

G008872



4

G008873



5

G008874



6

G008875



7

G008876

**From:** Sprague, Elizabeth [mailto:SpragueE@cbsnews.com]
**Sent:** Wednesday, June 02, 2010 3:25 PM
**To:** Erica Miranda
**Subject:** Earth Quake Photos used by CBS
**Importance:** High


Hey Erica

I am just wondering if you have any record of us downloading or using any of
these earthquake photos they are apparently owned by Daniel Morel.  He has been
making a stir as you may know.   If you have any record of us using or
downloading them I'd love to know.

Thank you

Elizabeth


<image006.jpg>   <image007.jpg>   <image008.jpg>


<image009.jpg>  <image010.jpg>  <image011.jpg>

<image012.jpg>  <image013.jpg>  <image014.jpg>

8

G008877



Redacted

**From:** Suzanne Weller
**Sent:** Friday, June 11, 2010 10:28 AM
**To:** Katie Calhoun
**Subject:** FW: Getty Images - Haiti Earthquake Image Recall

FYI

**From:** Michel duCille [mailto:ducille@washpost.com]
**Sent:** Thursday, June 10, 2010 7:46 PM
**To:** Cynthia Edorh
**Cc:** Heather Cameron; Suzanne Weller; Eric N Lieberman
**Subject:** Re: Getty Images - Haiti Earthquake Image Recall

Cynthia,

We have removed the images (picture # 268,269, 270) from the Haiti gallery.

Regards

Michel du Cille
Director of Photography, Multimedia, Video
The Washington Post
202-334-7376
202-253-5309 cell

Cynthia Edorh <cynthia.edorh@gettyimages.com>

06/10/2010 04:44 PM

To 'Michel duCille' <ducille@washpost.com>

cc Suzanne Weller <Suzanne.Weller@gettyimages.com>, Heather Cameron
<heather.cameron@gettyimages.com>

Subject Getty Images - Haiti Earthquake Image Recall



1

G008810

Hi Michel,

How are you? We have noticed 3 images used on washingtonpost.com that are now the subject of a copyright dispute.
As you know, Getty Images indemnifies you against any copyright claims that emerge as the result of an image you have obtained and licensed from us.
To further protect you against any copyright claims, we ask that you remove images 268, 269 and 270 on slideshow below (credited to Lisandro Suero-AFP/Getty Images)

http://www.washingtonpost.com/wp-dyn/content/gallery/2010/01/12/GA2010011203712.html

Thank you,
Cynthia

Cynthia Edorh
Getty Images
75 Varick Street, 5th Floor
New York, NY 10013
Tel  646 613 4548

G008811