# EXHIBIT S

1           Eisenberg
2           MR. ROSENFELD:  I'm sorry.  Only
3    for distributing and not for what?
4           THE WITNESS:  Not for archiving.
5           A.    -- and images that we send out as
6    file or obituary images.  Those are already in TEAMS
7    and we're just resending them to customers.
8           Q.    Does TEAMS keep a record of resending
9    to customers in that situation?
10          A.    No.
11          Q.    Is there some other system that keeps
12   a record of that dissemination of an asset?
13          A.    The sending would go through the
14   distribution system.
15          Q.    And there would be a record on the
16   distribution system's database?
17          A.    I would assume so.  That's not a
18   system that's in my remit.
19          Q.    And under what circumstances would a
20   picture be identified for distribution but not for
21   archive?
22          A.    I'm not sure that I have an example.
23   I know that is a picture desk flow that exists.  The
24   picture desk would have more examples of that.
25          Q.    Is it your understanding that that is

1           Eisenberg
2    an unusual occurrence?
3           A.    Compared to the overall volume of
4    images, yes.
5           Q.    You used the phrase "not for
6    archiving."  What is archiving at Getty Images; is
7    that having something on the TEAMS system?
8           A.    Yes.
9           Q.    Is there a separate archiving
10   function or database at Getty Images besides TEAMS
11   for editorial pictures?
12          A.    Not for images that are published,
13   no.
14          Q.    What about for images that are not
15   published?
16          A.    They typically live in the same
17   system if they're digital.
18          Q.    So let's take the example of an image
19   flowing from an editorial partner.  The typical
20   situation:  An editorial partner has the image and
21   makes it available to and through Getty Images.  Do
22   you have that in mind?
23          A.    It depends on the partner.
24          Q.    Let's use AFP as the example.  How
25   does the image get from AFP to TEAMS to the website?

1           Eisenberg
2           A.    I'm aware of the process overall.
3    It's not a process I'm personally responsible for
4    but I'm aware of the overall principle.
5           Q.    All right.  If you can tell me the
6    overall principle, then.
7           A.    The overall principle is that AFP
8    sends us the feed of their images.  That feed goes
9    through our distribution system.  It goes through a
10   series of data transformation channels to ensure
11   that the formatting of that data is acceptable to
12   our system and in the required format for import to
13   TEAMS.  The images are then sent to TEAMS
14   automatically and they are imported and unless there
15   is a data problem or missing data, they publish
16   directly to the website.
17          Q.    All right.  Let's take them in each
18   step.  And to the extent you have an understanding
19   as to how that step works, I'm going to ask you
20   about that.
21          So the starting point -- I guess the
22   starting point is there is a partner relationship
23   between AFP and Getty Images, correct?
24          A.    Yes.
25          Q.    And a way that images are transmitted

1           Eisenberg
2    from AFP to Getty is through a feed of images from
3    AFP; is that correct?
4           A.    Yes.
5           Q.    Are there other means that have been
6    used, that you know of, to transmit assets or
7    content from AFP to Getty Images besides the feed of
8    images?
9           A.    Yes.
10          Q.    What are the other ways?
11          A.    At the beginning of a partnership we
12   did a large bulk import of AFP content into our
13   systems.
14          Q.    And that would have been five or ten
15   years ago, somewhere in that range?
16          A.    It would have been at the beginning
17   of the relationship.
18          Q.    Okay.  Any other ways in which
19   content is transferred from AFP to Getty Images that
20   you know of?
21          A.    I believe we receive everything
22   through the feed.  It's possible that the picture
23   desk has other ways, but I'm not aware of them.
24          Q.    And what is the feed, if you know?
25          A.    It's a method for transmitting images

1           Eisenberg
2  to us.  I don't know technically whether it's FTP or
3  a satellite.  I don't know.
4       Q.    But is it your understanding that it
5  is a digital transmission on some regular basis from
6  AFP to Getty?
7       A.    Yes.
8       Q.    Okay.  Now, in connection with that
9  feed and before it gets through the distribution
10  system is there anything that happens to it at Getty
11  Images, that is the assets that are on the feed,
12  before it gets to TEAMS?
13       A.    At what step are you referring to?
14       Q.    The very initial step as the feed is
15  coming in from AFP to Getty.
16       A.    Uh-huh.
17       Q.    If the assets are properly formatted,
18  do they go directly to TEAMS without any human
19  intervention?
20       A.    Once they have gone through the data
21  transformation step they do, yes.
22       Q.    What is the data transformation step,
23  so far as you understand?
24       A.    Simply changing the formatting from
25  the structure that AFP has in their system to the

1           Eisenberg
2  formatting that our system requires to change it --
3  to accept them.
4       Q.    And is it your understanding that
5  that is already built into the system, that function
6  of converting from their formatting to Getty's
7  formatting?
8       A.    We built that to make it work.
9       Q.    So if everything works properly at
10  that phase, where does the image -- and let's use a
11  single image.  Even though it's a feed, where does
12  the image go on Getty Images' databases?
13       A.    It would flow through the system, get
14  imported into TEAMS.  And assuming the required data
15  is present to publish, it would publish to the
16  website.
17       Q.    When you say go through the
18  distribution system, is that that conversion process
19  that you were identifying or is that something else?
20       A.    That is part of the overall process,
21  which I don't know exactly which part of the
22  distribution system would handle that.
23       Q.    I see.
24           What other aspects of the
25  distribution system would be involved in the

1           Eisenberg
2  transmission of the image that's on the AFP feed and
3  is going to be imported into TEAMS?  What other
4  distribution systems must the image run through, if
5  any?
6       A.    What do you mean by "other"?
7       Q.    Maybe there are no others, maybe it
8  is simply the data conversion process.  There is no
9  other aspect of a distribution system that the image
10  must go through before it goes onto TEAMS -- before
11  it is imported onto TEAMS?
12       A.    Again, it's not a system I own or am
13  responsible for, so I don't know precisely what
14  steps happen in there.  I know the general
15  principle, which is that it runs through the data
16  transformations that are necessary simply to get the
17  format of the data correct.
18       Q.    So then the image, if the formatting
19  has gone through without a glitch, is imported onto
20  TEAMS.  Correct?
21       A.    Uh-huh.
22       Q.    What happens next to that image in
23  the typical flow?
24       A.    When it's imported into TEAMS, TEAMS
25  runs an automatic check that all the required data

1           Eisenberg
2  for publishing is present.  That's what happens for
3  every single image.  If all the required data is
4  present, it will publish it downstream and that will
5  send it to the website.
6       Q.    And is there a list or -- well, do
7  you know --
8           Strike that.  Let me start it again.
9           Do you know what data must be present
10  in connection with an image that is fed from AFP to
11  Getty Images before it will be placed on TEAMS?
12       A.    Yes.
13       Q.    What are those data requirements?
14       A.    It has to have an asset file.  It has
15  to have a create date.
16       Q.    Create date?
17       A.    Uh-huh.
18           It has to have a country.  It has to
19  have a category and a subcategory value.  It has to
20  have a source.  It has to have a linked photographer
21  or contract.  It typically needs to have something
22  in the caption field.
23       Q.    Anything else?
24       A.    Can you read the list back to me
25  again, please.

1           Eisenberg
2           (Answer read: "Uh-huh.  It has to
3    have a country.  It has to have a category
4    and a subcategory value.  It has to have a
5    source.  It has to have a linked
6    photographer or contract.  It typically
7    needs to have something in the caption
8    field."
9           MR. ROSENFELD:  And before that you
10   said asset file and create date.
11       A.    It has to have a headline.
12       Q.    Headline?
13       A.    Yes.  I knew there was something
14   else.
15       Q.    Anything else that you can recall?
16       A.    Not off the top of my head.
17       Q.    All right.  If something else comes
18   to you during this deposition, like a bolt of
19   lightning or like any other way, I would ask you to
20   offer that to me and let me know that.
21           There is another data field that
22   would be required before an image is imported from
23   an AFP feed to TEAMS.
24       A.    These are data requirements for any
25   editorial asset, not just for AFP.

1           Eisenberg
2       Q.    And that would be true from any
3    source; is that correct?
4       A.    Yes.  There is a system-required
5    field.
6       Q.    And if one of the fields is either
7    empty or not properly filled out, what happens?
8       A.    The image will be in TEAMS but it
9    will not publish to the website.
10      Q.    And will there be some indication of
11   that to someone?
12      A.    There is a field that's called "Ready
13   for publish" that will say "No."
14      Q.    And what happens next with respect to
15   those images that for one reason or another have a
16   "No" next to "Ready for publish"?
17      A.    What happens?
18      Q.    Yes.  Does it go to somebody's
19   attention who then tries to follow up and figure out
20   what the problem is and correct it?  Does it
21   automatically go back to AFP?  Those sorts of
22   things.  Or does it just sit there with a big "No"
23   on it?
24      A.    Are you asking if there is an
25   automatic notification?

1           Eisenberg
2       Q.    That's one of the questions.  And
3    we'll do them one at a time.  That was a compound
4    question and you have a very good objection to it.
5           Is there an automatic notification to
6    anyone that one or more of the fields have not been
7    filled out properly and the item is not ready for
8    publication?
9       A.    No, not in TEAMS.
10      Q.    So then what happens?  Does the image
11   simply not get published?
12      A.    Yes.
13      Q.    And is there any intervention by any
14   human to do something to find out why it is that it
15   wasn't published and to correct the problem?
16      A.    Is there or can there be?
17      Q.    Is there, typically.
18      A.    If somebody notices that the image is
19   not published and it should be, then yes.
20      Q.    And typically -- well, has that --
21           Strike that.
22           Has that occurred during the time
23   that you've been at Getty Images in connection with
24   any images that were fed from AFP to Getty?  That
25   is, an image for one reason or another had a "No"

1           Eisenberg
2    next to "Ready for publish" and indeed the image was
3    not published on Getty's website.
4       A.    Yes.
5       Q.    And in any of those instances, as you
6    sit here today can you recall what was done, if
7    anything, to allow the image to be published?
8       A.    The missing or incorrect data was
9    added which then allowed the image to comply with
10   the publish rules and published to the website.
11          COURT REPORTER:  I'm sorry, the
12      published rules?
13      A.    Publish rules or the validation
14   rules.  That's a required field.
15      Q.    And that happened periodically, in
16   your experience, with respect to the AFP feed?
17      A.    Yes.
18      Q.    Is it a daily occurrence?
19      A.    It can be.  I don't necessarily have
20   visibility to that.
21      Q.    Who would handle that?
22      A.    Anybody who can make such an edit in
23   TEAMS can take that step.
24      Q.    And do you have the ability to make
25   edits in TEAMS?

Eisenberg

1
2     A.    Yes.
3     Q.    And about how many people do?
4     A.    I don't know.
5     Q.    Is it dozens?
6     A.    Probably.
7     Q.    Now, in the instances where you've
8  known that an image was not ready for publishing
9  because one or more of these fields was not filled
10 out either properly or at all, who was it that
11 noticed that the image was not ready for publishing?
12    A.    In a specific instance?
13    Q.    Yes.  Just give me an example.
14    A.    I may have, the picture desk may
15 have.
16    Q.    Is there anyone at Getty whose job it
17 is to see and report on any images that are not
18 ready for publishing because there was a glitch in
19 one of these fields?
20    A.    Any single person with that specific
21 responsibility?
22    Q.    A group.  Is there anybody whose job
23 it is at the end of the day to see how many of these
24 things are not being published because there seems
25 to be a problem in one of the data fields?

Eisenberg

1
2     A.    It's something -- different people
3  would typically look in their workflows.  There is
4  no single group whose only job it is to do that.
5     Q.    And in some instances would someone
6  at AFP advise Getty Images that an image that they
7  had included in the feed appears -- doesn't appear
8  to be on the website?  Have you heard of that?
9     A.    They may.  They would work with the
10 picture desk, so ...
11    Q.    And that's away from you, again?
12    A.    Yes.
13    Q.    We're going through the process of
14 something going from the feed to the Getty Images
15 website.  If the data fields have either been
16 properly filled out or corrected, what happens next
17 to an image before it goes onto TEAMS, if anything?
18    A.    From what point?
19    Q.    We have the feed, there is a
20 particular image.  It's gone through the
21 distribution system.  All of the data that is to be
22 presented under the TEAMS criteria are present.  Is
23 there any other step that needs to occur before the
24 image appears on TEAMS or is downloaded onto TEAMS?
25    A.    No, not that I'm aware.  Typically

Eisenberg

1
2  part of the data transformation is sending it to
3  TEAMS, part of the distribution system.
4     Q.    When you say sending it to TEAMS,
5  that would be something automatic if all these other
6  steps have been completed properly?
7     A.    That's part of the path that the
8  image takes on the way from the distribution system
9  to TEAMS, yes.
10    Q.    And if everything is fine with the
11 image in terms of its formatting, it's been
12 converted properly and all the data that should be
13 there is present, is there any human intervention at
14 Getty Images -- and I'm referring to since January
15 of 2010 -- before the image appears on TEAMS?
16    A.    No.
17    Q.    When the image appears on TEAMS, what
18 happens between that event and the image appearing
19 on Getty Images' website?
20    A.    As I explained just previously, it
21 goes through the publish validation steps.  That is
22 within TEAMS, where it checks that those required
23 fields are present and correct.
24    Q.    And if the "Ready for publish" says
25 "Yes" what happens next?

Eisenberg

1
2     A.    The image goes from TEAMS to our
3  website.
4     Q.    And is that without any human
5  intervention if all of these other steps have
6  happened automatically?
7     A.    Yes.
8     Q.    When something -- when an image is on
9  TEAMS, can it be removed from TEAMS?
10    A.    What do you mean by that?
11    Q.    I mean it's not there anymore.
12    A.    From TEAMS or the website?
13    Q.    TEAMS.
14    A.    I don't think so.  Images now may
15 change to a different model within TEAMS, but we
16 don't completely delete them.
17    Q.    And do you understand whether Getty
18 Images can today see what was placed on TEAMS on a
19 particular day?  Is that a capability that's
20 available to Getty Images?
21    A.    With the exception of some very old
22 content, yes.
23    Q.    So today if you wanted to know what
24 was inputted onto TEAMS on January 12, 2010, you can
25 secure that information, correct?

Eisenberg

1
2      A.    I'm not sure.  I would have to
3  research that.
4      Q.    Now, during this process from the
5  feed to appearing on the website, when did Getty
6  Images numbers get placed on an image and how do
7  they get placed on an image?
8      A.    When the image is imported into TEAMS
9  it is automatically assigned a number.
10     Q.    So the system does that itself?
11     A.    Yes.
12     Q.    And there is not an instance where an
13  image would be imported onto TEAMS but not given a
14  number, in your experience, correct?
15     A.    That's correct.
16     Q.    And what if the same image comes
17  through a second time through a feed?  Is it given a
18  different number or does the system recognize that
19  it's the same image?
20     A.    If it arrives as a separate asset, it
21  will be given its own number.
22     Q.    And are there any -- strike that.
23           When is "Getty" added to the image
24  prior to it appearing on the website?  And by
25  "Getty" I mean either as a credit or as an

Eisenberg

1
2  identifier of some kind in the image as it appears
3  on Getty's website.
4      A.    I believe that it's part of the data
5  transformation that occurs before import.  I'm not
6  entirely sure but I'm pretty sure it's part of that.
7      Q.    So you think it occurs even before
8  the image rolls onto TEAMS?
9      A.    I believe so.
10     Q.    Now let's talk about what happens if
11  something is -- strike that.
12           What is your understanding of what a
13  kill notice is?
14     A.    It is a method of notifying
15  recipients of an image that was previously sent but
16  should not have been available and needs to be
17  removed.
18     Q.    And what is your understanding at
19  Getty Images as to the workflow, if there is a
20  typical workflow, for kill notices?  And this is
21  since January of 2010.
22     A.    That's not a workflow within my
23  expertise.  I know it exists, I know the general
24  principle of it, but it's not a workflow either.
25     Q.    Well, do you have an understanding as

Eisenberg

1
2  to how that notification process rolls out at Getty
3  Images?  And I'm referring to the period January of
4  2010 to the present.
5      A.    For what content?
6      Q.    Editorial.  Editorial stills.
7      A.    It depends on the origin of the
8  content.
9      Q.    What is -- have you ever seen a
10  situation where at Getty Images there has been a
11  change of credit in an image that was available on
12  Getty's website?
13     A.    What do you mean by "credit"?
14     Q.    That a particular image is credited
15  to one individual or entity and that has to be
16  changed.  Have you ever seen that at Getty Images?
17     A.    Yes.
18     Q.    And how does that workflow occur, if
19  you know?
20     A.    It would typically be an edit of the
21  asset or it can be a resubmission of the asset.
22     Q.    I see.  Well, let's take the case
23  where -- and it's like this case.  Are you aware
24  that there was a directive to change the credit of
25  any of the images that are at issue in this case?

Eisenberg

1
2      A.    To change?
3      Q.    To have a credit change, changing the
4  name of the photographer.
5           MR. ROSENFELD:  If you know.
6      A.    The part of the work I was involved
7  with, no.
8      Q.    Have you ever seen an instance where
9  an image that was on Getty's website had to have an
10  edit to change the name of the photographer?
11     A.    Any image?
12     Q.    Yes.
13     A.    Yes.
14     Q.    And have you played any part in the
15  actual editing process?
16     A.    Occasionally.
17     Q.    And how did the editing process work
18  in general when there is to be a change in the name
19  of a photographer?
20     A.    It depends on if it's simply a
21  correction of a spelling or an actual correction of
22  which photographer an image is connected to.
23           COURT REPORTER:  I'm sorry.  "And
24     it mentions" --
25           I didn't hear you.

Page 58

Eisenberg

1
2      A.   Or if it's a change in which
3  photographer an image is connected to.
4      Q.   Let's take the latter situation where
5  there is a change in the name of the photographer.
6  Not just a spelling; there is a different
7  photographer.  How has that process worked for
8  images on Getty's website since January of 2010?
9      A.   If an image is linked to the wrong
10  photographer in TEAMS, we would need to edit the
11  image and link it to the correct photographer.
12      Q.   And when you say "we" in that answer,
13  who is "we"?
14      A.   It could be anybody who has the
15  permission to do so.
16      Q.   Did AFP have the permission to edit
17  anything in TEAMS?
18      A.   That's not something I have control
19  over so I can't tell you for sure.  I believe they
20  did, but I would not be the person responsible to
21  confirm that.
22      Q.   Well, in part this is what is called
23  a 30(b)(6) deposition, and I don't know whether that
24  information was imparted to you but that's something
25  that we do want to know about the editing process.

Page 59

Eisenberg

1
2          Who would you ask to find out whether
3  AFP had access to TEAMS such that they could change
4  what was in TEAMS?
5      A.   Somebody who has access to the user
6  management of TEAMS users, an administrative
7  function.
8      Q.   What group would that be or what
9  person?
10      A.   The TEAMS group.
11      Q.   And who in TEAMS, if you wanted to
12  ask that very question?
13      A.   I would put in a ticket to request
14  that information.
15      Q.   And that would then go to the TEAMS
16  group and they would determine who should respond.
17  Is that how that worked?
18      A.   Yes.
19      Q.   When you've gone in --
20          You said you have on occasion edited
21  an asset to change the name of the photographer.
22      A.   Uh-huh.
23      Q.   What were the instances where you've
24  done that?  How did it come to your attention the
25  change should be made?

Page 60

Eisenberg

1
2      A.   I would receive a request from
3  somebody in the business and who can approve such
4  requests, and I would then go ahead and make that
5  change.
6      Q.   And would TEAMS record and preserve
7  the identity of who made the change?  Is that part
8  of the metadata?
9      A.   It records who last made a change to
10  the asset.  I don't know for sure if it records
11  every change ever made to the asset.
12      Q.   Okay.
13      A.   That I don't know.
14      Q.   Who would know that?
15      A.   Again, the TEAMS group.
16      Q.   Do you know who Daniel Morel is?
17      A.   Only through this case.
18      Q.   And who is he, so far as you
19  understand?
20      A.   A photographer.
21      Q.   A photographer who was in Haiti at
22  the time of the earthquake; is that your
23  understanding?
24      A.   I believe so.
25      Q.   Do you know who Lisandro Suero is?

Page 61

Eisenberg

1
2      A.   I've only heard the name in
3  connection with this case.
4      Q.   And what is your understanding as to
5  who he was and how he's connected to this case?
6      A.   I'm not sure.  All I know is that his
7  name was on some of the images we found in our
8  system.
9      Q.   Taking Daniel Morel first, when did
10  you first hear of his name?
11      A.   Whenever the request for these images
12  first came up.
13      Q.   Prior to that time, did you
14  understand that there had been any change in the
15  name of the photographer of any images relating to
16  the Haiti earthquake?  That is prior to the time
17  that you were asked to do something with respect to
18  Daniel Morel.
19      A.   Not that I recall.
20      Q.   If there was a change of the name of
21  the photographer that was to be made, in January of
22  2010 would you have been part of that change
23  process?
24      A.   Possibly, but not necessarily.
25      Q.   And why do you say that?

16  (Pages 58 to 61)

Page 62

```
1                    Eisenberg
2        A.    Other people have the ability to make
3   these changes.
4        Q.    And are those people who report to
5   you?
6        A.    No.
7        Q.    And do you have any recollection in
8   participating in a change of name of the
9   photographer for any Daniel Morel images?
10       A.    Not that I recall.
11       Q.    Same question for Lisandro Suero.  Do
12  you recall participating in any change of name of
13  the photographer for any assets that had been
14  identified as his?
15       A.    Do you mean "change" as in updating
16  the images or including removal of the images?
17       Q.    First I'm just asking about changing
18  the name from Lisandro Suero to someone else.  Did
19  you participate?
20       A.    Not that I recall.
21       Q.    One of the things that you
22  identified, one of the pieces of data that must be
23  present before TEAMS would accept the image was the
24  source and the other was the linked photographer or
25  contract.  Do you remember that?
```

Page 63

```
1                    Eisenberg
2        A.    Uh-huh.
3        Q.    Yes?
4        A.    Yes.
5        Q.    And is the name of the photographer
6   one of the things that is required?  The name of an
7   individual photographer before an image will be
8   downloaded onto TEAMS.
9        A.    That is part of the data.
10       Q.    Which category?  Which one of those
11  fields does it apply to?  Is it source or linked
12  photographer or contract, or something else?
13       A.    Can you repeat the question?
14       Q.    Yes.
15             In which of these categories that you
16  provided us of required data is the name of the
17  photographer required?
18       A.    It creates the link to the
19  photographer.
20       Q.    And that's the linked photographer or
21  contract requirement in the data that must be
22  present?
23       A.    Yes.
24       Q.    And must it be the name of an
25  individual or can the linked photographer be an
```

Page 64

```
1                    Eisenberg
2   entity in order for an image to be accepted on
3   TEAMS?
4        A.    As long as it matches what we have in
5   our system, the name could be anything.  It could be
6   the name of an entity, it could be a specific
7   individual name.
8        Q.    And have you seen in that linked
9   photographer or contract or name field a situation
10  where the only identifier has been AFP?
11       A.    Yes.
12       Q.    So that TEAMS will accept an image if
13  the linked photographer is identified as AFP; is
14  that correct?
15       A.    Yes.
16       Q.    And there is no requirement of any
17  additional name?
18       A.    How do you mean?
19       Q.    I mean a particular photographer.  It
20  will still be accepted on TEAMS and ultimately
21  passed through to the website if the linked
22  photographer or contract is AFP?
23       A.    Yes.  The only requirement in TEAMS
24  is that we have a record that matches the name that
25  comes in.
```

Page 65

```
1                    Eisenberg
2        Q.    Okay.  So if on the AFP feed the same
3   image is coming through under the name Daniel Morel
4   and another, the same image, is coming under the
5   name Lisandro Suero and another image is coming
6   through under the name AFP, all of those will be
7   accepted by TEAMS if all the other data is present
8   and each image will be given its own number; is that
9   correct?
10       A.    If they arrive as separate assets,
11  yes.
12       Q.    And that's been true for how long?
13       A.    For as long as I recall.  TEAMS
14  assigns a new number to each new asset it receives.
15       Q.    And you've known that for years,
16  correct?
17       A.    Yes.
18       Q.    And so far as you know, is that
19  commonly understood at Getty Images?  That is, that
20  if an image-- the identical image comes in under
21  different indicators, it could be published
22  separately under each one of those indicators?
23       A.    What do you mean by "indicators"?
24       Q.    Name:  AFP, Lisandro Suero, Daniel
25  Morel, Mickey Mouse.
```

                                    17 (Pages 62 to 65)

1              Eisenberg
2       A.   I believe it's known.
3       MR. BAIO:  I am going to ask the
4  reporter to mark as Eisenberg 1 --
5       THE WITNESS:  Can we take a quick
6  break?
7       MR. BAIO:  Oh, surely.  Yes,
8  absolutely.  Let's take a short break.
9       THE VIDEOGRAPHER:  This concludes
10  tape number 2.  The time is 11:22 a.m.  We
11  are off the record.
12       (Recess taken.)
13       MR. BAIO:  Please mark these.
14       (Eisenberg Exhibit 1, four-page
15  document bearing Bates Nos. G002793 to
16  G002796, marked for identification.)
17       (Eisenberg Exhibit 2, document
18  bearing Bates Nos. AFP000513 to AFP00519,
19  marked for identification.)
20       (Eisenberg Exhibit 3, multi-page
21  document bearing Bates Nos. G002803 to
22  G002821, marked for identification.)
23       (Eisenberg Exhibit 4, multi-page
24  document bearing Bates Nos. G002859 through
25  G002935, marked for identification.)

1              Eisenberg
2       THE VIDEOGRAPHER:  This begins tape
3  number 3.  The time is 11:37 a.m.  We are
4  back on the record.
5       MR. BAIO:  Just to clarify a point,
6  not so much for you but I guess for
7  counsel, this is a notice deposition of
8  the witness in her capacity as an employee
9  but I believe you also in an e-mail
10  designated her as a continuing part of the
11  30(b)(6), particularly with respect to
12  back-end information and metadata to the
13  extent it was not covered by Ms. Calhoun.
14       Is that right?
15       MR. ROSENFELD:  Yes.
16       My understanding is that we were
17  saying that Ms. Eisenberg was the
18  30(b)(6) witness on the back-end system.
19  So to the extent that her testimony is
20  about that, she is testifying as a
21  30(b)(6) and otherwise she is testifying
22  in her individual capacity.
23       MR. BAIO:  Yes.  And that's what
24  the record will reflect.
25       Q.   So I have marked as Exhibit 1 a

1              Eisenberg
2  four-page document with the Bates numbers G00-2793
3  to 96.
4       MR. BAIO:  And Shoshanna, please
5  hand that out.
6       I am putting that before the
7  witness.  You will be getting your copy
8  coming around or you can look at the
9  original.  Either way.
10       Q.   And Ms. Eisenberg, it is an e-mail
11  chain.  Part of it is redacted by counsel for Getty
12  Images but if you read from the bottom up, so to
13  speak, you will see them I think in chronological
14  order.  And I will be asking you about the various
15  e-mails in this chain.  Let me know when you are
16  done reviewing.  It's two-sided.
17       A.   Okay.
18       Q.   Have you had an opportunity to look
19  at Eisenberg Exhibit 1, this e-mail chain that we
20  have marked as an exhibit?
21       A.   Yes.
22       Q.   And if you look on the first page of
23  that document under the word "redacted" there
24  appears an e-mail from Heather Cameron to you, Lisa
25  Wilmer and CC'ing Pancho Bernasconi and Nancy Monson

1              Eisenberg
2  dated February 2, at 15:42:16, 2010.
3       Do you see that?
4       A.   Yes.
5       Q.   Did you receive this e-mail at or
6  around that date in time?
7       A.   I believe so.  I don't have a
8  specific recollection of this e-mail.
9       Q.   Do you have any reason to believe
10  that you didn't receive it?
11       A.   No.
12       Q.   And you remember learning about the
13  issue that's discussed in this document, correct?
14  In Exhibit 1.
15       A.   Yes.
16       Q.   You remember learning about Daniel
17  Morel and his Haiti images as described in this
18  Exhibit 1, correct?
19       A.   As described in this e-mail, yes.
20       Q.   And did you read the e-mail when you
21  received it?
22       A.   I believe so.
23       Q.   And you actually did follow up based
24  upon the inquiries that were made to you; is that
25  correct?

Page 70

Eisenberg

1
2      A.    I believe so.
3      Q.    Was this e-mail or the e-mail beneath
4  it which is from Heather Cameron to you and Jennifer
5  Walker, was this the first time that you heard about
6  the Daniel Morel Haiti images issue?
7      A.    As far as I recall.
8      Q.    Do you remember learning about the
9  issue prior to February 2, 2010, which is the date
10 that you received this e-mail chain?
11     A.    I don't remember.  That was almost
12 two years ago.
13     Q.    Do you remember taking any action in
14 connection with the Daniel Morel or Haiti images or
15 any earthquake images concerning Haiti prior to
16 February 2nd of 2010?
17     A.    Any action in regards to any
18 earthquake images?
19     Q.    Yes.
20     A.    In Getty Images' system?
21     Q.    Prior to February 2, 2010.
22     A.    Would that include images unrelated?
23     Q.    Yes.
24     A.    I don't recall.  It's certainly
25 possible.  It's part of what I do every day.

Page 71

Eisenberg

1
2      Q.    And do you recall prior to receiving
3  this exhibit on February 2 or the information in
4  this exhibit on February 2, 2010 that you
5  participated in the removal of any images relating
6  to the Haiti earthquake prior to the date of this
7  e-mail?
8      A.    I don't remember.  I work on -- I
9  work on a lot of projects with a lot of different
10 people every day.  I don't recall the specifics.
11     Q.    Understood.
12           Do you remember when the Haiti
13 earthquake hit on January 12, 2010?
14     A.    I remember that it happened.
15     Q.    Do you remember a lot of activity at
16 Getty Images that you were learning about concerning
17 that earthquake on January 12, 2010?
18     A.    What do you mean in terms of
19 activity?
20     Q.    Scurrying around trying to get
21 information, making sure that things are loaded?
22 Anything about the earthquake.  A dramatic
23 news-breaking event.  Do you remember doing anything
24 at Getty Images the day that dramatic event was
25 unfolding?

Page 72

Eisenberg

1
2      A.    I would have been working.  I know we
3  received a lot of images.
4      Q.    On which day?
5      A.    We receive a lot of images every day.
6  Generally when there is a big news event we would
7  typically receive more images as soon as we can get
8  people there to provide coverage.
9      Q.    And do you, as you sit here today,
10 know whether Getty Images had people in Haiti the
11 day of the event?
12     A.    I don't know.
13     Q.    Would you be surprised to learn that
14 Getty Images did not have anyone on the ground on
15 the day of the earthquake?
16     A.    The logistics part is not what I
17 would work on so I don't know that I could judge
18 whether that would be surprising or not.
19     Q.    And as you sit here today, do you
20 recall whether there was a significant inflow of
21 imagery on the same day as the earthquake relating
22 to the earthquake?
23     A.    I don't recall when that flow of
24 imagery would have started.
25     Q.    Okay.

Page 73

Eisenberg

1
2           So when you got Exhibit 1 on
3  February 2, 2010, you said you read it.  Let's look
4  at the first e-mail in chronology, which appears on
5  the page with the numbers 2795, and I think you will
6  see it's from Claire Keeley to Heather Cameron and
7  the subject is the Daniel Morel Haiti images.
8           This was attached to the chain that
9  you received, correct?
10     A.    I believe so.
11     Q.    And do you remember reading it?
12     A.    I don't specifically remember reading
13 it.  It was two years ago when I first read it.
14     Q.    Okay.  Let's see if we can refresh
15 your recollection.  Do you know who Claire Keeley is
16 or was at the time you received this?
17     A.    Other than what her title is at the
18 bottom of the e-mail, no.
19     Q.    So you understood, though, that she
20 was from Corbis, correct?
21     A.    I can see in the e-mail that she
22 works for Corbis.
23     Q.    And you understood when you read this
24 that she was identifying a serious problem that she
25 was hoping Getty Images could resolve.

19 (Pages 70 to 73)

Eisenberg

1
2        And I realize you didn't get the
3    e-mail until February 2nd, but when you read it you
4    understood that Corbis was identifying an issue?
5        A.   Yes.
6        Q.   Had you in the past seen requests by
7    other agencies or groups identifying a problem with
8    an image that appeared on Getty Images' website?
9        A.   I had previously seen such requests,
10   yes.
11       Q.   And if you're asked to do something
12   or were asked to do something in connection with
13   that, as a good employee of Getty Images you tried
14   to fulfill the duties that were put to you, correct?
15       A.   To the best of my abilities.
16       Q.   And you did that in this case as
17   well, correct?
18       A.   As far as I recall, yes.
19       Q.   Now, Ms. Keeley is referring to the
20   following, if you look at the second sentence.
21   "Today one of Corbis' editorial photographers
22   uploaded some of his pictures from the earthquake in
23   Haiti and put them on his Twitter page."
24           Do you see that?
25       A.   I do.

Eisenberg

1
2        Q.   Did you understand that that was
3    being -- that the author was referring to Daniel
4    Morel there?
5        A.   It does not say so specifically, but
6    I made that assumption based on the subject line and
7    the next sentence.
8        Q.   The next sentence states, "It appears
9    that they were then illegally copied and distributed
10   to third parties, including Getty."
11           Do you see that?
12       A.   Yes.
13       Q.   And what was your understanding of
14   what that was referring to?
15       A.   Which part?
16       Q.   The illegally copied and distributed
17   to third parties.
18       A.   I assumed that the "distributed to
19   third parties" meant that the images had been sent
20   to us.
21       Q.   And what was your understanding about
22   "illegally copied"?
23       A.   That's what Corbis at the time were
24   reporting as having happened to the images.
25       Q.   And did you ask anyone who illegally

Eisenberg

1
2    copied the images as described by Ms. Keeley?
3        A.   I did not receive that at the time.
4        Q.   And in February 2, 2010 did you ask
5    anybody, "What is this illegally copied stuff?"
6        A.   That was not what was requested of
7    me.
8        Q.   So you didn't ask that?
9        A.   I don't believe so.
10       Q.   Then it refers to one such example is
11   on the home page of the New York Times website.
12   Daniel's picture is the 14th one and it is credited
13   as Daniel Morel/AFP Getty Images.
14           Do you see that?
15       A.   Yes.
16       Q.   As you look as they credit Daniel
17   Morel/AFP Getty Images what does that mean to you,
18   if anything?
19       A.   What do you mean?
20       Q.   Does it mean that Getty Images has
21   rights to the image?
22           That's your understanding.  I am not
23   asking for a legal conclusion, but when you see
24   Getty's name on a credit, do you believe that Getty
25   is saying "We have the right to publish this"?

Eisenberg

1
2        A.   I -- seeing that would make me think
3    that it is an image that went through our
4    syndication.
5        Q.   And through your syndication means
6    what?
7        A.   That we sent out and distributed to
8    clients and to our website.
9        Q.   And is it your understanding, then,
10   that when something is on our website that people
11   could buy a license to the image?
12       A.   Unless the image is set up to not do
13   that, yes.
14       Q.   And if it's not set up to do that,
15   what about people who receive the Getty feed?
16           Let me ask first.  What is Getty's
17   feed, if there is one?
18       A.   It would be the series of images
19   originating from Getty Images as one of our
20   editorial feeds that we transmit to clients.
21       Q.   And about how many clients receive
22   that feed today?
23       A.   I have no idea.
24       Q.   Is it tens?  Twenties?  Hundreds?
25   Give me a range.

Page 78

Eisenberg

1
2       A.   I don't know.  That's outside of my
3   expertise.
4       Q.   So looking up at the next e-mail
5   there is Heather Cameron again to Claire Keeley.  Do
6   you remember reading that e-mail?
7       A.   Again, I don't have a specific
8   recollection of reading it.
9       Q.   But you are not denying it was part
10   of what you saw?
11       A.   No, no.
12       Q.   If you look at the next e-mail up,
13   which is on the pages ending with the number 2794,
14   that's from Jennifer Walker to Heather Cameron on
15   February 2, 2010, and that -- in that e-mail she
16   states, "Hi Heather I've just been notified that
17   Getty still has not removed the Daniel Morel images
18   from its website.  Please see the below link."  And
19   there is a link identified and you will see it has
20   Lisandro Suero's name embedded in it.
21           Do you see that?
22       A.   I do.
23       Q.   And did you, when you received this
24   e-mail, click on that link?
25       A.   I don't remember.

Page 79

Eisenberg

1
2       Q.   Do you remember reading the language
3   I just read to you?
4       A.   Again, I don't specifically recall
5   reading this because it was two years ago.
6       Q.   Do you remember learning that there
7   had been -- and this is on February 2, 2010 -- that
8   Getty Images had removed a number of images from its
9   website prior to February 2, 2010, which images were
10   created by Daniel Morel?
11       A.   Yes, as far as this particular e-mail
12   referred to them.
13       Q.   And did you understand that there
14   were, as a result of this exchange, a number of
15   images also created by Daniel Morel which had not
16   been removed from Getty's website?
17       A.   I understood that there was a list of
18   images that Jennifer Walker referred to as being
19   from Daniel Morel website and still being on the Getty
20   Images website.
21       Q.   And if you look at the next e-mail up
22   which starts on the first page of Eisenberg 1, that
23   appears to be the first e-mail to you on this
24   subject.  Is that your recollection as well, this is
25   the first e-mail that you received on the subject?

Page 80

Eisenberg

1
2       A.   I believe so.
3       Q.   And if this is New York time 5:32,
4   you were in California at the time?
5       A.   I think so.
6       Q.   So that would have been 2:32, three
7   hours earlier?
8       A.   I don't know what assigns the system
9   time.  Heather Cameron is in Seattle, so that may
10   have been Pacific time.
11       Q.   So looking at that e-mail that she
12   sent to you and Jennifer Walker and also cc'd Pancho
13   Bernasconi --
14           Who is Mr. Bernasconi?
15       A.   He is our director of photography, I
16   believe is his title at the moment.
17       Q.   Do you report to him in any way?
18       A.   No.
19       Q.   She states in that e-mail, "Jennifer,
20   I'm so sorry.  I'm not sure what happened.  I
21   thought all of them were pulled from our site when
22   you contacted us on the 13th.  We'll get these
23   additional 12 down ASAP.  If you haven't heard back
24   from Vincent, you can try contacting Eva Hambach.
25   She confirmed she received our e-mail on the 13th

Page 81

Eisenberg

1
2   alerting her to the issue."
3           Do you remember reading that at or
4   about the date this bears?
5       A.   As before, no specific recollection
6   but it is part of the e-mail.
7       Q.   Did you understand that there had
8   been removed from the website prior to February 2nd
9   a bunch of images as described in Ms. Cameron's
10   e-mail?
11       A.   That's what I understood from her
12   e-mail.
13       Q.   And the directive then to you is
14   "Chris, would you please make sure the images below
15   are removed from the site immediately.  If you could
16   please reply back to all if us when they are
17   down" -- I guess that meant all of us but it says if
18   us -- "that would be terrific.  Thanks."
19           Do you see that?
20       A.   I do.
21       Q.   And then there are a bunch of
22   numbers.  What do those numbers reflect?
23       A.   I assume those to be the asset
24   numbers of those images within our system.
25       Q.   And what did you do when you received

21 (Pages 78 to 81)

Eisenberg

1
2  this?
3      A.   I don't specifically recall the exact
4  steps simply because it was almost two years ago but
5  what I would typically do is search for those
6  images, look at the data on the images to make sure
7  that they match the description of what is being
8  talked about.
9          The purpose of that step is to make
10  sure that somebody didn't make a typo in one of the
11  numbers and we accidentally include an image that
12  actually shouldn't be part of this.
13      Q.   Okay.
14      A.   I would have then addressed any
15  queries that looking at that data brought up and if
16  everything matched the description in the original
17  e-mail request, I would then follow the request and
18  pull the images.
19      Q.   Okay.  And that's what you believe
20  you actually did in connection with this request?  I
21  realize the timing after --
22          I'm sorry.  You said, "I believe so."
23  The timing may not be exactly as you described but
24  you believe you took those steps, correct?
25      A.   Yes.

Eisenberg

1
2      Q.   Now, if you look at Ms. Cameron's
3  e-mail to you above that -- and she drops off
4  Jennifer Walker, the person from Corbis -- she
5  writes to you, "Chris, I'm not sure why we didn't
6  capture all of them at the same time so I have
7  attached an e-mail that includes a list of images
8  pulled by Preston on the 13th as well as the kill
9  notice we received on the 14th."
10          Do you see that?
11      A.   I do.
12      Q.   And who was Preston?
13      A.   I'm assuming that referred to Preston
14  Rescigno.  He is the picture desk editor that works
15  for Pancho.
16      Q.   From this e-mail there was an
17  attachment that included a list of images that were
18  pulled on the 13th, correct?
19      A.   I believe so.
20      Q.   And did you look at that list?
21      A.   Most likely.
22      Q.   And that list had numbers and it
23  would identify the images that were pulled off the
24  website?
25      A.   Most likely.  I can't tell without

Eisenberg

1
2  seeing it.
3      Q.   And there is also a reference to a
4  "kill notice we received on the 14th."  Do you see
5  that?
6      A.   I do.
7      Q.   And did you see the kill notice that
8  was attached to the e-mail to you on February 2,
9  2010?
10      A.   I don't recall.
11      Q.   There is then a question to you:  "Is
12  there any chance these 12 were delayed on the upload
13  process or something so they appeared live on the
14  site after Preston's pull?  Very odd."  And then she
15  goes on to state, "Lisa, looks like we missed some
16  images the first time around.  Bummer."  Do you see
17  that?
18      A.   I do.
19      Q.   Did you respond to her, her inquiry
20  about whether there was a delay and that's why they
21  appeared after the pull?
22      A.   I don't remember exactly.  I assume I
23  would have.
24      Q.   But you don't remember doing that one
25  way or the other?

Eisenberg

1
2      A.   Not specifically.
3      Q.   And what did you do next after this?
4  You said that you had looked.  Do you remember what
5  conclusion you drew based upon your review?
6      A.   For what question?
7      Q.   Make sure the images below are
8  removed from the site immediately.  It's a question
9  that appears on the bottom of the first page,
10  "Chris, would you please make sure."
11      A.   As far as I recall, I went through
12  the process that I described just previously.
13      Q.   And then did you pull down the images
14  from the site?
15      A.   I pulled down -- I believe that I
16  pulled down the images that were in the list of
17  asset numbers that Heather had requested.
18      Q.   And when you looked at the asset
19  numbers that Heather had requested, did you discover
20  anything?
21      A.   I have a hard time remembering that
22  without seeing those images.
23      Q.   Okay.
24      A.   It was two years ago.
25      Q.   Okay.

22 (Pages 82 to 85)

1            Eisenberg
2      A.   Sorry.
3      Q.   Well, do you remember finding out
4  that the credits had been to Lisandro Suero and not
5  Daniel Morel?  And by the credits I mean to those
6  numbers that appear on the second page of Exhibit 1.
7      A.   I don't recall if it was part of this
8  e-mail chain.  I know that some of the images we
9  looked at had a caption credit that had Lisandro
10  Suero's name and I therefore questioned whether
11  those were the images that needed to be removed
12  because the removal request very specifically talked
13  about removing images from Daniel Morel.
14      Q.   Now, when you -- when you did what
15  you just described, did you look at the images that
16  were on Preston's list that had been provided to you
17  the same day?
18      A.   When I first looked at the list of
19  images that Heather provided, that was before I
20  received the other e-mail.
21      Q.   When was that, then?  When did you --
22          What are you referring to before
23  February 2, 2010?
24      A.   No.  There was two e-mails.
25      Q.   Yes.

1            Eisenberg
2      A.   The initial e-mail from Heather
3  Cameron to me that requested me to remove the images
4  did not talk about Preston.
5      Q.   I see.  And then 10 minutes later you
6  received the next e-mail, correct?
7      A.   Yes.
8      Q.   Now, after you received the second
9  e-mail, I asked you whether you looked at the
10  Preston images.
11      A.   I don't recall whether and when.  I
12  assume that I most likely would have.  Typically if
13  I investigate something I would if I get more
14  information. I don't know at what time that would
15  have been.
16      Q.   Okay.  But there weren't that many
17  images on the Preston list?  Are there 10 or so?
18      A.   I don't recall.
19      Q.   Well, do you remember this whole
20  thing, seeing hundreds of images in the process of
21  the Daniel Morel issue?
22      A.   I don't believe so but I don't
23  recall.
24      Q.   So you saw the Preston images and
25  then there were 12 images that were identified in

1            Eisenberg
2  the Heather Cameron e-mail, correct?  That's the
3  numbers that appear on the second page of this
4  exhibit.
5          MR. ROSENFELD:  Objection to the
6      characterization of her testimony.
7      Q.   Do you have the question in mind?
8      A.   Can you repeat the question?
9      Q.   Let me ask you:  There are 12 images
10  that are identified in Ms. Cameron's e-mail to you
11  when she asks you to take the images down and remove
12  them from the site, correct?  Twelve.
13      A.   I did not count them.
14      Q.   Take your time.
15      A.   But that appears to be -- yes, that
16  appears to be the case.
17      Q.   And then there was a list of the
18  images that Preston had taken down.  Do you see
19  that?
20      A.   I see that Heather refers to it.  I
21  don't have the actual list here.
22      Q.   I don't either.  I don't have it
23  attached to this, but it identifies images.
24          And did you compare the two?  There
25  were 12 on one list and then there is the Preston

1            Eisenberg
2  list, and did you visually look at them to see if
3  the images were the same?
4      A.   I don't recall exactly what I did.
5      Q.   You don't recall one way or the other
6  whether you looked at the 12 and compared them to
7  the Preston list?
8      A.   I looked at the 12 because I had been
9  requested to pull the images.
10      Q.   Okay.
11      A.   I don't recall exactly what I did
12  with them in relation to Preston.
13      Q.   And you don't recall whether you just
14  eyeballed them to see whether the 12 were just like
15  the ones that appeared on Preston's list?  You don't
16  recall doing that?
17      A.   Not specifically, no.
18      Q.   Let me show you what I have marked as
19  Exhibit 2.  It's a document produced by AFP, 000513
20  to 519.  And I don't expect you to have seen the
21  first page, but you will see that starting on the
22  second page you are involved in a number of e-mail
23  exchanges starting on the Bates numbered Page 514,
24  near the bottom of the page -- I'm sorry, not 514.
25  515 at the top of the page.

Page 90

Eisenberg

1  Eisenberg
2      MR. BAIO:  And just for the record
3  while you were looking and take whatever
4  time you need, you will see that this is a
5  different chain but it starts in the same
6  place as the last with the Claire Keeley
7  e-mail dated January 13, leading up to the
8  directive to you from Heather Cameron
9  dated February 2 at 5:32 p.m.  Then it
10 picks up from there and I'm going to ask
11 you about the picking up from there.
12     THE WITNESS:  Can we make it a
13 little bit warmer?  It's getting a little
14 cold.
15     THE VIDEOGRAPHER:  The time is
16 12:12 p.m.  We are going off the record.
17     (Recess taken.)
18     THE VIDEOGRAPHER:  The time is
19 12:12 p.m. and we will go back on the
20 record.
21     MR. BAIO:  It will take a minute or
22 two or four.
23     THE WITNESS:  Thank you.
24     Q.    I would like you to look at the
25 exhibit from that Page 515 to the end and I'll ask

Page 91

1  Eisenberg
2  you some questions.
3      A.    From 515 onwards?
4      Q.    Yes.  Towards the back.
5      A.    So I don't need to look at the first
6  pages?
7      Q.    That's correct.
8          Have you had an opportunity to review
9  those pages of this e-mail chain?
10     A.    Yes, just now.
11     Q.    And the pages that I brought to your
12 attention starting in the more recent time period on
13 515, Heather Cameron to Jennifer Walker and you
14 dated February 2, 2010 at 6:21 p.m., do you see that
15 e-mail?
16     A.    Yes.
17     Q.    Did you receive that e-mail at or
18 about the date it bears?
19     A.    I believe so.
20     Q.    And did you participate in the
21 exchange that appears below that?
22         Wherever your name appears as someone
23 making a statement.
24     A.    (No response.)
25     Q.    Let me change that.

Page 92

1  Eisenberg
2      If you look at the Page 516, you'll
3  see that the e-mail from Heather Cameron to you and
4  Jennifer Walker at 5:32 on February 2, 2010
5  reappears here.  Do you see that?
6      A.    Yes, I do.
7      Q.    The "Jennifer, I'm so sorry e-mail,"
8  do you see that?
9      A.    Uh-huh.  Yes.
10     Q.    And does the next e-mail up show your
11 response to Ms. Cameron of her inquiry?
12     A.    Yes.
13     Q.    And you wrote those words?
14     A.    I believe so.
15     Q.    And you opened up the images and
16 noted that the byline was to Lisandro Suero rather
17 than Daniel Morel, correct?
18     A.    Yes.
19     Q.    And you were asking whether in light
20 of that should they still be pulled?
21     A.    That is correct.
22     Q.    And at that point did you compare the
23 ones that had -- the images that had the byline
24 Lisandro Suero with the images that had the byline
25 Daniel Morel?

Page 93

1  Eisenberg
2      A.    I don't recall.
3      Q.    If you look up to the next e-mail,
4  Ms. Cameron writes to you and Ms. Walker of Corbis
5  later that same day.  Do you see that?
6      A.    Yes.
7      Q.    6:09 p.m.  And she asks whether
8  Mr. Morel believes that those are his images.  Do
9  you see that?
10     A.    I do.
11     Q.    And if you look at the next page that
12 is actually the previous page, 515, Ms. Walker
13 confirms "Yes, they are Daniel Morel's images.  We
14 believe they were stolen by a Twitter user by the
15 name of Lisandro Suero."  Do you see that?
16     A.    I do.
17     Q.    She also asks, "Please confirm when
18 they have been removed."  Do you see that?
19     A.    I do.
20     Q.    And you remember reading that at the
21 time?
22     A.    Again, I don't specifically remember
23 reading the specific e-mail, but I have no reason to
24 believe that I wouldn't have.
25     Q.    And if you look up at the next e-mail

24 (Pages 90 to 93)

Eisenberg

1
2  in chronology, which is at the top of that page,
3  it's from Ms. Cameron to you and Ms. Walker with
4  Mr. Bernasconi cc'd, directing you to pull the
5  images tonight.  Do you see that?
6      A.   I do.
7      Q.   And what did you understand you were
8  being asked to do?
9      A.   To remove the specific list of images
10 that Heather had provided in the previous e-mail and
11 confirm as being correct, despite the data on the
12 images being somewhat different than what was
13 originally requested.
14     Q.   And when you say somewhat different,
15 you mean it had Lisandro Suero's name as opposed to
16 Daniel Morel's, correct?
17     A.   Yes.  The original pull request was
18 for specific images from Daniel Morel.  I had noted
19 that those specific images did not in fact have
20 Daniel Morel's name and, therefore, had to verify
21 that this was indeed the correct images to pull.
22     Q.   Yes.
23     A.   Once that was verified, I would have
24 removed them.
25     Q.   Now, subsequent to being -- that

Eisenberg

1
2  you're being told that yes, these are images that
3  belong to Daniel Morel but they were stolen by
4  Lisandro Suero, did anyone tell you in connection
5  with removing images --
6          Strike that.  Let me ask first:  Did
7  you remove the images that night from the website?
8      A.   I believe so.  I don't know exactly
9  when I did so.
10     Q.   And they would be metadata that would
11 show that removal; is that correct?
12     A.   Yes.
13     Q.   And where would the metadata be?
14     A.   In TEAMS.
15     Q.   Now, you didn't remove the images
16 from TEAMS, though, did you?
17     A.   No.  When you pull an image, you set
18 a field that's called "Editorial ready to publish"
19 to "No."  That field controls whether we want the
20 image to publish to the customer-facing website or
21 not.  When we pull an image, we would set that to
22 "No."
23     Q.   And that's what you believe you did
24 in connection with the images that had been stolen
25 by Lisandro Suero?

Eisenberg

1
2      A.   I believe that's what I did with the
3  12 images that Heather had requested in her e-mail.
4      Q.   Okay.  Now, following the notice to
5  you and Getty Images about the Lisandro Suero
6  misnomer -- strike that.
7          Following February 2, 2010 did anyone
8  at Getty Images say to you, "Look, these images have
9  two different names, Lisandro Suero, Daniel Morel.
10 Please check our website to see if there are any
11 other designations of the same images that we should
12 consider and take down those images"?  Did anybody
13 tell you that, in words or substance?
14     A.   I don't recall.  That was two years
15 ago.
16     Q.   You don't remember anybody saying
17 that to you, though?
18     A.   Not specifically, no.
19     Q.   And do you remember thinking yourself
20 that there may very well be still be images from
21 January 12, 2010 that perhaps are only listed as AFP
22 as the photographer and that you or someone at Getty
23 Images should check to see if there were any
24 lingering images that fell in that category?  Did
25 you or not?

Eisenberg

1
2      A.   Sorry.  Did I what?
3      Q.   Did you think to yourself, "There may
4  be other duplicate images under different names and
5  we should check to see that those are pulled as well
6  off our website"?
7      A.   I may have.  Again, two years ago.  I
8  don't remember exactly.
9      Q.   Okay.  All I can do is ask you what
10 you remember.
11         Do you remember doing that, looking
12 on the website February 2, 2010 to see if there were
13 any other images that looked like the Lisandro Suero
14 images or those properly designated at least in part
15 to Daniel Morel, whether there were others that
16 should be pulled off the website?
17     A.   I don't specifically recall doing
18 that.
19     Q.   Do you recall doing that ever, like
20 from February 2 to today?
21     A.   Not specifically.
22     Q.   And did anybody ever tell you they
23 did that?  That is, look on the website to see if
24 there were other images after you removed the
25 Lisandro Suero images from the Getty website to

Eisenberg

1
2  determine whether under a different name there were
3  more Daniel Morel images still on the website.
4       A.   I'm sorry.  That's a very long
5  sentence.
6       Q.   Yes, it was.  Why don't we do this.
7  Let's -- let me try it one more time.
8       Did anybody tell you that after
9  February 2, 2010 they went on the Getty website to
10  see if there were other images just like the Daniel
11  Morel and Lisandro Suero images that were under
12  someone else's name to determine whether they should
13  be pulled from the Getty website?
14       A.   I don't specifically remember anybody
15  telling me so.  That's not to say that somebody did
16  or didn't.
17       Q.   But you have no recollection that
18  somebody came to you and said that?
19       A.   Not specifically.  Again, they may
20  have and I may not recall.
21       Q.   And you don't remember actually doing
22  that yourself?
23       A.   I may have.  It's something I might
24  do as part of an investigation.  You know, I worked
25  on a lot of other things at the time.

Eisenberg

1
2       Q.   All I can ask you is what you
3  remember.  And do you remember doing that?
4       A.   I don't remember if I specifically
5  did that.
6       MR. BAIO:  All right, let's take a
7  lunch break.  And I can go a little bit
8  longer, but I'm actually doing something
9  in the lunch break, not eating, and we
10  have to come back at 1:45.  Should I go
11  just a few more minutes or should we break
12  now?
13       MS. HOFFMAN:  We have to start the
14  other thing at 2:30.
15       MR. BAIO:  We certainly will, with
16  rhythmic regularity.
17       MR. ROSENFELD:  It's up to you.  As
18  long as we have time to get lunch.
19       MR. BAIO:  Okay.  Let's break now
20  and we will come back.  We will start at
21  1:45 promptly, if we can.  Okay?
22       THE WITNESS:  Okay.
23       MR. KAUFMAN:  So an hour and
24  fifteen minutes.
25       MR. BAIO:  Yes.

Eisenberg

1
2       THE VIDEOGRAPHER:  This concludes
3  tape number 3.  The time is 12:25 p.m.
4       (Luncheon recess taken at 12:25 p.m.)
5       --o0o--
6  A F T E R N O O N   S E S S I O N
7       (Time noted:  1:48 p.m.)
8       THE VIDEOGRAPHER:  This begins tape
9  number 4.  The time is 1:48 p.m. and we're
10  back on the record.
11  C H R I S T I A N E   E I S E N B E R G, resumed
12       and testified as follows:
13  CONTINUED EXAMINATION
14  BY MR. BAIO:
15       Q.   Ms. Eisenberg, you know that you are
16  still under oath, correct?
17       A.   Yes.
18       Q.   If you actually look at the Page 514
19  which is the e-mail in Exhibit 2 that is the
20  immediately preceding page to those that you
21  received, you will see at Bates No. 514 there is an
22  e-mail from Jennifer Walker to Heather Cameron and
23  it states, "As a result of the images remaining on
24  your site for so long, we believe there may have
25  been an incredible amount of licensing by these

Eisenberg

1
2  images by Getty/AFP."
3       Do you see that language?
4       A.   I see that language.
5       Q.   I don't have an e-mail showing that
6  you received it, but I'm going to ask you if you did
7  receive that e-mail, if you can remember receiving
8  the e-mail that was sent from Ms. Walker to
9  Ms. Cameron.
10       A.   I don't remember seeing that e-mail.
11       Q.   And do you remember learning that
12  Corbis was insisting that additional steps be taken
13  in connection with the Getty website following your
14  removal of the images by -- that were entitled
15  "Lisandro Suero"?
16       A.   I don't recall any communication from
17  Corbis that I was directly involved.
18       Q.   Do you recall learning that there
19  were ongoing complaints after you removed the
20  Lisandro Suero designated images from Getty's
21  website?
22       A.   I don't recall the exact sequence in
23  which things happened.  I remember that it was -- I
24  helped people look at it for just more than a single
25  time.

26 (Pages 98 to 101)

Eisenberg

1
2     Q.    And about how long did you continue
3  working on the matter, if you can recall?
4     A.    I don't recall.
5     Q.    Was it more than a week?
6     A.    I don't recall.  I work on many
7  different projects concurrently.
8     Q.    Sure.
9           What do you remember, the last thing
10  that you did on those Daniel Morel issues?
11     A.    I don't recall what the last thing
12  would have been.
13     Q.    I'm going to ask you to look at what
14  we have marked as Exhibit 3, which is a multi-page
15  document, e-mail chain identified as G002803 to 821.
16  Most of it is redacted but there is some text that I
17  would like to ask you about.
18     A.    Okay.  Are we done with the previous
19  one?
20     Q.    Yes.  You can put that one away.  I'm
21  sorry.  That's Exhibit 3.
22     MR. BAIO:  Here are two of them.
23     Q.    Although it's many Bates numbers, I
24  think you will see that the only text that we have
25  appears on the first page.  Do you see that?

Eisenberg

1
2     A.    Yes.
3     Q.    And do you see that it appears that
4  on March 9th at 11:20 on 2010 you wrote an e-mail
5  that appears at the second half of this first page
6  to Mr. Bernasconi.  Do you see that?
7     A.    I do.
8     Q.    And did you write that e-mail and
9  send it to him at or about the date it bears?
10     A.    I believe so.
11     Q.    So the last communication that we had
12  seen at least in writing for you was I think on
13  February 2nd.
14     MS. HOFFMAN:  February 2nd.
15     Q.    And from February 2nd to March 9th,
16  looking at this e-mail, does it refresh your
17  recollection as to anything that you did with
18  respect to the Daniel Morel issues at Getty Images?
19     A.    Not specifically.
20     Q.    And this can't really help you
21  because there is not a lot of words that you can
22  read other than what you wrote yourself.  You wrote,
23  "BTW, what is our workflow for removing images from
24  our site when AFP send us a mandatory kill notice?
25  Are AFP responsible for doing so themselves?"

Eisenberg

1
2     Q.    Do you see that?
3     A.    I do.
4     Q.    What made you ask that question?
5     A.    Most likely I had come across an AFP
6  kill notice in our systems that published to the
7  website.  And the workflow for dealing both with a
8  mandatory kill and the images that relate to them is
9  not in my remit, so I wanted to most likely make
10  Pancho aware that there were some mandatory kill
11  assets on the website.
12     Q.    And what was it that you saw on the
13  website that led you to write this e-mail to
14  Mr. Bernasconi?
15     A.    AFP sent out mandatory kill notices
16  when necessary, as we discussed earlier, to alert
17  clients to assets that should not have been sent out
18  when it was later discovered.
19           Typically those come across the feed
20  and they shouldn't go into the system; they should
21  only go in to customers.  That's one of the assets
22  that would only go in the feed but not into TEAMS.
23  And it's an advisory type file that simply has -- it
24  has a very small thumbnail of the image with
25  language saying "mandatory kill" and other

Eisenberg

1
2  information so that people can find the image it
3  refers to.
4           It's not the image itself.  It's a
5  very small copy of it for reference.
6           Those files are not supposed to be on
7  the website.  Sometimes they go through.  Since it's
8  not the image itself, there is no harm.  There is
9  nothing anybody can use, but they're not files that
10  are supposed to be on the website so we would want
11  to remove them from the website simply for better
12  customer experience.
13     Q.    So what you saw that led you to send
14  this e-mail to Mr. Bernasconi was a thumbnail image?
15  Not one that could be used, but a thumbnail image
16  with a mandatory kill notice attached to that image
17  or those images?
18     A.    It's actually an image where the
19  image itself contains part of the thumbnail as well
20  as a visual representation that says mandatory kill.
21     Q.    The words "mandatory kill" appear?
22     A.    I believe so.
23     Q.    And did they appear over the image or
24  as a caption or below the image?  If you know.
25     A.    I don't remember the exact layout.

27 (Pages 102 to 105)

Page 106

Eisenberg

1  
2  It's part of the image.
3      Q.    But you having seen the image as a
4  thumbnail and the mandatory kill notice on Getty's
5  website was unusual for you?  That is, you hadn't
6  seen that before?
7      A.    This particular asset?
8      Q.    No.  As a matter of procedure, were
9  you surprised to see on Getty's website a thumbnail
10  sketch with the phrase "mandatory kill" connected to
11  the thumbnail?
12      A.    Yes.
13      Q.    Okay.  Because you hadn't seen that
14  before.
15      A.    No.
16      Q.    No, you hadn't seen that before?
17      A.    You first asked me if I was
18  surprised.  Yes, I was surprised.
19      Q.    Yes, yes.
20      A.    I have seen that before, once or
21  twice.
22      Q.    I see.
23          And did you believe, the once or
24  twice that you saw it before the mandatory kill that
25  you are describing here, that it was done in error?

Page 107

Eisenberg

1  
2      A.    I don't understand the question.
3      Q.    Okay.  I won't ask it.
4          Did you think that -- what was the
5  image that you were talking about?
6      A.    I don't recall.
7      Q.    Were they Morel images?
8      A.    I don't recall exactly, but I don't
9  believe so.
10      Q.    The "re" is AFP/Morel.  Do you see
11  that?  That is the "re" in the e-mail that you sent
12  to Mr. Bernasconi.
13      A.    Yes.
14      Q.    Does that suggest to you that this
15  had anything to do with Morel, any Morel images?
16      A.    No.
17      Q.    It doesn't?
18      A.    No.
19      Q.    You then state, "We currently have 32
20  AFP images with 'mandatory kill' in the caption on
21  the website."  Do you see that?
22      A.    I do.
23      Q.    And what were those images?
24      A.    I don't recall what they were.
25      Q.    Were any of them Morel images?

Page 108

Eisenberg

1  
2      A.    I don't recall that.  I don't
3  remember exactly what they were.  That is most
4  likely what is redacted.
5      Q.    Okay.  I'm sorry.
6      A.    Just to clarify, we would receive
7  them from AFP whenever there is one sent out over
8  time.  So these may have been from a much longer
9  period.
10      Q.    When you say whenever there is one,
11  you mean a mandatory kill?
12      A.    Yes.
13      Q.    How many mandatory kills were there
14  that you can recall by AFP of images that appeared
15  on Getty's website during the first six months of
16  2010?
17      A.    I have no idea.
18      Q.    Were there many that you had seen?
19      A.    I don't know.  I would not typically
20  go looking for them.
21      Q.    You then went on in your e-mail to
22  say, "And when I spot checked the original image for
23  at least one of those is still on our website."
24          Do you see that?
25      A.    I do.

Page 109

Eisenberg

1  
2      Q.    What were you referring to there?
3      A.    That was referring to the fact that
4  for one of the mandatory kill notices, the image it
5  was sent to kill was still published.
6      Q.    And that's not only the thumbnail but
7  the actual image; is that correct?
8      A.    That is correct.
9      Q.    And did you determine what image that
10  was that had not been killed despite the mandatory
11  kill notice?
12      A.    I don't remember.
13      Q.    Was it a Morel image?
14      A.    I don't recall exactly.  I don't
15  believe so, but I don't remember.
16      Q.    Was it an image attributable to
17  Mr. Lisandro Suero?
18      A.    I don't recall what the images were.
19      Q.    But the image number appears in the
20  parentheses.  That is, the original image number is
21  88979394.  Is that correct?
22      A.    Oh, yes, that is -- that would be the
23  image number, yes.
24      Q.    And that's an image that you could
25  retrieve if you wanted to, correct?

28 (Pages 106 to 109)

Page 118

Eisenberg

1
2      Q.   And when Mr. Gebhard told you they
3  usually take appropriate action, did you understand
4  that by that he meant the London Getty desk would
5  remove the images pursuant to the kill notice that
6  it received from AFP?
7      A.   I was not sure what exactly he meant
8  by "appropriate action" but since that is not my
9  department I did not ask specifically about that.
10     Q.   He does state they do not push back
11 to AFP.  Does that lead you to believe that at the
12 time you understood that the London desk would take
13 care of the matter itself and would not go or revert
14 to AFP to carry out the kill notice?
15     A.   I take it to mean that the typical
16 behavior would be to do that.
17     Q.   "To do that" would be the London desk
18 itself would remove the images from TEAMS?
19     A.   If that was what the appropriate
20 action was deemed to be for those images.
21     Q.   And your understanding was they
22 didn't rely on AFP to do that; is that correct?
23     A.   Not typically.
24     Q.   Not typically.  They wouldn't
25 typically go back to AFP?

Page 119

Eisenberg

1
2      A.   That is my understanding of what
3  Andreas is saying.
4      Q.   Did anyone ever tell you that that
5  was inaccurate?  That is, Andreas' statement.
6      A.   Not that I recall.
7      Q.   He then goes on to report to you,
8  "NYC tends to do that, but if it seems important, we
9  would rather do it ourselves than waste time in a
10 discussion."
11         Do you see that?
12     A.   I do.
13     Q.   And what did you understand from that
14 sentence?
15     A.   I understand Andreas to say that the
16 New York desk would typically refer these requests
17 to AFP but may do the work themselves if that is
18 deemed the better course of action.
19     Q.   Well, the words he used were "if it
20 seems important"; isn't that correct?
21     A.   That's what he says right there.
22     Q.   And if it seems important --
23         And he, by the way, was on the
24 New York desk.  Right?
25     A.   Yes.

Page 120

Eisenberg

1
2      Q.   So he's talking about his own
3  behavior and the behavior of people under his direct
4  supervision.
5      A.   His department, yes.
6      Q.   And he was saying to you, "If it
7  seems important we will carry out the kill notice
8  ourselves rather than waste time in a discussion"?
9  Is that your understanding of what he was saying to
10 you?
11     A.   That's what he is saying right there.
12     Q.   So that --
13         He then concludes, "In the end:
14 Inconsistent."  That is, did you understand him to
15 say, "There is no consistent pattern in our workflow
16 on this issue"?
17     A.   That is correct.
18     Q.   He then states, "We should discuss
19 standardizing on one or the other.  Probably useful
20 for the greater image partner discussion, too."  Do
21 you see that?
22     A.   I do.
23     Q.   Have you since the date of this
24 e-mail, March of 2010, participated in discussions
25 standardizing the workflow in the situation

Page 121

Eisenberg

1
2  discussed here?
3      A.   I don't recall.  It is possible it
4  has come up in conversation.
5      Q.   So far as you know today, is there a
6  definitive workflow for addressing mandatory kills
7  from AFP with respect to images that appear on Getty
8  Images' website?
9      A.   That's the workflow that's not in my
10 area of expertise.  I am not aware if that is or
11 isn't the case.
12     Q.   If you look on the Page 2919, it's
13 from you to Andreas Gebhard with further discussion
14 on this point.  Do you see that?
15     A.   I do.
16     Q.   You state to him, "That's exactly
17 what I was thinking."  Do you see that?
18     A.   I do.
19     Q.   What did you mean?
20     A.   I agreed with his statement that we
21 should discuss standardizing the workflow.
22     Q.   You then state, "We should perhaps
23 find out from Legal what our obligation is for
24 partner content where they send us a notice to kill
25 it ..."  Do you see that?

31 (Pages 118 to 121)

Page 122

Eisenberg

1
2    A.   I do.
3    Q.   Did you follow up on that task?
4    A.   I don't recall.
5    Q.   Do you know if he did?
6    A.   I do not know that.
7    Q.   Going to the pages with the Bates
8  numbers 2907 to 2908 in that same Exhibit 4, you
9  will see that the --
10   A.   May I?
11   Q.   Yes, please. I will help guide you,
12 but take whatever time you need.
13       Two of the e-mails are what we just
14 discussed and they appear on 2907 and 2908. The
15 bottom of 2908, at least in terms of text, is an
16 e-mail that did not exist in the earlier exchange
17 that I asked you about.
18   A.   Okay.
19   Q.   You will see that before your
20 response as to 32 AFP images with mandatory kill,
21 Mr. Bernasconi wrote to you on March 9, 2010 and
22 Ms. Cameron saying, "Not for us to send as it's not
23 our photo. The kill would have to have been sent by
24 AFP." Do you see that?
25   A.   I do.

Page 123

Eisenberg

1
2    Q.   And what was he referring to there to
3  you?
4    A.   I don't know. I don't see the
5  initial part of that e-mail.
6    Q.   Nor do we. Was he referring to
7  AFP/Morel -- strike that.
8        Was he referring to Mr. Morel's
9  photo?
10   A.   I don't know that, based on this
11 e-mail.
12   Q.   And when he refers to the kill, do
13 you know what that is referring to?
14   A.   My assumption would be based only on
15 the sentence it says here, that he's referring to a
16 mandatory kill and what he's saying is that an image
17 sent by AFP, if the image needs to be killed, that's
18 a decision that would have been made by AFP. It's
19 not a decision that would have been up to Getty to
20 make.
21   Q.   And then --
22   A.   Because it's not our image.
23   Q.   But you wrote to Mr. Bernasconi
24 asking "What is the workflow for removing images
25 from our site when AFP send us a mandatory kill

Page 124

Eisenberg

1
2  notice?" Correct?
3    A.   That's correct.
4    Q.   Notwithstanding what he said to you,
5  you asked that question.
6    A.   I did.
7    Q.   And the answer that you received was
8  from Mr. Gebhard, correct?
9    A.   Correct.
10   Q.   And you saw earlier that
11 Mr. Bernasconi asked Mr. Gebhard to respond to you,
12 correct?
13   A.   Yes.
14   Q.   And I would like you to look at the
15 page with the Bates numbers in Exhibit 4, G002864.
16   A.   Can you give me that number again?
17   Q.   Yes, 2864. It's also got a little --
18 it's near the front. It has a little page number 6
19 on it as well.
20   A.   Oh, okay.
21   Q.   First of all, have you seen either of
22 these two e-mails before?
23   A.   I don't remember.
24   Q.   Have you seen them in preparation for
25 this deposition?

Page 125

Eisenberg

1
2    A.   I believe they were among the
3  documents we looked at.
4    Q.   I believe this is within the 30(b)(6)
5  part of this questioning because it's about TEAMS,
6  which is the back end, but you will answer as best
7  you can.
8        The bottom e-mail from Andreas
9  Gebhard to Mr. Bernasconi states, "Hi, Pancho.
10 These are the images in TEAMS. All of them are
11 taken off the customer-facing website, i.e. cannot
12 be downloaded by clients anymore." And then there
13 is a "Daniel Morel" written, the words "Daniel
14 Morel" in all caps written on that page.
15       Do you see that?
16   A.   I do.
17   Q.   And do you know what Mr. Gebhard is
18 talking about there?
19   A.   Specifically he appears to be talking
20 about images with those specific numbers that he
21 located in TEAMS.
22   Q.   And those are AFP Morel images?
23   A.   His e-mail refers to images
24 categorized under Daniel Morel and Lisandro Suero so
25 my assumption is that is what he is talking about.

32 (Pages 122 to 125)

Page 126

Eisenberg

1
2      Q.    And he states that the images are in
3  TEAMS, correct?
4      A.    Yes, he does.
5      Q.    So does that mean that as of
6  March 25, 2010 neither AFP nor Getty Images removed
7  the images from TEAMS?
8      A.    That is correct.  Because, as we said
9  earlier, even when we removed them from being
10  available on the website, we don't remove them from
11  TEAMS.  We don't delete the assets out of TEAMS
12  anymore.
13      Q.    That does confuse me because when
14  Mr. Gebhard responded to you he said, "AFP's
15  Washington bureau is trained and capable of removing
16  images off of TEAMS."  He didn't say off the
17  website, he said off of TEAMS.  Was he inaccurate
18  when he said that?
19      A.    He may have phrased it in a more
20  colloquial way.  TEAMS being our asset management
21  system is sometimes used as just a generic term.  So
22  removing images off of TEAMS doesn't necessarily
23  mean we're literally deleting them from the system.
24  It typically means we move them from being
25  available, which is done in TEAMS.

Page 127

Eisenberg

1
2      Q.    I see.
3      But the image itself remains on TEAMS
4  in any instance, whether Getty Images removes the
5  image or an image from its website or AFP removes an
6  image and in the case of what Mr. Gebhard is saying,
7  only its Washington bureau.  So it remains on TEAMS
8  but comes off the website; is that correct?
9      A.    Yes.
10      Q.    So in the e-mail from Mr. Gebhard to
11  Mr. Bernasconi when he says these are the images in
12  TEAMS, to you there is nothing peculiar about that,
13  that the images that were on TEAMS initially would
14  always stay on TEAMS?
15      A.    Yes.
16      Q.    And he then goes on to state they
17  were taken off the customer-facing website.  Do you
18  see that?
19      A.    I do.
20      Q.    And that was your understanding of
21  what the state of affairs was as to the Morel images
22  as of March 25, 2010?
23      A.    Based on his e-mail there, yes.
24      Q.    Now he writes in the next e-mail to
25  Mr. Bernasconi, and maybe it's the same e-mail --

Page 128

Eisenberg

1
2      A.    I believe the section below there is
3  exactly the section above, just a short version of
4  it, because the date is exactly the same and the
5  wording is exactly the same.
6      Q.    I see.
7      So you believe the e-mail that
8  appears at the bottom of Page 2864, if it continued
9  on the next page it would have the language under
10  "Daniel Morel" for the e-mail that's above it?
11      A.    It appears to me that that is an
12  exact replica of the item above it, yes.
13      Q.    He states, that is Mr. Gebhard, in
14  that March 25, 2010 e-mail, "I found no AFP kill
15  notice in TEAMS, which is consistent with standard
16  operating procedures."  What does that mean?
17      A.    He explains in the sentence below
18  that kill notices are only sent out over the feeds
19  by AFP, meaning that they are not sent to Getty to
20  go to TEAMS.  That relates to what I explained
21  earlier about those not typically going to TEAMS,
22  but sometimes that doesn't work and they do make it
23  through.
24      Q.    So that the kill notices in this case
25  were only sent out over the feeds by AFP and not

Page 129

Eisenberg

1
2  through some other means?
3      A.    I take it to say that the kill notice
4  was sent out over the feeds and not sent to TEAMS.
5      MR. BAIO:  I just want to take a
6  minute or two to see if I have anything
7  else.
8      THE WITNESS:  May I get some water?
9      MR. BAIO:  Yes, you may.
10      Let's go off the record.
11      THE VIDEOGRAPHER:  The time is
12  2:27 p.m. and we are off the record.
13      (Recess taken.)
14      THE VIDEOGRAPHER:  The time is
15  2:30 p.m. and we are back on the record.
16      Q.    Ms. Eisenberg, you wanted to clarify
17  something that you had testified about earlier.
18  Please go ahead.
19      A.    Yes.
20      When you asked specifically if there
21  was ever any direct communication I may have
22  initiated with anybody at AFP directly for any
23  matter at all, I do recall that very occasionally I
24  have had direct contact with Eva Hambach at AFP to
25  request a specific image for a client, for example.

33 (Pages 126 to 129)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

AGENCE FRANCE PRESSE,

                Plaintiff,

    v.

DANIEL MOREL,

                Defendant and
                Counterclaim Plaintiff

    v.

AGENCE FRANCE PRESSE,

                Counterclaim Defendant,

And

GETTY IMAGES (US), INC., CBS
BROADCASTING, INC., ABC, INC., TURNER
BROADCASTING, INC. and (AFP and Getty
Licensees does 1 - et. al).

                Third Party Counterclaim
                Defendants

---------------------------------------------------------x

Case No. 10-cv-2730 (WHP)

ECF Case

**ACKNOWLEDGMENT**

      I, CHRISTIANE EISENBERG, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of September 14, 2011; that the transcript is a true, complete and correct record of my testimony, except for the corrections, if any, noted in the attached errata sheet, and that the answers on the record as given by me are otherwise true and correct.

                                     _____

                                    CHRISTIANE EISENBERG

Sworn and subscribed to before me
this 17th day of October , 2011.

_____
Notary Public, State of New York
California

IN SEOUK HONG
Commission # 1832694
Notary Public - California
Los Angeles County
My Comm. Expires Feb 18, 2013

DWT 18244106v1 0053349-000076

**Chris Eisenberg Deposition Corrections**

**Wednesday, September 14, 2011:**

Page 8, line 5: should be "Allsport Photography" instead of "All Sport Photography"

Page 8, line 10: should be "Allsport Photography" instead of "All Sport Photography"

Page 9, line 9: should be "Allsport Photography" instead of "All Sport Photography"

Page 10, line 4: should be "Allsport Photography" instead of "All Sport Photography"

Page 13, line 14: should be "data management of editorial stills" instead of "data management or editorial stills"

Page 22, line 6: should be "or of certain types" instead of "or off of certain types"

Page 41, line 19: should be "supp category" instead of "subcategory"

Page 55, line 24: should be "my workflow" instead of "a workflow"

Page 95, line 18: should be "Editorial ready  for sale" instead of "Editorial ready  to publish"

Page 104, line 15: should be "AFP send out" instead of "AFP sent out"

Page 131, line 9: should be "controlled vocabulary" instead of "control vocabulary"





Redacted

**From:** Heather Cameron
**To:** Chris Eisenberg; Lisa Willmer
**Cc:** Pancho Bernasconi; Nancy Monson
**Sent:** Tue Feb 02 17:42:16 2010
**Subject:** FW: Daniel Morel Haiti Images

Chris, I'm not sure why we didn't capture all of them at the same time, so I've attached an email that includes a list of images pulled by Preston on the 13th as well as the kill notice we received on the 14th.

Is there any chance these 12 were delayed on the upload process or something so they appeared live on the site after Preston's pull? Very odd.

Lisa, looks like we missed some images the first time around. Bummer.

**From:** Heather Cameron
**Sent:** Tuesday, February 02, 2010 5:32 PM
**To:** 'Jennifer Walker'; Chris Eisenberg
**Cc:** Pancho Bernasconi
**Subject:** RE: Daniel Morel Haiti Images

Jennifer, I'm so sorry – I'm not sure what happened – I thought all of them were pulled from our site when you contacted us on the 13th. We'll get these additional 12 down asap. If you haven't heard back from Vincent, you can try contacting Eva Hambach – she confirmed she received our email on the 13th alerting her to the issue.

Chris, would you please make sure the images below are removed from the site immediately? If you could please reply back to all if us when they are down, that would be terrific. Thanks.

1

G002793

95737370
95737394
95737403
95734704
95734818
95734844
95734865
95734878
95734885
95734896
95737398
95740695


Heather Cameron
Senior Paralegal

Getty Images, Inc.
601 N. 34th Street
Seattle, WA  98103
206.925.6424 Direct
206.925.5623 Facsimile
heather.cameron@gettyimages.com

This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient you should not disseminate, distribute or copy this e-mail or any attachments hereto. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system without copying or disclosing the contents. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Getty Images, 601 N 34th St, Seattle, WA. 98103, USA, www.gettyimages.com.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us and by an external service provider to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have concerns about this automatic filtering.

**From:** Jennifer Walker [mailto:Jennifer.Walker@corbis.com]
**Sent:** Tuesday, February 02, 2010 5:07 PM
**To:** Heather Cameron
**Subject:** FW: Daniel Morel Haiti Images

Hi Heather,

I have just been notified that Getty still has not removed the Daniel Morel images from its website. Please see the below link...

http://www.gettyimages.com/Search/Search.aspx?contractUrl=2&language=en-US&family=editorial&assetType=image&p=lisandro%20suero%20haiti#

I have sent a note to Vincent Amalvy at AFP with no response. Would you mind sharing the name of the person you mention below, in the D.C. office?

Sincerely,

Jennifer Walker
Intellectual Property Enforcement Specialist

2

G002794

Corbis
http://www.corbis.com

This e-mail may contain information that is priveleged, confidential and exempt from disclosure. If you are not the intended recipient, please do not distribute it. Please notify us immediately and delete all copies. Thank you

**From:** Heather Cameron [mailto:heather.cameron@gettyimages.com]
**Sent:** Wednesday, January 13, 2010 2:53 PM
**To:** Claire Keeley
**Cc:** Corbis Copyright Compliance; Pancho Bernasconi; Lisa Willmer
**Subject:** RE: Daniel Morel Haiti Images

Claire, thank you for letting us know. Our picture desk in New York has already removed the content at issue from our website, all of which came to us via our relationship with AFP. Getty Images has no editorial control over the content posted to our website via AFP. Have you already been in touch with AFP by chance? If not, I can provide you with contact information for someone in their D.C. office (the same person to whom we will forward your email below).

Kind regards,

Heather Cameron
Senior Paralegal

Getty Images, Inc.
601 N. 34th Street
Seattle, WA 98103
206.925.6424 Direct
206.925.5623 Facsimile
heather.cameron@gettyimages.com

This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient you should not disseminate, distribute or copy this e-mail or any attachments hereto. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system without copying or disclosing the contents. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Getty Images, 601 N 34th St, Seattle, WA. 98103, USA, www.gettyimages.com.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us and by an external service provider to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have concerns about this automatic filtering.

**From:** Claire Keeley [mailto:claire.keeley@corbis.com]
**Sent:** Wednesday, January 13, 2010 1:37 PM
**To:** Heather Cameron
**Cc:** Corbis Copyright Compliance
**Subject:** Daniel Morel Haiti Images
**Importance:** High

Heather,

We have a serious problem that I am hoping you can help me resolve. Today, one of Corbis' editorial photographers uploaded some of his pictures from the earthquake in Haiti and put them on his Twitter page. It appears that they were then illegally copied and distributed to third parties, including Getty. One such example is on the home page of the New York Times website - Daniel's picture is the 14th one and it is credited as "Daniel Morel/AFP-Getty

3

Images." Daniel is exclusive to Corbis and is terribly dismayed by third parties distributing his works. Assuming you aren't the right person to help me, can you please put me in touch with the right person at Getty to see what we can do to halt this distribution? We will be issuing DMCA notices today but I thought that this approach might bear more fruit. Thanks in advance!

Regards,
Claire

Claire L. Keeley
Senior Corporate Counsel

**Corbis**
http://www.corbis.com

710 Second Ave., Suite 200
Seattle, WA 98104
Main: 206.373.6000
Direct: 206.373.6293
Mobile: 206.972.0303
Fax: 206.373.6100
Email: claire.keeley@corbis.com

This e-mail may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not distribute it. Please notify us immediately and delete all copies.
Thank you.

G002796



EXHIBIT
Eisenberg 2
9/14/2011   EB

**De :** Michel SCOTTO
**Envoyé :** jeudi 18 février 2010 18:56
**À :** Marielle EUDES
**Objet :** RE: Daniel Morel Haiti Images

Je ne vois plus rien sur le site de Getty.


Michel SCOTTO
Director Photo Business Development
AGENCE FRANCE-PRESSE
11,13, place de la Bourse
75002 PARIS
Tel:(33) 140418145
Mobile: (33) 685811527
http://www.afp.com

 Please consider the environment before printing this e-mail. Thank you.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**De :** Marielle EUDES
**Envoyé :** jeudi 18 février 2010 09:23
**À :** Michel SCOTTO
**Objet :** TR: Daniel Morel Haiti Images

Getty a bien tout enlevé ??

**Marielle EUDES**
Directrice de la Photo / Director of Photography

 Agence France-Presse
11-13 pl de la Bourse  75002 Paris
Tél: (33-1) 40.41.49.63 / Fax: (33-1) 40.4149.32
marielle.eudes@afp.com

privileged

AFP000513

# privileged

**From:** Heather Cameron
**To:** Jennifer Walker
**Cc:** Eva HAMBACH; Pancho Bernasconi ; Nancy Monson
**Sent:** Wed Feb 17 19:21:28 2010
**Subject:** RE: Daniel Morel Haiti Images

Jennifer, the best contact for you at AFP is Eva Hambach, cc'd here. I will ask our team here to run a license history for all of the images at issue, and I'll send that information to Eva at AFP since we've referred this issue to AFP for resolution.

Heather Cameron
Senior Paralegal
Getty Images, Inc.
601 N. 34th Street
Seattle, WA  98103
206.925.6424 Direct
206.925.5623 Facsimile
heather.cameron@gettyimages.com

This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient you should not disseminate, distribute or copy this e-mail or any attachments hereto. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system without copying or disclosing the contents. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Getty Images, 601 N 34th St, Seattle, WA. 98103, USA, www.gettyimages.com.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us and by an external service provider to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have concerns about this automatic filtering.

**From:** Jennifer Walker [mailto:Jennifer.Walker@corbis.com]
**Sent:** Wednesday, February 17, 2010 4:11 PM
**To:** Heather Cameron
**Subject:** RE: Daniel Morel Haiti Images

Hi Heather,

Thank you for your prompt attention to the matter regarding our exclusive photographer Daniel Morel's images uploaded onto the Getty site via AFP.

As a result of the images remaining on your site for so long, we believe there may have been an incredible amount of licensing of these images by Getty/AFP. We have found dozens of websites displaying Mr. Morel's images with the Getty/AFP credit, both naming Lisandro Suero and Daniel Morel as the photographer. This is quite concerning for our photographer as well as Corbis.

In an effort to properly credit our photographer as well as obtain licensing revenue for the use of the images, please provide copies of your licensing histories for the images. Please also advise how best we may go about requesting the same of AFP. You indicated that you could provide the email address of someone in their office, however I have yet to make contact with anyone. Would you please provide the name of an AFP rep I can work with in their DC office?

Also, what steps, if any, have been taken by Getty to remedy this situation? If Getty has licensed the images, have your clients been notified that the images are being used without proper authorization?

Thank you in advance for your assistance. I look forward to hearing back.

AFP000514

Kindly,

Jennifer Walker
Intellectual Property Enforcement Specialist

Corbis
http://www.corbis.com

This e-mail may contain information that is priveleged, confidential and exempt from disclosure. If you are not the intended recipient, please do not distribute it. Please notify us immediately and delete all copies. Thank you.

**From:** Heather Cameron [mailto:heather.cameron@gettyimages.com]
**Sent:** Tuesday, February 02, 2010 6:21 PM
**To:** Jennifer Walker; Chris Eisenberg
**Cc:** Pancho Bernasconi
**Subject:** RE: Daniel Morel Haiti Images

Thanks for the confirmation.

Chris, please do pull these tonight.  Thanks so much for your quick response.
Heather Cameron
Senior Paralegal
Getty Images, Inc.
601 N. 34th Street
Seattle, WA  98103
206.925.6424 Direct
206.925.5623 Facsimile
heather.cameron@gettyimages.com

This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient you should not disseminate, distribute or copy this e-mail or any attachments hereto. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system without copying or disclosing the contents. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Getty Images, 601 N 34th St, Seattle, WA. 98103, USA, www.gettyimages.com.
PLEASE NOTE that all incoming e-mails will be automatically scanned by us and by an external service provider to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have concerns about this automatic filtering.

**From:** Jennifer Walker [mailto:Jennifer.Walker@corbis.com]
**Sent:** Tuesday, February 02, 2010 6:19 PM
**To:** Heather Cameron
**Subject:** RE: Daniel Morel Haiti Images

Heather.

Yes, these are Daniel Morel's images. We believe they were stolen by a twitter user by the name of Lisandro Suero. I am not sure how or if AFP got permission to load the images, but we did find tweets from someone at AFP to Lisandro Suero wanting to discuss the images.

Please confirm when they have been removed.

Jennifer Walker
Intellectual Property Enforcement Specialist

Corbis
http://www.corbis.com

This e-mail may contain information that is priveleged, confidential and exempt from disclosure. If you are not the intended recipient, please do not distribute

AFP000515

it. Please notify us immediately and delete all copies. Thank you.

**From:** Heather Cameron [mailto:heather.cameron@gettyimages.com]
**Sent:** Tuesday, February 02, 2010 6:09 PM
**To:** Chris Eisenberg; Jennifer Walker
**Cc:** Pancho Bernasconi
**Subject:** RE: Daniel Morel Haiti Images

Excellent question, Chris!

Jennifer, when you open each image in the link below in the detail view page, the images are credited to another photographer, not Daniel Morel.   Does Mr. Morel believe these are his images?
Heather Cameron
Senior Paralegal
Getty Images, Inc.
601 N. 34th Street
Seattle, WA  98103
206.925.6424 Direct
206.925.5623 Facsimile
heather.cameron@gettyimages.com

This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient you should not disseminate, distribute or copy this e-mail or any attachments hereto. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system without copying or disclosing the contents. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Getty Images, 601 N 34th St, Seattle, WA. 98103, USA, www.gettyimages.com.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us and by an external service provider to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have concerns about this automatic filtering.

**From:** Chris Eisenberg
**Sent:** Tuesday, February 02, 2010 5:43 PM
**To:** Heather Cameron
**Subject:** RE: Daniel Morel Haiti Images

These are under byline Lisandro SUERO rather than Daniel Morel – are they definitely the ones to pull?

**From:** Heather Cameron
**Sent:** Tuesday, February 02, 2010 5:32 PM
**To:** Jennifer Walker; Chris Eisenberg
**Cc:** Pancho Bernasconi
**Subject:** RE: Daniel Morel Haiti Images

Jennifer, I'm so sorry – I'm not sure what happened – I thought all of them were pulled from our site when you contacted us on the 13th.  We'll get these additional 12 down asap.  If you haven't heard back from Vincent, you can try contacting Eva Hambach – she confirmed she received our email on the 13th alerting her to the issue.

Chris, would you please make sure the images below are removed from the site immediately?  If you could please reply back to all if us when they are down, that would be terrific.  Thanks.

95737370
95737394
95737403
95734704
95734818
95734844
95734865

AFP000516

95734878
95734885
95734896
95737398
95740695

Heather Cameron
Senior Paralegal
Getty Images, Inc.
601 N. 34th Street
Seattle, WA  98103
206.925.6424 Direct
206.925.5623 Facsimile
heather.cameron@gettyimages.com

This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient you should not disseminate, distribute or copy this e-mail or any attachments hereto. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system without copying or disclosing the contents. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Getty Images, 601 N 34th St, Seattle, WA. 98103, USA, www.gettyimages.com.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us and by an external service provider to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have concerns about this automatic filtering.

**From:** Jennifer Walker [mailto:Jennifer.Walker@corbis.com]
**Sent:** Tuesday, February 02, 2010 5:07 PM
**To:** Heather Cameron
**Subject:** FW: Daniel Morel Haiti Images

Hi Heather,

I have just been notified that Getty still has not removed the Daniel Morel images from its website. Please see the below link...

http://www.gettyimages.com/Search/Search.aspx?contractUrl=2&language=en-US&family=editorial&assetType=image&p=lisandro%20suero%20haiti#

I have sent a note to Vincent Amalvy at AFP with no response. Would you mind sharing the name of the person you mention below, in the D.C. office?

Sincerely,

Jennifer Walker
Intellectual Property Enforcement Specialist

Corbis
http://www.corbis.com

This e-mail may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not distribute it. Please notify us immediately and delete all copies. Thank you

**From:** Heather Cameron [mailto:heather.cameron@gettyimages.com]
**Sent:** Wednesday, January 13, 2010 2:53 PM
**To:** Claire Keeley
**Cc:** Corbis Copyright Compliance; Pancho Bernasconi; Lisa Willmer

AFP000517

**Subject:** RE: Daniel Morel Haiti Images

Claire, thank you for letting us know.  Our picture desk in New York has already removed the content at issue from our website, all of which came to us via our relationship with AFP.  Getty Images has no editorial control over the content posted to our website via AFP.  Have you already been in touch with AFP by chance?  If not, I can provide you with contact information for someone in their D.C. office (the same person to whom we will forward your email below).

Kind regards,

Heather Cameron
Senior Paralegal


Getty Images, Inc.
601 N. 34th Street
Seattle, WA  98103
206.925.6424 Direct
206.925.5623 Facsimile
heather.cameron@gettyimages.com


This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient you should not disseminate, distribute or copy this e-mail or any attachments hereto. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system without copying or disclosing the contents. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Getty Images, 601 N 34th St, Seattle, WA. 98103, USA, www.gettyimages.com.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us and by an external service provider to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have concerns about this automatic filtering.

----

**From:** Claire Keeley [mailto:claire.keeley@corbis.com]
**Sent:** Wednesday, January 13, 2010 1:37 PM
**To:** Heather Cameron
**Cc:** Corbis Copyright Compliance
**Subject:** Daniel Morel Haiti Images
**Importance:** High


Heather,

We have a serious problem that I am hoping you can help me resolve.  Today, one of Corbis' editorial photographers uploaded some of his pictures from the earthquake in Haiti and put them on his Twitter page.  It appears that they were then illegally copied and distributed to third parties, including Getty.  One such example is on the home page of the New York Times website - Daniel's picture is the 14th one and it is credited as "Daniel Morel/AFP-Getty Images."  Daniel is exclusive to Corbis and is terribly dismayed by third parties distributing his works.  Assuming you aren't the right person to help me, can you please put me in touch with the right person at Getty to see what we can do to halt this distribution?  We will be issuing DMCA notices today but I thought that this approach might bear more fruit.  Thanks in advance!

Regards,
Claire

Claire L. Keeley
Senior Corporate Counsel

**Corbis**
http://www.corbis.com

AFP000518

710 Second Ave., Suite 200
Seattle, WA 98104
Main:  206.373.6000
Direct:  206.373.6293
Mobile:  206.972.0303
Fax:  206.373.6100
Email:  claire.keeley@corbis.com

This e-mail may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not distribute it. Please notify us immediately and delete all copies.
Thank you.



**From:** Pancho Bernasconi
**Sent:** Tuesday, March 09, 2010 2:22 PM
**To:** Andreas Gebhard
**Subject:** Fw: AFP/Morel

Can you answer her, pls?
Pancho Bernasconi

Director of Photography
Getty Images News & Sports
917-558-1371 (Cell)
646-613-3703 (Work)
pancho.bernasconi@gettyimages.com

Sent via Blackberry

**From:** Chris Eisenberg
**To:** Pancho Bernasconi
**Sent:** Tue Mar 09 11:20:51 2010
**Subject:** RE: AFP/Morel
BTW – what is our workflow for removing images from our site when AFP send us a Mandatory Kill notice? Are AFP responsible for doing so themselves?

We currently have 32 AFP images with "Mandatory Kill" in the caption on the website, and when I spot checked, the original image for at least one of those is still on our website (88979394 – kill notices for this one are 88987244, 88987341 and 88987191)



Redacted

G002803



Redacted

2

G002804



Redacted

G002805



Redacted

4

G002806



Redacted

5

G002807



6

G002808



G002809



8

G002810



9

G002811



10

G002812



11



12

G002814



13

G002815



14

G002816



15

G002817



16

G002818

17

G002819



18

G002820



G002821



G002822





Begin forwarded message:

> From: Pancho Bernasconi <Pancho.Bernasconi@gettyimages.com>
> Date: June 8, 2010 12:38:47 EDT
> To: Andreas Gebhard <Andreas.Gebhard@gettyimages.com>
> Subject: Fw: Getty Images Lightbox: AFP earthquake imagery
>
> Fyi...
> Pancho Bernasconi
>
> Director of Photography
> Getty Images News & Sports
> 917-558-1371 (Cell)
> 646-613-3703 (Work)
> pancho.bernasconi@gettyimages.com
> _____
> Sent via Blackberry
>

Redacted

G002859



Redacted

2

G002860



Redacted

3

G002861



Redacted

G002862



Redacted

5

G002863

>
> From: Andreas Gebhard <Andreas.Gebhard@gettyimages.com>
> Date: March 25, 2010 10:23:15 EDT
> To: Pancho Bernasconi <Pancho.Bernasconi@gettyimages.com>
> Subject: AFP / Morel
>
>
> Hi Pancho,
>
> These are the images in TEAMS. All of them are taken off the customer facing website, i.e. cannot be downloaded by clients anymore.
>
> DANIEL MOREL
> 95739064, 95738474, 95738495, 95738590, 95740635, 95740714, 95743940, 95738439, 95738505, 95738589, 95740651, 95740640, 95740636, 95738477, 95738491, 95738554, 95740618, 95738446, 95738515, 95738581, 95740616, 95740679, 95738444, 95738464
>
> LISANDRO SUERO
> 95734885, 95737417, 95734865, 95734825, 95734898, 95737394, 95734818, 95734704, 95737403, 95734878, 95737370, 95734844, 95734896, 95737398, 95740695
>
> I found no AFP kill notice in TEAMS which is consistent with Standard Operating Procedures. Kill Notices are only sent out over the feeds (XGTY) by AFP and then the killed images are inactivated in the database.
>
> Andreas
>
>
Begin forwarded message:

> From: Andreas Gebhard <Andreas.Gebhard@gettyimages.com>
> Date: March 25, 2010 10:23:15 EDT
> To: Pancho Bernasconi <Pancho.Bernasconi@gettyimages.com>
> Subject: AFP / Morel
>
> Hi Pancho,
>
> These are the images in TEAMS. All of them are taken off the customer facing website, i.e. cannot be downloaded by clients anymore.
>
> DANIEL MOREL

6

G002864



Redacted

Redacted

G002865



Redacted

G002866



Redacted

G002867



Redacted

Redacted

10

G002868

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

11

G002869

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

12

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

13

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

14

G002872

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

15

G002873

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

16

G002874

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

17

G002875

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

18

G002876

>
>
>
>
>
>
>
>
>
>
>                                                                    f
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

19

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

20

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

21

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

22

G002880

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

23

G002881

\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>
\>

24

G002882

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

G002883

>
>
>
>
>
>
>
>
>
>
>

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
> **************************************************************
Begin forwarded message:

> From: Pancho Bernasconi <Pancho.Bernasconi@gettyimages.com>
> Date: March 9, 2010 14:22:28 EST
> To: Andreas Gebhard <Andreas.Gebhard@gettyimages.com>
> Subject: Fw: AFP/Morel
>
> Can you answer her, pls?
> Pancho Bernasconi
>
> Director of Photography
> Getty Images News & Sports
> 917-558-1371 (Cell)
> 646-613-3703 (Work)
> pancho.bernasconi@gettyimages.com
> _____
> Sent via Blackberry
>
>
> From: Chris Eisenberg

26

G002884



Redacted

G002885



Redacted

G002886



Redacted

G002887



Redacted

30

G002888

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

31

>
>
>
>
>
>
>
>
>
>
>
>
>
>

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

32

G002890



>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
> *
>
>
>
>
>
>
>
>
>
>
>
>

33

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

34

G002892

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

35

G002893

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

36

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

37

G002895

> 
> *************************************************************************
Begin forwarded message:

> From: Andreas Gebhard <Andreas.Gebhard@gettyimages.com>
> Date: March 9, 2010 14:37:20 EST
> To: Pancho Bernasconi <Pancho.Bernasconi@gettyimages.com>
> Subject: Re: AFP/Morel
> 
> Will double-check w/ Dave, then get back to her.
> 
> 
> Andreas Gebhard
> New York Picture Desk Manager
> Getty Images Inc
> 
> Mobile +1 646 552 6454
> NY Picture Desk +1 646 613 3741
> 
> Sent from a BlackBerry
> 
> 
> From: Pancho Bernasconi
> To: Andreas Gebhard
> Sent: Tue Mar 09 11:22:28 2010
> Subject: Fw: AFP/Morel
> 
> Can you answer her, pls?
> Pancho Bernasconi
> 
> Director of Photography
> Getty Images News & Sports
> 917-558-1371 (Cell)
> 646-613-3703 (Work)
> pancho.bernasconi@gettyimages.com
> _____
> Sent via Blackberry
> 
> 
> From: Chris Eisenberg
> To: Pancho Bernasconi
> Sent: Tue Mar 09 11:20:51 2010
> Subject: RE: AFP/Morel
> 
> BTW – what is our workflow for removing images from our site when AFP send us a Mandatory Kill notice? Are AFP responsible for doing so themselves?
> 
> We currently have 32 AFP images with "Mandatory Kill" in the caption on the website, and when I spot checked, the original image for at least one of those is still on our website (88979394 – kill notices for this one are 88987244, 88987341 and 88987191)

> 

G002896



Redacted

G002897



40

G002898



41

G002899



Redacted

G002900

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

43

G002901

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

44

G002902

>
>
>
>
>
>
>
>
>

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

>
>
>
>
>
>
>
>
>
>
>
>
>
>

>
>
>

>
>
>

45

G002903

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

46

G002904

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

47

G002905

>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>

G002906

>
>
>
>
>
>

>
>
>
>
>
>

>
>
>
>
>
>

>
>
>
>
>
>
>

>
>
>
>
>
>
>

>
>
>
>
>
>

Begin forwarded message:

> From: Andreas Gebhard <Andreas.Gebhard@gettyimages.com>
> Date: March 9, 2010 15:32:37 EST
> To: Chris Eisenberg <Chris.Eisenberg@gettyimages.com>
> Cc: Pancho Bernasconi <Pancho.Bernasconi@gettyimages.com>
> Subject: Re: AFP/Morel
>
> Hi Chris,

49

G002907

>
> At the moment, we have no definitive workflow on this. AFP's Washington Bureau is trained and capable of removing images off of TEAMS. The other global AFP offices are not. Since most of their kills seem to originate in the Middle East/Nicosia, this usually falls into London's opening hours. The London desk then usually takes appropriate action, for lack of a better solution. They do not push back to AFP. NYC tends to do that but if it seems important, we rather do it ourselves than waste time in a discussion. In the end: inconsistent.
>
> We should discuss standardizing on one or the other. Probably useful for the greater Image Partner discussion, too.
>
> Regards,
>
> Andreas
>
>
>>
>> From: Chris Eisenberg
>> To: Pancho Bernasconi
>> Sent: Tue Mar 09 11:20:51 2010
>> Subject: RE: AFP/Morel
>> BTW – what is our workflow for removing images from our site when AFP send us a Mandatory Kill notice? Are AFP responsible for doing so themselves?
>>
>> We currently have 32 AFP images with "Mandatory Kill" in the caption on the website, and when I spot checked, the original image for at least one of those is still on our website (88979394 – kill notices for this one are 88987244, 88987341 and 88987191)
>>
>>
>> From: Pancho Bernasconi
>> Sent: Tuesday, March 09, 2010 10:56 AM
>> To: Heather Cameron; Chris Eisenberg
>> Subject: RE: AFP/Morel
>>
>> Not for us to send as it's not our photo.  The Kill would have to have been sent by AFP.
>>

Redacted

G002908



51

G002909



Redacted

G002910



53

G002911

>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>

G002912

```
>>
>>
>>
>>
>>
>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
```

G002913

>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>

G002914

>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>

G002915

>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>

G002916

>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>

G002917

>>
>>
>>
>>
>>
>>
>>
>>
>
>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>
>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>
>>

60

G002918

\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>
\>\>

Begin forwarded message:

\> From: Chris Eisenberg <Chris.Eisenberg@gettyimages.com>
\> Date: March 9, 2010 16:02:56 EST
\> To: Andreas Gebhard <Andreas.Gebhard@gettyimages.com>
\> Cc: Pancho Bernasconi <Pancho.Bernasconi@gettyimages.com>
\> Subject: RE: AFP/Morel
\>
\> That's exactly what I was thinking. We should perhaps find out from Legal what our obligation is for partner content where they send us a notice to kill it....
\>
\> Thanks!
\>
\> From: Andreas Gebhard
\> Sent: Tuesday, March 09, 2010 12:33 PM
\> To: Chris Eisenberg
\> Cc: Pancho Bernasconi
\> Subject: Re: AFP/Morel
\>
\> Hi Chris,
\>

61

G002919

> At the moment, we have no definitive workflow on this. AFP's Washington Bureau is trained and capable of removing images off of TEAMS. The other global AFP offices are not. Since most of their kills seem to originate in the Middle East/Nicosia, this usually falls into London's opening hours. The London desk then usually takes appropriate action, for lack of a better solution. They do not push back to AFP. NYC tends to do that but if it seems important, we rather do it ourselves than waste time in a discussion. In the end: inconsistent.
>
> We should discuss standardizing on one or the other. Probably useful for the greater Image Partner discussion, too.
>
> Regards,
>
> Andreas
>
>
>
> From: Chris Eisenberg
> To: Pancho Bernasconi
> Sent: Tue Mar 09 11:20:51 2010
> Subject: RE: AFP/Morel
> BTW – what is our workflow for removing images from our site when AFP send us a Mandatory Kill notice? Are AFP responsible for doing so themselves?
>
> We currently have 32 AFP images with "Mandatory Kill" in the caption on the website, and when I spot checked, the original image for at least one of those is still on our website (88979394 – kill notices for this one are 88987244, 88987341 and 88987191)
>
>



G002920



Redacted

G002921



Redacted

G002922



Redacted

65

G002923



Redacted

66

G002924

>
>
>
>

Redacted

>
>
>
>
>
>
>
>
>
>
>
>
>
>

Redacted

>
>
>
>
>
>
>
>
>
>
>
>
>
>

Redacted

>
>
>
>
>

67

G002925



```
>
>
>
>
>
>
>
>
>
```

Redacted

```
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
```

Redacted

```
>
>
>
>
>
>
>
>
>
>
>
>
>
>
```

Redacted

```
>
```

68

G002926

```
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
> *********************************************************************
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
> *********************************************************************
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
```

69

G002927



Redacted

```
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
```

Redacted

```
>
>
>
>
>
>
>
>
>
>
>
>
>
>
>
```

Redacted

```
>
>
>
>
>
>
>
>
>
```

70

G002928



```
>
>
>
>
>
>
> ****************************************************************
> ************************************************************
>
>
>
>
>
>
```

Redacted

```
>
>
>
>
>
```

Redacted

```
>
>
>
>
>
>
```

Redacted

```
>
>
>
>
```

Redacted

```
>
>
>
>
>
```

71

G002929



Redacted

72

G002930



Redacted

G002931



Redacted

dac

> From: Claire Keeley [mailto:claire.keeley@corbis.com]
> Sent: Wednesday, January 13, 2010 1:37 PM
> To: Heather Cameron
> Cc: Corbis Copyright Compliance
> Subject: Daniel Morel Haiti Images
> Importance: High
>
> Heather,
>
> We have a serious problem that I am hoping you can help me resolve.  Today, one of Corbis' editorial photographers uploaded some of his pictures from the earthquake in Haiti and put them on his Twitter page.  It appears that they were then illegally copied and distributed to third parties, including Getty.  One such example is on the home page of the New York Times website - Daniel's picture is the 14th one and it is credited as "Daniel Morel/AFP-Getty Images."  Daniel is exclusive to Corbis and is terribly dismayed by third parties distributing his works.  Assuming you aren't the right person to help me, can you please put me in touch with the right person at Getty to see what we can do to halt this distribution?  We will be issuing DMCA notices today but I thought that this approach might bear more fruit.  Thanks in advance!
>
> Regards,
> Claire
>
> Claire L. Keeley
> Senior Corporate Counsel
>
> Corbis
> http://www.corbis.com
>
> 710 Second Ave., Suite 200
> Seattle, WA  98104
> Main:  206.373.6000
> Direct:  206.373.6293
> Mobile:  206.972.0303

G002932

\> Fax: 206.373.6100
\> Email: claire.keeley@corbis.com
\>
\>
\> This e-mail may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not distribute it. Please notify us immediately and delete all copies.
\> Thank you.
\>
Begin forwarded message:

Redacted

G002933

Redacted

> From: Heather Cameron
> Sent: Tuesday, February 02, 2010 5:32 PM
> To: 'Jennifer Walker'; Chris Eisenberg
> Cc: Pancho Bernasconi
> Subject: RE: Daniel Morel Haiti Images
>
> Jennifer, I'm so sorry – I'm not sure what happened – I thought all of them were pulled from our site when you contacted us on the 13th. We'll get these additional 12 down asap. If you haven't heard back from Vincent, you can try contacting Eva Hambach – she confirmed she received our email on the 13th alerting her to the issue.
>
> Chris, would you please make sure the images below are removed from the site immediately? If you could please reply back to all if us when they are down, that would be terrific. Thanks.
>
> 95737370
> 95737394
> 95737403
> 95734704
> 95734818
> 95734844
> 95734865
> 95734878
> 95734885
> 95734896
> 95737398
> 95740695
>
>
> Heather Cameron
> Senior Paralegal
> Getty Images, Inc.
> 601 N. 34th Street
> Seattle, WA 98103
> 206.925.6424 Direct
> 206.925.5623 Facsimile
> heather.cameron@gettyimages.com
> This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient you should not disseminate, distribute or copy this e-mail or any attachments hereto. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system without copying or disclosing the contents. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. If verification is required please request a hard-copy version. Getty Images, 601 N 34th St, Seattle, WA. 98103, USA, www.gettyimages.com.
> PLEASE NOTE that all incoming e-mails will be automatically scanned by us and by an external service provider to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have concerns about this automatic filtering.
> From: Jennifer Walker [mailto:Jennifer.Walker@corbis.com]

G002934

> Sent: Tuesday, February 02, 2010 5:07 PM
> To: Heather Cameron
> Subject: FW: Daniel Morel Haiti Images
>
> Hi Heather,
>
> I have just been notified that Getty still has not removed the Daniel Morel images from its website. Please see the below link...
>
> http://www.gettyimages.com/Search/Search.aspx?contractUrl=2&language=en-US&family=editorial&assetType=image&p=lisandro%20suero%20haiti#
>
> I have sent a note to Vincent Amalvy at AFP with no response. Would you mind sharing the name of the person you mention below, in the D.C. office?
>
> Sincerely,
>
> Jennifer Walker
> Intellectual Property Enforcement Specialist
>
> Corbis
> http://www.corbis.com
>
> This e-mail may contain information that is priveleged, confidential and exempt from disclosure. If you are not the intended recipient, please do not distribute it. Please notify us immediately and delete all copies. Thank you
>
>
>
> From: Heather Cameron [mailto:heather.cameron@gettyimages.com]
> Sent: Wednesday, January 13, 2010 2:53 PM
> To: Claire Keeley
> Cc: Corbis Copyright Compliance; Pancho Bernasconi; Lisa Willmer
> Subject: RE: Daniel Morel Haiti Images
>
> Claire, thank you for letting us know.  Our picture desk in New York has already removed the content at issue from our website, all of which came to us via our relationship with AFP.  Getty Images has no editorial control over the content posted to our website via AFP.  Have you already been in touch with AFP by chance?  If not, I can provide you with contact information for someone in their D.C. office (the same person to whom we will forward your email below).
>
> Kind regards,
> Heather Cameron
> Senior Paralegal
>
> Getty Images, Inc.
> 601 N. 34th Street
> Seattle, WA  98103
> 206.925.6424 Direct
> 206.925.5623 Facsimile
> heather.cameron@gettyimages.com
>
> This message may contain privileged or confidential information and is intended only for the individual named. If you are not the named addressee or an employee or agent responsible for delivering this message to the intended recipient

G002935



78

G002936