UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

AGENCE FRANCE PRESSE,

                Plaintiff,

      -v-

DANIEL MOREL,

                Defendant

      -v-

GETTY IMAGES, INC., ET AL.,

                Counterclaim
                Defendants

----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JAN 1 4 2013

10 Civ. 02730 (AJN)

OPINION

ALISON J. NATHAN, District Judge:

On March 26, 2010, Plaintiff Agence France Presse ("AFP") filed a Complaint against photographer Daniel Morel seeking a declaration that AFP had not infringed Morel's copyrights in certain photographs and alleging commercial defamation. (Compl. ¶ 3). In response, Morel filed counterclaims against AFP, Getty Images, Inc. ("Getty"), and the Washington Post (the "Post"),[1] asserting that AFP, Getty, and the Post (collectively, "Counterclaim Defendants") have willfully infringed his copyrights, and that AFP and Getty are secondarily liable for the infringement of others and have violated the Digital Millennium Copyright Act ("DMCA"). (See Dkt. No. 80).[2] The parties now have filed cross-motions for summary judgment regarding

---

[1] Morel does not dispute that the WP Company LLC d/b/a The Washington Post publishes the newspaper "The Washington Post" and the website www.washingtonpost.com and has been sued erroneously as the Washington Post Company, or that WP Company LLC is a subsidiary of The Washington Post Company. (CC Def. SMF ¶ 63; Morel CSMF ¶ 63).

[2] Certain other claims were dismissed in a decision by Judge Pauley before the case was transferred to the undersigned. (Dkt. No. 52).

liability on the copyright and DMCA claims, as well as certain legal questions regarding how damages are to be assessed should liability be found.

## I.     BACKGROUND

The Court has undertaken a thorough review of the record, particularly the evidence cited in the parties' 56.1 statements and counterstatements.  *See Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000); *see also 24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 429 F.3d 39, 46 (2d Cir. 2005) (noting that courts are not required to consider what the parties fail to point out in their 56.1 statements, although they may exercise their discretion to do so); *Charter Oak Fire Ins. Co. v. Tri-County Fire & Safety Equip. Co.*, 636 F. Supp. 2d 193, 197 (E.D.N.Y. 2009) ("[I]t is only those portions of the record submitted in connection with a motion to which the court's attention is specifically directed, that the court is obligated to consider in determining whether a material issue of fact exists.").  On careful consideration of the evidence, the following facts and disputes of fact appear from the record.[3]

### A.  Morel Tweets Photos of the 2010 Haiti Earthquake

On January 12, 2010, a devastating earthquake struck Haiti.  (Morel SMF ¶ 12; CC Def. CSMF ¶ 12; Morel Decl. ¶ 11).  Morel, a photojournalist, was on scene and captured a number of images of the aftermath.  (Morel SMF ¶¶ 1, 13; CC Def. SMF ¶ 1, 13; Morel Decl. ¶¶ 2, 12-14).  Morel then posted his photographs to Twitter through a TwitPic account.  (Morel SMF ¶¶ 17, 21; CC Def. CSMF ¶¶ 17, 21; Morel Decl. ¶¶ 16, 19, 22; Hoffman Decl. Ex. U at Twitpic001-002).

---

[3] The Court notes that there are several instances in which Morel purports to dispute assertions in Counterclaim Defendants' 56.1 statement, but has cited no evidence that demonstrates such a dispute.  Except to the extent that the Court has located record evidence that, in fact, controverts such assertions or the assertions are not substantiated by the record, Morel's unsupported denials are insufficient to create a genuine issue of material fact.  *See Lorterdan Props. at Ramapo I, LLC v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 2012 U.S. Dist. LEXIS 95693, at *2-4 n.1 (S.D.N.Y. July 9, 2012); *BOUSA, Inc. v. United States (In re Bulk Oil (USA) Inc.)*, 2007 U.S. Dist. LEXIS 27346, at *48-50 (S.D.N.Y. Apr. 11, 2007) ("[F]ailure to provide any citation at all will leave a factual allegation without evidentiary value.").

The parties dispute—and the evidence is contradictory—as to precisely when Morel uploaded these photos.[4]  Morel contends that he uploaded them between 6:13 pm and 7:28 pm on January 12, 2010, an assertion supported by his declaration (Morel Decl. ¶¶ 22) and certain documentary evidence (Hoffman Decl. Ex. B, Morel Dep. Ex. 16 at 109).  Counterclaim Defendants argue that he did so precisely three hours later, between 9:13 and 10:28 pm, and rely on other documentary evidence and deposition testimony establishing this timeline.  (Hoffman Decl. Exs. U at TwitPic 18-20, Y; Winecoff Dep. at 12:17-13:3).  Counterclaim Defendants' position as to the timing of these events is, however, undercut by e-mails indicating Morel's pictures were posted on the timeline he describes.  (Morel SMF ¶¶ 41, 47; CC Def. CSMF ¶¶ 41, 47; Morel Decl. ¶¶ 22, 36-37; *cf. also* CC Def. CSMF ¶¶ 30-31).  Based on the evidence before it, the Court cannot conclusively resolve the precise timing of these events.  Regardless, shortly after Morel posted his pictures online—between 6:53 pm and 7:51 pm, if Morel's timeline is accepted, or between 9:53 pm and 10:51 pm per the evidence presented by Counterclaim Defendants—they were reposted to the Twitter account of Lisandro Suero, who tweeted that he had exclusive photographs of the earthquakes.  (Morel SMF ¶¶ 28-29, 38; CC Def. CSMF ¶¶ 28-29, 38; Hoffman Decl. Exs. B, Morel Dep. Ex. 16 at 109; Hoffman Decl. U at Twitpic 0002-0003, 0018-020).

## B.  AFP Obtains Morel's Photos

Also on January 12, 2010, Vincent Amalvy, the Director of Photography for North America and South America at AFP was searching for photographs of the aftermath of the earthquake in Haiti.  (CC Def. SMF ¶¶ 122, 124; Morel CSMF ¶¶ 122, 124; Amalvy Decl. at ¶¶

---

[4] Similar disputes regarding timing exist as to certain other activities on Twitter, such as the re-tweeting of Morel's photos by Lisandro Suero.

2, 4).  For example, at 7:12 pm he sent a link to the results of a PicFog search of the term "Haiti" to AFP's photo desk at wapix@afp.com; later that hour, he sent images of the earthquake in Haiti (not captured by Morel) to this same address.  (Morel SMF ¶¶ 31, 36-37; CC Def. CSMF ¶¶ 31, 36-37; Amalvy Dep. at 80:9-18, 98:2-99:8, 131:16-132:6; Hoffman Decl. Ex. E at AFP000833-834).  Once a photo is provided to AFP's photo desk, it is loaded to the AFP system for validation and captioning so that it can be distributed by AFP.  (Morel SMF ¶¶ 77-78; CC Def. CSMF ¶¶ 77-78).  AFP distributes such photographs through its international wire and a databank called ImageForum, which allows subscribers to access the photos either as part of a subscription plan or on an "a la carte" basis.  (CC Def. SMF ¶¶ 11-12, 14-15; Morel CSMF ¶¶ 11-12, 14-15; Amalvy Decl. ¶ 2).

As the evening progressed, Amalvy continued to send pictures to the AFP photo desk, including at least one created by Tequila Minsky, sent shortly after 9:00 pm.  (Morel SMF ¶¶ 53-55; CC Def. CSMF ¶¶ 53-55; Hoffman Decl. Ex. E; Minksy Decl. at ¶¶ 4, 7).  As particularly relevant to this action, between 11:23 pm and 11:36 pm, Amalvy sent eight of Morel's photographs to the AFP photo desk (the "Photos-at-Issue").  (Morel SMF ¶¶ 21, 69-76; CC Def. CSMF ¶¶ 21, 69-76; Hoffman Decl. Ex. E at AFP000813-818, 821-828).

## C.  Getty Receives Morel's Photos

After their receipt by AFP, AFP transmitted the Photos-at-Issue, credited to Suero, to Getty.  (CC Def. SMF ¶¶ 153, 156, 169; Morel CSMF ¶¶ 153, 156, 169; CC Def SMF ¶ 170; Morel CSMF ¶ 170; Eisenberg Decl. ¶ 16; Amalvy Dep. Ex. 14-A; Amalvy Decl. ¶ 15).  Getty distributes photographic images worldwide from a database of nearly 41 million images, allowing both subscribers and nonsubscribers to license these images, including on an "a la carte" basis.  (CC Def. SMF ¶¶ 29-34; Morel CSMF ¶¶ 29-34; Calhoun Decl. ¶¶ 2-5; Eisenberg

Decl. ¶¶ 3-4).  For users with subscriptions, the terms of these subscriptions determine the types or categories of images to which they have access, the purpose for which the images may be used, and the duration of permissible use; the use of content is also governed by the terms of licenses to that content.  (CC Def. SMF ¶¶ 32-34; Morel CSMF ¶¶ 32-34; Calhoun Decl. ¶¶ 4-5).

At the time AFP forwarded Morel's images to Getty, AFP and Getty had entered into a license agreement under which they granted reciprocal rights to, *inter alia*, display and license their images.  (Hoffman Decl. Ex. AA; CC Def. SMF ¶ 46-47; Morel CSMF ¶ 46-47).  As a result, AFP typically transmits roughly 1500 to 2000 images per day to the Getty system.  (CC Def. SMF ¶ 48; Morel SMF ¶ 48; Bernasconi Decl. ¶ 6).

When AFP transmits an image to Getty through AFP's feed, the image is first received and processed by Getty's system, which runs certain automated checks to ensure, *inter alia*, that the image is properly formatted for Getty's internal TEAMS database and reflects the required data for publishing.  (Morel SMF ¶¶ 97, 99; CC Def. CSMF ¶¶ 97, 99; Eisenberg Dep. at 35:18-36:16; 40:24-41:5).  If all the required data is present, the image is transmitted to Getty's customer-facing website.  (Morel SMF ¶ 99; CC Def. CSMF ¶ 99; Eisenberg Dep. at 35:18-36:16; 40:24-41:5).  However, if the image does not have all of the data required for publishing, it will remain in Getty's internal database, but will not be automatically published to Getty's website.  (Morel SMF ¶¶ 100-02; CC Def. CSMF ¶¶ 100-02; Eisenberg Dep. Tr. at 41:8-43:16).  In such instances, human intervention may be required to correct the issue, allowing the image to publish to Getty's website.  (Morel SMF ¶¶ 104-06; CC Def. CSMF ¶¶ 104-06; Eisenberg Tr. at 43:17-49:7).  When the Photos-at-Issue were transmitted to Getty, it appears such human intervention may have been necessary to allow the Photos-at-Issue to publish, although the precise nature of this intervention is disputed—particularly as to whether Getty altered

information about the byline or caption identifying the photographer.  (CC Def. SMF ¶ 156; Morel CSMF ¶ 156; Morel SMF ¶ 131; CC Def CSMF ¶ 131; Eisenberg Decl. ¶ 16).

### D.  Efforts to Correct the Byline and Remove the Photos-at-Issue

On the morning of January 13, 2010, Benjamin Fathers at AFP questioned the attribution of the Photos-at-Issue to Lisandro Suero, e-mailing Amalvy at 4:36 am (EST) that "I'm not sure Lisandro Suero's photos are his but they belong to Daniel Morel" with a link to Morel's TwitPic page.  (Morel SMF ¶ 119; CC Def. SMF ¶ 119; Fathers Tr. at 9:16-10:5, 25-29; Fathers Dep. Ex. 9 (AFP000421)).  About an hour after Fathers e-mailed Amalvy, AFP issued a "caption correction" that went out to Image Forum, AFP's wire, and AFP's archive, that credited Morel for the Photos-at-Issue.  (Morel SMF ¶ 123-24; CC Def. CSMF ¶ 123-24; CC Def. SMF ¶ 173-74; Morel CSMF ¶ 173-74; Hambach Dep. Tr. at 192; Hambach Dep. Ex. 11).  The caption correction did not, however, expressly state that the photographs that had already been credited to Suero should have been credited to Morel—rather, it stated that it was "CORRECTING BYLINE FOR FOLLOWING IMAGES Dec050/052/053/054/055/056/057/058 showing the destruction in Haiti following an earthquake measuring 7.8 in Port-au-Prince.  IMAGES SHOULD HAVE THE BYLINE OF DANIEL MOREL AFP PHOTO."  (Morel CSMF ¶ 174; Amalvy Decl. Ex. C).  AFP also changed the photographer credit of the Photos-at-Issue in ImageForum and on its wire to Daniel Morel.  (CC Def. SMF ¶ 181-82; Morel CSMF ¶¶ 181-82; Amalvy Decl. ¶¶ 18-19 & Exs. C &D; Fathers Dep. Vol. II at 41:13-44:10).  As the morning of January 13, 2010, progressed, AFP continued to internally discuss the proper attribution of the Photos-at-Issue, with Fathers noting that "it is very difficult to know to whom the photos belong, that's one of the risks of twitter but we are going to be vigilant so that we find the right bylines,"

and attempted to contact Morel.  (Morel SMF ¶¶ 135-37; CC Def. ¶¶ 135-37; Fathers Dep. Tr. at 25:5-30:17; Fathers Dep. Ex. 1 (AFP000440), Ex. 12 (AFP000581); Ex. 12-B (AFP000618)).

The caption correction also was sent to Getty through AFP's feed to Getty and was distributed to Getty's customers who received AFP's content via Getty's image feed, but was not displayed on Getty's website.  (CC Def. SMF ¶¶ 176-77; Morel. CSMF ¶¶ 176-77).  AFP also transmitted re-credited copies of the Photos-at-Issue—most crediting Daniel Morel and a few crediting "David" Morel—to Getty, with a caption that read "EDITORS NOTE ---- CORRECTING NAME OF PHOTOGRAPHER" with an updated photo credit "AFP PHOTO/DANIEL MOREL."   (Hambach Decl. ¶ 6; Eisenberg Decl. ¶ 17; CC Def. SMF ¶ 183-84; Morel CSMF ¶ 183-84).  AFP transmitted several corrected versions of each of the Photos-at-Issue, but did not remove the photos credited to Suero from Getty's system.  (Eisenberg Decl. ¶ 17; Hambach Decl. ¶ 6).  There is no mechanism in the AFP/Getty workflow that automatically locates and removes or updates photographs subject to a caption correction; rather, the photographs are simply resent to Getty's system with the corrected information.  (CC Def. SMF ¶ 186; Morel CSMF ¶ 186; Eisenbeg Decl. ¶ 18).

At 4:37 p.m. on January 13, 2010, Claire Keeley, Corporate Counsel at Corbis, Inc. ("Corbis"), e-mailed Heather Cameron, a Senior Paralegal at Getty, alerting her that Morel had uploaded his pictures to Twitter, that the photos were being distributed "credited as Daniel Morel/AFP-Getty Images," and that Morel was "exclusive to Corbis."  (Morel SMF ¶ 177; CC Def. SMF ¶ 177; Cameron Dep. Ex. 1 (G003806); Cameron Decl. ¶13 & Ex. C).  Morel and Corbis had previously entered into a representation agreement whereby Corbis was to be Morel's exclusive worldwide licensing agent for images sent to Corbis.  (Morel SMF ¶¶ 145-46; CC Def. CSMF ¶¶ 145-46; Morel Decl. ¶ 68 & Ex. E).  Prior to Keeley's e-mail, Morel had informed

Corbis that he had not given Getty or AFP authorization to sell the Photos-at-Issue.  (Morel SMF
¶ 167; CC Def. CSMF ¶ 167; Hoffman Ex. CC (COR 1693); Hoffman Reply Decl. Ex. G (COR
1020-21, 1030)).  Keeley's e-mail did not provide additional information to more particularly
identify the photos to which she was referring, did not reference images credited to Lisandro
Suero, and did not contain copies of the images themselves.  (Cameron Decl. Ex. C).  It did,
however, indicate that Corbis planned on issuing notices under the DMCA later that day.
(Cameron Decl. Ex. C).

Getty claims that after receiving this notice from Corbis, it searched for and removed all
of the earthquake-related images attributed to Daniel Morel that it found on its customer-facing
website.[5]  (CC Def. SMF ¶ 190; Cameron Decl. ¶ 15; Cameron Dep. Tr. at 16:3-21; Morel SMF
¶¶ 178, 180; CC Def. CSMF ¶¶ 178, 180).  Cameron informed Keeley via an e-mail at 2:53 pm
that these images had been removed and that the photos had been posted to Getty's service by
AFP, suggesting that Corbis should get in touch with AFP about the issue.  (Morel SMF ¶ 177;
CC Def. SMF ¶ 177; Cameron Dep. Ex. 1 (G003806); Cameron Decl. ¶13 & Ex. C).  It is
undisputed that Getty did not, at this time, remove the images credited to Suero.  (CC Def. SMF
¶¶ 215-16; Morel CSMF ¶¶ 215-16; Morel SMF ¶ 225, 235-36; CC Def. CSMF ¶ 225, 235-36).

---

[5] Morel controverts this statement, claiming that "Calhoun Dep. Exs. 1 and 2 show that Getty Images continued to
licenses 'Images attributed to Daniel Morel,' and that as of March 25, 2010, images credited to Daniel Morel
remained in TEAMS," citing  Bernasconi Dep. Ex. 16 and Morel's SMF ¶ 177.  (Morel CSMF ¶ 190).  Morel does
not appear to have submitted Bernasconi Dep. Ex. 16 to the Court (*see* Hoffman Decl. ¶ 22; Hoffman Reply Decl. ¶
5) or pages 76 through 88 of Bernasconi's deposition transcript (*See* Hoffman Decl. Ex. Q; Hoffman Reply Decl.
Ex. D), and none of the evidence cited in Morel SMF ¶ 177 supports these claims—all of these citations are to the e-
mail exchange between Keeley and Cameron.  No column of Calhoun Dep. Exs. 1 and 2 provides any direct
information regarding attribution of the photographs.  However, to the extent that the Court might infer that those
images with the description in column G "----EDITORS NOTE---- CORRECTING NAME" were images attributed
to Morel, as suggested by both that note itself, the fact that the "masterid" in column E is the same for some (but not
all) of these entries as the identification numbers for the images Getty pulled from its website (Morel SMF ¶¶ 178,
180), and other record evidence, the Court notes that a few invoice dates for these photos fall on January 14, 2010,
or later.  (*See also* Morel SMF ¶ 231-33; CC Def. SMF ¶ 231-33; Morel Opp. at 13).  There is thus an issue of fact
as to the precise times at which these photographs were removed from Getty's website, but it appears that these
images were removed by January 14, 2010.

Getty also does not dispute that after receiving this notification from Corbis on January 13, 2010, it was aware it had no right to license Daniel Morel's photographs.  (Morel SMF ¶ 240; CC Def. CSMF ¶ 240).

That evening, Cameron forwarded Corbis's e-mail to employees of AFP, noting in addition that Getty had "pulled 24 AFP assets from our site this afternoon credited to Daniel Morel/AFP."  (Cameron Ex. C).  That night, a Corbis employee contacted Amalvy, noting that he was "working on an infringement issue[] in which a twitter user by the name of Lisandro Suero posted images that [are] copyright protected by one of our exclusive photographers, Daniel Morel" and asking for assistance removing the images from AFP's site and sites posting the images crediting "Lisandro Suero – AFP/Getty." (Morel SMF ¶ 186, CC Def. CSMF ¶ 186; Amalvy Dep. Ex. 16 (AFP00512)).

The next day, January 14, 2010, at 2:58 pm, AFP issued a "Kill Notice" which stated

> MANDATORY KILL == MANDATORY KILL == MANDATORY KILL
> Due to a recent copyright issue, we kindly ask you to kill from all your systems
> Daniel Morel Pictures from Haiti.  We are sorry for any inconvenience; thank you
> for your cooperation.
> MANDATORY KILL == MANDATORY KILL == MANDATORY KILL

(Hambach Decl. Ex. A).  The Kill Notice was distributed through AFP's wire and in ImageForum, as well as being added to AFP's archive and sent via e-mail to AFP subscribers who had previously requested to receive such notices.  (Hambach Decl. ¶ 7-8; CC Def. SMF ¶ 196-99, 203; Morel CSMF ¶ 196-99, 203).  After the Kill Notice was issued, AFP removed from ImageForum and its archive all photos credited to Daniel Morel.  (Hambach Decl. ¶ 9; CC Def. SMF ¶ 206; Morel CSMF ¶ 206).

The Kill Notice was also sent to Getty's feed, and thus to Getty's customers who receive AFP's content through that feed.  (Hambach Decl. ¶ 7; CC Def. SMF ¶ 202; Morel CSMF ¶

202).  The Kill Notice did not identify specific image numbers used by Getty, provide thumbnails of the images in question, or provide notice that any of the Photos-at-Issue were credited to Suero or "David" Morel.  (CC Def. SMF ¶ 208; Morel CSMF ¶ 208; Hambach Decl. Ex. A).[6]  However, the evidence suggests that the Kill Notice was reviewed—as was AFP's earlier caption correction—by at least Getty employee Andreas Gebhard.  (Morel SMF ¶ 228; CC Def. CSMF ¶ 228; Cameron Dep. Ex. 17 (G002964-2965)).  Indeed, in response to an e-mail from AFP containing the Kill Notice, Gebhard replies "[h]andling" and later states "[y]ou guys [AFP] had re-sent them yesterday, to correct the photogs name, too."  (Morel SMF ¶ 228; CC Def. CSMF ¶ 228; Cameron Dep. Ex. 17 (G002964-2965)).  Gebhard had also earlier seen Morel's photos on Twitter in the evening of January 12, 2010.  (Morel SMF ¶ 63; CC Def CSMF ¶ 63; Hoffman Decl. Ex. Q, Bernasconi Dep. Ex. 1).

On February 2, 2010, Corbis again contacted Cameron at Getty, noting that "Getty still has not removed the Daniel Morel images from its website" and directing Cameron to a link to a search for photographs credited to Suero.  (Morel SMF ¶ 245; CC Def. SMF ¶ 245; Cameron Dep. Ex. 17 (G002961-62).  Getty removed the images credited to Suero that night.  (CC Def. SMF ¶ 216; Morel CSMF ¶ 216; Cameron Decl. ¶ 24; Eisenberg Decl. ¶ 22).  None of the Photos-at-Issue remained available for licensing on Getty's website after this point.  (CC Def. SMF ¶ 217; Morel CSMF ¶ 217; Cameron Decl. ¶ 25; Eisenberg Decl. ¶ 22).[7]  Thereafter, and

---

[6] Morel cites evidence from the Bernasconi deposition that kill notices typically contain more information than merely stating that there is a "recent copyright issue."  (Bernasconi Dep. Tr. at 106:5-107:23).

[7] Morel claims that Getty continued licensing the Photos-at-Issue until June 22, 2010.  (Morel CSMF ¶¶ 216-17 (citing Morel SMF ¶¶ 246-47, 250, and "Withheld Doc. # 13" (Hoffman Decl. Ex. II); Morel Opp. at 13 (failing to cite any supporting evidence).  The Court has reviewed Morel's submissions, and the evidence cited therein insofar as it has been included in the record, and finds no support for Morel's contention.  (Hambach Dep. Ex. 14 (discussing, in February 2010, the removal of the images credited to Suero); COR 962-64 (same); Eisenberg Dep. Ex. 2 (AFP000514) (same)).  At most, the evidence to which Morel has directed the Court shows that Getty was still contacting licensees of the Photos-at-Issue on June 22, 2010, regarding the copyright dispute that had arisen over

after being contacted by Morel's counsel, Getty took efforts to reach out to its customers who had purchased the Photos-at-Issue and notify them regarding Morel's copyright claim.  (CC Def. SMF ¶¶ 219, 228-30; Morel CSMF ¶¶ 219, 228-30; Calhoun Decl. ¶¶ 17-19; Calhoun Dep. Tr. at 102:15-106:24, 187:19-192:17, 200:7-17, 212:21-213:18; Cameron Decl. ¶¶ 41-43; Cameron Dep. Tr. at 69:21-70:24).

### E.  The Post

The Post concedes that it received from Getty and published four of the Photos-at-Issue on its website, three credited to "Lisandro Suero/AFP/Getty Images" and one credited to "Daniel Morel-AFP/Getty Images."  (CC Def. SMF ¶¶ 234-35; Morel CSMF ¶¶ 234-35).[8]  Although the Post admits publishing some of the Photos-at-Issue, it denies that it did so with knowledge that they were infringing or that it should be held liable for willful infringement.  Morel, however, points to a series of events that he contends demonstrates that the Post was on notice of its infringement and continued to display the Photos-at-Issue, rendering it liable for willful infringement.

Specifically, nearly two months after the earthquake, on March 9, 2010, Morel's counsel, Barbara Hoffman, sent a letter to an officer of the Post's parent company, Ann McDaniel, and

---

these images, not that it was itself continuing to license the images up to this date.  (Hoffman Decl. Ex. II).

[8] Morel raises an ostensible dispute about the number of the Photos-at-Issue that the Post published, contending that the Post downloaded nine assets from Getty.  On review of the record, and drawing all reasonable inferences in his favor, the Court finds that Morel has failed to raise a genuine issue of fact as to the number of the Photos-at-Issue that the Post downloaded or published.  Morel's own narrative statement of fact suggests that several of those images he contends the Post downloaded were duplicates, (Morel SMF ¶ 190 (citing Bernasconi Dep. Exs. 9 &16; Calhoun Dep. Ex. 2; Cameron Dep. Ex. 27)), and none of the record evidence that Morel cites appears to support his claim that nine images were downloaded: Bernasconi Dep. Ex. 9 is an internal Getty e-mail that does not address the Post's conduct; Bernasconi Dep. Ex. 16 does not appear to be in the summary judgment record (Hoffman Decl. ¶ 22 & Ex. Q); and Calhoun Dep. Ex. 2 and Cameron Dep. Ex. 27 suggest that only six unique images were downloaded (*see also* Morel SMF ¶ 200).  More fundamentally, however, the Post has submitted evidence, uncontroverted by Morel, that the downloads Morel points to were actually by employees of Slate and The Root (Cameron Supp. Decl. ¶¶ 21-23 & Ex. E; Calhoun Dep. Ex. 2 at rows 245-253, column R; McLaughlin Supp. Decl. ¶ 5), separate companies from the Post.

via e-mail to TWPCoReply@washpost.com, that stated that Morel had determined to allow the Post to display Morel's photographs, but required them to correct the credit to read "Daniel Morel." (CC Def. SMF ¶¶ 240, 242; Morel CSMF ¶¶ 240, 242; Gish Decl. ¶ 3 & Ex. A). The Post contends it has no record of receiving this letter in March 2010, and the TWPReply@washpost.com e-mail address is a generic address administered by the Post's parent company, not affiliated with the Post's news organization or any specific person. (CC Def. ¶¶ 241-42; Morel CSMF ¶¶ 241-42; McLaughlin Decl. ¶¶ 12-13). On roughly May 13, 2010, Hoffman sent a letter to the Post's Executive Editor Marcus W. Brauchli via Federal Express, demanding Morel's images be removed; the Post and Brauchli deny receiving this letter, noting that the Federal Express records show it was incorrectly addressed to "Marous Brauchi." (CC Def. SMF ¶¶ 244; Morel CSMF ¶¶ 244; Gish Decl. Exs. A & B; McLaughlin Decl. ¶ 14 & Ex. A). The same letter was sent by e-mail to national@washpost.com and foreign@washpost.com, which are monitored by low-level aides. None of the above letters were sent to the Post's legal department. (CC Def. SMF ¶¶ 243, 246; Morel CSMF ¶¶ 243, 246; McLaughlin Decl. ¶ 12, 15).

On June 10, 2010, Michel duCille, a Post employee, was notified by Getty that three photographs in the Post's online gallery were the subject of a copyright dispute and should be taken down. (CC Def. SMF ¶ 247; Morel CSMF ¶ 247). DuCille and a colleague logged into the gallery and took the correct steps to delete the photographs but, for unknown reasons, the photographs continued to appear in the gallery. (CC Def. SMF ¶¶ 248, 259; Morel CSMF ¶¶ 248, 259; Morel SMF ¶ 294; CC Def. CSMF ¶ 294; Ghatti Decl. ¶¶ 4-9 & Ex. A; duCille Decl. ¶¶ 20-21 & Ex. A). On June 17, 2010, Hoffman again set a letter via Federal Express to McDaniel and Brauchli, which this time was routed to James McLaughlin in the Post's legal department. (CC Def. SMF ¶¶ 249-50; Morel CSMF ¶¶ 249-50; McLaughlin Decl. ¶¶ 16-17 &

Ex. A).  McLaughlin e-mailed Hoffman to acknowledge receipt and ask her to identify the images to be removed, since the June 17 letter did not provide this information and McLaughlin had not seen the previous letters.  (CC Def. SMF ¶ 251; Morel CSMF ¶ 251; McLaughlin Decl. ¶¶ 18-20 & Ex. B; Gish Decl. Ex. A).  Hoffman did not respond.  (CC Def. SMF ¶ 252; Morel CSMF ¶ 252; McLaughlin Decl. ¶ 22).  McLaughlin did, however, confer with the Post's General Counsel, and was informed that duCille had reported that he removed the images.  (CC Def. SMF ¶ 253; Morel CSMF ¶ 253; McLaughlin Decl. ¶ 21; duCille Decl. ¶ 22).

On April 6, 2011, after Morel's counsel contacted Getty and AFP and noted that Morel's images were still on the Post's website, counsel for Getty informed McLaughlin of this fact.  (CC Def. SMF ¶ 255; Morel CSMF ¶ 255; McLaughlin Decl. ¶ 23).  On April 8, 2011, after McLaughlin was sent a link to the Photos-at-Issue by Getty's counsel confirming they were still visible on the Post's website, McLaughlin had the images removed from the website.  (CC Def. SMF ¶¶ 255-58; Morel CSMF ¶¶ 255-58; McLaughlin Decl. ¶ 23; Ghatti Decl. ¶ 5)

## II.    DISCUSSION

Summary judgment is proper only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).  In reviewing the evidence on a motion for summary judgment, courts are to construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Id.*  A fact is material if it might affect the outcome of the suit under the governing law and an issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

Because several of the issues presented for summary judgment turn on questions of intent, a brief word is in order regarding the propriety of summary judgment if a defendant's

state of mind is at issue.  As a general matter, although it may be permissible to grant summary judgment when mental state is at issue if there are sufficient undisputed material facts on the record, courts are generally reluctant to do so.  *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995).  Issues of intent are questions of fact and, as such, the Second Circuit has explained that summary judgment should be used sparingly.  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012).  In short, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  The court's role in deciding a motion for summary judgment is to identify factual issues, not to resolve them."  *Id.* at 174 (quotation marks and citations omitted); *see also Koon Chun Hing Kee Soy & Sauce Factory v. Star Mark Mgmt.*, 2007 U.S. Dist. LEXIS 1404, at *25-26, *41-42, *46 (E.D.N.Y. Jan. 8, 2007).

### A.  <u>Direct Liability</u>

Morel moves for summary judgment on his claim of direct copyright infringement.  To prove direct infringement, Morel must establish (1) ownership of a valid copyright and (2) that the Counterclaim Defendants infringed any of his exclusive rights granted by 17 U.S.C. § 106.  *See Arista Records LLC v. Doe*, 604 F.3d 110, 117 (2d Cir. 2010).  Defendants do not dispute that Morel holds a valid copyright in the Photos-at-Issue.  (Morel SMF ¶ 22-23; CC Def. CSMF ¶ 22-23; CC Def. Opp. at 6).

Morel asserts AFP and Getty engaged in a number of violations of his exclusive rights granted by § 106, including infringement of his exclusive right of reproduction, infringement of his exclusive right of public display, and infringement of his exclusive right to distribute the

copyrighted works.[9]  (Morel Br. at 19-28).  Counterclaim Defendants, although raising

affirmative defenses that they claim preclude liability, do not contest that they have engaged in

activities with respect to the Photos-at-Issue that—absent their affirmative defenses—would

infringe these rights.  (AFP Opp. at 6 ("Nor do Defendants dispute for purposes of this motion

that they copied, distributed and displayed certain of the Photos at Issue.  Specifically, as

articulated in their Joint Brief, AFP and Getty Images copied, distributed and displayed the eight

Photos at Issue and the Post displayed a subset of those photos.") (internal citations omitted)).[10]

In light of the above, the dispute between the parties with regard to liability for direct

infringement turns on Counterclaim Defendants' affirmative defenses, namely their claims that

(1) by posting the Photos-at-Issue on TwitPic/Twitter, Morel granted them a license, (2) Getty is

entitled to the benefit of a DMCA safe-harbor, and (3) Getty has not engaged in volitional

conduct sufficient to impose liability.[11]  The parties cross-move on these issues, each side

contending that they are entitled to judgment in their favor.

### 1.  Third Party Beneficiary/License Defense

---

[9] Morel cites 17 U.S.C. § 106(4) in asserting that AFP and Getty have infringed his exclusive right of distribution. (Morel Br. at 22)  The Court assumes this is a typographical error and that Morel intends to refer to 17 U.S.C. 106(3).

[10] Morel also purports to move for summary judgment against "Getty Clients Does 1 – et al" and lists in his brief a number of "Getty Clients" he claims have engaged in infringement.  (Morel Br. at 22-23).  It appears that Morel seeks summary judgment against an unspecified number of parties who are not involved in this litigation, including some who are still unidentified.  Similarly, Morel asserts infringement of his exclusive right to create derivative works of the Photos-at-Issue, claiming that "licensees of AFP and Getty Images used [the Photos-at-Issue] in TV programming, in newspapers, on posters, *inter alia*, Soles for Souls . . . and the Clinton Foundation, on websites, as banners and as logos."  (Morel Br. at 21).  Morel then asserts that "[s]uch uses by Getty and AFP subscribers, customers, and clients are direct infringements" of Morel's rights, including his right to create derivative works. (Morel Br. at 21).  It is not clear if Morel raises the activities of Soles for Souls and the Clinton Foundation as related to his claims for secondary liability or in an effort to obtain summary judgment against these entities.  Morel cannot, of course, obtain summary judgment against non-parties who have never been named or served in this matter.

[11] Counterclaim Defendants had previously asserted that Morel lacked standing to bring this action, but have now withdrawn that defense.  (CC Def. Opp. at 10-11).

The Court begins by considering AFP's argument that it cannot be held liable because Morel granted it a license by posting the Photos-at-Issue on Twitter.  In short, although recognizing that merely posting material on the internet does not vitiate a copyright in those materials (CC Def. Opp. at 7), AFP contends that by posting the Photos-at-Issue on Twitter through TwitPic, Morel subjected the Photos-at-Issue to the terms of service governing content posted to those websites, and that these terms of service provided AFP with a license.  In response, Morel contests that Twitter or TwitPic's terms of service granted AFP a license for its conduct, but does not dispute that he accepted Twitter's terms of service or that, as a general matter, they apply to the Photos-at-Issue.  (CC Def. SMF ¶¶ 80, 82; Morel CSMF ¶¶ 80, 82; Morel Br. at 47-48; Morel Opp. at 25-27; Morel Reply at 12-15).

A license is an affirmative defense to a copyright claim.  *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).  If only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized.  *Tasini v. New York Times Co.*, 206 F.3d 161, 171 (2d Cir. 1999); *Bourne*, 68 F.3d at 632.  The Court will address the question of whether the Twitter Terms of Service in effect when Morel posted the Photos-at-Issue ("Twitter TOS") provided AFP with a license by first reviewing the evidence on which AFP relies, and then considering whether AFP has either demonstrated the existence of such a license or raised a genuine issue of material fact precluding a grant of summary judgment in Morel's favor.

      a.  <u>AFP's evidence</u>

It is undisputed that Morel uploaded the Photos-at-Issue through his TwitPic account. When a user creates an account with TwitPic (Hendon Decl. Ex. 4 at 3, they are directed to a page which states that "[b]y authorizing an application you continue to operate under Twitter's

16

Terms of Service."  (Hendon Decl. ¶ 6, Ex. 4; *see also* Dkt. No. 33-3, 33-4, 33-5).  The relevant

TwitPic TOS themselves also state that "[b]y uploading your photos to TwitPic you give TwitPic

permission to use or distribute your photos on Twitpic.com or affiliated sites.   All images

uploaded are copyright © their respective owners."  (Dkt. No. 33-4).

 Because Morel uploaded the Photos-at-Issue through TwitPic, the Twitter TOS apply to

the Photos-at-Issue.  As relevant here, the Twitter TOS provide the following, in a section

entitled "Your Rights."

> You retain your rights to any Content you submit, post or display on or through
> the Services. By submitting, posting or displaying Content on or through the
> Services, you grant us a worldwide, non-exclusive, royalty-free license (with the
> right to sublicense) to use, copy, reproduce, process, adapt, modify, publish,
> transmit, display and distribute such Content in any and all media or distribution
> methods (now known or later developed).
>
> Tip[:] This license is you authorizing us to make your Tweets available to the rest
> of the world and to let others do the same. But what's yours is yours – you own
> your content.
>
> You agree that this license includes the right for Twitter to make such Content
> available to other companies, organizations or individuals who partner with
> Twitter for the syndication, broadcast, distribution or publication of such Content
> on other media and services, subject to our terms and conditions for such Content
> use.
>
> . . .
>
> Such additional uses by Twitter, or other companies, organizations or individuals
> who partner with Twitter, may be made with no compensation paid to you with
> respect to the Content that you submit, post, transmit or otherwise make available
> through the Services.
>
> . . .
>
> You are responsible for your use of the Services, for any Content you provide,
> and for any consequences thereof, including the use of your Content by other
> users and our third party partners. You understand that your Content may be
> rebroadcasted by our partners and if you do not have the right to submit Content
> for such use, it may subject you to liability. . . .

(Hendon Decl. Ex. 2).  AFP also notes that the Twitter TOS state "Tip[:] What you say on

Twitter may be viewed all around the world instantly.  You are what you Tweet!" and "We

encourage and permit broad re-use of Content."  (Hendon Decl. Ex. 2).  From this foundation,

AFP argues that it is a third-party beneficiary of the license agreement between Morel and

Twitter, claiming in particular that the Twitter TOS intended to confer a benefit (in the form of a

license) on Twitter's "other users."  (CC Def. Br. at 8-12; CC Def. Opp. at 9; CC Def. Reply at

1-2).

AFP also points to Twitter's *Guidelines for Third Party Use of Tweets in Broadcast or

Other Offline Media* ("Guidelines") which provide "[w]e welcome and encourage the use of

Twitter in broadcast."  (Hendon Decl. Ex. 5).  Counterclaim Defendants do not, however,

address the very next sentence of the Guidelines, which discusses "requirements" to "ensure that

Twitter users receive attribution for their content," or the content of these guidelines which

include, among other things, a requirement that the username be included with the Tweet and

that the full text of the Tweet be used.  (Hendon Decl. Ex. 5).  Similarly, for displaying images

shared on Twitter, the guidelines require that broadcasters "[a]lways display the image and its

associated Tweet together; think of the image as part of the Tweet itself" and "[a]lways include a

clear reference to Twitter."  (Hendon Decl. Ex. 5).  The Guidelines also have suggestions for

broadcasters to "get the most" out of using Tweets in their broadcasts.  (Hendon Decl. Ex. 5).

b.  The Twitter TOS do not provide a license for AFP's conduct

The Twitter TOS are governed by California law.  (Hendon Decl. Ex. 2).  AFP argues

that it was a third party beneficiary to the Twitter TOS and derives a license from those terms of

service, and is therefore insulated from liability.  (CC Def. Mot. at 8-12).  The test for

determining whether a contract was made for the benefit of a third person is whether an intent to

benefit a third person appears from the terms of the contract. *Martin v. Bridgeport Cmty. Assoc., Inc.*, 173 Cal. App. 4th 1024, 1034 (Cal. App. 2d Dist. 2009); *Prouty v. Gores Tech. Group*, 121 Cal. App. 4th 1225, 1232 (Cal. App. 3d Dist. 2004). An individual may be a third-party beneficiary to a contract if the terms of the contract "necessarily require" that the promisor conferred a benefit on that third party. *Prouty*, 121 Cal. App. 4th at 1232; *see also Oracle Am., Inc. v. Innovative Tech. Distribs. LLC*, 2012 U.S. Dist. LEXIS 134343, at *55-57 (N.D. Cal. Sept. 18, 2012). The terms of the agreement, however, must "clearly manifest" an intent to benefit the third party. *See Martin*, 173 Cal. App. 4th at 1034 ("Reading the agreement as a whole in light of the circumstances under which it was made, the terms of the agreement must clearly manifest an intent to make the obligation inure to the benefit of the third party."); *San Francisco v. Western Air Lines, Inc.*, 204 Cal. App. 2d 105, 120-21 (Cal. App. 1st Dist. 1962); *see also Green Desert Oil Group v. BP West Coast Prods.*, 2011 U.S. Dist. LEXIS 131140, at *9 (N.D. Cal. Nov. 14, 2011) (explaining that, although an intended beneficiary need not be specifically identified in the contract, they still must fall within a class "clearly intended" by the parties to benefit from the contract).

The Court need not fix the precise scope of any license created by the Twitter TOS in order to resolve the dispute before it. Rather, it suffices to say that based on the evidence presented to the Court the Twitter TOS do not provide AFP with an excuse for its conduct in this case. *See Prouty*, 121 Cal. App. 4th at 1233 (explaining that, while third-party benefieciary status is often a question of fact, "where, as here, the issue can be answered by interpreting the contract as a whole and doing so in light of the uncontradicted evidence . . . the issue becomes one of law that we resolve independently."); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.*, 171 Cal. App. 4th 35, 51 (Cal. App. 1st Dist.

2009) ("Where the facts are undisputed, the issue is one of law").  Put differently, the evidence does not reflect a clear intent to grant AFP a license to remove the Photos-at-Issue from Twitter and license them to third parties, nor does it "necessarily require" such a license.  *See Martin*, 173 Cal. App. 4th at 1034 (holding that the facts pleaded did not clearly manifest an intent to benefit the party claiming third-party beneficiary status); *see also Charles Lowe Co. v. Xomox Corp.*, 1999 U.S. Dist. LEXIS 20308, at *23-24 (N.D. Cal. Dec. 23, 1999) (granting summary judgment because nothing in the terms of the contract disclosed an intent to benefit the claimed third-party beneficiary).  Indeed, this is the fatal flaw in AFP's argument: it fails to recognize that even if some re-uses of content posted on Twitter may be permissible, this does not necessarily require a general license to use this content as AFP has.

The import of the Twitter TOS has already been discussed once in this matter in a decision that bears on the Court's current analysis.  Specifically, before this litigation was transferred to the undersigned, Counterclaim Defendants argued on a motion to dismiss before Judge Pauley that the Twitter TOS granted an express license to use Morel's images or, alternatively, that they are third party beneficiaries of a license agreement between Twitter and Morel, embodied in the Twitter TOS.  *Agence Fr. Presse v. Morel*, 769 F. Supp. 2d 295, 302-03 (S.D.N.Y. 2011).  Judge Pauley concluded that the express language of the Twitter and TwitPic TOS did not provide an express license that covered AFP.  *See id.*  Moreover, with respect to AFP's claim of third-party beneficiary status, Judge Pauley found that the Twitter TOS "'necessarily required' Morel as promisor to confer certain rights of use on two classes— Twitter's partners and sublicensees" and the Twitter TOS statement that they "encourage and permit broad reuse-of Content" did not, on the pleadings, establish Twitter's intent to confer a license on "other users."  *Id.* at 303.

Arguing for third party beneficiary status, AFP advances on this motion many of the same arguments that Judge Pauley has already considered and rejected with regard to the express language of the Twitter TOS.  For example, the plain language of the Twitter TOS does not support finding a license covering AFP's conduct, even as a third-party beneficiary.  As Judge Pauley already explained, the Twitter TOS spell out expressly the entities to whom a license is granted, namely Twitter and its partners—and AFP does not contend that it is one of Twitter's "partners."  *Id.*  Construing the Twitter TOS to provide an unrestrained, third-party license to remove content from Twitter and commercially license that content would be a gross expansion of the terms of the Twitter TOS.  Indeed, if Twitter intended to confer such a benefit, it easily could have manifested this intent.  Instead, the Twitter TOS specify that the license was granted to Twitter and its partners, that the license "includes the right for Twitter to make . . . Content available," and that additional uses of this content "by Twitter" or its partners may be made without compensation.  In short, rather than showing that the benefit AFP claims was "necessarily required," *Oracle Am.*, 2012 U.S. Dist. LEXIS 134343, at *55-57 , by the Twitter TOS, the terms of this contract cut <u>against</u> finding that Twitter intended to confer the benefit of a license on AFP to sell licenses to the pictures posted on Twitter or TwitPic.

In addition, in making its arguments on summary judgment AFP wholly ignores those portions of the Twitter TOS that are directly contrary to its position, particularly those portions stating that "[y]ou retain your rights to any Content you submit, post or display" and "what's yours is yours – you own your content."  These statements would have no meaning if the Twitter TOS allowed third parties to remove the content from Twitter and license it to others without the consent of the copyright holder.  *See Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1027 (Cal. App. 4th Dist. 2011) ("To the extent practicable, the meaning of a contract must be derived

21

from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless.").  Far from "necessarily requiring" the license AFP now claims, the Twitter TOS provides that users retain their rights to the content they post—with the exception of the license granted to Twitter and its partners—rebutting AFP's claim that Twitter intended to confer a license on it to sell Morel's photographs.

The reference in the Twitter TOS to use of content by "other users," and that the license authorizes Twitter to "make your Tweets available to the rest of the world and to let others do the same" are not to the contrary.  First, the reference to "other users" occurs in a paragraph of the Twitter TOS addressing the user's responsibility for the content they post, not the paragraphs discussing the licenses granted under the Twitter TOS.  Moreover, even assuming that these statements grant *some* form of license to third parties ("other users") to, for example, re-tweet content posted on Twitter—a question not before the Court—they do not suggest an intent to grant a license covering the activities at issue here.   To the contrary, the phrase "other users" suggests that any such license may be limited to use of the material on Twitter; otherwise, the Twitter TOS would simply refer to "others" rather than "other users."[12]  When read in the context of the Twitter TOS as a whole, this phrase is not sufficient to create a genuine dispute as to whether the Twitter TOS necessarily require the license claimed by AFP.

Likewise, as Judge Pauley has already held, "that Twitter 'encourage[s] and permit[s] broad re-use of Content' does not 'necessarily require'" that AFP was granted a license to remove the Photos-at-Issue from Twitter and license them to others.  *Agence Fr. Presse*, 769 F.

---

[12] Similarly, the statement in the Twitter TOS that "[t]h[e] license is you authorizing us to make your Tweets available to the rest of the world and to let others do the same" refers to making the Tweets available to the world, not to allowing others to sell the content of those Tweets.

Supp. 2d at 303.  This language—which, Judge Pauley explained, is at best ambiguous—cannot overcome the content of the Twitter TOS as a whole, which demonstrates that no such license was intended, let alone "clearly manifest" or "necessarily required."  *Oracle Am.*, 2012 U.S. Dist. LEXIS 134343, at *55-57; *Martin*, 173 Cal. App. 4th at 1034.

Nor do the Guidelines suggest AFP's commercial uses are licensed.  If anything, the Guidelines further underscore that the Twitter TOS were not intended to confer a benefit on the world-at-large to remove content from Twitter and commercially distribute it: the Guidelines are replete with suggestions that content should not be disassociated from the Tweets in which they occur.  In this vein, AFP's reliance on the statement in the Guidelines that Twitter "welcome[s] and encourage[s] the use of Twitter in broadcast" is not convincing, as AFP's removal from Twitter and commercial licensing of the Photos-at-Issue is not akin to the rebroadcast of a Tweet.  Thus, even to the extent that the Guidelines could rebut the evidence found in the Twitter TOS, they do not create a dispute precluding summary judgment in Morel's favor because they cut against finding that the license claimed by AFP is "necessarily required" by the Twitter TOS or was intended by Twitter.

Finally, AFP presents the Court with a false dichotomy, claiming that either its conduct must have been licensed or "the uncountable number of daily 're-tweets' on Twitter and in the media where Twitter/TwitPic posts are copied, reprinted, quoted, and rebroadcast by third parties, all could constitute copyright infringements."  (CC Def. Opp. at 10).  However, as the Court has just explained, a license for one use does not equate to a license for all uses.  *See, e.g.*, *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 20 (2d Cir. 1976); *Netbula, LLC v. Bindview Dev. Corp.*, 516 F. Supp. 2d 1137, 1150 (N.D. Cal. 2007) (explaining that "if . . . a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action

for copyright infringement").  Indeed, Counterclaim Defendants recognize in their briefs that there are many different kinds of license, stating that "[s]ome terms of service provide creative commons licensees, some provide license with attribution, some provide no license." (CC Def. Opp. at 7).  By the same token, even assuming there may be *some* license to third parties granted by the Twitter TOS—for example, a license to "re-tweet" content posted on Twitter—this function of Twitter simply does not necessarily require the license urged by AFP or manifest an intent to grant such an unrestricted license.

The Court concludes that AFP has not demonstrated that it is entitled to summary judgment and, in fact, based on the evidence before the Court, AFP has failed to demonstrate a genuine issue of material fact precluding the Court from granting summary judgment in Morel's favor on AFP's license defense.  *See Prouty*, 121 Cal. App. 4th at 1233 ("[W]here, as here, the issue can be answered by interpreting the contract as a whole and doing so in light of the uncontradicted evidence . . . the issue becomes one of law that [the Court may] resolve independently."); *see also Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (explaining that to survive summary judgment, a party must come forward with specific facts demonstrating a genuine issue for trial); *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg.*, 132 F.3d 1303, 1307 (9th Cir. 1997) (explaining that summary judgment is permissible even if a contract is ambiguous when the ambiguity, considering all the evidence in the light most favorable the non-movant, could not be resolved in the non-movant's favor); *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (same).  In short, considering all of the evidence on this issue presented to the Court, and drawing all reasonable inferences in AFP's favor, the Twitter TOS do not "necessarily require" the benefit that AFP now claims.

AFP and the Post raise no other defenses to liability for direct copyright infringement and, in fact, concede that if their license defense fails—as the Court has determined that it does—they are liable for direct copyright infringement. Getty, however, raises further defenses to liability, which the Court now considers.

### 2. DMCA Safe Harbor

Getty claims that it cannot be liable because it is entitled to the benefit of a safe-harbor under the DMCA, one that covers infringement claims that arise "'by reason of the storage at the direction of a user material that resides on a system or network controlled or operated by or for [a] service provider.'" *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012) (quoting 17 U.S.C. § 512(c)(1)). This safe harbor, among others, was created by Congress through Title II of the DMCA, the "Online Copyright Infringement Liability Limitation Act" ("OCILLA"), to clarify the liability faced by service providers who transmit potentially infringing material over their networks. *Id.*

In order to qualify for the OCILLA safe harbors, a party must meet a set of threshold criteria. Most importantly for purposes of the present motions, the party seeking the benefit of the safe harbor must be a "service provider," defined in pertinent part as "a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B). Courts considering this threshold requirement have generally held that this definition is "broad," with some going so far as to suggest that the definition of service provider is so broad that they "have trouble imagining the existence of an online service that *would not* fall under the definitions." *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002); *see also Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1175 (C.D. Cal. 2002) (noting that "[a]lthough there appears to be uniform agreement that the definition is broad . . . the Court

has found no discussion of this definition's limits"); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2011); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1099-1100 (W.D. Wash. 2004); *cf. Viacom*, 676 F.3d at 39 (explaining that service providers are not limited to those who merely store material, but not expanding upon the limits of this definition).

In the case at bar, however, it appears that notwithstanding the breadth of activities that courts have held are performed by service providers, the Court may have encountered facts defining the limits of what constitutes a service provider.  In order to determine whether there is a material dispute on whether Getty qualifies as a service provider, the Court must take a more detailed look at the meaning of this term.

In defining "service provider," section 512(k)(1)(B) provides that the party seeking to invoke the safe harbor must be "a provider of online services or network access, or the operator of facilities therefor."  *See Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012) (questions of statutory interpretation begin with the text of the statute). Notwithstanding those Courts that have noted the breadth of this definition, Congress must have intended this threshold inquiry to impose some limitation on the availability of the § 512 safe harbors, or it would not have included the "service provider" requirement at all.  The question before the Court at this juncture is what it means to provide online "services," and the limits of the OCILLA safe harbors.

Looking first to the ordinary meaning of "service," Black's Law Dictionary contains a number of definitions of "service."  *United States v. Gravel*, 645 F.3d 549, 551 (2d Cir. 2011) (explaining that a fundamental canon of statutory interpretation is that words should be given their ordinary meaning unless otherwise defined, and consulting dictionaries to ascertain that

meaning).  For example, "service" is defined as "[t]he act of doing something useful for a person or company, [usually] for a fee"; "[a] person or company whose business it is to do useful things for others"; and "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice."  BLACK'S LAW DICTIONARY 1491 (9th ed. 2009); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1137 (11th ed. 2003) (defining service as "useful labor that does not produce a tangible commodity").  As relevant to this case, these definitions would not encompass an entity selling a product or, in particular, licensing a copyrighted work, because that entity would not be "doing something useful for a person or a company" or providing a "commodity . . . in the form of human effort."  Indeed, holding that an entity was performing a "service" on such facts would appear to entirely obviate the definition of "service provider" in OCILLA—any individual engaged in any form of business only, including selling a product, could claim to be a "service provider" under OCILLA.  Thus, the text of the statute suggests that a "service provider" under OCILLA is an entity that, in broad terms, facilitates, supports, or enables online access or the activities of users of the internet.

Reviewing the substance of the particular OCILLA safe-harbors supports the Court's analysis that an entity that is directly licensing copyrighted material online is not a "service provider."  *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990) (in interpreting statutes, courts should look to the whole law, and its object and policy).  The four safe harbors under OCILLA are for "[t]ransitory digital network communications," in which providers automatically pass material through their system, such as in providing connectivity to a website; "[s]ystem caching," the automatic and temporary storage of material to facilitate access to that material; "[i]nformation residing on systems or networks at [the] direction of users," such as where a provider supplies server space for the online storage of materials by its users; and

27

"[i]nformation location tools" such as search engines, which refer or link users to material.  17

U.S.C. § 512(a)-(d); *see also Recording Indus. Ass'n of Am. v. Univ. of N.C. at Chapel Hill*, 367

F. Supp. 2d 945, 948-49 (M.D.N.C. 2005) (summarizing the OCILLA safe harbors); MELVILLE

B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT §§ 12B.02-12B.05 (2012).  Although the

meaning of the gatekeeping "service provider" requirement is not necessarily limited to these

four categories, these categories provide examples that inform the Court's inquiry into the

meaning of "service provider."  In particular, consistent with the ordinary meaning of "service

provider" discussed above, each of these safe harbors is generally directed toward protecting

entities that "do something useful" for others with respect to providing or facilitating access to

materials online or the activities of internet users, such as providing search engines or

connectivity to a website.  In contrast, licensing copyrighted material online more closely

resembles the mere sale of goods (albeit, in this case, intellectual property) than facilitating

users' activities online.

      Indeed, the legislative history of OCILLA confirms that Congress's focus was "to ensure

that the efficiency of the Internet will continue to improve and that the variety and quality of

services on the Internet will expand."  S. REP. NO. 105-190 at 2 (1998).  To that end, the

OCILLA safe harbors were directed at ensuring that service providers were less likely to

"hesitate to make the necessary investment in the expansion of the speed and capacity of the

internet."  *Id.* at 8.  For example, in the ordinary course of their operations, online service

providers engage in acts that might expose them to copyright liability, such as making copies in

order to transmit materials over the internet, or to host materials on websites, and referring users

to websites that may have infringing material.  *Id.*  Viewed in this context, the common, ordinary

definition of a "service" provider discussed above is sensible, and the safe harbors would not encompass those entities who merely sell or license copyrighted materials.

Finally, every case the Court has reviewed in which a party was a held to be a "service provider" under OCILLA reflects a fact pattern in which the party claiming the benefit of the DMCA safe-harbor was "doing something useful" for other entities or individuals, such as providing a file hosting or file sharing platforms, rather than itself selling or licensing copyrighted material.  *See Viacom*, 676 F.3d at 28; *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 667 F.3d 1022, 1026, 1035 (9th Cir. 2011) ("Veoh Networks (Veoh) operates a publicly accessible website that enables users to share videos with other users."); *Obodai v. Demand Media, Inc.*, 2012 U.S. Dist. LEXIS 83109, at *10 (S.D.N.Y. June 12, 2012) ("Because the defendant operates a website that permits users to post and share materials, it falls within the broad definition of a service provider under section 512(k)(1)(B)."); *Wolk*, 840 F. Supp. at 724 ("Because Photobucket offers a site that hosts and allows online sharing of photos and videos at the direction of users, Photobucket, like YouTube.com or Veoh.com, qualifies as a 'service provider' under § 512(k)(1)(B)."); *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 633-34 (S.D.N.Y. 2011); *Corbis Corp.*, 351 F. Supp. 2d at 1094, 1099-1100 (explaining that "Amazon operates web sites, provides retail and third party selling services to Internet users, and maintains computers to govern access to its web sites," and noting also that "Amazon, however, does not sell any of its own inventory on the zShops platform"); *In re Aimster Copyright Litig.*, 252 F. Supp. 2d at 658 ("Aimster is a service provider under the DMCA's definition in that it provides the routing of digital communication between its users."); *Perfect 10*, 213 F. Supp. 2d at 1175 (explaining that it may be a "close question" as to whether an age-verification service qualified as a "provider of online services," but assuming this to be the case); *Hendrickson v.*

29

*Ebay, Inc.*, 165 F. Supp. 2d 1082, 1084, 1088 (C.D. Cal. 2001) (explaining that there was no dispute that eBay was an internet service provider and that eBay "provides an Internet website service where . . . buyers and sellers of consumer goods and services have come together to buy and sell items").  In short, the text of the statute, the ordinary definition of the word "service," the structure of the OCILLA safe harbors, the legislative history, and the cases applying the safe harbors uniformly suggest that a "service provider" under OCILLA is an entity engaged in facilitating or supporting online access or the activities of users of the internet.

Applying this statutory construction in the present case, the Court has encountered an issue of fact regarding whether Getty qualifies as a service provider.  Getty's argument is, in essence, that it merely provides a file hosting service for AFP's images—*i.e.*, it provides a system on which AFP's images are posted and distributed to customers—and thus cannot be held liable for any infringement of those images that occurred because the images were obtained from its system.  However, the record before the Court contains evidence from which a jury could infer that Getty does not, in fact, simply host AFP's images.  In particular, the evidence Morel has presented suggests that the agreement between AFP and Getty grants Getty rights to itself license the images that AFP provides, with a payment of royalties to AFP.  (Morel Ex. AA at 1-3, 5-6).  Moreover, Morel has submitted evidence that Getty employees were actively involved in the licensing of the Photos-at-Issue to at least certain charitable organizations, again suggesting that Getty acts not as a passive host or online facilitator of access to AFP's images, but rather as a licensor of its own rights.  (Morel SMF ¶¶ 159, 232-33; CC Def. CSMF ¶¶ 159, 232-33).  On this evidence, a jury could infer that Getty's role extends beyond merely providing a file-hosting service to AFP, and that Getty itself acted as a licensor of the Photos-at-Issue.  As

such, the Court concludes that there is an issue of fact as to whether Getty is, in fact, a service provider under OCILLA.

In addition, the Court denies summary judgment because issues remain as to Getty's intent and the financial benefit Getty may have received from its licensing of the Photos-at-Issue. The DMCA safe harbor at issue in this matter requires that the party seeking the benefit of the safe harbor (1) lack knowledge or awareness that the material at issue is infringing, lack awareness of facts or circumstances from which infringing activity is apparent, and act expeditiously to remove material known to be infringing upon obtaining such knowledge; and (2) not receive a financial benefit directly attributable to the infringing activity.  17 U.S.C. § 512(c)(1); *see also Viacom*, 676 F.3d at 36.  As discussed in greater detail below with respect to whether Getty may be liable for willful infringement, there is a genuine issue of fact as to whether or not Getty had the requisite intent under § 512(c)(1) to avail itself of the safe harbor. Likewise, as discussed below in considering Morel's claims for vicarious liability, there remains a genuine issue of fact as to whether Getty received a direct financial benefit from licensing the Photos-at-Issue.

### 3.  Volitional Conduct

For similar reasons, the Court cannot grant summary judgment as to Getty's liability based on Getty's argument that it has not engaged in sufficient volitional conduct to be held liable for copyright infringement.

Getty's position rests, for the most part, on a case with which the Court is intimately familiar: the Second Circuit's decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 130-133 (2d Cir. 2008) ("*Cablevision*") and the decisions of courts applying that case. In relevant part, the Second Circuit in *Cablevision* held that the defendants' Remote Storage

DVR ("RS-DVR") service did not render them liable for infringement of the plaintiffs' reproduction rights under 17 U.S.C. § 106(1).  Specifically, in *Cablevision* there were "only two instances of volitional conduct  . . . : Cablevision's conduct in designing, housing, and maintaining a system that exists only to produce a copy, and a customer's conduct in ordering that system to produce a copy of a specific program."  *Id.* at 131.  On these facts, the Second Circuit held that it was the customer who "made" the copies at issue, not the defendants who merely created and maintained the automated system for doing so and, therefore, the defendants could not be directly liable for violating the reproduction right.  *See id.* at 131-34 ("In determining who actually 'makes' a copy, a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct."); *see also Wolk*, 840 F. Supp. 2d at 741-43 (applying *Cablevision* and finding no evidence of volitional conduct where the reproduction was accomplished automatically without intervention by the relevant defendants); *Perfect 10, Inc. v. Megaupload Ltd.*, 2011 U.S. Dist. LEXIS 81931, at *9-13 (S.D. Cal. July 26, 2011).

The Second Circuit did not, however, extend its decision in *Cablevision* beyond the parameters of the reproduction right; rather, *Cablevision* expressly declined to reach the issue of whether the defendants' operation of the RS-DVR system involved volitional conduct sufficient to attach liability for the public performance of the copyrighted works.  *Cablevision*, 536 F.3d at 134 (2d Cir. 2008) ("[W]e note that our conclusion in Part II that the customer, not Cablevision, 'does' the copying does not dictate a parallel conclusion that the customer, and not Cablevision, 'performs' the copyrighted work. The definitions that delineate the contours of the reproduction and public performance rights vary in significant ways.").  Notably, Morel claims Getty violated

not just his exclusive right to reproduce the Photos-at-Issue, but also his right to distribute and publicly display those works. (Morel Br. at 19-28; *cf.* AFP Opp. at 6).

For similar reasons as discussed with regard to Getty's DMCA safe-harbor defense, there are genuine disputes of fact sufficient to preclude summary judgment on this issue. As already discussed, there is evidence in the record from which a jury could infer that Getty took affirmative acts to distribute the Photos-at-Issue, including entering a license agreement with AFP, actively licensing the Photos-at-Issue to charitable organizations, and setting a price for the Photos-at-Issue. Likewise, the record also contains evidence that Getty maintains the customer-facing website on which the Photos-at-Issue were displayed, had control over whether the Photos-at-Issue were displayed, and may have taken actions to allow the Photos-at-Issue to appear on its website. Although the scope of the actions Getty has taken is disputed, there is certainly sufficient evidence to create a genuine dispute as to whether, and to what extent, Getty took volitional acts that resulted in violations of Morel's rights. *See Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 338 Fed. Appx. 329, 335-36 (4th Cir. July 7, 2009) ("Unlike an ISP, who has no control over the content that its users upload to the Internet, Sprint's original loading of the software onto its computers was volitional."); *Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 146-49 (S.D.N.Y. 2009) (considering the distribution right and discussing steps taken by the defendants that led the Court to conclude that the defendants satisfied the volitional conduct requirement, including that the defendants were aware of the distribution of digital music files, took active steps to remove access to certain content and blocked users, and had control over content posted to their servers); *cf. United States v. Am. Soc'y of Composers (In re Cellco P'ship)*, 663 F. Supp. 2d 363, 378 (S.D.N.Y. 2009) (considering volitional conduct in the context of the public performance right). Thus, the parties' motions for summary judgment on

Getty's defense that it has not engaged in sufficient "volitional conduct" to be held liable for copyright infringement are denied.

### B.  Willful Infringement

Under 17 U.S.C. § 504(c), a copyright owner may elect to recover statutory damages in lieu of actual damages for infringement.  *Lipton*, 71 F.3d at 472.  When a copyright owner establishes that a defendant's infringement was "willful[], the court in its discretion may increase the amount of statutory damages to a sum not more than $150,000."  17 U.S.C. § 504(c)(2).  "As a general rule, a determination as to willfulness requires assessment of a party's state of mind, a factual issue that is not usually susceptible to summary judgment, although exceptions may be made where the evidence of willfulness is unassailable."  *United States Media Corp. v. Edde Enm't, Inc.*, 1996 U.S. Dist. LEXIS 13389, at *21 (S.D.N.Y. Sept. 10, 1996).

To prove that infringement was "willful" under the Copyright Act, the plaintiff must show (1) that the defendant knew its conduct was infringing or (2) that the defendant's actions were the result of reckless disregard or willful blindness to the prospect that its conduct was infringing.  *See Bryant v. Media Right Prods.*, 603 F.3d 135, 143 (2d Cir. 2010); *Island Software & Computer Serv. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005); *Lipton*, 71 F.3d at 472 ("We have previously held that a defendant's copyright infringement will be found willful pursuant to § 504(c)(2) where the defendant had knowledge that its conduct constituted infringement or showed reckless disregard for the copyright holder's rights.").  Knowledge of infringement need not be proven directly but may be inferred from the defendant's conduct.  *See Island Software*, 413 F.3d at 264; *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1010-11 (2d Cir. 1995) (distinguishing "actual" knowledge from "constructive" knowledge in this context).

In evaluating the infringer's state of mind, courts have looked to factors including "whether the infringer was on notice that the copyrighted work was protected; whether the infringer had received warnings of the infringements; [and] whether the infringer had experience with previous copyright ownership, prior lawsuits regarding similar practices, or work in an industry where copyright is prevalent." *Marshall v. Marshall*, 2012 U.S. Dist. LEXIS 45700, at *91 (E.D.N.Y. Mar. 30, 2012) (citations omitted). Infringement is generally not willful if a party reasonably and in good faith believes that its conduct is innocent, despite warnings to the contrary. *N.A.S. Import, Corp. v. Chenson Enterprises, Inc.,* 968 F.2d 250, 252 (2d Cir. 1992); *see also Marshall*, 2012 U.S. Dist. LEXIS 45700, at *92-93. The burden of proving willfulness is on the copyright holder. *Bryant*, 603 F.3d at 143.

### 1. AFP

There is plainly a disputed issue of material fact as to willful infringement by AFP. Amalvy attests in his declaration that when he "downloaded the photographs from Mr. Suero's TwitPic page, and had them entered into the AFP systems, [he] believed AFP had the right to distribute the photographs for editorial (news) purposes." (Amalvy Decl. ¶ 16). In contrast, Morel submits evidence from which a jury could infer, *inter alia*, that Amalvy's conduct was contrary to AFP's policies regarding use of material from social media, statements by others at AFP suggesting his conduct was not permissible, and evidence that Amalvy similarly transmitted other photographs to AFP without consent of the copyright holders. (Morel SMF ¶¶ 86, 95, 263; CC Def. CSMF ¶¶ 86, 95, 263; Hoffman Decl. Ex. I; Orye Dep. Ex. 2; Orye Dep. Tr. at 30:2-35:25; Amalvy Dep. Ex. 25-A). Whether AFP's conduct was willful therefore turns in substantial part on a jury determination of the credibility of Amalvy's assertion that at the time of

the infringement he believed AFP had the right to distribute the photographs. *See, e.g.*, *Redd*, 678 F.3d at 174 (credibility is an issue for the jury).

### 2. Getty

There is likewise a disputed issue of fact as to whether Getty may be liable for willful infringement. Morel's basic contention is that Getty continued to distribute the Photos-at-Issue credited to Suero even though Getty received the caption change and Kill Notice and was contacted by Corbis, demonstrating that Getty was aware that the Photos-at-Issue were incorrectly credited to Suero and were being distributed without authorization. (Morel Mot. at 33-35). Getty contends that it acted innocently, promptly removing the Photos-at-Issue as it became aware that they were infringing. (CC Def. Opp. at 30-32).

On review of the record, the Court concludes that there is a genuine dispute as to Getty's willfulness based on Getty's failure to remove the images credited to Suero. Specifically, Morel has presented evidence that Andreas Gebhard at Getty was aware of both the caption change and the Kill Notice. From this evidence, a jury could infer that Gebhard knew that there were copies of the Photos-at-Issue on Getty's system that did not properly credit Morel and were infringing. Moreover, Gebhard had apparently seen the Photos-at-Issue when Morel posted them on Twitter, suggesting that he was capable of identifying the infringing images when the Kill Notice was sent. A reasonable jury could, therefore, infer that the continued distribution of these images, even though credited to Suero, was done with knowledge of infringement or, at very least, with reckless disregard as to whether Getty was still distributing images that infringed Morel's copyrights. Likewise, to the extent the evidence may suggest that Getty's subsequent actions with respect to contacting clients regarding the Photos-at-Issue show a disregard for Morel's copyrights, this, too, is a question of fact for the jury to resolve.

For his part, Morel contends not only that Getty's motion for summary judgment should be denied but that summary judgment should, in fact, be granted in his favor against Getty on the issue of willfulness because, he contends, Getty independently obtained and licensed one or more of the Photos-at-Issue. (*e.g.*, Morel Opp. at 28-29 (citing Morel SMF ¶¶ 62, 69, 80-82, 117).  In support, Morel contends that (1) that the New York Times displayed one of the Photos-at-Issue with the credit "AFP/Getty Images" thirty to forty minutes prior to AFP's transmission of the Photos-at-Issue to Getty and (2) Getty's image database contained more images credited to Suero than contained in AFP's database, ImageForum.  From these facts, Morel argues that a jury would be required to find that Getty independently obtained and distributed one or more of the Photos-at-Issue, and therefore must have known the Photos-at-Issue were infringing.

Morel cannot obtain summary judgment based on these arguments.  As to his first point, Morel points to an e-mail which notes that the New York Times was displaying one of the Photos-at-Issue, and contends that the time stamp shows that the e-mail was sent prior to Getty's receipt of the Photos-at-Issue from AFP.  However, the e-mail Morel relies on is dated "January 13, 2010 4:05 AM" and the uncontroverted testimony is that this e-mail was part of a chain that was sent over the course of a few minutes at 4:00 am EST—well *after* AFP sent the Photos-at-Issue to Getty.  (Hoffman Decl. Ex. K, Clinch Dep. Ex. 8, Clinch Dep. Tr. at 49:5-13, 51:8-17).  As such, Morel's contention that Getty obtained and licensed the Photos-at-Issue before their transmission by AFP appears unsupported.  In addition, Morel has offered no explanation as to why an image obtained independently by Getty would be credited to AFP as well as Getty Images.  As to Morel's second point, Getty has offered evidence demonstrating that the Photos-at-Issue were received by Getty from AFP.  (Cameron Supp. Decl. Ex. B-C (column H)).

Accordingly, Morel's motion for summary judgment on the issue of Getty's willfulness, like that of Counterclaim Defendants, must be denied.

### 3.   The Post

Similarly, the Court concludes that there are genuine issues of fact which preclude summary judgment on the issue of the Post's willfulness.  In particular, questions of fact remain as to whether employees of the Post received letters, e-mails, or other notifications from Morel's counsel that the Photos-at-Issue were infringing.  For example, given that at least one of Hoffman's letters was, in fact, routed to the Post's legal department, a jury could refuse to credit the Post's contention that it did not receive Hoffman's other letters.  Likewise, in light of the "mailbox rule" which creates a presumption that properly addressed letters are received by the persons to whom they were addressed, the receipt of Hoffman's letters—and whether they were so badly misaddressed that they were not received—is an issue appropriate for jury resolution. *Cf. Hagner v. United States*, 285 U.S. 427, 430 (1932) ("The rule is well settled that proof that a letter properly directed was placed in a post office, creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." (emphasis added)); *Tatum v. Merit Sys. Prot. Bd.*, 2012 U.S. App. LEXIS 9490, at *6 (Fed. Cir. May 10, 2012) (unpublished) (mailbox rule applies to "properly directed letter[s]" and presumption of receipt can be rebutted by evidence that the letter was not received or the address was not correct).

### C.   <u>Secondary Liability</u>

The parties also cross-move on Morel's claims for contributory and vicarious copyright liability.  For the reasons explained below, both of the motions for summary judgment must be denied.

### 1. Contributory Liability

The principles of contributory copyright infringement are well established: "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Arista Records*, 604 F.3d at 117 (quotation marks omitted); *see also MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). The standard for knowledge is an objective one, imposing liability on those who know or have reason to know of the direct infringement. *Arista Records*, 604 F.3d. at 118. Liability requires, however, that the defendant engage in personal conduct that encourages or assists the infringement. *Id.* Thus, courts have held that a defendant is contributorily liable only if it (1) knew or had reason to know of the underlying direct infringement and (2) materially contributed to the infringement. *Capitol Records*, 821 F. Supp. 2d at 648; *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 2011 U.S. Dist. LEXIS 20536, at *11 (S.D.N.Y. Mar. 1, 2011).

AFP and Getty claim they cannot be liable for contributory infringement because Morel cannot show that they participated in any alleged infringement beyond merely providing the means to accomplish the infringing activity. (CC Def. Br. at 32-33). However, "[o]ne who furnishes a copyrighted work to another, who in turn wrongfully copies from that work, may be liable as an infringer." NIMMER § 12.04(3)(b); *see also Cablevision*, 536 F.3d at 132-33; *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1202 n.12 (N.D. Cal. 2004); *cf. Wolk*, 840 F. Supp. 2d at 750 ("'[O]ne who furnishes a copyrighted work to another *but is innocent of any knowledge of the other party's intended illegitimate use* will not be liable.'" (quoting *Livnat v. Lavi*, 1998 U.S. Dist. LEXIS 917, at *9 (S.D.N.Y. Jan. 29, 1998)) (emphasis added)). In addition, courts have suggested that providing servers through which direct infringement is accomplished may give rise to contributory liability. *Capitol Records*, 821 F. Supp. 2d at 648

39

("In particular, substantial contribution is found where an internet service provider's servers are the sole instrumentality of their subscribers' infringement." (quotation marks omitted)); *see also USENET.com*, 633 F. Supp. 2d at 155 ("In this case, Defendants' servers are the sole instrumentality of their subscribers' infringement."); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011) ("In contrast, where a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, that party knows of and contributes to direct infringement and may be liable for contributory copyright infringement." (quotation marks omitted)).  As discussed above, there is evidence from which a jury could conclude that AFP and Getty actively provided the Photos-at-Issue to downstream users who directly infringed Morel's rights.  Moreover, to the extent that downstream infringers used Getty's server's to accomplish the reproduction of the Photos-at-Issue, this also suggests participation.

AFP and Getty further contend that Morel cannot prove contributory liability because he cannot prove the requisite state of mind.  *See, e.g.*, *Wolk*, 840 F. Supp. 2d at 750-51 (granting summary judgment in part because the plaintiff did not demonstrate that the defendant acted with knowledge that the images it was passing along were infringing).  For the same reasons expressed in the Court's discussion of willfulness, there are genuine issues of fact as to AFP and Getty's knowledge that the Photos-at-Issue were infringing that preclude summary judgment.

### 2.  Vicarious Liability

The parties also cross-move on Morel's claim for vicarious liability.  At the outset, the Court must address whether Morel has properly presented a claim for vicarious liability against AFP.  Counterclaim Defendants urge that Morel's Third Amended Counterclaims do not assert such a claim (CC Def. Br. at 35-36; Dkt. No. 80 at ¶¶ 152-157), and Morel does not argue that

his pleadings raise such a claim.  (Morel Reply at 23).  Instead, he claims that he has not waited until summary judgment to raise this claim because he indicated in a letter to the Court that he intended to raise such a claim in his summary judgment papers, and that he has not acted in bad faith.  (Morel Br. at 23; Hoffman Reply Decl. Ex. H).  The Court will not consider claims on summary judgment that have not been raised by the pleadings.[13]  *See Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006); *Syracuse Broadcasting Corp. v. Newhouse*, 236 F.2d 522, 525 (2d Cir. 1956); *Evans-Gadsden v. Bernstein Litowitz Berger & Grossman LLP*, 491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007).

Turning to the substance of the claim Morel has asserted against Getty, a defendant may be vicariously liable for the infringement of others if the defendant "profit[s] from direct infringement while declining to exercise a right to stop or limit it."[14]  *MGM Studios*, 545 U.S. at 930.  Courts have held that to prove vicarious liability, a plaintiff must show that the defendant has (1) the right and ability to control or supervise the infringing activity and (2) a direct financial interest in the exploitation of the copyrighted materials.  *See USENET.com*, 633 F. Supp. 2d at 156; *Dixon v. Atlantic Recording Corp.*, 1985 U.S. Dist. LEXIS 15291, at *6 (S.D.N.Y. Oct. 3, 1985).  Importantly, to find vicarious liability, proof of knowledge that a copyright is being violated is not required.  *USENET.com*, 633 F. Supp. 2d at 156; *Dixon*, 1985 U.S. Dist. LEXIS 15291, at *6.

Courts have found a direct financial benefit may exist if directly infringing parties pay fees or money to the allegedly vicariously liable defendant for the infringing works.  *See, e.g.*,

---

[13] Morel's reference to Federal Rule of Civil Procedure 15 is also unavailing, as that rule governs amendments to pleadings and Morel has neither amended his pleadings to raise this claim nor moved for leave to amend.

[14] Counterclaim Defendants urge that the law of vicarious liability is codified by the DMCA safe harbor discussed *supra*.  (CC Def. Br. at 34-35; *see also* CC Def. Opp. at 36-37).  *Viacom*, 676 F.3d at 37, recently held otherwise. *See also Obodai*, 2012 U.S. Dist. LEXIS 83109, at *24-25.

*Yash Raj Films (USA), Inc. v. Bobby Music Co. & Sporting Goods, Inc.*, 2006 U.S. Dist. LEXIS 69582, at*4-6 (E.D.N.Y. Sept. 27, 2006) ("As sole owner, Akhtar received a direct financial benefit from the profits of the business, which included the sale of infringing goods."); *cf. also Dixon*, 1985 U.S. Dist. LEXIS 15291, at *6-9.  Getty argues that a direct financial benefit requires that the infringing content placed on Getty's system be a "draw" for the individuals accessing that system.  (AFP Br. at 23; AFP Opp. at 37; AFP Reply at 10).  However, in the cases Getty cites, there is no suggestion that the entity charged with vicarious infringement had been paid a fee for the use of the infringing material.  *See Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) ("The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits."); *Wolk v. Kodak Imaging Network, Inc.*, 2011 U.S. Dist. LEXIS 27541, at *18 (S.D.N.Y. Mar. 17, 2011); *Capitol Records*, 821 F. Supp. 2d at 633-34; *Adobe Sys. v. Canus Prods.*, 173 F. Supp. 2d 1044, 1050-51 (C.D. Cal. 2001).  In contrast, there is evidence in this case that Getty was directly compensated for the licensing of the infringing Photos-at-Issue—particularly to the extent that these photos were obtained by the direct infringers from Getty "a la carte,"  rather than merely as part of a feed of all images on Getty's system.

In addition, as to the element of control, "[u]nder the common law vicarious liability standard, [t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise."   *Viacom*, 676 F.3d at 37 (quotation marks omitted; alteration in original); *see also A&M Records v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002) ("To avoid liability for vicarious infringement, Napster must exercise this reserved right to police the system [including to locate infringing material and terminate users'

access] to its fullest extent."); *USENET.com*, 633 F. Supp. 2d at 157 (S.D.N.Y. 2009) ("Here, it is undisputed that Defendants expressly reserve the right, in their sole discretion, to terminate, suspend or restrict users' subscriptions, thereby limiting their access to uploading or downloading content to or from Defendants' servers.").  Likewise, if defendants have the ability to block access to infringing content, this may also indicate control.  *See USENET.com*, 633 F. Supp. 2d at 157 ("Defendants likewise have the right and ability to block access to articles stored on their own servers that contain infringing content . . . .").  On the record before the Court, a jury could find this element of vicarious liability based on Getty's ability to remove the Photos-at-Issue from its system, its efforts to enforce the Kill Notice, and its ability to block subscribers from using its system.  However, the Court cannot say that the record before it is sufficiently clear that a jury would be *compelled* to find that Getty exercised sufficient control to be held liable for vicarious infringement—at present, the evidence as to the function of Getty's system is not sufficiently unequivocal that the Court can hold that Morel has demonstrated this element of vicarious liability as a matter of law.

### D.  DMCA Copyright Management Information Claims

The parties also cross-move for summary judgment on Morel's claims arising under the DMCA for the removal or alteration of copyright management information ("CMI").  At core, these allegations are based on the distribution of the Photos-at-Issue credited to Suero, the distribution of the Photos-at-Issue credited to Getty and/or AFP, and the distribution of the Photos-at-Issue credited to Morel as a "stringer" for AFP and Getty.[15]

---

[15] By way of background, in deciding Counterclaim Defendants' motion to dismiss, Judge Pauley has ruled that CMI need not be removed from a photograph itself to give rise to a claim for removal of CMI.  *See Agence Fr. Presse*, 769 F. Supp. 2d at 305.  Rather, transmitting photographs without including CMI that appears next to photographs, such as on Morel's TwitPic page, that identifies authorship could give rise to a claim for removal of CMI.  *See id.*

### 1.  Claims under the DMCA

Morel alleges a violation of 17 U.S.C. § 1202(a), a provision of the DCMA that prohibits, among other things, knowingly providing or distributing false copyright management information with the intent to induce, enable, facilitate, or conceal copyright infringement.  17 U.S.C. § 1202(a); *Agence Fr. Presse*, 769 F. Supp. 2d at 304.  To violate this provision, the person providing or distributing the false CMI must know that information is false and provide or distribute the false CMI with the intent to induce, enable, facilitate, or conceal infringement. *Ward v. Nat'l Geographic Soc'y*, 208 F. Supp. 2d 429, 449-50 (S.D.N.Y. 2002); *see also Agence Fr. Presse*, 769 F. Supp. 2d at 304-05.  Morel also alleges a violation of 17 U.S.C § 1202(b), a section of the DMCA which provides that it is unlawful to take any of the following acts with the knowledge or reasonable grounds to know that these acts will "induce, enable, facilitate, or conceal an infringement":

> (1) intentionally remove or alter any copyright management information,
> (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
> (3) distribute  . . . works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law.

17 U.S.C. §1202(b); *see, e.g.*, *Gordon v. Nextel Communs.*, 345 F.3d 922, 925-27 (6th Cir. 2003) (discussing § 1202(b)).

### 2.  Analysis

Looking to Morel's claims against AFP, the Court must first address the parties' conflicting contentions regarding where Amalvy obtained Morel's photos.  AFP steadfastly maintains that the photographs were obtained from Suero's Twitter page, and at the time that Amalvy obtained these photographs, he was unaware that the photos belonged to Morel.  Thus,

AFP contends, Morel cannot prove the requisite state of mind for liability under the DMCA. Although sometimes asserting that the Photos-at-Issue were obtained from Morel's Twitter or TwitPic pages (*see, e.g.*, Morel SMF ¶ 67), Morel also acknowledges Amalvy may have obtained them from other sources—for example, that they were obtained from Suero's page, Morel's page, or the Radio Tele Ginen website (*see, e.g.*, Morel CSMF ¶ 124)—but argues that, regardless, Amalvy was aware Morel held the rights to the photographs (*see* Morel CSMF ¶¶ 109, 111-12, 115, 124-131, 138, 143).

AFP's evidence that Amalvy obtained the photographs from Suero and was ignorant of Morel at the time he downloaded them is straightforward, relying on Amalvy's deposition testimony and declaration.  Amalvy asserts that he downloaded the photographs from Suero's TwitPic page believing that he was the photographer and transmitted them to AFP. (Amalvy Decl. ¶¶ 4-5, 7-9; Amalvy Dep. at 88:3-24; 90:23-92:4; 179:17-180:18).  He asserts that at the time he downloaded these photographs from Suero, he did not know Morel or know of him. (Amalvy Decl. ¶ 20).  Although Amalvy e-mailed Morel at 9:42 pm on January 12, 2010, at the address photomorel@yahoo.com and asked him if he had images of the earthquake, Amalvy asserts that he was not aware that Morel was the creator of the photographs posted on Suero's page.[16]  (Morel SMF ¶ 58; CC Def. CSMF ¶ 58; Morel Decl. ¶¶ 44; Hoffman Decl. Ex. D at AFP000932; Amalvy Decl. ¶ 21).  He testified at his deposition that while searching online, he did not encounter Morel's "photomorel" page.  (Amalvy Dep. at 91:3-10).  Also favoring AFP's position is that the Photos-at-Issue were, indeed, credited to Suero rather than Morel, suggesting that Amalvy did, in fact, obtain them from Suero.

---

[16] According to Counterclaim Defendants' timeline, this e-mail would have been sent before Morel posted his photographs online.

Morel's evidence that Amalvy downloaded the pictures from him is not strong.  The only evidence of substance Morel cites on this point, Amalvy's 9:42 pm e-mail to Morel, is direct evidence only that Amalvy was aware that Morel was a photojournalist who might have pictures of Haiti, and was actively seeking his photos out.[17]  However, from this evidence, viewed in light of Amalvy's subsequent e-mails containing Morel's photographs, his activities searching for photographs online and e-mailing them to the AFP, and his admitted position that he did not believe it was problematic to download and use photographs from Twitter (Amalvy Decl. ¶ 16), Morel argues that the jury could infer that Amalvy obtained the Photos-at-Issue from Morel's Twitter feed.

AFP has plainly provided evidence sufficient for a jury to find that Amalvy obtained the Photos-at-Issue not from Morel's Twitter page, but from Suero.  As to whether Morel has provided sufficient evidence that a jury could accept his contention that Amalvy obtained the Photos-at-Issue from Morel's Twitter page, and thus knew the credit to Suero was false, the Court notes that, on this posture, it may not consider any evidence that the jury is not required to believe and is not permitted to make credibility judgments.  *See Redd*, 678 F.3d at 174.  In light of the standard for summary judgment and the fact-bound nature of this question, the Court finds a dispute remains that precludes summary judgment as to AFP's credit of the Photos-at-Issue to Suero.

Regardless, even if this factual dispute were settled in AFP's favor, there is other evidence from which a jury could conclude AFP distributed the Photos-at-Issue with false,

---

[17] In essence, the remainder of Morel's evidence on this point is founded in the claim that Amalvy necessarily must have encountered Morel's photographs online, often citing to the bare fact that Amalvy was searching online for photographs.  (*E.g.* Morel CSMF ¶¶ 109, 111-12, 124-26, 128-29, 131, 138, 143 (citing to a host of paragraphs in Morel's 56.1 statement which, upon examination of the evidence cited, broadly show that Amalvy was engaged in these activities but do not provide any concrete evidence of where Amalvy obtained the Photos-at-Issue)).

altered, or removed CMI and did so with the requisite intent.  For example, Morel has presented evidence that the Photos-at-Issue were credited to, among others, "DANIEL MOREL/AFP/Getty Images," "Lisandro Suero/AFP/Getty Images," "Daniel Morel/Agence France-Presse – Getty Images," and "AFP/Getty Images/Daniel Morel," (Galembo Decl. Exs. D, J-1, J-2, J-3; *see also* CC Def. SMF ¶¶ 163, 234; Morel CSMF ¶¶ 163, 234).  Morel contends that distributing the Photos-at-Issue with these credits also violated the above provisions of the DMCA because including "AFP" and "Getty" in the caption likewise provides false and altered CMI about the ownership of the Photos-at-Issue.  *See*  17 U.S.C. §1202(c)(3).  Although AFP has presented declarations suggesting that these captions are not "intended to provide any information about copyright ownership," (Amalvy Decl. ¶ 13; Hambach Decl. ¶ 3) there is evidence that the caption does, in fact, convey information about copyright ownership.  (*See, e.g.*, Hoffman Decl. Ex. X, Tarot Dep. Tr. 75:16-77:14).  In fact, Judge Pauley has already held in ruling on the motion to dismiss in this case that "Morel's allegations that AFP labeled his photos with the credit lines 'AFP/Getty/Daniel Morel' and 'AFP/Getty/Lisandro Suero' are sufficient to plead falsification of CMI." *Agence Fr. Presse*, 769 F. Supp. 2d at 304.   Moreover, the evidence also suggests that AFP and Getty added their watermarks (Amalvy Dep. Tr. at 142:13-25; Morel SMF ¶ 236, CC Def. CSMF ¶ 236; Hoffman Decl. Ex. EE) to at least some of the Photos-at-Issue, which is facially suggestive of ownership.

Furthermore, there is also evidence that Morel may have been credited as a "stringer" for AFP.[18] (Hoffman Ex. X, Tarot Dep. Tr. 74:24-75:15).  Although Amalvy attests that designating Morel as a stringer does not convey information about copyright ownership (Amalvy Decl. ¶ 14),

---

[18] The Court notes that the evidence cited in Morel's 56.1 Statement ¶¶ 123-125 does not support this contention: the purportedly enlarged image in ¶ 124 is not an enlargement of either the image in ¶ 123 or Amalvy Dep. Ex. 14-A, both of which refer to Suero, not Morel, as a stringer; Hambach Dep. Ex. 11 also does not refer to Morel as a stringer.

there is evidence from which a jury could infer that it does.  (Morel SMF ¶ 126; CC Def. SMF ¶ 126, Hoffman Decl. Ex. R, Calhoun Dep. Tr. at 23:10-14; Galembo Decl. ¶ 19); *see also McClatchey v. AP*, 2007 U.S. Dist. LEXIS 17768, at *6 n.3, *16 (W.D. Pa. Mar. 9, 2007) ("However, the metadata also identified Ms. McClatchey as a 'stringer,' from which subscribers could have inferred that the Associated Press owned the copyright.").

With regard to all of this information, there remain issues of fact as to whether AFP knew that the CMI was false or altered, and whether it intended, knew, or had reasonable grounds to know that its actions would "induce, enable, facilitate, or conceal an infringement."  In particular, the same issues of fact discussed above with regard to whether AFP can be liable for willful infringement also preclude summary judgment here.  AFP has presented evidence that it believed its conduct was licensed, and therefore the distribution of the photographs was non-infringing; Morel has provided evidence from which a jury could infer that AFP knew its conduct was infringing and, as relevant here, that adding "AFP" to the caption would "induce, enable, facilitate, or conceal" its infringement and the infringements of its subscribers.  *Cf. also id.* at *16-17 ("As Plaintiff notes, the nature of APs' business is to provide stories and pictures for use by its members and subscribers. Thus, a reasonable factfinder could conclude that by cropping out the copyright notice, Defendant had the requisite intent to induce, enable, facilitate or conceal infringement.").

Similarly, issues of fact remain as to whether Getty can be liable for violations of these provisions of the DMCA.  As the Court discussed in considering the issue of Getty's willfulness, there is record evidence from which a jury could infer that at least Gebhard was aware that there remained on Getty's system copies of the Photos-at-Issue that wrongfully credited Suero and to which Getty did not have a valid license.  From this evidence, a jury could find Getty knew that

the CMI on these images was false and altered,[19] and intent, knowledge, or reasonable grounds to know that continuing to distribute the Photos-at-Issue with incorrect CMI would induce, facilitate, enable, or conceal infringement.  *See also Agence Fr. Presse*, 769 F. Supp. 2d at 305 ("As to Getty, Morel alleges that even after AFP issued a wire to change the photographer credit from Suero to Morel, Getty continued to license photos crediting Suero.  Getty sought to obtain credit for the photographs even though it knew of Morel's reputation and had not investigated Suero's authorship.  These allegations sufficiently plead knowledge and intent.").

In sum, the record before the Court contains genuine disputes as to at least the following: (1) the source of the Photos-at-Issue, *i.e.*, whether they were obtained from Morel or Suero, (2) whether and to what extent the captions to the Photos-at-Issue convey copyright information; and (3) AFP and Getty's state of mind in distributing the Photos-at-Issue.  In light of these disputes, the cross-motions for summary judgment on these claims must be denied.

### E.  <u>Damages</u>

The parties also present a dispute as to how the provisions for statutory damages under the Copyright Act and DMCA are, respectively, to be interpreted.  In both instances, Morel claims that the law provides that he may recover massive awards of statutory damages from Counterclaim Defendants.  Counterclaim Defendants dispute his interpretation of the law.

#### 1.  Statutory damages under the Copyright Act

The Copyright Act provides that a copyright owner may elect to receive statutory damages, rather than actual damages, any time before final judgment is rendered.  17 U.S.C. §

---

[19] To the extent that Counterclaim Defendants base their motion for summary judgment on the premise that Morel cannot prove that Getty itself removed or altered the CMI on the Photos-at-Issue, the Court notes that § 1202(b)(3) also prohibits distribution of works with CMI known to be altered, and Morel's counterclaims are reasonably read to plead a violation on this theory.  (Dkt. No. 80 at ¶¶ 165).  The Court notes, however, that no claim for violation of the DMCA is pleaded against the Post.  (Dkt No. 80 at ¶¶ 158-69).

504(c).  Specifically, a copyright owner may receive "an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just."  17 U.S.C. § 504(c)(1).  The maximum award of statutory damages may be increased from $30,000 to $150,000 on a showing of willfulness.  17 U.S.C. § 504(c)(2).

In certain circumstances, the application of § 504(c) is straightforward.  If a single infringer has engaged in any number of infringements for which that infringer is liable individually, the statute mandates a single statutory award of damages per work infringed.  *See* 17 U.S.C. § 504(c)(1); *WB Music Corp. v. RTV Commun. Group, Inc.*, 445 F.3d 538, 541 (2d Cir. 2006); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 313, 317 (S.D.N.Y. 2011) ("For any individually liable infringer, a plaintiff is entitled to one statutory damage award per work.").  Likewise, if a group ("two or more") of infringers have engaged in any number of infringements for which all are jointly and severally liable, the statute again mandates a single statutory award of damages per work infringed.  *See* 17 U.S.C. § 504(c)(1); *Columbia Pictures TV v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 294 (9th Cir. 1997), *rev'd on other grounds sub nom in Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998).  Neither the number of infringements of a particular work nor the number of infringers of that work is relevant to the damages calculation in these circumstances.  Finally, if multiple infringers are each liable individually, a separate award of statutory damages against each infringer is appropriate—although the award against each infringer is still limited to one award per work infringed, even if that individual engaged in multiple acts of infringement of that work.  *See* 17 U.S.C. § 504(c)(1); *see Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 192-93 (1st Cir.

2004) ("And if a plaintiff proves that two different defendants each committed five separate infringements of five different works, the plaintiff is entitled to ten awards, not fifty." (quoting *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 144 (5th Cir. 1992)).

Here, however, the parties dispute the proper application of § 504(c)(1) to cases involving an alleged infringer who, through principles of secondary liability, may be found jointly liable with a number of alleged downstream direct infringers, none of whom are jointly liable with the other alleged downstream infringers. For example, in this case Morel alleges that Getty is secondarily liable for the direct infringements of each of its subscribers who obtained the Photos-at-Issue, and thus jointly liable with each of those subscribers. None of those subscribers, however, are jointly liable with each other—the Post, for example, would not be liable for the direct infringements of other subscribers such as Slate.

Thus, Morel argues that Getty (and AFP) are liable for not just a single statutory damages award for each work infringed, but rather a separate award of statutory damages for each distinct subscriber with whom they are jointly and severally liable. This argument rests on the view that when § 504(c)(1) authorizes "an award of statutory damages for all infringements involved in the action . . . for which any two or more infringers are liable jointly and severally," it does so for each set of jointly and severally liable infringers. For instance, according to Morel, because Getty and the Post are one set of jointly and severally liable infringers, a statutory award against Getty is authorized based on the Post's infringement; likewise, because Getty and Slate are a different set of jointly and severally liable infringers, a separate statutory award is also authorized against Getty based on Slate's infringement. *See also Lime Group*, 784 F. Supp. 2d at 316-17. As such, Morel's theory of damages would thus allow a statutory award against Getty and AFP in the tens or hundreds of millions of dollars. (Dkt. No. 80 at ¶ 119 (alleging

51

infringement by hundreds of downstream licensees)).  Getty and AFP contend that Morel may

not multiply the damages against them in this fashion, and that they are each liable only for a

single award of statutory damages per work infringed.

The statutory text is not a model of clarity on this issue but—on the whole—it favors

Counterclaim Defendants' interpretation rather than Morel's.  For instance, § 504(c)(1) provides

for "*an* award of statutory damages for *all* infringements involved in the action, with respect to

*any one work*."  17 U.S.C. § 504(c)(1) (emphasis added).  The intent of this statute therefore

appears to be to constrain the award of statutory damages to a single award per work, rather than

allowing a multiplication of damages based on the number of infringements.  Morel's

interpretation would effectively bypass the limit of a single statutory award for "all

infringements" of a work because it would hold Getty or AFP liable for multiple infringements

of a single work.  This conclusion is further supported by § 504(c)(1)'s provision that a group of

defendants who are all jointly and severally liable with each other are also to be liable for only a

single statutory damages award, suggesting that a copyright holder should not be allowed to

multiply damages against an infringer based on the infringing activity of jointly liable third-

parties.  Relatedly, as pointed out in *McClatchey v. AP*, 2007 U.S. Dist. LEXIS 40416, at *10

(W.D. Pa. June 4, 2007), the interpretation Morel offers "would render the word 'any' [in 'for

which any two or more infringers and jointly and severally liable'] superfluous, or alternatively,

would rewrite the statute to impose a single award only where 'all infringers are liable jointly

and severally.'"

Also counseling against Morel's proposed interpretation is that it would lead to absurd

results.  *See SEC v. DiBella*, 587 F.3d 553, 572 (2d Cir. 2009) ("Where an examination of the

statute as a whole demonstrates that a party's interpretation would lead to absurd or futile results

plainly at variance with the policy of the legislation as a whole, that interpretation should be rejected." ).  First, as Counterclaim Defendants point out, Morel's interpretation of the statutory damages provision could lead to awards of statutory damages that are massively disproportionate when compared to the actual harm caused by the infringing defendants.   Indeed, as discussed above, Morel's position in this case is that—notwithstanding the extent of the actual harm that Counterclaim Defendants may have caused—he is entitled to tens or hundreds of millions of dollars of damages.[20]  The Court finds it unlikely that Congress intended the statutory damages provision of the Copyright Act to create such a result.

Second, and even more persuasive, adopting Morel's approach would lead to other troubling results.  For example, an infringer who engages in a hundred acts of direct infringement of a single work is liable for only one statutory damages award.  Likewise, a contributory infringer who is jointly and severally liable with a single direct infringer who has engaged in a hundred acts of direct infringement of a single work is also, plainly, liable for only one statutory damages award.  Yet, under Morel's proposed interpretation of § 504(c), a hundred (or more) awards of statutory damages would be appropriate for a contributory infringer who finds itself in Getty's circumstances.   Viewed in light of the text of § 504(c), which provides generally for a single award of statutory damages "for all infringements involved in the action," as to any one work, the Court cannot fathom any Congressional intent to justify such disparate results.  Rather, Congress's intent appears to have been to restrict statutory damages to a single award per work, per infringer; Morel's approach is directly to the contrary.

---

[20] Morel attempts to claim that this litigation is not parallel to cases that rejected his approach, discussed below, because those cases involved very large amounts of damages.  As already noted, Morel's theory of damages would also lead to extremely high statutory damage awards in this case.  In any event, statutory interpretation does not differentiate between cases in the way this argument would suggest.

Moreover, although the Second Circuit has not spoken on this precise question, the Court is presented with a number of opinions that—although not binding—shed light on the issue. The majority of these decisions adopt the result urged by Counterclaim Defendants, particularly in the context of the vast multiplication of statutory damages that would occur if Morel's position were adopted. In *Arista Records LLC v. Lime Group LLC*, 784 F. Supp 2d. at 316-21, the court rejected the approach Morel now advocates. First, the court noted that a multiplication of statutory damages was inappropriate because the fact-finder in an infringement case is already permitted to consider factors that relate to the number of direct infringers. *Id.* at 317. Second, parallel to a portion of the Court's analysis above, the *Arista* court noted that this position could lead to an absurdly large award of damages, possibly amounting to over a billion dollars. *Id.* Third, it noted that although the plaintiffs relied on a Ninth Circuit decision, *Columbia Pictures*, and a hypothetical example contained in Nimmer on Copyright § 14.04[E][2][d] (2002), "subsequent decisions have rejected outright both the *Columbia Pictures* decision and the Nimmer hypothetical, finding them inapplicable to situations involving large numbers of infringements." *Id.* at 317-18.[21] Likewise, *McClatchey* also rejected Morel's proposed interpretation. *McClatchey*, 2007 U.S. Dist. LEXIS 40416, at *7-13 ("In sum, the Court concludes that the most plausible interpretation of the statute authorizes a single award when there is any joint and several liability, even if there is not complete joint and several liability amongst all potential infringers."). *Bouchat v. Champion Prods.*, 327 F. Supp. 2d 537, 552-53 (D. Md. 2003), rejected Morel's position as "absurd" and declined to follow *Columbia Pictures*.

The Court finds that these are persuasive and that the authority Morel cites is insufficient

---

[21] The court also relied on a factor not argued here, that the plaintiffs had not consistently pursued this theory of damages. *See Lime Group*, 784 F. Supp. 2d at 321.

to convince the Court to adopt the approach he advocates.   For example, in support of his argument, Morel primarily relies on *Columbia Pictures*, 106 F.3d at 294.  In that case, the Ninth Circuit essentially adopted Morel's position, but did so in a footnote which neither directly addressed the statutory text nor engaged in detailed analysis of the issue.  *See id.* at 294 & n.7; *see also Lime Group*, 784 F. Supp. 2d at 318 (rejecting the Ninth Circuit's approach in *Columbia Pictures*).  Moreover, as already discussed, subsequent cases have declined to follow *Columbia Pictures* as unpersuasive.

Many of the other cases Morel relies on are cited simply for the proposition that although Getty's and AFP's subscribers who have engaged in direct infringement of the Photos-at-Issue may be jointly and severally liable with Getty or AFP for that infringement, they are not jointly and severally liable with other infringing subscribers.  (Morel Opp. at 45-46).   Similarly, the legislative history that Morel cites (Morel Opp. at 49) provides only that

> [w]here the infringements of one work were committed by a single infringer acting individually, a single award of statutory damages would be made. Similarly, where the work was infringed by two or more joint tortfeasors, the bill would make them jointly and severally liable for an amount in the $250 to $10,000 range. However, where separate infringements for which two or more defendants are not jointly liable are jointed [*sic*] in the same action, separate awards of statutory damages would be appropriate.

H.R. Rep. No. 94-1476 at 162 (1976).  Although the last sentence of the paragraph just quoted arguably supports Morel's position, it is—at best—unclear, as it does not squarely address the issue before the Court.  *See also Lime Group*, 784 F. Supp. 2d at 321 (noting that the legislative history was not illuminating because this precise situation was not contemplated by the drafters and the history dates back to 1976, before facts similar to those at issue regarding massive damages awards were likely to arise).  Finally, those cases addressing individually liable infringers are likewise inapposite.  *See Venegas-Hernandez*, 370 F.3d 183, 192-94; *Mason*, 967

F.2d 135, 143-44; *Fitzgerald v. CBS Broad.*, Inc., 491 F. Supp. 2d 177, 182-83 (D. Mass. 2007).

The Court concludes that any awards of statutory damages against AFP or Getty may not be multiplied based on the number of infringers with whom AFP or Getty is jointly and severally liable. Rather, AFP and Getty are, at most, each liable for a single statutory damages award per work infringed.

### 2. Statutory damages under the DMCA

The parties present a similar dispute in their arguments regarding the scope of statutory damages available for violations of the DMCA. The DMCA provides for statutory damages in the amount of "not less than $2,500 or more than $25,000" for "each violation of section 1202." 17 U.S.C. § 1203(c)(3)(B). Morel contends that this provision allows him to recover a separate award of statutory damages for each distribution of the Photos-at-Issue. (*See, e.g.*, Morel Reply at 19-20). In other words, Morel seeks a separate award for each entity that downloaded or received the Photos-at-Issue from AFP or Getty with false CMI, amounting—"at a minimum" by Morel's calculations—to almost $44,500,000. (Morel Reply at 19-20).[22] Counterclaim Defendants urge the Court that this interpretation conflicts with the decisions of other courts that have considered this issue and the statutory text.

Reviewing § 1203(c)(3)(B), the Court concludes that Counterclaim Defendants have proposed the correct interpretation of this provision. In particular, Counterclaim Defendants' position is supported by comparing the damages available under § 1203(c)(3)(B) for violations of § 1202, with those available under § 1203(c)(3)(A) for violations of § 1201, which prohibits, *inter alia*, the circumvention of technological measures that control access to a copyrighted

---

[22] This calculation assumes the maximum award of statutory damages, which Morel urges is warranted. If the $2,000 minimum award were provided in each instance, the award would come out to $4,445,000.

work.  *See* 17 U.S.C. § 1201(a).  Specifically, the statutory damages available for violations of §

1201 are "an award of statutory damages for each violation of section 1201 in the sum of not less

than $ 200 or more than $ 2,500 *per act of circumvention*."  17 U.S.C. § 1203(c)(3)(A) (emphasis

added).  In contrast, the statutory award available for violations of § 1202 is merely assessed "for

each violation of § 1202," and contains no parallel reference to damages "per act."  17 U.S.C. §

1203(c)(3)(B).  The omission of the references to damages "per act" differentiates the damages

available for violations of § 1202 from those available for violations of § 1201, and demonstrates

that damages should not be multiplied based on the number of recipients of the Photos-at-Issue.

Rather, damages should be assessed per violation—*i.e.*, based on AFP and Getty's actions in

uploading or distributing the Photos-at-Issue, regardless of the number of recipients of these

images.

  The analysis described above parallels that in *McClatchey*, which the Court finds

persuasive.  *See McClatchey*, 2007 U.S. Dist. LEXIS 40416, at *13-18 (holding that "the term

'each violation' is best understood to mean 'each violative act performed by Defendant'" such

that "AP committed only one alleged violative act by distributing the End of Serenity photograph

to its PhotoStream subscribers, even though there were 1,147 recipients.").  Moreover, the other

courts considering this question have uniformly followed *McClatchey*'s approach.  *See Granger*

*v. One Call Lender Servs., LLC*, 2012 U.S. Dist. LEXIS 104885, at *12-15 (E.D. Pa. July 26,

2012) ("Defendants posted the infringing product onto the internet on six separate occasions . . .

thereby committing six violative acts."); *Stockart.com, LLC v. Engle*, 2011 U.S. Dist. LEXIS

20470, at *40-41 (D. Colo. Feb. 18, 2011); *Stockwire Research Group, Inc. v. Lebed*, 577 F.

Supp. 2d 1262, 1266-67 (S.D. Fla. 2008) ("[T]his Section focuses solely on the Defendants'

conduct, or in other words, the number of times the Unauthorized Product was posted on the

internet for distribution, regardless of the number of end-recipients."); *Goldman v. Healthcare Mgmt. Sys.*, 559 F. Supp. 2d 853, 867-68 (W.D. Mich. 2008); *see also Craigslist, Inc. v. Doe*, 2011 U.S. Dist. LEXIS 53123, at *14-15 (N.D. Cal. Apr. 25, 2011). Indeed, Morel has not pointed to a single case that adopts the view that damages may be assessed under § 1203(c)(3)(B) for each download or receipt of an image with false, removed, or altered CMI: both of the cases on which he relies addressed violations of § 1201, not § 1202. *See TracFone Wireless, Inc. v. Anadisk LLC*, 685 F. Supp. 2d 1304, 1317-18 (S.D. Fla. 2010); *Blizzard Entm't, Inc. v. Reeves*, 2010 U.S. Dist. LEXIS 85560, at *4-9 (C.D. Cal. Aug. 10, 2010).

## CONCLUSION

The Court GRANTS Morel's motion for summary judgment that AFP and the Post are liable for copyright infringement as to the Photos-at-Issue. The Court also rejects Morel's arguments regarding the scope of statutory damages available under the Copyright Act and DMCA. The Court otherwise DENIES the summary judgment motions. A conference is set for February 1, 2013, at 4:00 pm to discuss further scheduling of this matter.

SO ORDERED:

Dated: January 14, 2013
New York, New York

ALISON J. NATHAN
United States District Judge

58