UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ X
                                                         :
AGENCE FRANCE PRESSE,
                                                         :
                              Plaintiff,
                                                         :
                    -against-
                                                         :
DANIEL MOREL
                                                         :     10-CV-2730 (AJN)
                              Defendant,
                                                         :
                    -against-
                                                         :
GETTY IMAGES (US), INC., AGENCE FRANCE
PRESSE, ET AL.,                                          :

                              Counterclaim               :
                              Defendants.
                                                         :
‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑ X


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL OR REMITTITUR


WILLKIE FARR & GALLAGHER LLP

**787 Seventh Avenue
New York, New York 10019**

**Attorneys for Plaintiff Daniel Morel**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................i

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ..........................................................................................................................3

I.   THE APPLICABLE STANDARDS. ..........................................................................3

II.  THE JURY'S FINDING OF WILLFUL INFRINGEMENT BY AFP AND GETTY
     IMAGES SHOULD NOT BE DISTURBED OR REDUCED. ...................................5

     A.   Evidence Supports the Jury's Finding that AFP Willfully Infringed Mr.
          Morel's Copyright in the Photos-at-Issue. ...................................................6

          1.   There was Sufficient Evidence for the Jury to Conclude that AFP Knew that
               its Conduct was Infringing. ..............................................................6

          2.   There was Ample Evidence For the Jury to Find that AFP Harbored Actual
               Doubts About its Right to Distribute Mr. Morel's Photographs and Yet
               Willfully Proceeded Without Investigating Further......................................12

     B.   Evidence Supports the Jury's Finding That Getty Images Willfully Infringed
          Mr. Morel's Copyright in the Photos-at-Issue. ..........................................16

          1.   There was Sufficient Evidence for the Jury to Conclude that Getty Images
               Knew that its Conduct was Infringing...........................................................16

          2.   There Was Ample Evidence for the Jury to Find that Getty Images Harbored
               Actual Doubts About its Right to Distribute Mr. Morel's Photographs and
               Yet Willfully Proceeded Without Investigating Further. ...............................20

III. DEFENDANTS' MOTION FOR A NEW TRIAL OR REMITTITUR SHOULD BE
     DENIED. ...................................................................................................................23

     A.   The Jury's Award of Actual Damages is Supported by the Evidence and was
          Not Tainted by Counsel's Remarks. ...........................................................24

          1.   The Jury's Award of Actual Damages is Supported by Competent Evidence.
               ........................................................................................................24

          2.   Statements Concerning Actual Damages Made by Counsel During
               Summation were Neither Improper Nor Objected To....................................25

     B.   The Jury's Award of Statutory Damages Under the Copyright Act is Entitled
          to Great Deference and Should Not Be Disturbed or Reduced.................27

1.    It was Within the Jury's Discretion to Set the Statutory Award at the Maximum Level of the Established Range. ...................................................27

2.    Statutory Damages Need Not Be Commensurate with Actual Damages.......28

3.    The Jury's Statutory Damages Award for Defendants' Copyright Infringements is Supported by the Evidence.................................................30

IV.    DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON MR. MOREL'S DMCA CLAIMS SHOULD BE DENIED. ........................................................33

A.    Evidence Supports the Jury's Verdict that AFP *Provided* and *Distributed* False CMI and *Altered* CMI in Violation of the DMCA. ...........................................33

B.    Evidence Supports the Jury's Verdict that Getty Images *Provided* and *Distributed* False CMI and *Altered* CMI in Violation of the DMCA. ......................35

C.    Competent Evidence Supports the Jury's Finding that AFP and Getty Images Violated the DMCA with the Requisite Intent............................................................35

D.    Mr. Morel is Entitled to Awards for Defendants' Copyright Infringement *and* Defendants' Violations of the DMCA. ....................................................................37

CONCLUSION ..........................................................................................................................39

# TABLE OF AUTHORITIES

*Cases*                                                                                    *Page(s)*

*Adobe Sys. Inc. v. Feather,*
    895 F. Supp. 2d 297 (D. Conn. 2012) ........................................................... 38

*Arista Records LLC v. Furia Sonidera, Inc.,*
    No. 05 Civ. 5906, 2007 WL 922406 (E.D.N.Y. Mar. 26, 2007) ..................................... 29

*Banushi v. Palmer,*
    500 F. App'x 84 (2d Cir. 2012) ............................................................. 38

*Bevevino v. Saydjari,*
    574 F.2d 676 (2d Cir. 1978) ................................................................. 4

*Blue Moon Media Group, Inc. v. Field,*
    No. CV 08-1000, 2011 WL 4056068 (E.D.N.Y. Apr. 11, 2011) ..................................... 38

*Bryant v. Media Right Prods., Inc.,*
    603 F.3d 135 (2d Cir. 2010) ............................................................ 5, 27

*Capitol Records, Inc. v. Thomas-Rasset,*
    680 F. Supp. 2d 1045 (D. Minn. 2010) ....................................................... 29

*Capitol Records, Inc. v. Thomas-Rasset,*
    692 F.3d 899 (8th Cir. 2012) ............................................................... 29

*Castle Rock Entm't v. Carol Pub. Grp., Inc.,*
    955 F. Supp. 260 (S.D.N.Y. 1997) .......................................................... 11

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.,*
    259 F.3d 1186 (9th Cir. 2001) .......................................................... 28, 30

*DLC Mgmt. Corp. v. Town of Hyde Park,*
    163 F.3d 124 (2d Cir. 1998) .............................................................. 4, 5

*Donovan v. Penn Shipping Co., Inc.,*
    536 F.2d 536 (2d Cir. 1976) ............................................................... 23

*EMI Entm't World, Inc. v. Karen Records, Inc.,*
    806 F. Supp. 2d 697 (S.D.N.Y. 2011) ....................................................... 29

*Feltner v. Columbia Pictures Television, Inc.,*
    523 U.S. 340 (1998) ...................................................................... 29

*Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*,
  807 F.2d 1110 (2d Cir. 1986) ............................................................................. 11

*F.W. Woolworth Co. v. Contemporary Arts*,
  344 U.S. 228 (1952) ........................................................................................... 29

*Granger v. One Call Lender Servs., LLC*,
  No. 10-3442, 2012 WL 3065271 (E.D. Pa. July 26, 2012) ............................. 39

*Greenway v. Buffalo Hilton Hotel*,
  143 F.3d 47 (2d Cir. 1998) ............................................................................... 26

*Hamil America, Inc. v. GFI*,
  193 F.3d 92 (2d Cir. 1999) ............................................................................... 28

*In Design v. Lauren Knitwear Corp.*,
  No. 87 CIV. 0206, 1992 WL 42911 (S.D.N.Y. Feb. 24, 1992) ........................ 5

*Indu Craft, Inc. v. Bank of Baroda*,
  47 F.3d 490 (2d Cir. 1995) ............................................................................... 38

*John Perez Graphics & Design, LLC v. Green Tree Inv. Group, Inc.*,
  No. 12-cv-4194, 2013 WL 1828671 (N.D. Tex. May 1, 2013) ...................... 39

*Kirsch v. Fleet St., Ltd.*,
  148 F.3d 149 (2d Cir. 1998) ............................................................................. 23

*L.A. Printex Indus., Inc. v. Does 1-10*,
  No. 12–3344, 2013 WL 6170580 (2d Cir. Nov. 26, 2013) .................... 4, 5, 27

*Lipton v. Nature Co.*,
  71 F.3d 464 (2d Cir. 1995) ................................................................................. 5

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
  302 F. Supp. 2d 455 (D. Md. 2004) ............................................................ 28, 29

*Magee v. U.S. Lines, Inc.*,
  976 F.2d 821 (2d Cir. 1992) ............................................................................. 41

*Malmsteen v. Berdon, LLP*,
  595 F. Supp. 2d 299 (S.D.N.Y. 2009) .............................................................. 26

*Matthews v. CTI Container Transp. Int'l Inc.*,
  871 F.2d 270 (2d Cir. 1989) ............................................................................. 26

*Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp.*,
  801 F.2d 13 (2d Cir. 1986) ............................................................................... 37

*MJD Marketing, Inc. v. McGrail*,
  No. 11-cv-02842, 2012 WL 261199 (D. Md. Jan. 26, 2012) .......................................... 39

*Nairn v. Nat'l R.R. Passenger Corp.*,
  837 F.2d 565 (2d Cir. 1988) ..................................................................................... 31

*Nintendo of Am., Inc. v. Dragon Pac. Int'l*,
  40 F.3d 1007 (9th Cir. 1994) .................................................................................... 39

*Pacific Stock, Inc. v. MacArthur & Co., Inc.*,
  No. 11-00720, 2012 WL 3985719 (D. Haw. Sept. 10, 2012) ......................................... 39

*Peer Int'l Corp. v. Luna Records, Inc.*,
  887 F. Supp. 560 (S.D.N.Y. 1995) ............................................................................. 29

*Peer Int'l Corp. v. Max Music & Entm't*,
  No. 05 Civ. 5906, 2004 WL 1542253 (S.D.N.Y. July 9, 2004) ....................................... 29

*Peer Int'l Corp. v. Pausa Records, Inc.*,
  909 F.2d 1332 (9th Cir. 1990) ................................................................................... 30

*Propet USA v. Shugart*,
  No. C06-0186, 2007 WL 4376201 (W.D. Wash. Dec. 13, 2007) .................................... 39

*Psihoyos v. John Wiley & Sons, Inc.*,
  No. 11-cv-01416, 2012 WL 6771364 (S.D.N.Y. Aug. 30, 2012) ...................................... 9

*Psihoyos v. John Wiley & Sons, Inc.*,
  No. 11 Civ. 1416, 2012 WL 5506121 (S.D.N.Y. Nov. 7, 2012) .............................. *passim*

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012) ................................................................................. 4, 19

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000). ................................................................................................ 3

*Richardson v. Marsh*,
  481 U.S. 200 (1987) ........................................................................................... 27, 37

*Rogers v. Ecolor Studio*,
  No. 11 Civ.4493, 2013 WL 752256 (E.D.N.Y. Feb. 7, 2013) ........................................ 29

*Scala v. Moore McCormack Lines, Inc.*,
  985 F.2d 680 (2d Cir. 1993) ..................................................................................... 31

*Sequa Corp. v. GBJ Corp.*,
  156 F.3d 136 (2d Cir. 1998) ...................................................................................... 5

*Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir.1997) ......................................................... 38

*Sony BMG Music Entm't v. Tenenbaum*,
    660 F.3d 487 (1st Cir. 2011) ...................................................... 31

*Stockart.com v. Engle*,
    No. 10-cv-00588, 2011 WL 10894610 (D. Colo. Feb. 18, 2011) .................. 39

*Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*,
    74 F.3d 488 (4th Cir. 1996) ................................................... 28, 30

*Tiffany v. Vill. of Briarcliff Manor*,
    No. 95 Civ. 8335, 1999 WL 1080243 (S.D.N.Y. Nov. 30, 1999) .................... 4

*Tu v. TAD Sys. Tech. Inc.*,
    No. 08-CV-3822, 2009 WL 2905780 (E.D.N.Y. Sept. 10, 2009) ................... 38

*Veerman v. Deep Blue Grp. L.L.C*,
    No. 08 Civ. 5042, 2010 WL 4449067 (S.D.N.Y. Nov. 3, 2010) ..................... 9

*Wantanabe Realty Corp. v. City of New York*,
    No. 01 Civ. 10137, 2003 WL 22862646 (S.D.N.Y. Dec. 3, 2003) ................. 26

*Warner Bros. Inc. v. Dae Rim Trading, Inc.*,
    677 F. Supp. 740 (S.D.N.Y. 1988) ............................................. 29

*Yurman Design, Inc. v. PAJ, Inc.*,
    262 F.3d 101 (2d Cir. 2001) ............................................. *passim*

### Statutes                                                     Page(s)

Fed. R. Civ. P. 50(a) ............................................................. 3

17 U.S.C. § 1202(a) .......................................................... 33, 36

17 U.S.C. § 1202(b) ...................................................... 33, 34, 36, 37

17 U.S.C. § 1202(c) ............................................................ 36

### Other Authorities                                    Page(s)

Complaint, *Agence France Presse v. Google Inc.*,
    1:05-cv-00546 (DDC), ECF No. 1. .......................................... 36

145 Cong. Rec. H6798-99 ................................................................................................ 11, 31

145 Cong. Rec. 13785 ....................................................................................................... 11

H.R. Rep. 106-216 ............................................................................................................ 31

Plaintiff Daniel Morel[1] submits this memorandum of law in opposition to the Motion filed by Defendants AFP and Getty Images for judgment as a matter of law, new trial, and/or remittitur on the jury verdict (Dkt. Nos. 313-15) (the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

Over six days in mid-November 2013, the seven-member jury received evidence and heard testimony from nine witnesses – Mr. Morel, four representatives from AFP, and four from Getty Images – about the events following the earthquake that devastated Haiti on January 12, 2010, as well as Defendants' conduct and their infringement of Mr. Morel's iconic earthquake photographs in the days, weeks, and months that followed.  After receiving the jury charge from the Court and deliberating for a day and a half, the unanimous jury rendered its verdicts in favor of Mr. Morel. The jury found that AFP and Getty each acted willfully when they infringed Mr. Morel's copyright in the Photos-at-Issue and repeatedly violated the DMCA when they altered and falsified copyright management information concerning those photographs.

Based on the evidence, the jury found that Mr. Morel suffered actual damages of $275,000 as a result of Defendants' willful misappropriation and worldwide licensing of his photographs. Weighing the factors identified in the Court's instructions, the jury also awarded Mr. Morel statutory damages under the Copyright Act at the top of the range established by Congress for willful infringement – $1.2 million for eight Photos-at-Issue – and $20,000 as statutory damages for Defendants' serial non-innocent violations of the DMCA.

Continuing their four-year war of attrition against Mr. Morel, Defendants now ask this Court to eradicate the jury's findings across the board, slash the amounts they must pay Mr. Morel, or

---

[1]    Consistent with the terminology used at trial, Mr. Morel is referred to as "Plaintiff" and Agence France Presse ("AFP") and Getty Images (US), Inc. ("Getty Images") are referred to as "Defendants" in this motion.  In fact, AFP is the Plaintiff and a Counterclaim Defendant in this action, Mr. Morel is the Defendant and Counterclaim Plaintiff, and Getty Images is a Counterclaim Defendant.

order a "do-over" in the form of a new trial on all issues.  In support of their motion, Defendants trot out the same arguments that the jury rejected after receiving and evaluating the evidence. According to the Defendants:  AFP and Getty Images merely made understandable mistakes that could not possibly rise to the level of willfulness; Mr. Morel principally has himself to blame for Defendants' unlawful sale of his photographs; Defendants were actually trying to help Mr. Morel by having his misidentified works seen by more people; and Mr. Morel should receive, at most, an amount that AFP and Getty – the adjudicated infringers in this case – believe is an appropriate licensing fee.

Defendants' motions should be denied in their entirety.  Post-trial motions are not vehicles for re-litigating decided matters or "taking a second bite at the apple."  The applicable standards require that the losers at trial show that there is such a complete absence of evidence supporting the verdicts that the jury's findings could only have been the result of "sheer surmise" and "conjecture," or that the jury's verdicts were egregious, rising to the level of a "miscarriage of justice."  *See* Point I, below.  Defendants have failed to meet these stringent standards.

As detailed below, there was ample evidence for the jury to conclude that each Defendant knew or was willfully blind to the fact that it was infringing Mr. Morel's copyright during their extensive and unauthorized licensing campaign of his works.  Defendants' principal strategy is to ignore any and all evidence that does not comport with the unconvincing stories that they offered up to the jury, electing instead to regurgitate the self-serving denials of wrongdoing that their representatives uttered from the witness stand.  Defendants also fail to address the documentary evidence that supports the jury's verdict on Mr. Morel's actual damages, including the invoices and sales charts that show the extent of Defendants' licensing of the Photos-at-Issue and the specific prices at which Defendants sold that work to its customers.  *See* Point III.A, below.

Defendants argue that the jury's award of $1.2 million as statutory damages under the Copyright Act "shocks the conscience." The argument is specious. The jury had extensive evidence to conclude that an award at the maximum level of the permissible range was warranted against both Defendants, including: Defendants' self-proclaimed status as champions of copyright protections; their willful violations of Mr. Morel's rights in his own work; their failure over many months to even attempt to meliorate the effect of their infringements; their refusal to accept responsibility for their own acts; their continued efforts to blame Mr. Morel or each other for the various infringements; and the need to set the awards at a level necessary to deter similar conduct in the future by these industry-leading giants and other would-be internet thieves.

Finally, Defendants' arguments that they did not violate the DMCA and that any statutory awards under that section would constitute a double recovery are unsupported by the facts and wrong as a matter of law. *See* Point IV, below.

The motions should be denied in their entirety.

## ARGUMENT

## I.     THE APPLICABLE STANDARDS.

Judgment as a matter of law is only appropriate where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). In evaluating a motion for a judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

Judgment as a matter of law may not be granted "unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached." *Yurman*

*Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108 (2d Cir. 2001) (quoting *This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998)).  This standard will be met "only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against the moving party."  *Id.*; *see also L.A. Printex Indus., Inc. v. Does 1-10*, No. 12–3344, 2013 WL 6170580, at *3 (2d Cir. Nov. 26, 2013) (affirming denial of defendant's motion for judgment as a matter of law where a reasonable juror could conclude that defendant had willfully infringed plaintiff's work).

The standard for a new trial is similarly difficult for Defendants to meet.  As a general matter, "jury verdicts should be disturbed with great infrequency," and only in the most "egregious cases."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012); *Tiffany v. Vill. of Briarcliff Manor*, No. 95 Civ. 8335, 1999 WL 1080243, at *2 (S.D.N.Y. Nov. 30, 1999), *aff'd*, 216 F.3d 1073 (2d Cir. 2000); *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978) (courts must "abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result").  Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial is appropriate "if and only if the verdict is seriously erroneous or a miscarriage of justice."  *Raedle*, 670 F.3d at 417-18; *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  Under Second Circuit precedent, "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury."  *Raedle*, 670 F.3d at 418 (reversing trial court's grant of judgment as a matter of law finding that prior jury verdict should not have been

disturbed); *see also DLC Mgmt.*, 163 F.3d at 134; *Lipton v. Nature Co.*, 71 F.3d 464, 472-73 (2d Cir. 1995).

Finally, Rule 59 "is not a vehicle for relitigating old issues . . . or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998); *In Design v. Lauren Knitwear Corp.*, No. 87 Civ. 0206, 1992 WL 42911, at *1 (S.D.N.Y. Feb. 24, 1992).

## II.   THE JURY'S FINDING OF WILLFUL INFRINGEMENT BY AFP AND GETTY IMAGES SHOULD NOT BE DISTURBED OR REDUCED.

Infringement is "willful" under the Copyright Act where "the defendant had knowledge that his actions constituted infringement, or recklessly disregarded such possibility." *L.A. Printex Indus.*, 2013 WL 6170580, at *1; *Yurman Design*, 262 F.3d at 112; *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010). "Willfulness need not be proven directly but may be inferred from the defendant's conduct." *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416, 2012 WL 5506121, at *1 (S.D.N.Y. Nov. 7, 2012) (quoting *N.A.S. Import., Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 252 (2d Cir. 1992)). A plaintiff can prove that "an infringement was 'willful' under the Copyright Act by demonstrating that the defendant acted with 'reckless disregard' for, or willful blindness to, the plaintiff's rights." *Id*. A jury's finding of willfulness is reviewed "under the same deferential Rule 50 standard that applies to factual determinations pertinent to liability." *Yurman Design*, 262 F.3d at 112.

Consistent with the law, the Court properly charged the jury as to the legal standard for willfulness and the factors that the jury could consider in deciding whether the Defendants acted willfully when they infringed Mr. Morel's copyright in the eight Photos-at-Issue:

> Infringement is "willful" if the infringer either knew that its conduct was infringing or acted with reckless disregard or willful blindness to the prospect that its conduct was infringing, that is, that it harbored actual doubts about its right to distribute Mr. Morel's photographs and yet willfully proceeded to do so without investigating further. You may infer a

defendant's state of mind, including reckless disregard or willful blindness, from its conduct.

Factors you should consider in determining willfulness include:  whether the defendant knew or should have known that Mr. Morel's photographs were protected by copyright; whether the defendant received warnings about its infringements; whether the defendant had experience with previous copyright ownership or prior lawsuits regarding similar practices; and whether the defendant was in an industry where knowledge of copyright is prevalent.

Jury Instruction No. 16; Tr. at 1049:20-1050:10.

After receiving this charge and evaluating the evidence, the jurors unanimously held that each defendant acted willfully when it infringed Mr. Morel's copyright.  In attacking the jury's verdict, Defendants have failed to cite a single copyright case where a jury's finding of willfulness was overturned by the trial judge.  This should not be the first such case.  Defendants' post-trial motion challenging the jury's findings that they acted willfully should be denied.

A.    **Evidence Supports the Jury's Finding that AFP Willfully Infringed Mr. Morel's Copyright in the Photos-at-Issue.**

The documentary evidence and testimony from the Defendants themselves support the jury's findings that the Defendants acted willfully when they misappropriated and licensed Mr. Morel's photographs.  Based on that evidence, the jury properly concluded that AFP either knew that its conduct was infringing or recklessly disregarded or was willfully blind to the prospect that it was infringing Mr. Morel's rights.  In fact, there was evidence to support both an actual knowledge and a willful blindness jury verdict against AFP.

1.    **There was Sufficient Evidence for the Jury to Conclude that AFP Knew that its Conduct was Infringing.**

The jury could conclude that AFP *actually knew* that it was infringing Mr. Morel's copyright on two different occasions:  first, when Mr. Amalvy sent Mr. Morel's photographs to the AFP Photo Desk and AFP thereafter distributed the initial set of the Photos-at-Issue attributed to

"Lisandro Suero/AFP"; and second, when AFP distributed another set of the Photos-at-Issue on January 13, knowing full well that the pictures were Mr. Morel's and that he had not authorized AFP to license his work.

As to the January 12 time period, Amalvy knew that Mr. Morel was a photographer located in Haiti who may have photographed the aftermath of the earthquake, and Amalvy knew that **before** he forwarded the misidentified "Lisandro Suero" photographs to AFP's Photo Desk.  At 9:42 p.m. on the evening of January 12, about twelve minutes after Mr. Morel uploaded his first photograph to TwitPic, Amalvy emailed Mr. Morel, asking in French, "do you have pictures?"  Trial Exs. 1A, 1B, 141A; Tr. at 258:19-259:7.  Mr. Amalvy recalled that he had seen photographs of the earthquake on the Internet that evening – including some not attributed to Lisandro Suero – but he denied seeing any of the fifteen images that Mr. Morel posted beginning around 9:30 p.m., even though there were "very few" photographs posted that night.[2]  Tr. at 259:8-259:10, 260:5-260:23, 261:15-261:22.

Mr. Amalvy used Twitter on the evening of January 12, 2010.  He testified that he learned about Mr. Morel's photographs from a tweet by Richard Morse.[3]  Tr. at 251:22-252:22.  Amalvy also sent several tweets to Suero over a two hour period, asking for permission to use the pictures.  Trial Ex. 400A at TWI000004.  Mr. Amalvy testified that he did not receive any responsive tweets from Mr. Suero granting such permission at any time.  Tr. at 281:19-282:11.[4]  Despite using Twitter

---

[2]  In stark contrast to Amalvy, the principal Getty Images photo editors who were on the scene that evening – Andreas Gebhard and Pancho Bernasconi – both saw Mr. Morel's photographs shortly after he posted them on the Internet.  Trial Ex. 2; Tr. at 518:16-518:20.  The Getty representatives, however, testified that, somehow, they had not seen **anything** that Lisandro Suero posted on January 12.  Tr. at 519:4-519:14, 599:20-599:22.  Not surprisingly, the claimed ignorance of the witnesses for each Defendant dovetailed nicely with the contrasting stories that their employers unsuccessfully tried to sell to the jury.

[3]  Mr. Morse was the owner of the Hotel Oloffson in Port-au-Prince, and a good friend of Mr. Morel.  Tr. at 167:3-167:7.

[4]  "Q.  [T]hat night you knew how to use [Twitter] and you tweeted to Mr. Suero what, four times?  A.  I was sending messages.  The main thing for me [was] to get in touch with him, and so I kept sending him up to three, four messages on Twitter.  Q.  On Twitter did Mr. Suero get back to you?  A.  No, I didn't receive any messages.  I didn't receive an answer. . . .  Q.  Mr. Suero, so he didn't tell you these are my pictures because he didn't respond?  A.  No, I didn't receive an answer.  All my messages to Mr. Suero went unanswered."

that evening, Amalvy conveniently testified that he did not see the various Suero tweets that made it clear that Suero was tweeting from the Dominican Republic and could not have been the photographer of the Photos-at-Issue.  Tr. at 270:1-273:20, 281:2-281:6.  As Mr. Amalvy conceded during the trial, "if I had seen [those tweets], I would have thought that [Mr. Suero] was actually – he was not in Haiti."  Tr. 272:1-272:2; *see also* Tr. at 272:4-272:6 ("Q.  So far as you know, was anyone at AFP monitoring or looking at Mr. Suero's Tweets that evening?  A.  No.  If we had seen it, we would have acted differently.").

As the hours passed on the evening of January 12, Amalvy found himself under tremendous pressure to publish something – anything – showing the aftermath of the earthquake.  As he later wrote to his boss at AFP, "We had nothing to show for an earthquake that looked awful… maybe even worse.  Like many of our counterparts (NYT, AP, Reuters, etc.) we started to scramble."  Trial Ex. 130A (ellipses in original).  Before finally "taking the plunge," he told his boss, "I waited a long time before acting, but in my opinion, AFP couldn't be completely invisible about a disaster of this magnitude… and if we had to go there… use the best possible …."  *Id*. (ellipses in original).

From this evidence, the jury could have reasonably concluded that Amalvy and AFP *knew* that they did not have permission to license the photographs when the first round of Mr. Morel's pictures were widely distributed to AFP customers under the AFP banner.  The jury was permitted to evaluate and pass on the credibility of the witnesses and draw reasonable inferences from the evidence presented.  *See* Jury Instruction No. 6 ("So, while you are considering the evidence presented to you, you are permitted to draw, from the facts which you find to be proven, such reasonable inferences as would be justified in light of your experience."); Tr. at 1039:6-1039:9.  The jury could well have concluded that Mr. Amalvy knew of Mr. Morel's photographs on the evening of January 12, had read the tweets that exposed Mr. Suero as a fraud, knew that AFP did

not have permission to commercially exploit the Photos-at-Issue, but nevertheless concluded that AFP had to make available some earthquake photographs on its feed and to its paying customers, regardless of the consequences that may follow.  Better to use the name of the unknown Lisandro Suero than the name of a known photojournalist.

To be sure, these findings do not comport with the story that AFP served up to the jury.  But that is not the standard on this motion, and the jury was not required to accept AFP's version of events.  *See Psihoyos v. John Wiley & Sons, Inc.*, 2012 WL 5506121, at *2-3; *Veerman v. Deep Blue Grp. L.L.C*, No. 08 Civ. 5042, 2010 WL 4449067, at *5 (S.D.N.Y. Nov. 3, 2010) (denying defendants' post-trial motions because "[t]he jury [was] not required to accept [defendants'] version of facts . . . .  The jury was not required to accept [defendants'] evidence denying or tending to minimize the impact of [their] practices").

In *Psihoyos*, for example, defendant argued that the jury's finding of willfulness was improper because the jury had heard "uncontradicted testimony" that its "photo department certainly intended to get permission" to use the photograph at issue, and "indeed sen[t] a purchase order requesting such permission to Psihoyos' office . . . but neither Psihoyos nor his licensing agent . . . responded to that request."  Mem. of Law in Support of Mot. for Remittitur, or in the Alternative, for a New Trial, at 8, *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 01416, 2012 WL 6771364 (S.D.N.Y. Aug. 30, 2012), ECF No. 99.  The *Psihoyos* Court rejected defendant's argument, finding that other evidence heard by the jury – including evidence "[d]efendant failed to note" in its motion – supported the jury's determination.  2012 WL 5506121, at *2-3.  In the same way, the jury in this case was not required to accept Amalvy's claim that he never saw Suero's tweets and never saw Mr. Morel's postings of fifteen different photographs, particularly in light of the conflicting evidence that AFP failed to note in its Motion papers.

-9-

Separately, AFP unquestionably made the second unauthorized distribution of Mr. Morel's photographs on January 13 with the knowledge that it was infringing Mr. Morel's copyright.  For example, both Amalvy and Benjamin Fathers knew before that second distribution that the photographs were taken by Mr. Morel and not by Lisandro Suero.  Trial Exs. 19A, 400A at TWI000024; Tr. at 326:1-326:10, 326:23-327:4.  And both knew that Mr. Morel had not given AFP permission to use, license, distribute, or sell his pictures.  Trial Exs. 19A, 261, 400A at TWI000024; Tr. at 345:20-346:10.  Nevertheless, AFP distributed the same eight photographs again, this time with the caption "Daniel Morel/AFP" or "David Morel/AFP."  Trial Ex. 28.  These uncontested facts – infringement of Mr. Morel's works coupled with AFP's affirmative knowledge that it did not have permission to distribute the photographs – add up to willful violations of the Copyright Act.

Defendants ask this Court to create a remarkable new principle of law that knowing violations of the Copyright Act cannot be willful if the wrongdoers intend to negotiate with the victim post-infringement and pay an amount – in this case, purportedly $20,000 – that the wrongdoers decide is appropriate.[5]  AFP – a purported guardian of copyright law – articulated this supposedly ameliorating defense as follows:

> That the use was not authorized at the time [of the second distribution of Mr. Morel's photographs] was not a concern to [Mr. Amalvy] because he believed, based on the manner in which the photographs were posted, that the photographer's intent was for third parties to use the photographs and, if necessary, for any deal to be reached retroactively.

Mot. at 7.

AFP cited no authority to support this argument.  This is not surprising given that the argument turns the law on its head.  As an initial matter, Mr. Amalvy's alleged subjective belief that

---

[5]     The supposed $20,000 figure was never even offered to Mr. Morel. Tr. at 178:1-179:10, 366:21-370:3. In addition, Defendants did not make – and have not made – any payment whatsoever to Mr. Morel despite their infringements. Tr. at 178:1-179:10, 284:5-285:11.

he was actually doing Mr. Morel a favor by misappropriating his works and selling them has nothing whatsoever to do with whether AFP acted "willfully," namely, with knowledge that the conduct was infringing or with reckless disregard or willful blindness to the prospect that its conduct was infringing. *See Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir. 1986) ("[A] court need not find that an infringer acted maliciously to find willful infringement . . . . knowledge that its actions constitute an infringement establishes that the defendant acted willfully."); *Castle Rock Entm't v. Carol Pub. Grp., Inc.*, 955 F. Supp. 260, 266-67 (S.D.N.Y. 1997), *aff'd*, 150 F.3d 132 (2d Cir. 1998) (intent to harm is not required to support a finding of willful infringement).  AFP concedes that Mr. Amalvy – its Director of Photography for the Americas – knew "[t]hat the use was not authorized at the time" and proudly asserts that this "was not a concern to" him.  Mot at 7.  Based on these facts alone, the jury had more than sufficient evidence to find that AFP acted willfully in the second unauthorized distribution of Mr. Morel's photographs.

More fundamentally, AFP's self-serving defense against knowing violations of the Copyright Act would rewrite the law.  The Copyright Act is designed to protect the rights of copyright holders and deter would-be infringers from violating those rights by creating a statutory framework that ***significantly enhances*** the monetary exposure of sophisticated parties who knowingly misappropriate and exploit protected works.  145 Cong. Rec. H6798-99 (statement of Rep. Berman) ("[T]o provide meaningful disincentives for infringement . . . the cost of infringement must substantially exceed the cost of compliance so that those who use or distribute intellectual property have an incentive to comply with the law."); 145 Cong. Rec. 13785 (statement of Rep. Hatch) ("Section 504(c) of the Copyright Act provides for the award of statutory damages at the plaintiff's election in order to provide greater security for owners . . . and to provide greater

-11-

deterrence for would-be infringers.").  AFP's argument seeks to do precisely the opposite:  in AFP's view, the giant photo agency should be allowed to take whatever it wants from the Internet and later pay whatever it thinks is appropriate if the copyright holder fails to respond promptly to a request for permission to license.  Put differently, AFP is seeking a ruling that would allow AFP to do to another photojournalist exactly what it did in this case, with the only consequence being a requirement that AFP pay a licensing fee that AFP believes to be sufficient.  That AFP continues to press this baseless argument further shows that it still hasn't learned its lesson.

> **2.**   **There was Ample Evidence For the Jury to Find that AFP Harbored Actual Doubts About its Right to Distribute Mr. Morel's Photographs and Yet Willfully Proceeded Without Investigating Further.**

Based on the same evidence noted above and the additional testimony identified below, the jury had ample evidence to support a finding that AFP "recklessly disregarded" or was "willfully blind" to Mr. Morel's rights when AFP infringed his works.  Time and again, AFP harbored actual doubts about its right to distribute the Photos-at-Issue, yet it willfully moved forward without investigating what turned out to be easily discoverable facts.  As was shown at trial, Amalvy and the other AFP representatives were just a few mouse clicks away from resolving their claimed doubts, but in every instance they ignored AFP's established guidelines and recklessly plowed ahead with their misappropriation and unlawful licensing.

As the jury learned, AFP and its personnel understood that the use of materials from social networking sites such as Twitter and Facebook carries "significant risks to [AFP]'s reputation for reliability and accuracy" and raises "legal or ethical issues."  Trial Ex. 144A at AFP000228; Tr. at 275:12-276:15.  AFP therefore issued to all editors and reporters a series of specific Guidelines to follow when dealing with fast-breaking news events that are reported and documented on social networks.  According to AFP's Stylebook:

> These guidelines are aimed at minimizing the risks to the agency by
> ensuring as far as possible the authenticity of the material, our ethical
> standing and legal rights to use the material, and that we have provided the
> proper contexts for clients.

*Id.*

Mr. Amalvy was aware of the Guidelines in January 2010.  Tr. at 274:18-275:2, 276:11-276:19, 278:18-278:24.  For over fifteen years, he had worked as an AFP photojournalist in the field.  Tr. at 243:7-244:7, 284:23-284:24.  He later rose through the editorial ranks, eventually becoming AFP's international Editor-in-Chief of Photography.  Tr. at 245:19-245:23.  At the time of the Haiti earthquake, Amalvy was based in Washington D.C., serving as Director of Photography for the Americas.  Tr. at 246:1-246:23.  With Mr. Amalvy's extensive experience as a photographer and editor, the directives contained in the Guidelines, and the conduct of AFP and its staff in the hours and days following the earthquake, the jury had a significant body of competent evidence to conclude that AFP was "recklessly indifferent" or "willfully blind" to Mr. Morel's rights.

Mr. Amalvy testified that it was he who found the photographs that were posted by Lisandro Suero.  Tr. at 259:24-260:16.  Amalvy conceded at trial that he had doubts about Suero's ownership rights in the works that Suero was loading on to TwitPic.  Tr. at 278:1-278:6.  He also eventually admitted that he was not even sure that all of the Photos-at-Issue had been taken by the same photographer, let alone that the photographer was actually a person named Lisandro Suero.  Tr. at 312:1-312:12.  Amalvy nevertheless authorized the worldwide distribution of the Photos-at-Issue on January 12 with the credit line "Lisandro Suero/AFP."

In addition to Amalvy's own well-founded doubts, the AFP Guidelines should have stopped him in his tracks that night.  The Guidelines warned that photographs posted on social networking sites could very well be inauthentic, doctored, or misappropriated.  Trial Ex. 144A at AFP000228.  The Guidelines therefore identified a series of steps that AFP personnel should take before

acquiring such pictures and licensing them as AFP property.  In dealing with such material, the

Guidelines called for AFP's staff and editors to verify the content, origin, ownership, source, and

pre-publication of any such works.  *Id*.  As the evidence shows, Mr. Amalvy and his colleagues did

virtually nothing that night to verify any of these things.

For example, while Mr. Amalvy knew nothing about Lisandro Suero and harbored doubts as

to whether Suero was the true author of the photographs, Amalvy did not take ***any steps***, or direct

anyone else, to verify who Mr. Suero was or whether he actually took the Photos-at-Issue:

> Q. First, I want to ask what did you do to confirm Mr. Suero's identity and
> what did you do to confirm the fact that he took the pictures?
>
> A. I tried to write Mr. Suero.
>
> Q. What else did you do to verify his identity and whether he took the
> photographs?
>
> A. Nothing else.
>
> *****
>
> Q. Did you ask the person on the desk, please find out what or who
> Lisandro Suero is?
>
> A. I think as part of our general conversation, I might have asked about it,
> but we didn't undertake any specific research.
>
> Q. Did you take any general research to find out anything about the person
> using the name Lisandro Suero?
>
> A. No.

Tr. at 288:2-288:8, 265:21-266:3.

The Guidelines also directed AFP personnel to determine whether photographs posted on

social networks had "already been published," thereby helping to verify whether the photograph

was actually taken by the person posting it or by someone else.  Trial Ex. 144A at AFP000230.  As

the jury learned, Mr. Morel posted the Photos-at-Issue on the Internet before Suero misappropriated

and re-posted them, and Mr. Morel's original postings could be found online.  Trial Ex. 141A.  The

Getty folks, particularly Mr. Gebhard, had no trouble finding Mr. Morel's photographs on January

12, and even Benjamin Fathers, an AFP Photo Editor based in Paris, found Mr. Morel's

photographs online shortly after the earthquake occurred.  Trial Exs. 2, 19A; Tr. at 518:16-518:20.

Here is the testimony as to what the AFP people did – or did not do – on January 12 to

determine whether the pictures had already been published, as required under the Guidelines:

> Q.  What did you do that evening to verify whether the photos had already
>     been published?
>
> A.  Nothing else, as I tried to get in touch with Mr. Suero, questions about
>     the content of those pictures.
>
> Q.  Did you ask anyone in the AFP network to use whatever tools they had
>     to see whether they had been already published by someone else?
>
> A.  No.
>
> Q.  Did you find out from Mr. Suero whether it was exclusive?
>
> A.  I tried to join him, to reach him.
>
> Q.  But you never heard back from him whether it was exclusive or
>     anything like that?
>
> A.  No.

Tr. 288:14-289:1.

So here again, AFP and Amalvy had serious doubts about Suero's purported authorship of

the Photos-at-Issue, but chose to ignore AFP's Guidelines, remain willfully blind to the facts, and

made no effort to investigate what anyone with a computer and access to a search engine could have

discovered in minutes.  AFP's conduct fits squarely within the definition of willful infringement.

AFP has failed to show, as it must on this motion, that "there is such a complete absence of

evidence supporting the verdict that the jury's findings [of willfulness] could only have been the

result of sheer surmise and conjecture."  *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108 (2d

Cir. 2001).  AFP's motion to upset the jury's finding that it acted willfully should, therefore, be

denied.

**B.** **Evidence Supports the Jury's Finding That Getty Images Willfully Infringed Mr. Morel's Copyright in the Photos-at-Issue.**

As with AFP, the jury had a significant body of evidence to support its finding that Getty Images willfully infringed Mr. Morel's copyright in the Photos-at-Issue when it licensed his photographs to hundreds of customers from January 12, 2010 to February 2, 2010. At trial and on this motion, Getty Images clings to one overarching argument to excuse its three-week-long licensing spree of Mr. Morel's photographs, while pointing the finger at its world-wide partner, AFP, in the process:  Getty Images' representatives purportedly never heard the name "Lisandro Suero" from any source until February 2, when they supposedly learned from Corbis that Suero had claimed credit for the Photos-at-Issue.  Mot. at 9-10; Tr. at 677:7-677:11 (Bernasconi), 519:4-519:14, 577:25-578:3 (Gebhard); *see also* Tr. at 96:18-96:25, 102:2-102:8.  Because AFP never issued a "kill notice" for the first wave of Suero-credited photographs, Getty Images claimed that it continued to license those photographs supposedly in ignorance of the overlap.

The major stumbling block to this story is that the jury had ample evidence from a variety of sources to conclude that Getty Images' agents – principally, "Pancho" Bernasconi and Andreas Gebhard – knew of Mr. Suero and his thievery almost immediately after the earthquake.  At a minimum, the jury could conclude, based on the evidence presented and the factors identified in the Court's charge, that Getty Images acted with reckless disregard or willful blindness to the prospect that its continuing conduct was infringing Mr. Morel's copyright.

**1.** **There was Sufficient Evidence for the Jury to Conclude that Getty Images Knew that its Conduct was Infringing.**

The jury had before it admissible evidence that both Mr. Bernasconi, Getty's Director of Photography in the U.S., and Mr. Gebhard, Getty's Picture Desk Manager in New York, learned about Lisandro Suero and his role in misappropriating the Photos-at-Issue weeks before February 2, 2010.  Perhaps most damning on this point was the testimony given by Vincent Amalvy during

questioning by his and AFP's own counsel concerning a conversation that Amalvy had on January

13 or 14, 2010, with his counterpart at Getty Images, Bernasconi:

> Q. At the time on the 13th and 14th of January 2010, did you actually talk
> to anybody at Getty Images about the Lisandro Suero pictures?
>
> A. At one moment I spoke to Pancho Bernasconi.
>
> Q. On January 13 or 14th?
>
> A. Yes, I think so.

Tr. at 361:21-362:1; *see also* Tr. at 371:25-372:14.

On January 13, 2010, Bernasconi also exchanged emails with one of his colleagues, Simone

Joyner, a Getty Images photo editor based in London.  Their correspondence concerned an "AFP

stringer" named "Lisandro Suero" who had posted images depicting the aftermath of the Haiti

earthquake on Twitter:

> Q. So you, sitting here today, you remember getting an e-mail from Simone
> Joyner on January 13, 2010?
>
> A. I remember in the course of this case.
>
> Q. I see.  Was the reference to an AFP stringer pictures on Twitter?
>
> A. Again, in the course of this case I've been reminded of that, yes.
>
> Q. That's what she brought to your attention on the 13th?
>
> A. That's the e-mail, yeah.
>
> Q. Did she tell you that she just noticed that an AFP stringer was also
> posting his images on Twitter?
>
> A. Again, in looking at the e-mail since then, that's what the e-mail says.
>
> Q. So, Ms. Joyner on the 13th, the day after the earthquake, was bringing to
> your attention that an AFP stringer was posting his images on Twitter.
> Is that correct?
>
> A. Yes, sir.
>
> * * * *
>
> Q. Does that refresh your recollection that what you received on January 13
> from Simone Joyner was a document referring to an AFP stringer
> named Lisandro Suero?
>
> A. I see that now.
>
> Q. You actually saw it then, didn't you?

-17-

> A.  I'm sorry?
>
> Q.  You actually saw that e-mail on January 13, 2010.
>
> A.  Yes, I did, because I responded to her.  So I must have seen it.

Tr. at 598:21-599:12, 600:7-600:15.

In his response to her email, Bernasconi told Ms. Joyner, "Yes, I am aware."  Tr. at 601:9-601:12.  At the trial, however, Bernasconi continued to testify that he did not even learn about the name "Lisandro Suero" until February 2, 2010.  Tr. at 677:7-677:11.

On January 12, 2010, Andreas Gebhard, the head of Getty Images' New York Picture Desk, looked online for news sources about the Haiti earthquake.  Tr. at 514:23-514:25, 517:3-519:3.  He learned on Twitter that Mr. Morel was on the ground in Haiti and had taken pictures of the earthquake's devastation.  Trial Ex. 2; Tr. at 518:16-518:20.  After viewing the photographs, Gebhard wrote an email to his boss, Bernasconi – the only email he wrote to Bernasconi that evening – identifying Mr. Morel's Twitter name, highlighting that the pictures "look very decent," and providing a link to one of the Photos-at-Issue for Bernasconi to see for himself.  Trial Ex. 2; Tr. at 517:3-517:14.  Mr. Gebhard also testified that he likely "retweeted" a tweet that referred to "some powerful images by Haitian photojournalist Daniel Morel."  Tr. 520:1-521:11.  Despite looking at the stream of messages that were passing on Twitter, Gebhard claimed that he did not see any that referred to Lisandro Suero, who himself tweeted about the earthquake 91 times that evening.  Tr. 519:1-519:8; Trial Ex. 403A.[6]

On January 13, 2010, Getty Images received the "Change of Caption" Notice from AFP directing Getty Images to modify the caption on the first distribution of earthquake photographs that

---

[6]  Incredibly, Gebhard, the head of Getty Images' New York Picture Desk, appeared to have no interest in the photographs of the earthquake that Getty posted on its website or that its customers plastered on the front pages of newspapers on January 14, 2010 with the names "Lisandro Suero/AFP/Getty Images" under the photographs.  Tr. at 530:5-530:8, 531:15-533:9; *see also* Trial Ex. 162.  The jury did not have to believe this tale.

AFP had sent on January 12 to identify Daniel Morel (or, in one instance, David Morel) as the photographer.  Although Gebhard saw the "Change of Caption Notice," he claimed that he never looked to see to whom the first round of photographs were credited.  Tr. at 538:16-539:14.  The ranking AFP witness, however, testified that any responsible professional in the digital media business would check to see who was identified as the photographer in the earlier distribution and make sure that the old name was removed and the correct name included in its place.  Tr. at 334:7-335:1 (Amalvy).

Based on this evidence, the jury could reject out of hand the oft-stated excuse that the Getty Images representatives never even heard the name "Lisandro Suero" in all of January 2010.  Indeed, the jury could properly conclude that Bernasconi was flat-out lying when he testified, "We didn't find out about Lisandro Suero's name until February 2."  Tr. at 677:10-677:11.[7]  The jury also had every right to conclude that Bernasconi not only learned about Lisandro Suero as early as January 13, but also that he knew that Mr. Morel's remarkable photographs had been posted by an "AFP stringer" named Lisandro Suero.  In evaluating both the evidence before it and the credibility of the Getty witnesses, the jury therefore could reasonably conclude that Getty Images knew from mid-January that Getty was not authorized to license either the Suero-credited or the Morel-credited Photos-at-Issue.  Yet Getty *did* license those pictures dozens of times during the latter part of January and early February.  Trial Exs. 264C, 265C; Tr. at 728:8-728:10.  The jury therefore had an adequate evidentiary basis to conclude, as it did, that Getty Images' infringements – like AFP's – were willful and anything but "regular."

---

[7]      The only transcript that the jury asked to review was of Bernasconi's testimony.  Court Ex. 6; Tr. at 1069:9-1069:11.  As the Court noted in the jury charge, "If you find that any witness has lied under oath at this trial, you should view the testimony of such witness cautiously and weigh it with great care.  It is, however, for you to decide how much of the witness' testimony, if any, you wish to believe."  Jury Instruction No. 8; Tr. at 1040:12-1040:16.  Under applicable law, a court should rarely disturb a jury's evaluation of a witness's credibility.  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  That principle applies here.

**2.        There Was Ample Evidence for the Jury to Find that Getty Images Harbored Actual Doubts About its Right to Distribute Mr. Morel's Photographs and Yet Willfully Proceeded Without Investigating Further.**

The same evidence that would sustain a finding that Getty Images actually knew that it was infringing Plaintiff's copyright also supports the conclusion that Getty Images acted recklessly or with willful blindness to the prospect that it was infringing Mr. Morel's copyright when it licensed his photographs throughout January and in early February 2010.  The jury could properly find that, despite receiving both the Change of Caption Notice and the Kill Notice, Getty Images willfully proceeded to license the Photos-at-Issue for weeks without investigating the situation at all, deciding instead to deflect the blame on to its indemnifying partner, AFP.

In its charge to the jury, the Court identified a number of factors that the jury should consider in determining whether Getty Images acted willfully.  Jury Instruction No. 16; Tr. at 1049:20-1050:10.  These factors included whether Getty Images should have known that Mr. Morel's photographs were protected by copyright, whether Getty Images received warnings about its infringements, and whether Getty Images was in an industry where knowledge of copyright is prevalent.  *Id*.  The evidence before the jury relating to these factors provided a sufficient – in fact, a compelling – basis for a finding that Getty Images acted with reckless disregard or willful blindness to the prospect that its continued licensing of the Photos-at-Issue was infringing.

In Getty Images' industry – the digital licensing business – knowledge of copyright is not only prevalent, it is at the core of its business.[8]  As Andreas Gebhard testified, he always understood that a photograph is protected by copyright the moment it is taken, and that the photographer retains the right to decide who to sell it to.  Tr. at 503:1-503:17.  Gebhard added that copyright "is what our

---

[8]        The same is true, of course, for AFP.

entire business is built on . . . [Copyright protection] is of course important.  Otherwise we can't

conduct our business."  Tr. at 544:9-544:17.

For years, Getty Images has trumpeted its commitment to copyright protection on its

website:

> Getty Images considers the subject of copyright protection of the utmost importance and has an active program utilizing a range of measures to deal with the issue.
>
> We are committed to continuing to do all that we can to enforce copyright laws and ensure that both our company and our photographers and filmmakers are compensated for their work.
>
> * * * *
>
> We also employ a team who are dedicated to ensuring worldwide copyright compliance.  Their sole task is to protect copyright by tracking and pursuing copyright infringements on behalf of the company and our contributors.

Trial Ex. 155.

While these are noble words from the biggest player in the industry, the evidence at trial

supports the conclusion that Getty Images and its agents had no interest in protecting Mr. Morel's

copyright.  As early as the evening of January 12, Getty Images had reason to believe it did not have

the right to show Mr. Morel's photographs.  Over the next two days, Getty Images received the

Change of Caption Notice directing Getty Images to change the initially-identified photographer's

name to Mr. Morel's as well as the Kill Notice directing it to remove all the Photos-at-Issue from its

website.  Tr. at 533:10-533:14 (Gebhard), 536:9-536:16 (Gebhard), 761:15-761:18 (Bernasconi);

Trial Exs. 29, 30, 46.  At that point, Getty Images was on actual notice that it had posted on its

website, and made available for licensing, two sets of Morel photographs.  Despite this uncontested

fact, no one at Getty did anything to fix the incorrect name on the first set of Morel pictures or to

remove from its website the previously misidentified series of photographs.

Mr. Gebhard saw the Change of Caption Notice identifying Daniel Morel as the actual photographer of the eight Photographs-at-Issue.  Tr. at 533:10-533:23.  He understood that AFP had "re-sent" a second set of photographs on January 13, this time with Mr. Morel's name.  Trial Ex. 55.  He also received AFP's Kill Notice directing Getty and its customers to remove the Morel photographs from all systems.  Tr. at 541:6-541:11, 536:9-536:16; Trial Ex. 46.

Gebhard knew a number of other facts by January 14, 2010.  First, he had seen some of the Photos-at-Issue on the day of the earthquake – "Pix on twitter look very decent," he noted.  Trial Ex. 2.  Second, although there were only eight Photos-at-Issue, Gebhard found at least fourteen assets in Getty Images' systems that included the name "Morel," leading him to realize that AFP had actually sent the same photographs a number of times, each one of which existed as a separate picture available to customers to be licensed on Getty Images' website.  Tr. at 540:21-540:24; *see also* Tr. at 561:18-561:23.  Third, Gebhard knew that despite sending the Kill Notice, AFP had not removed the Photos-at-Issue from Getty Images' website, even though Eva Hambach of AFP had been specifically trained to do so.  Tr. at 557:1-557:13; *see also* Tr. at 568:9-568:12.  Gebhard himself had to remove each asset from Getty Images' website.  Tr. at 539:23-540:1, 558:21-558:24.  But even with all this information, Gebhard ***did not*** check whether all iterations of the Photos-at-Issue had been removed from Getty Images' systems or website.  Tr. at 539:9-539:14, 557:11-559:9, 541:23-542:18.  Getty Images offered no testimony from any witness that he or she checked throughout the entire month of January whether the company continued to license any of the Photos-at-Issue, even though the Kill Notice said that the pictures had to be purged because of a "copyright issue."

Instead, Gebhard blamed AFP for Getty Images' and his own failure to stop customers from licensing Mr. Morel's photographs after January 14:

Q. As the New York photo desk manager, did you make it your business to
keep track of change of caption notices that you might receive?

A. No, I did not make it my business to check up on what our image
partners would do, no.

Q. Did anybody have that job?

A. Look, we partner with organizations that have their own editorial desks,
that have their own editorial staff, that are, you know, well respected
and big international news organizations.  So, no, we don't check up on
them.  We don't, you know, second guess them or double check
everything that they send to us.  That's not how our arrangements are
set up.  That's not how our systems are set up.

Tr. at 534:6-534:18.

As a result of Getty Images' failure to remove the Photos-at-Issue from its website, Getty

Images licensed Mr. Morel's photographs twenty-eight times between January 14 and February 2,

2010.  There was more than sufficient evidence for the jury to conclude that Getty Images acted

with reckless disregard or willful blindness to the prospect that such licensing infringed Mr. Morel's

copyright.  Getty Images' motion should therefore be denied.

## III.   DEFENDANTS' MOTION FOR A NEW TRIAL OR REMITTITUR SHOULD BE DENIED.

A new trial may be ordered where the verdict is found to be "excessive," meaning that it is

so high that it "shocks the judicial conscience and constitutes a denial of justice."  *Kirsch v. Fleet

St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).  Remittitur, "the process by which a court compels a

plaintiff to choose between reduction of an excessive verdict and a new trial," is an "invasion of the

jury's prerogative and the right of the plaintiff to its determination," and thus "can be justified only

in limited situations."  *Psihoyos*, 2012 WL 5506121, at *1; *Donovan v. Penn Shipping Co., Inc.*,

536 F.2d 536, 539 (2d Cir. 1976).  On the rare occasion that remittitur is appropriate, "a district

court should remit the jury's award only to the maximum amount that would be upheld by the

-23-

district court as not excessive." *Psihoyos*, 2012 WL 5506121, at *1 (citing *Earl v. Bouchard Transp. Co., Inc.*, 917 F.2d 1320, 1330 (2d Cir. 1990)).

The jury awards for Defendants' Copyright Act violations of $275,000 in actual damages and $1.2 million in statutory damages cannot be said to "shock the judicial conscience" or amount to a miscarriage of justice.  Accordingly, neither a new trial nor remittitur is appropriate here.

> **A.     The Jury's Award of Actual Damages is Supported by the Evidence and was Not Tainted by Counsel's Remarks.**

Defendants concede that the jury was properly charged as to its responsibilities in evaluating the evidence and establishing an actual damages award.  Mot. at 23.  The jury was explicitly told that their assessment of actual damages "may not be based on mere speculation."  Jury Instruction No. 14; Tr. at 1046:9-1046:11.  When the jury halted its deliberations to seek specific guidance on this subject, the Court – without objection from Defendants' counsel – pointed the jury to the specific provisions of its charge concerning actual damages.  *See* Court Ex. 5; Tr. at 1069:2-1070:14.

So charged, the jury returned to its deliberations, ultimately finding that Mr. Morel had suffered actual damages of $275,000 as a result of Defendants' copyright infringements.  On this motion, Defendants argue that the jury failed to follow the Court's charge and came up with an amount that was completely speculative and supported by no evidence whatsoever.  Mot. at 20-25. Defendants are wrong across the board; the jury's verdict of actual damages should stand.

> **1.     The Jury's Award of Actual Damages is Supported by Competent Evidence.**

The jury had a significant amount of pricing and distribution information to consider in assessing Mr. Morel's actual damages.  Defendants concede that their own documents demonstrated that they distributed Mr. Morel's photographs without authority to a thousand or more licensees. Trial Exs. 137, 138, 264C and 265C; Tr. at 787:13-787:24 (Tarot).  The jury also had before it

-24-

charts that showed that Getty Images licensed Mr. Morel's photographs for a variety of prices, including sales at $275 and one in excess of $1,450. *See, e.g.*, Trial Ex. 264C at rows 29, 30, 38, 61-64. AFP earned as much as €231 (approximately $335) from the sale of a single image. Trial Ex. 138.

Defendants claim, however, that there is "not a scintilla of evidence" that their many subscribers would have paid anything if they had not gotten the pictures from Defendants' feed. Mot. at 24. This is simply wrong. NBC was one of Defendants' subscribers that received Mr. Morel's photographs through their feeds. Trial Ex. 265C at rows 227-230. NBC had agreed to pay Mr. Morel *$500* for one photograph but reneged once the network realized it already had the photograph. Tr. at 171:13-171:20, 176:19-177:1.

Moreover, Defendants' own documents highlighted the unique and remarkable quality of Mr. Morel's photographs, which appeared on the front pages of newspapers around the world. Trial Exs. 76A, 162. As Vincent Amalvy conceded on the stand, in extreme situations, "for example in the Concorde crash, in a situation like that, we could buy pictures for – they are expensive when we buy them." Tr. at 370:1-370:3. The Haiti earthquake was unquestionably an extreme situation. While Defendants urge that the jury should have accepted their proposed actual damages figures of $15,000–$20,000, the jury was not required to accept their competing suggestion. *See Psihoyos*, 2012 WL 5506121, at *3 (upholding jury's damages calculation); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 113-114 (2d Cir. 2001) (same).[9] Because there was competent evidence from which the jury could arrive at its verdict, it should not be disturbed by this Court.

   **2.    Statements Concerning Actual Damages Made by Counsel During Summation were Neither Improper Nor Objected To.**

---

[9]    Defendants fail to cite a single case in which a jury's award of actual damages was vacated as speculative. *See* Mot. at 21.

Defendants also argue that the jury "improperly followed plaintiff's counsel's suggestion of calculating actual damages using unsupportable speculation." Mot. at 23. This argument is baseless.

As an initial matter, Defendants have failed to identify anything that Mr. Morel's counsel said during closing that was improper; the only statements cited in Defendants' Motion were directly supported by the evidence. Mot. at 23. Moreover, the jurors explicitly asked during their deliberations for the definition of actual damages and whether they should use the damages calculations provided by the attorneys.[10] With counsels' agreement, the Court pointed the jurors to the appropriate language in the jury charge. Tr. at 1069:2-1070:14, 1074:1-1074:24.

Separately, where, as here, a complaining party fails to contemporaneously object to allegedly improper statements made by counsel during summation, the court should grant a new trial *only* "when the error is so serious and flagrant that it goes to the very integrity of the trial." *Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d 299, 309 (S.D.N.Y. 2009) (internal quotations omitted); *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998) ("Where it appears . . . that the complaining party failed to object at trial to the statements [made during summation], we may reverse only for plain error because [the] failure [to object] deprives the trial court of an opportunity to deal with those remarks then and there."); *see also Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989); *Wantanabe Realty Corp. v. City of New York*, No. 01 Civ. 10137, 2003 WL 22862646, at *6 (S.D.N.Y. Dec. 3, 2003). As Defendants themselves acknowledge in their Motion, the jury was provided clear instruction that arguments made by the attorneys were not evidence and should not be considered as such. Mot. at 23. "[J]uries are

---

[10]   Getty Images' counsel had suggested during her closing that the appropriate actual damages amount should be pegged at the $275 day rate for a photographer on assignment, a benchmark and figure that had nothing to do with the issues being tried. Tr. at 972:12-972:14.

presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and

Defendants provide no basis upon which this Court could find otherwise here.

> **B.**   **The Jury's Award of Statutory Damages Under the Copyright Act is Entitled to Great Deference and Should Not Be Disturbed or Reduced.**

The jury was properly instructed that it could award Mr. Morel up to "$150,000 for each of

the eight works they infringed" – up to a total of $1.2 million – if it found that the Defendants

willfully violated Mr. Morel's copyright in each of his eight works.  Tr. at 1051:1-1051:5.  The

jurors also were instructed that "within these [described] ranges you have discretion to choose an

amount that you believe is just in light of the evidence presented."  Tr. at 1051:12-1051:14.  To help

guide the jurors in their assessment of an appropriate statutory damages award, the Court informed

the jurors that they could consider "any or all" of the *Bryant* factors in their deliberations.  Tr. at

1051:15-1052:3.  Those factors include the jurors' evaluation of Defendants' states of mind, the

deterrent effect (if any) on the Defendants themselves or third-parties, and the conduct and attitude

of the parties.  *Id.*; *see Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010).

Guided by this charge and presented with a full evidentiary record, the jury unanimously

decided that Defendants were jointly and severally responsible to pay Mr. Morel the maximum

statutory amount for their willful infringement:  $1.2 million.  Tr. at 1081:4-1081:8; Amended

Judgment, Dkt. No. 307, at 1.  Defendants now ask this Court to eradicate or reduce the jury's

award because it purportedly "shocks the conscience," is significantly greater than Mr. Morel's

actual damages, and is higher than awards that have been granted in other cases.  Each argument is

meritless.

> **1.**   **It was Within the Jury's Discretion to Set the Statutory Award at the Maximum Level of the Established Range.**

In the Second Circuit, a jury's award of statutory damages is entitled to great deference.

*L.A. Printex Indus., Inc. v. Does 1-10*, No. 12-3344, 2013 WL 6170580, at *2 (2d Cir. Nov. 26,

2013) ("We apply a deferential standard in reviewing an award of statutory damages."); *Hamil America, Inc. v. GFI*, 193 F.3d 92, 97 (2d Cir. 1999) (reviewing the jury's "actual calculation of damages for clear error"); *accord Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 459 (D. Md. 2004) ("an award within the statutory range is entitled to substantial deference"). Courts have also held that once a jury makes a finding as to the infringer's state of mind, it has "wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195 (9th Cir. 2001); *see also Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996) ("[I]f the jury was presented with evidence justifying a finding of willful infringement, it is given broad discretion to award up to $100,000 [the statutory maximum in 1996] for each work copied.").

Here, the jury determined that both Defendants willfully infringed Mr. Morel's copyright. With that finding alone, the jury had the discretion to set the statutory award at the very top of the statutory range. With the added evidence of the Defendants' contemptuous behavior toward Mr. Morel, their position as industry powerhouses, and their disproportionate economic power compared to the photojournalists who depend on them for their livelihoods, Defendants cannot seriously complain that a $1.2 million judgment against them would shock anyone's conscience.[11]

### 2.   Statutory Damages Need Not Be Commensurate with Actual Damages.

AFP and Getty Images argue that under applicable law, statutory damages awards ***must*** be commensurate with actual injury. Mot. at 25 (emphasis added). The law is directly contrary. Courts have repeatedly held that a statutory damages award should not be reversed or disturbed because it "bears little relationship to the plaintiff's actual damages." *Psihoyos*, 2012 WL 5506121,

---

[11]   While Defendants assert that "statutory damages are not intended to provide a plaintiff with a windfall recovery" (Mot. at 26), they fail to cite a single case in which a jury award that fell within the statutory range was found to be excessive because it provided a "windfall recovery" to a plaintiff.

at *3 (denying defendant's motion for remittitur or a new trial); *Yurman Design*, 262 F.3d at 113-14 (affirming jury award of statutory damages even though it had "little relationship to the $19,000 in profits [defendant] claimed to have earned on the jewelry at issue"). In *Lowry's Reports*, the court noted that "[t]here has never been a requirement that statutory damages must be strictly related to actual injury." 302 F. Supp. 2d at 460-61; *see also Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 909 (8th Cir. 2012) (rejecting the trial court's conclusion that "statutory damages must still bear some relation to actual damages").[12]

Indeed, the Supreme Court of the United States has held that "a rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952). It is well-established that statutory damages "are not meant to be merely compensatory or restitutionary. The statutory award is also meant to discourage wrongful conduct." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 113-14 (2d Cir. 2001); *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998) ("[A]n award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment."); *Psihoyos*, 2012 WL 5506121, at *3 (statutory damages intended for "deterring others besides the defendant as well as discouraging the defendant itself" from committing future infringement).

---

[12]    All of the cases cited by Defendants – except one – awarded statutory damages after a default or bench trial. As such, potentially excessive jury verdicts were not at issue. *See Peer Int'l Corp. v. Luna Records, Inc.*, 887 F. Supp. 560, 568–69 (S.D.N.Y. 1995) (assessing damages after bench trial); *Rogers v. Ecolor Studio*, No. 11 Civ.4493, 2013 WL 752256, at *6–8 (E.D.N.Y. Feb. 7, 2013) (assessing damages after default); *Arista Records LLC v. Furia Sonidera, Inc.*, No. 05 Civ. 5906, 2007 WL 922406, at *3 (E.D.N.Y. Mar. 26, 2007) (awarding statutory damages after default); *Peer Int'l Corp. v. Max Music & Entm't*, No. 05 Civ. 5906, 2004 WL 1542253, at *4 (S.D.N.Y. July 9, 2004) (awarding statutory damages after default); *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 677 F. Supp. 740 (S.D.N.Y. 1988) (awarding statutory damages after bench trial); *EMI Entm't World, Inc. v. Karen Records, Inc.*, 806 F. Supp. 2d 697, 707-09 (S.D.N.Y. 2011) (awarding damages after bench trial). The remaining case, *Capitol Records*, was reversed on appeal. *See* 680 F. Supp. 2d 1045, 1053-54 (D. Minn. 2010) (remitting jury verdict), *vacated by* 692 F.3d 899 (8th Cir. 2012) (remanding with instructions to reinstate jury verdict).

In line with the deterrent purpose of statutory damages, courts routinely hold that large statutory awards are *not* excessive when they are imposed – as in this case – against large corporations or other business entities.  *See, e.g.*, *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham*, 259 F.3d 1186, 1195 (9th Cir. 2001) ($31.68 million dollar verdict not excessive where imposed against defendant-television station); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1337 (9th Cir. 1990) ($4 million dollar award of maximum statutory damages not excessive where imposed against company that manufactured, distributed, and sold musical compositions); *Superior Form Builders*, 74 F.3d at 496 (defendant was the largest taxidermy supplier in the country).

Similarly, large statutory awards are frequently found *not* excessive where, as here, the infringers used the copyrighted work for commercial purposes and earned a profit.  *See, e.g.*, *Psihoyos*, 2012 WL 5506121, at *3 (verdict was not excessive where infringer published the copyrighted work in a book and profited from the book's sales); *Superior Form Builders*, 74 F.3d at 496 (verdict not excessive where infringer, as a result of his infringing activities, "became the largest taxidermy supplier in the country"); *Columbia Pictures*, 259 F.3d at 1195 ($31.68 million dollar verdict not excessive where defendant-television station profited from airing infringing content).

### 3.   The Jury's Statutory Damages Award for Defendants' Copyright Infringements is Supported by the Evidence.

Ignoring the evidence that was adduced at trial, Defendants assert that the jury verdict should be overturned and replaced with a statutory award in the range of $20,000-$50,000 per work.  Mot. at 31.  In support of this assertion, Defendants cite cases in which courts awarded statutory damages within this proposed range for willful infringement.  Mot. at 31-33.  But, in all but two of these cases, the amount awarded was set by the court as the initial fact finder, and none of the cases

-30-

cited by Defendants involved a court overturning a jury's award for copyright infringement or a jury that stayed within statutory maximums.[13]  The jury in this case could have set the award at a lower level, but it was reasonably convinced by the sheer volume of evidence that was adverse to the Defendants that the maximum was appropriate.

Defendants also argue that the legislative history of the Copyright Act supports their argument that the maximum statutory damages awarded by the jury are excessive and inappropriate. Mot. at 27-28.  But Defendants have this wrong as well.  The 1999 bill, which raised the maximum amount of statutory damages awardable to its present level, was intended "to provide meaningful disincentives for infringement."  145 Cong. Rec. H6798-99 (Rep. Berman).  The increase in the statutory award was also designed to address "new technologies that would allow Internet users to steal copyrighted works."  *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 500 (1st Cir. 2011).  Congress was concerned that the prior maximums were so low that "many infringers d[id] not consider the [] copyright infringement penalties a real threat and continue[d] infringing."  H.R. Rep. 106-216 at 3.  In light of this, the 1999 bill "increase[d] copyright penalties to have a significant deterrent effect on copyright infringement."  *Id.*  And it was reasoned that in order to achieve the desired deterrent effect, "the cost of infringement must substantially exceed the cost of compliance so that those who use or distribute intellectual property have an incentive to comply with the law."  145 Cong. Rec. H6798-99 (Rep. Berman).[14]

The evidence of the Defendants' post-infringement conduct was particularly damning, and provided an additional basis for the jury to award maximum statutory damages.  From January 12,

---

[13]   The two cases cited by Defendants in which a jury's damages award was overturned as excessive – *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680 (2d Cir. 1993), and *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565 (2d Cir. 1988) – were personal injury actions in which the juries were neither guided nor constrained by statute in awarding damages for pain and suffering to the injured plaintiffs.  Such cases are inapposite here.

[14]   Getty Images itself warned would-be infringers that infringing "ultimately costs more than properly licensing the image before use."  Trial Ex. 157 at 11.

2010 up to the time of trial – a period of almost four years – neither Defendant *ever* issued a Kill

Notice for the first wave of the Photos-at-Issue credited to "Lisandro Suero/AFP/Getty Images."

Tr. at 326:6-326:10 (Amalvy); 353:24-354:9 (Amalvy); 631:9-631:11 (Bernasconi).  There also was

evidence that AFP tried to pull the wool over Mr. Morel's eyes when Amalvy, Fathers, and others

asked Mr. Morel in writing for permission to use the Photos-at-Issue *without* telling him that AFP

had already blasted his photographs around the world under the name "Lisandro Suero" and with

the designations "AFP/Getty Images."  Trial Exs. 261, 400A at TWI000024; Tr. at 346:7-346:17

(Amalvy).

     Neither AFP nor Getty Images made any serious effort until late March 2010 to even begin

contacting individual customers who were continuing to use Mr. Morel's photographs without

permission.  At that time, Catherine Calhoun, Getty Images' Vice President of Sales, was given the

task of contacting the **199 customers** located in eleven different countries who were improperly

using the Photos-at-Issue.  Trial Ex. 83; Tr. at 703:11-706:4.  That process dragged on in fits and

starts through the end of 2010.  *See, e.g.*, Trial Exs. 110, 124, 294.  A similar, but quickly-

abandoned, program was also initiated by AFP.  On or about March 10, 2010, Eva Hambach, AFP's

Deputy Director of Photography for the Americas, was assigned the job of identifying AFP

customers who continued to display Mr. Morel's photographs without permission and getting them

to cease their improper use.  Tr. at 436:21-437:20.  After less than a week, Hambach simply gave

up.  In an email to her boss, Mr. Amalvy, she wrote:

> [I]t is impossible to scrub the web of all Daniel Morel/AFP entries.  They're
> on websites, blogs (even in Iran!), video clips on YouTube, they're
> everywhere.  If you were unaware of the significance of a single AFP
> picture, you've been set straight now (me too!).

Trial Ex. 77A; Tr. at 442:4-442:14, 459:11-460:22.

In light of all of the evidence heard at trial and the policies of deterrence underlying the statutory damages scheme of the Copyright Act, the jury verdict as to statutory damages should be left undisturbed.

## IV.   DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON MR. MOREL'S DMCA CLAIMS SHOULD BE DENIED.

Defendants have not made the necessary showing under Rule 50(a) to overcome the jury's determination that they repeatedly violated Mr. Morel's rights under the DMCA.  The jury in this case heard ample evidence at trial from which it reasonably concluded that AFP and Getty Images violated Sections 1202(a) and (b) of the DMCA.  As such, the jury's verdict imposing liability and damages for Defendants' series of violations should not be upset.

### A.   Evidence Supports the Jury's Verdict that AFP *Provided* and *Distributed* False CMI and *Altered* CMI in Violation of the DMCA.

Section 1202(a) of the DMCA prohibits ***providing and distributing false*** copyright management information ("CMI"):

> No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement – (1) provide copyright management information that is false, or (2) distribute or import for distribution copyright management information that is false.

17 U.S.C. § 1202(a).

Section 1202(b) of the DMCA prohibits ***removing or altering*** CMI and distributing CMI knowing that it has been removed or altered without the permission of the copyright owner:

> No person shall, without the authority of the copyright owner or the law – (1) intentionally ***remove or alter*** any copyright management information, (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, **or** (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

-33-

17 U.S.C. § 1202(b) (emphasis added).

Substantial evidence was presented at trial upon which the jury could base its verdict that AFP:  (1) *provided or distributed* false CMI in violation of Section 1202(a), and (2) *altered* CMI in violation of Section 1202(b).

As an initial matter, the jury heard evidence that AFP *provided* and *distributed* false CMI when it first circulated the Photos-at-Issue.  Amalvy admitted that before transmitting the Photos-at-Issue through its wire to its customers and partners, AFP added the words "Lisandro Suero/STR" to the captions of each of Mr. Morel's photographs (Tr. at 308:6-308:14 (Amalvy)) and that AFP's designation "Lisandro Suero/STR" in the caption line was false:

> Q.  The next entry is auteur Lisandro Suero/STR.  What does it mean to say auteur?
>
> A.  Author means the byline.  And that's the person who took the picture.
>
> Q.  That information was added by AFP on the transmission to its paying customers, the name Lisandro Suero?
>
> A.  Yes, that's right.
>
> Q.  That was false?
>
> A.  Yes.

Tr. at 320:15-320:23 (Amalvy); *see also* Trial Ex. 18; Tr. at 406:10-406:16 (Hambach).  Amalvy also admitted that the "source" – designated as "AFP" – was similarly incorrect.  Tr. 320:2-321:4.

The jury also received evidence that AFP *altered* the CMI accompanying the Photos-at-Issue after it confirmed that Mr. Morel was the photographer.  Mr. Amalvy acknowledged that AFP *altered* the credit information that accompanied Mr. Morel's images, and re-sent the Photos-at-Issue to Getty Images and its customers, this time with Mr. Morel's name and "AFP" in the caption line.

**B.    Evidence Supports the Jury's Verdict that Getty Images *Provided* and *Distributed* False CMI and *Altered* CMI in Violation of the DMCA.**

Similarly, the jury heard evidence upon which it could conclude that Getty Images:  (1) *provided and/or distributed* false CMI in violation § 1202(a), and (2) *altered* CMI in violation of § 1202(b).

Getty Images *provided* false CMI associated with Mr. Morel's photographs in violation of DMCA § 1202(a) when it sent Mr. Morel's photographs credited to "Lisandro Suero" to its customers through its feed and made the photographs available for customers to purchase through its website.  Tr. at 657:2-657:17 (Bernasconi); 767:9-767:20 (Cameron); *see also* Trial Exs. 271, 272, 273 (listing all assets associated with Mr. Morel's photographs that had been available for sale in Getty Images' system).[15]  Getty Images both *provided* and *altered* CMI associated with Mr. Morel's photographs in violation of DMCA § 1202(b) by listing "AFP" as the "Photographer/Artist" of the photographs in invoices it sent to its customers.  Trial Exs. 280 at G009759; 281A at G009766; 283 at G009788, G009816, G009817; 285 at G009824; 286 at G009833; 287 at G009835; 288 at G009836; 289 at G009837; 290 at G009850; 291 at G009853; 292 at G009860 (identifying "AFP" as the "Photographer/Artist" of Mr. Morel's photograph).

**C.    Competent Evidence Supports the Jury's Finding that AFP and Getty Images Violated the DMCA with the Requisite Intent.**

Defendants argue that no reasonable jury could have found that AFP and Getty Images acted with the requisite intent under the DMCA.  But here too, the evidence supported the jury's conclusion.

In order to find a violation under sections 1202(a) and (b) of the DMCA, a jury must conclude that the defendant acted with the requisite intent.  This means that under section 1202(a),

---

[15]    More than 700 Getty Images customers downloaded Morel's photographs from its website.  Trial Ex. 265C.  In addition, Getty Images sold Morel's photographs "a la carte" approximately 100 times.  Trial Ex. 264C.

the jury must conclude that a defendant "knowingly and with the intent to induce, enable, facilitate, or conceal infringement" provided or distributed false CMI.  Under Section 1202(b), a jury must conclude that the defendant "intentionally" altered or removed CMI or distributed CMI "knowing that the copyright management information had been removed or altered *without the authority of the copyright owner*."  17 U.S.C. §§ 1202(a) and 1202(b).

Defendants claim that the addition of their respective identifiers – "AFP" and "Getty Images" – to the Photos-at-Issue did not amount to CMI,[16] and even if it did, they argue that such alterations to the credit line of a photo fall short of establishing the requisite intent under section 1202(a) of the DMCA.  Mot. at 15-16.  But by adding their respective identifiers, both AFP and Getty Images asserted their ownership and right to license the images to their manifold customers worldwide.  By doing so, Defendants knowingly sought to *induce* customers to license the Photos-at-Issue for a fee.  AFP's counsel acknowledged as much when he admitted to the Court that the jury could reasonably conclude that the designation of AFP or Getty Images as the "source" of the Photos-at-Issue, as seen, for example, in Trial Exs. 18 and 28, "implies an entitlement of AFP to use the photograph."  Tr. at 847:13-847:16.[17]  AFP makes clear to its customers in its subscription and licensing agreements that "AFP's copyright notice or credit line shall appear on AFP Material."

---

16     Both AFP and Getty Images argue that the inclusion of "AFP," "Getty Images," and "AFP/Getty Images" does not amount to CMI.  Mot. at 14-15; Tr. at 844:9-844:15, 845:17-845:21.  Yet, in connection with a lawsuit that AFP pursued against Google, that same counsel asserted on behalf of AFP that "[t]he inclusion of AFP's name . . . with its stories and photographs is copyright management information in accordance with 17 U.S.C. § 1202(c)."  Compl., *Agence France Presse v. Google Inc.*, 1:05-cv-00546 (DDC), ECF No. 1.

AFP's flip-flopping aside, Defendants cite no case to support their argument that the inclusion of "AFP/Getty Images" in the credit line of an image does not amount to CMI, and instead ask the Court to accept a strained and convoluted reading of the statutory language.  Mr. Morel respectfully submits that the better reading of the statute is that such information constitutes both "[t]erms and conditions for use of the work," (17 U.S.C. § 1202(c)(6)), and "other identifying information about the copyright owner of the work" (17 U.S.C. § 1202(c)(3)) and is, therefore, properly considered CMI.

17     Tr. at 847:13-847:16 ("The Court:  can the jury conclude that AFP listed as a source for the photograph implies an entitlement of AFP to use the photograph?  A:  Yes.").  Such a designation falls clearly within the statutory definition of CMI which includes information as to the "[t]erms and conditions of use of the work."  17 U.S.C. § 1202(c)(6).

Trial Ex. 150 at AFP000060.  Getty Images asserts on its website that "all of the content featured or displayed on this Site" – including photographers' images – "is owned by Getty Images, its licensors, or its third-party image partners."  Trial Ex. 159.

The evidence supporting the jury's conclusion that Defendants *knowingly* altered CMI "without the authority of the copyright owner" in violation of section 1202(b) of the DMCA is similarly competent.  17 U.S.C. § 1202(b).  AFP acknowledged that at the time it distributed the second set of the Photos-at-Issue, credited to "Daniel Morel/AFP," it had not obtained permission from Mr. Morel to license, sell or do anything whatsoever with his images.  Trial Exs. 19A, 261, 400A at TWI000024; Tr. at 345:20-346:10 (Amalvy).  Getty Images' witnesses acknowledged that at the time it credited "AFP" as the photographer of the Photos-at-Issue, it was fully aware that the images were taken by Mr. Morel.  Tr. 673:21-674:1 (Bernasconi) ("Q.  This is a Getty Images' invoice from January 25, 2010, isn't it?  A.  That's what it says, yes, sir.  Q.  Yes.  That was after the caption change and after the kill notice, correct?  A.  Yes, sir."), 675:20-675:22 (Bernasconi) ("Q.  AFP was not the photographer, correct?  A.  Correct.").

    **D.**    **Mr. Morel is Entitled to Awards for Defendants' Copyright Infringement *and* Defendants' Violations of the DMCA.**

Finally, Defendants repeat the arguments made in their *in limine* motion that Mr. Morel cannot as a matter of law recover statutory damages under both the Copyright Act and the DMCA because such a recovery would result in Mr. Morel recovering twice for the same injury.  But this argument fails too.[18]

As an initial matter, it is well-established that a jury is presumed to have followed the Court's instructions.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Mfrs. Hanover Trust Co. v.*

---

[18] Mr. Morel renews all arguments presented in his memoranda of law in opposition to Defendants' motions *in limine* and argued in opposition to Defendants' pre-verdict Rule 50 motion.  *See* Omnibus Mem. of Law in Opp. to Plaintiff and Counterclaim Defendants' Motions *in Limine*, Dkt. No. 250 at 27; Tr. at 831:7-833:18.

*Drysdale Sec. Corp.*, 801 F.2d 13, 27 (2d Cir. 1986); *Banushi v. Palmer*, 500 F. App'x 84, 87 (2d

Cir. 2012).[19]  The jury here was told that "the law does not allow a plaintiff to recover twice for the

same injury" and specifically instructed as follows:

> [I]f you find that Mr. Morel is entitled to a verdict on both his copyright
> infringement and his DMCA claims, you may not compensate him twice for
> any harm he might have suffered.
> […]
> And in determining the amount of damages to award Mr. Morel for any
> DMCA violations that you find, you should compensate him only for that
> extra harm and not for whatever harm you have already compensated him
> for through your award for copyright infringement.

Jury Instruction No. 25; Tr. at 1058:5-1058:8, 1058:19-1058:23.  Defendants have not demonstrated

that the jury disregarded the Court's instructions, and fail to cite any case in which a jury's DMCA

damages award was vacated as duplicative of other damages.[20]  Mr. Morel submits that the jury

properly concluded that he suffered two wrongs as a result of Defendants' conduct and

appropriately awarded Mr. Morel damages for those wrongs.

Evidence adduced at trial supports such a conclusion.  *First,* Mr. Morel was injured when

Defendants infringed upon his copyright by willfully distributing, licensing, and selling his eight

photographs for profit without his permission.  For these injuries, the jury awarded Mr. Morel

$275,000 in actual damages or $1.2 million in statutory damages under the Copyright Act.  *Second,*

Mr. Morel was injured when Defendants intentionally altered the CMI associated with Mr. Morel's

---

[19]  Even if the jury's findings may be subject to numerous interpretations, not all of which may be consistent with the Court's instructions, the "court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict."  *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995).  "This role derives from the Seventh Amendment's obligation on courts not to recast factual findings of a jury, and is based on the notion that 'juries are not bound by what seems inescapable logic to judges.'"  *Id.* (quoting *Morissette v. United States*, 342 U.S. 246, 276 (1952) (internal citations omitted).

[20]  All four cases cited by Defendants involve damages assessed by the court after a bench trial or default and are, therefore, inapposite.  *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955 (2d Cir.1997) (damages assessed by judge after bench trial); *Tu v. TAD Sys. Tech. Inc.*, No. 08-CV-3822, 2009 WL 2905780 (E.D.N.Y. Sept. 10, 2009) (damages assessed by court after default); *Adobe Sys. Inc. v. Feather*, 895 F. Supp. 2d 297 (D. Conn. 2012) (same); *Blue Moon Media Group, Inc. v. Field*, No. CV 08-1000, 2011 WL 4056068 (E.D.N.Y. Apr. 11, 2011) (same).

photographs.  Defendants' insertion of the words "Lisandro Suero," and "David Morel" as the photographer separately injured Mr. Morel because, as a result of Defendants' actions, the world was misinformed as to who captured the iconic images of one of this century's most devastating natural disasters.  Defendants compounded their misattributions when they added their own names to Mr. Morel's photographs without his permission, improperly telling the word that the mega-agencies had the right to license the works and linking him with two companies that he wanted nothing to do with.  For these injuries, the jury awarded Mr. Morel $20,000 under the DMCA.  The award should stand.  *See*, *e.g.*, *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994) (two damages awards appropriate because "[defendant's] selling the [plaintiff's] cartridges may have been one act, but it was two wrongs.").[21]

## CONCLUSION

For the foregoing reasons, Plaintiff Daniel Morel respectfully requests that Defendants' motion for judgment as a matter of law, a new trial, and/or remittitur be denied in its entirety.

---

[21]     Indeed, courts have awarded plaintiffs statutory damages under ***both*** the Copyright Act and § 1203(c)(3)(B) of the DMCA.  *See, e.g., Propet USA v. Shugart*, No. C06-0186, 2007 WL 4376201, at *2-5 (W.D. Wash. Dec. 13, 2007); *John Perez Graphics & Design, LLC v. Green Tree Inv. Group, Inc.*, No. 12 Civ. 4194, 2013 WL 1828671, at *5 (N.D. Tex. May 1, 2013); *Pacific Stock, Inc. v. MacArthur & Co., Inc.*, No. 11-00720, 2012 WL 3985719, at *6, 8 (D. Haw. Sept. 10, 2012); *Granger v. One Call Lender Servs., LLC*, No. 10-3442, 2012 WL 3065271, at *7 (E.D. Pa. July 26, 2012); *Stockart.com, LLC v. Engle*, No. 10-cv-00588, 2011 WL 10894610, at *14 (D. Colo. Feb. 18, 2011); *MJD Marketing, Inc. v. McGrail*, No. 11 Civ. 02842, 2012 WL 261199, at *2 (D. Md. Jan. 26, 2012).

Dated: New York, New York
January 24, 2014                          Respectfully submitted,


By:   /s/ Joseph T. Baio
_____

Joseph T. Baio
jbaio@willkie.com
Emma J. James
ejames@willkie.com
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Counsel for Plaintiff Daniel Morel*