UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: AUG 1 3 2014

------------------------------------------------------------------X

AGENCE FRANCE PRESSE,                        :
                                             :
                    Plaintiff,               :
                                             :
          -v-                                :
                                             :        10-cv-2730 (AJN)
DANIEL MOREL,                                :
                                             :        MEMORANDUM &
                    Defendant,               :        ORDER
                                             :
          -v-                                :
                                             :
GETTY IMAGES (US), INC., et al.,             :
                                             :
                    Counterclaim Defendants. :
------------------------------------------------------------------X

ALISON J. NATHAN, District Judge:

On November 22, 2013, following trial, a jury found that Agence France Presse ("AFP")

and Getty Images (US), Inc. ("Getty," and together with AFP, "Defendants"[1]) had willfully

infringed Daniel Morel's copyright in eight photographs taken in the aftermath of the January

2010 Haiti earthquake. The jury awarded Morel $303,889.77 in actual damages and infringers'

profits and $1.2 million in statutory damages. The jury also found that Defendants had

committed sixteen violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C.

§§ 1201–1205, and awarded Morel an additional $20,000 for those violations. Before the Court

---

[1] AFP originally brought this action seeking a declaratory judgment that it had not infringed Morel's photographs. Morel then filed counterclaims against AFP and impleaded Getty as a third-party defendant. (Other third-party defendants that Morel initially named are no longer part of this lawsuit.) Because Morel is alleging violations by AFP and Getty, the Court refers to AFP and Getty as "Defendants" for simplicity's sake. AFP and Getty were also called "Defendants" at trial to avoid confusing the jury. *See* Dkt. No. 270 at 1 n.2.

is Defendants' motion under Federal Rules of Civil Procedure 50 and 59(a) for judgment as a matter of law, a new trial, and/or remittitur.  Dkt. No. 313.  For the following reasons, Defendants' motion is granted in part and denied in part.

## I.    Background

The Court assumes familiarity with the facts of this case from its prior opinions on summary judgment and Judge Pauley's decision at the motion to dismiss stage, when the case was still assigned to him.  *Agence Fr. Presse v. Morel*, 769 F. Supp. 2d 295 (S.D.N.Y. 2011) ("*Morel I*"); *Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547 ("*Morel II*"), *reconsideration granted in part*, 934 F. Supp. 2d 584 (S.D.N.Y. 2013) ("*Morel III*"); Dkt. Nos. 49, 192, 217. Briefly, AFP commenced this action in March 2010 by filing a declaratory judgment complaint naming Morel as the defendant.  Morel, a professional photographer who lives in Haiti, had taken a number of photographs on January 12, 2010, in the aftermath of the devastating Haiti earthquake, and uploaded them to Twitter via a TwitPic account.  A Twitter user named Lisandro Suero copied the photographs into his own Twitter feed without Morel's consent, and though the parties dispute precisely what happened next, eight of the photographs—initially credited to Suero—ended up being distributed by AFP and its "image partner" Getty to thousands of news outlets and other customers around the world.

After AFP sought a declaration that it had not infringed Morel's copyright in the eight photographs,[2] Morel filed counterclaims against AFP for copyright infringement and violations of the DMCA and the Lanham Act, and also brought third-party claims against Getty and a number of Defendants' "downstream" customers (no longer parties) who had downloaded the images.  On January 14, 2011, Judge Pauley upheld the bulk of Morel's claims against a motion

---

[2] AFP also alleged commercial defamation, but that claim has been voluntarily dismissed.  Dkt. No. 34.

to dismiss, but granted the motion with respect to his Lanham Act claims. *Morel I*, 769 F. Supp. 2d at 302–04, 305–06, 308.

On April 27, 2012, following discovery, the remaining parties—at that point, only AFP, Getty, and the Washington Post ("the Post") were still litigating Morel's claims—filed cross-motions for summary judgment. This Court rejected as a matter of law Defendants' primary defense against Morel's copyright claims, namely, that Defendants were licensed to use Morel's photographs by virtue of Twitter's terms of service. That holding meant that AFP and the Post, neither of which had asserted any other defenses, were liable for copyright infringement. The Court also held that genuine issues of material fact precluded judgment on (1) Getty's remaining defenses against copyright infringement; (2) whether Defendants' copyright infringement was "willful" so as to trigger enhanced statutory damages under the Copyright Act, *see* 17 U.S.C. § 504(c)(2); (3) Defendants' secondary liability for the infringements committed by their downstream customers; and (4) Defendants' liability under the DMCA. *Morel II*, 934 F. Supp. 2d at 564, 568–69, 571–72, 572–75, 578. On reconsideration, the Court clarified that Defendants' liability for copyright infringement was joint and several, and that Morel could therefore prove at most eight infringements and receive at most eight statutory damages awards—i.e., one per photograph. *Morel III*, 934 F. Supp. 2d at 588–94.

Before trial, Getty dropped its two remaining copyright infringement defenses, thereby conceding liability. The Court also determined that Morel's secondary liability claims were duplicative, since liability for direct infringement had already been established against both Defendants. Tr. at 870:13–16. Accordingly, the only issues on which the jury was instructed were whether Defendants' infringements were willful, whether Defendants were liable under the DMCA, and damages under both the Copyright Act and the DMCA.

Trial commenced on November 13, 2013.  There were nine witnesses: Morel; Vincent Amalvy, AFP's Director of Photography for North and South America; Eva Hambach, AFP's Deputy to the Director of Photography for North America and South America; Andreas Gebhard, Getty's Editorial Distribution Director; Francisco ("Pancho") Bernasconi, Getty's Vice President for U.S. News and Sports; Katherine Calhoun, Getty's Senior Sales Director for North American Media; Heather Cameron, a Senior Paralegal in Getty's Legal Department; Gilles Tarot, AFP's Director of Sales and Marketing for North America; and Benjamin Fathers, AFP's photo desk chief for Europe and Africa. *See* JPTR Exs. C, D (describing witnesses' roles).

The jury heard testimony from November 14 to November 20, 2013, and delivered its verdict on November 22.  It found that both AFP and Getty had willfully infringed Morel's copyright in the eight photographs; awarded Morel $275,000 in actual damages, $28,889.77 total in infringing profits, and $1.2 million in statutory damages; found that AFP and Getty had jointly committed sixteen DMCA violations; and awarded Morel an additional $20,000 for those violations.  Court Exs. 9, 12.  On December 10, 2013, after Morel elected to receive statutory damages under the Copyright Act, the Court entered judgment in the amount of $1,220,000. Dkt. No. 306.  The parties submitted a stipulation staying execution of that judgment pending the final disposition of any post-trial motions.  Dkt. No. 311.

## II.   Discussion

Defendants move for judgment as a matter of law on the jury's finding that both AFP and Getty willfully infringed Morel's copyright in the eight photographs, as well as on Morel's DMCA claims.  Def. Br. at 4, 12.  Defendants also move in the alternative for a new trial on the jury's willfulness finding.  *Id.* at 12.  Finally, Defendants move for a new trial or remittitur on the jury's damages award for copyright infringement.  *Id.* at 20.

### A. Legal Standards

Judgment as a matter of law pursuant to Rule 50 is appropriate on a given issue if "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the non-moving party on that issue. Fed. R. Civ. P. 50(a)(1). A court should grant a Rule 50 motion only if "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (alterations in original) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)) (internal quotation mark omitted).

A district court may order a new trial pursuant to Rule 59(a) on the basis that the jury's verdict was against the weight of the evidence "if and only if" it determines that the verdict is "seriously erroneous" or "a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012) (quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002)). A court's discretion to order a new trial includes "overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)) (internal quotation mark omitted). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)

Generally, remittitur is appropriate under two circumstances: (1) when the court discerns "an error that caused the jury to include in the verdict a quantifiable amount that should be

stricken" or (2) when the award is "intrinsically excessive" in the sense that no reasonable jury

could have awarded the amount, whether or not the excessiveness can be attributed to "a

particular, quantifiable error." *Kirsch*, 148 F.3d at 165 (quoting *Trademark Research Corp. v.

Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)).  Where there is no discernible error, the

jury's verdict should be set aside as intrinsically excessive only if "the award is so high as to

shock the judicial conscience and constitute a denial of justice." *Id.* (quoting *O'Neill v.

Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988)) (internal quotation marks omitted).

### B.  Willful Copyright Infringement

The Copyright Act authorizes a jury to award enhanced statutory damages if it finds that

the defendant's infringement was willful.  17 U.S.C. § 504(c)(2).  Infringement is willful if

(1) "the defendant was actually aware of the infringing activity" or (2) "the defendant's actions

were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's

rights." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir.

2005); *see also N.A.S. Imp., Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 252 (2d Cir.

1992) (noting that the defendant's "knowledge may be 'actual or constructive.'  In other words,

it need not be proven directly but may be inferred from the defendant's conduct" (citation

omitted) (quoting *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1115 (2d Cir.

1986))).  In evaluating willfulness, courts look to several factors, including "whether the

infringer was on notice that the copyrighted work was protected; whether the infringer had

received warnings of the infringements; [and] whether the infringer had experience with previous

copyright ownership, prior lawsuits regarding similar practices, or work in an industry where

copyright is prevalent." *Morel II*, 934 F. Supp. 2d at 570 (alteration in original) (quoting

*Marshall v. Marshall*, No. 08-cv-1420 (LB), 2012 WL 1079550, at *25 (E.D.N.Y. Mar. 30

2012)) (internal quotation marks omitted).  A plaintiff bears the burden of proving willfulness. 17 U.S.C. § 504(c)(2); *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 143 (2d Cir. 2010).

Defendants argue that the evidence presented at trial was insufficient for the jury to find that either AFP or Getty committed willful copyright infringement, and that the Court should hold as a matter of law that their infringement was not willful or, alternatively, grant a new trial on that issue.  Def. Br. at 4–12.  For the reasons that follow, however, the Court will not disturb the jury's finding that both Defendants' infringement was willful.

### 1. AFP's Willfulness

The evidence was plainly sufficient for the jury to conclude that AFP's infringement was willful under either an actual knowledge or reckless disregard theory.  Amalvy testified that when he sent the pictures from Suero's Twitter feed to AFP's photo desk, he believed that Suero was the photographer and that Suero was authorizing Twitter users to distribute the photographs free of charge to bring public attention to the earthquake.  Tr. at 308:17–309:9.  But the jury was not required to believe Amalvy's testimony about his mindset, and there was sufficient other evidence indicating that Amalvy took the pictures with reckless disregard for whether he was authorized to do so.  Specifically, Amalvy testified that if he had seen Suero's tweets indicating that Suero was in the Dominican Republic, he would have questioned whether Suero had the right to authorize distribution of the photographs.  Tr. at 272:1–6, 18.  Although Amalvy said that he did not see these tweets, the jury could conclude from the fact that he sent multiple Twitter messages to Suero on the same night that he did, in fact, see them.  Tr. at 281:21–23 (Amalvy).  Moreover, even assuming that Amalvy believed the pictures were Suero's, an email reveals that he felt it was important for AFP to have photographs of the earthquake.  Ex. 130A ("I waited a long time before acting, but in my opinion, AFP couldn't be completely invisible

about a disaster of this magnitude. . . .  and *if we had to go there*. . . use the best possible")
(ellipses in original; emphasis added).  Amalvy testified to largely the same effect.  Tr. at 301:3–
302:10.  The jury could have concluded from this evidence that Amalvy harbored actual doubts
about AFP's right to use the photographs but went ahead anyway to "salvage the situation" for
AFP.  Tr. at 302:10.

Perhaps more to the point, AFP concededly became aware, on January 13, that the
pictures it had taken from Suero's Twitter feed had actually been taken by Morel.  Tr. at 325:18–
326:5 (Amalvy).  It also knew, at that point in time, that it did not have permission to use the
photographs, given that Morel had never granted such permission.  Nonetheless, AFP did not
cease distributing the photographs; to the contrary, it issued a caption correction identifying
Morel as the photographer and continued to make them available on its feed.  Ex. 28; Tr. at
327:8–13 (Amalvy).  The fact that AFP apparently took this course of action on the belief that it
could work out a deal with Morel at a later date, *see* Def. Br. at 7, does not suggest that it did not
know its conduct was infringing.  *See Fitzgerald Publ'g Co.*, 807 F.2d at 1115 ("[A] court need
not find that an infringer acted maliciously to find willful infringement.").  Indeed, the fact that
AFP apparently sought a retroactive license from Morel is arguably *evidence* that it knew, or at
least was indifferent to whether, its conduct was infringing; hence the need to seek a release from
liability after the fact.

Finally, it also bears noting that AFP works in an industry where copyright was prevalent
and has had extensive experience with copyright ownership.  Evidence was presented that AFP
has guidelines for handling copyright ownership and that the AFP employees implicated in
infringing Morel's copyright were aware of those guidelines.  Ex. 144B; Tr. at 275:5–21
(Amalvy).  In sum, there was sufficient evidence for the jury to conclude that AFP's

infringement was willful.  The Court therefore denies Defendants' Rule 50 motion with respect to AFP's willfulness.  In light of the evidence described above, the Court also concludes that the jury's verdict was not seriously erroneous or a miscarriage of justice, and therefore denies Defendant's motion for a new trial on AFP's willfulness.

### 2.  Getty's Willfulness

The evidence showed that Suero-credited versions of Morel's photographs remained available to Getty customers as late as February 2, 2010, roughly two and a half weeks after AFP sent a "kill notice" asking Getty to remove all "Daniel Morel pictures from Haiti" from Getty's systems.  Ex. 54.  And between receiving the kill notice on January 14 and pulling the remaining images from its website on February 2, Getty licensed these Suero-credited images to its customers numerous times.  Getty's willfulness therefore turns on whether it knew that the Suero-credited images were still available for sale on its site even after receiving the kill notice and removing Morel-credited images.  Although the evidence of Getty's willfulness is somewhat thin in comparison to the evidence regarding AFP's willfulness, the Court concludes that it was sufficient to support the jury's verdict.

On January 13, AFP sent a "caption correction" to Getty in order to credit Morel's photographs to Morel instead of Suero.  Ex. 28, 29.  There was evidence that Gebhard, who was responsible for removing the infringing photographs from Getty's website after it received the kill notice from AFP on January 14, was aware that AFP had sent the caption correction on the same photographs a day earlier.  Specifically, in a response to a January 14 email from Hambach notifying various Getty employees of the kill notice, Gebhard recognized that AFP had "correct[ed] the photogs [sic] name" the day before.  Ex. 55; Tr. at 537:5–539:22 (Gebhard). Gebhard claimed that he had not actually seen the substance of AFP's caption correction;

instead, he testified that when he was searching for Morel-credited photographs in response to the kill notice, he saw that some were credited to "David Morel" and inferred (apparently without further investigation) that the caption correction was meant to correct "David" to "Daniel." Tr. at 539:23–540:7. But the jury did not have to believe this explanation; it could have concluded, based on Gebhard's email, that he actually had seen the substance of the caption correction and therefore knew that Suero-credited versions of Morel's photographs had been made available to Getty's customers. In that case, Gebhard's failure to search for or remove those Suero-credited images from Getty's website would be sufficient evidence of willfulness. *See Morel II*, 934 F. Supp. 2d at 571.

Defendants point out that AFP's kill notice neither specified the image numbers of the infringing photographs nor mentioned Suero, and that AFP had sent multiple copies of Morel's photographs to Getty, making it difficult for Gebhard to know whether he had actually removed all of the images (whether credited to Suero or Morel) from Getty's website. Def. Br. at 9; Def. Reply at 5–6 & n.5. But the kill notice's failure to mention Suero is irrelevant if Gebhard knew that AFP had sent Suero-credited pictures, and the vagueness of the kill notice cuts both ways— it arguably suggests that Gebhard should have been more meticulous in finding and removing Morel's photographs. That is particularly true in light of the fact that Gebhard had seen the photographs on Morel's Twitter feed the night of the earthquake. *See* Ex. 2. The jury therefore could have concluded that Gebhard would have been able to identify the pictures just by looking. Accordingly, the alleged shortcomings of the kill notice do not preclude willfulness as a matter of law; they at most raised an additional factual issue for the jury.

Furthermore, as with AFP, there was evidence that Getty in general, and Gebhard in particular, were familiar with copyright and worked in an industry where copyright was

prevalent. *E.g.*, Tr. at 543:7–547:1 (Gebhard). That evidence further buttresses the jury's willfulness finding.

Defendants cite two cases for the proposition that Getty's actions amount to mere negligence, not willfulness, but these cases are distinguishable. In *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010 (7th Cir. 1991), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), the court agreed with the district court that the defendant's infringement was not willful as a matter of law because although the defendant had received notice that the plaintiff owned the copyright in certain videos produced by twelve companies, the two videos it allegedly infringed were not produced by any of those companies. *Id.* at 1020–21. The specific reference to *other* copyrighted works could not have put the defendant on notice with respect to the two infringed works. In this case, by contrast, AFP's kill notice did not convey any similar negative implication. It may have been vague, but it identified the correct copyright owner, and given the evidence suggesting that Gebhard actually knew that Getty was distributing Suero-credited photographs, the notice's failure to mention Suero is irrelevant. *King Records, Inc. v. Bennett*, 438 F. Supp. 2d 812 (M.D. Tenn. 2006), was decided after a bench trial and therefore applies the wrong standard. This Court's task is not to arrive at the best view of the evidence, but rather to determine whether the jury's findings were supportable.

Because the Court concludes that there was sufficient evidence to find Getty liable for willful copyright infringement, Defendants' motion for judgment as a matter of law on that issue is denied. The Court also denies Defendants' motion for a new trial on Getty's willfulness. In light of the evidence discussed above, the jury's verdict rested significantly on its assessment of the Getty witnesses' credibility. The Second Circuit has cautioned that while district courts may weigh evidence in considering Rule 59 motions, they should exercise this ability "with caution

11

and great restraint, as a judge 'should rarely disturb a jury's evaluation of a witness's credibility,'

and may not 'freely substitute his or her assessment of the credibility of witnesses for that of the

jury simply because the judge disagrees with the jury.'" *Raedle*, 670 F.3d at 418 (citations

omitted) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998);

and *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)).  The Court declines to hold that

the jury's assessment of the evidence in this case, turning as it did on the witnesses' credibility,

was seriously erroneous or a miscarriage of justice.

### C. DMCA Liability

Defendants argue that the evidence was insufficient to find them liable for violating the

DMCA.  The jury was instructed on two theories of DMCA liability, which the parties refer to as

"providing or distributing" false copyright management information ("CMI"), and "altering"

CMI.  These two theories correspond to two subsections of the DMCA.

First, the DMCA makes it unlawful to knowingly, and with the intent to "induce, enable,

facilitate, or conceal infringement," either "provide" or "distribute" (or "import for distribution")

false CMI.  17 U.S.C. § 1202(a).  Thus, under this subsection, § 1202(a), the defendant must

both know that the CMI is false, and provide or distribute the false CMI with the intent to induce,

enable, facilitate, or conceal infringement.  *See Ward v. Nat'l Geographic Soc'y*, 208 F. Supp. 2d

429, 449 (S.D.N.Y. 2002).

Second, the DMCA also prohibits doing any of the following "without the authority of

the copyright owner or the law" and with knowledge or reasonable grounds to know that it will

"induce, enable, facilitate, or conceal" infringement:

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute . . . works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law.

17 U.S.C. § 1202(b). As relevant here, the definition of CMI includes "[t]he name of, and other identifying information about, the author of a work," and "[t]he name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright." *Id.* § 1202(c)(2), (3).

Defendants challenge the jury's finding that AFP and Getty jointly committed eight violations of each subsection, for sixteen total DMCA violations. Def. Br. at 12–15. As explained below, the Court agrees with Defendants only in part. Specifically, there was insufficient evidence to find Getty liable for violating § 1202(b). Otherwise, the evidence was sufficient to support the jury's verdict.

### 1. AFP's DMCA Liability

Much of the same evidence on which the jury could have found that AFP's infringement was willful also permitted the jury to find AFP liable under both relevant subsections of the DMCA. First, there was evidence that AFP "provided or distributed" false CMI with the intent to induce, enable, or facilitate, or conceal infringement. 17 U.S.C. § 1202(a). As noted, the jury could have concluded based on Amalvy's January 12 Twitter activity that he knew the eight images were not Suero's from the beginning yet falsely credited them to Suero. Additionally, even if AFP's addition of the identifier "AFP" to Morel's images did not imply that AFP itself was the copyright owner, there was sufficient evidence that it conveyed false "identifying information about" the "author of a work," 17 U.S.C. § 1202(c)(1), by implying that Morel was

associated with AFP, which he was not. *See* Ex. 328 (email from Corbis suggesting that the "Getty Images" identifier on Morel's photographs suggested that Morel was associated with Getty); Tr. at 175:6–17 (Morel); *see also Morel II*, 934 F. Supp. 2d at 577 (finding a genuine factual issue with respect to whether "AFP" and "Getty Images" identifiers added by Defendants "convey[ed] information about copyright ownership" and therefore qualified as CMI).[3]  And the jury could have concluded that AFP acted with the required intent by providing and distributing the false CMI in order to license Morel's photographs to its customers. *See Morel II*, 934 F. Supp. 2d at 578 (citing *McClatchey v. Associated Press*, No. 05-cv-145, 2007 WL 776103, at \*6 (W.D. Pa. Mar. 9, 2007)).

Second, there was also evidence that AFP "alter[ed]" the CMI on Morel's photographs without Morel's authority and distributed copies of Morel's images knowing that the CMI had been altered without his authority.  17 U.S.C. § 1202(b)(1), (2).  The evidence showed that after AFP became aware that Suero was not the author of the eight images, AFP issued a caption correction identifying Morel as the photographer and continued to make the images available to its customers.  When it issued that caption correction, AFP concededly had not received permission from Morel to either distribute his photographs or make the correction.  From this evidence, the jury could have concluded that in continuing to distribute the photographs with a

---

[3] Defendants previously argued that the identifiers should be covered by language in the DMCA providing that the definition of CMI does not include "any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work."  17 U.S.C. § 1202(c).  The Court reserved on that argument during trial, Tr. at 899:7–17, but Defendants do not appear to have renewed it in their post-trial briefing.  *See Kirsch*, 148 F.3d at 164 ("As to any issue on which no proper Rule 50(b) motion was made, JMOL may not properly be granted by the district court . . . unless that action is required in order to prevent manifest injustice.").  In any event, although the Court has been unable to find any definition of § 1202(c)'s term "user," the definition is irrelevant in light of the Court's conclusion that the jury could have found that the identifiers *did* convey "identifying information about" the "author of the work."  *See* Tr. at 845:14–15 (observing that Defendants' "user" argument was "not a statutory argument . . . but an evidentiary argument")

caption identifying Morel as the photographer, AFP had both altered the "name of . . . the author of" the photographs, 17 U.S.C. § 1202(c)(2), without the authority of the copyright owner, and had distributed Morel's images while knowing that their CMI had been altered without his authority. And the jury could have concluded that AFP knew or had reasonable grounds to know that its alteration of CMI would "induce, enable, or facilitate infringement" by enabling the continued licensing of Morel's images—which were now credited to Morel but still not AFP's to license—to AFP's customers. Defendants' contention that AFP "was trying to correct its mistake," Def. Reply at 11 (emphasis omitted), does not imply that it did not know its activities were infringing or that it was not facilitating infringement.

### 2. Getty's DMCA Liability

The evidence supporting the jury's willfulness finding with respect to Getty's copyright infringement was also sufficient to support its finding that Getty violated § 1202(a) of the DMCA. Specifically, if Gebhard knew that the Suero-credited photographs were still available on Getty's feed yet failed to remove them after receiving AFP's kill notice, the jury could have concluded that he did so with the intent to enable the continued licensing of the Suero-credited images to Getty's customers. On that view of the facts, Gebhard also would have known, at the point when he failed to remove the images from Getty's feed, that CMI associated with the Suero-credited images—the Suero credit and "AFP" and "Getty Images" identifiers—was false. Accordingly, there was sufficient evidence for the jury to conclude that Getty's continued distribution of the Suero-credited images following AFP's kill notice satisfied all of the elements required by § 1202(a). *See Morel II*, 934 F. Supp. 2d at 578 & n.19 (identifying a triable issue of fact on Getty's DMCA liability in light of evidence involving Gebhard's knowledge of the Suero-credited images).

15

However, there was insufficient evidence to find Getty liable under § 1202(b) of the DMCA. Initially, the Court agrees with Defendants that the addition of the identifiers "AFP" and "Getty Images" cannot constitute *removal* or *alteration* of CMI—both of those words suggest that a defendant must take some action with respect to pre-existing CMI. *See Webster's Third New International Dictionary* 63 (2002 ed.) (defining "alter" as "to cause to become different in some particular characteristic"); *id.* at 1921 (defining "remove" as "to move by lifting, pushing aside, or taking away or off"). On that interpretation, the evidence showed that there were only two ways in which CMI on Morel's photographs was altered or removed without his authority: when Suero first took the images from Morel's TwitPic feed and removed the identifying information that accompanied the images on that feed, *see* Ex. 141A; *Morel I*, 769 F. Supp. 2d at 305–06 (rejecting argument that attributions "Morel" and "by photomorel" on Morel's TwitPic page were not CMI), and when, as described above, AFP changed the photographer credit on the photographs from Suero to Morel. Although Getty itself did not participate in these actions, it might still be liable if it distributed the images knowing that the CMI had been altered or removed without Morel's consent. *See* 17 U.S.C. § 1202(b)(3); *Morel II*, 934 F. Supp. 2d at 578 n.19.

But even if the jury believed that Gebhard knew there were images on Getty's feed that were wrongly credited to Suero even after AFP's kill notice, there was no evidence that he or anyone else at Getty knew that Suero had removed the TwitPic CMI from Morel's photographs. And there was no evidence that Getty knew Morel had not given AFP authority to change the photographer credit from Suero to Morel when AFP sent the caption correction; even if that lack of authority could have been inferred from the subsequent kill notice, there was no evidence that Getty continued to distribute *Morel*-credited images (as opposed to Suero-credited images) post–

16

kill notice.  Because there was therefore insufficient evidence supporting the jury's finding that

Getty acted with the knowledge required by § 1202(b), the Court concludes as a matter of law

that Getty was not liable under that subsection.

### D.  DMCA Damages

In addition to challenging the sufficiency of the evidence on DMCA liability, Defendants

raise two broad arguments with respect to the jury's DMCA damages award.  Like the Copyright

Act, the DMCA allows a plaintiff to choose between recovering actual damages and statutory

damages.  17 U.S.C. § 1203(c)(1), (3).  For violations of 17 U.S.C. § 1202 (the section of the

DMCA at issue here), the DMCA provides that a plaintiff "may elect to recover an award of

statutory damages for each violation . . . in the sum of not less than $2,500 or more than

$25,000."  *Id.* § 1203(c)(3)(B).  The jury awarded Morel $20,000 for sixteen DMCA violations,

finding that he suffered actual damages of $20,000 and awarding him $20,000 in statutory

damages.  Court Ex. 9 at 6, 7; Court Ex. 13.  Although Morel has noted that this is actually less

than the $40,000 minimum that a jury may award as statutory damages, Dkt. No. 287, he has not

filed any post-trial motions addressing this point.  The Court will therefore consider it abandoned

and turn to Defendants' arguments.  *See* Dkt. No. 305 (indicating that any objections to the

amount of the jury's award "must be made by appropriate post-trial motion").

First, Defendants repeat their argument, originally advanced in a motion in limine, that

recovering multiple awards under the DMCA requires a plaintiff to prove that he has suffered a

distinct injury traceable to each violation.  Def. Br. at 18–20.  Defendants ground this argument

in the statutory language, which provides that "[a]ny person *injured by a violation* of section

1201 or 1202 may bring a civil action in an appropriate United States district court *for such*

*violation*."  17 U.S.C. § 1203(a) (emphasis added).  The Court has already rejected this precise

argument, holding instead that the DMCA defines "violation" on a work-by-work basis and thus allows a plaintiff to recover one award per work infringed without demonstrating a separate injury as to each. Tr. at 893:1–896:16. This interpretation largely harmonizes the DMCA's statutory damages scheme with the Copyright Act's and is consistent with (limited) case law addressing the issue. *See Propet USA, Inc. v. Shugart*, No. 06-cv-186, 2007 WL 4376201, at *5 (W.D. Wash. Dec. 13, 2007); *Stockart.com, LLC v. Engle*, No. 10-cv-588, 2011 WL 10894610, at *14 (D. Colo. Feb. 18, 2011), *adopted*, No. 10-cv-588 (D. Colo. Apr. 7, 2011), ECF No. 63. The "injury" language that Defendants emphasize is better read as defining the class of plaintiffs who may sue for a given DMCA violation. Tr. at 894:24–895:22. Defendants have not cited any new authority or advanced any persuasive new arguments in their post-trial briefing, so the Court will not reconsider its earlier holding.[4]

Second, Defendants argue that Morel may not recover for any DMCA violations because there was insufficient evidence for the jury to conclude that he suffered an injury separate and apart from the injuries attributable to Defendants' copyright violations. Def. Br. at 16–18. Defendants are correct that the law ordinarily forbids a plaintiff from recovering twice for the same injury. *See Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1997). But they have never argued that DMCA damages will *always* be duplicative of an award for copyright infringement,[5] and therefore recognize that in an appropriate case, separate DMCA and copyright awards might be permissible. *See* Dkt. No. 252 at 16 n.12; Tr. at 898:20–24. This is true because the Copyright Act and the DMCA protect different interests. Accordingly, the jury was

---

[4] Given that this issue has already been decided, the Court disagrees with Defendants' contention that Morel has "tacitly conceded" their single-award argument by addressing it only in a footnote. Def. Reply at 13 n.12.

[5] For this reason, cases rejecting offhand the possibility of dual awards under the two statutes are inapposite in the context of this case. *E.g.*, *Adobe Sys. Inc. v. Feather*, 895 F. Supp. 2d 297, 303 n.5 (D. Conn. 2012).

instructed that "if you find that Mr. Morel is entitled to a verdict on both his copyright infringement and his DMCA claims, you may not compensate him twice for any harm he might have suffered." Court Ex. 3 at 29. The jury must be presumed to have determined that Morel suffered additional harm beyond what he suffered as a result of Defendants' copyright infringement. *See, e.g.*, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (noting the presumption that juries follow their instructions).

Defendants argue that even if the jury was correctly instructed, there was insufficient evidence supporting its finding that Morel suffered $20,000 in actual damages. However, the Court concludes that it need not address the sufficiency of the evidence on this point because it is irrelevant to whether the jury's *statutory* damages award (of the same amount) was appropriate. With respect to statutory damages under the DMCA, the jury was instructed, consistent with the parties' proposed jury instructions, *see* JPTR Ex. I at 69–70, that it was entitled to consider other factors in addition to Morel's actual damages, namely, the difficulty of proving actual damages, the circumstances of the violation, whether Defendants violated the DMCA intentionally or innocently, and deterrence. Court Ex. 3 at 32. In the context of the Copyright Act, it is clear that statutory damages can be awarded even in the absence of sufficient evidence supporting actual damages, *see Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001), and the Court likewise sees no reason why an inadequately supported claim of actual damages should preclude Morel from recovering statutory damages under the DMCA. In light of all the factors the jury was entitled to consider, its statutory award of $20,000—or half the statutory *minimum*—was permissible.

### E. Copyright Damages

The Copyright Act permits a plaintiff to choose between receiving an award of (1) compensatory damages, in the form of actual damages plus the infringer's profits or (2) statutory damages. *See* 17 U.S.C. § 504(a), (c).

The two categories of compensatory damages—actual damages and infringer's profits—are distinct: "any profits of the infringer that are attributable to the infringement" cannot be "taken into account in computing the actual damages." *Id.* § 504(b).

> The award of the infringer's profits examines the facts only from the infringer's point of view. If the infringer has earned a profit, this award makes him disgorge the profit to insure that he not benefit from his wrongdoing. The award of the owner's actual damages looks at the facts from the point of view of the copyright owner; it undertakes to compensate the owner for any harm he suffered by reason of the infringer's illegal act.

*Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001). In assessing actual damages, a factfinder may look to the profits that the plaintiff lost because of the infringement, any diminution in the market value of the plaintiff's copyright, or what the plaintiff would have received as a reasonable licensing fee for the defendant's infringing use. *See id.* at 164–66; *Fitzgerald Publ'g Co.*, 807 F.2d at 1118–19. Actual damages "should be broadly construed to favor victims of infringement," *Davis*, 246 F.3d at 164, but a jury's actual damages award also cannot be "based upon undue speculation," *Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 470 (2d Cir. 1985).

As an alternative to an award of actual damages plus infringer's profits, a plaintiff may elect to recover statutory damages at any time before a final judgment is rendered. 17 U.S.C. § 504(c). The Copyright Act prescribes three ranges for statutory damages, depending on whether the infringement was innocent, willful, or neither. The statutory damages range is $200 to $30,000 per work for innocent infringement, $750 to $150,000 per work for willful

infringement, and $750 to $30,000 per work for regular infringement. *See id.* The Second Circuit has prescribed six factors to be considered in setting statutory damages within these ranges: "(1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties." *Bryant*, 603 F.3d at 144.

On Morel's copyright claims, the jury awarded him $275,000 in actual damages, plus $28,889.77 total in infringing profits ($14,447.76 for AFP and $14,442.01 for Getty) or, alternatively, $1.2 million in statutory damages—the maximum possible statutory award for the willful infringement of eight works. Following trial, Morel elected to receive statutory damages. Dkt. No. 287. Defendants make two arguments for a new trial or remittitur. First, they argue that the jury's actual damages award of $275,000 was overly speculative and therefore amounts to a discernible error that would justify remittitur. Def. Br. at 20. Second, they argue that the $1.2 million statutory damages award was intrinsically excessive in light of the evidence. *Id.* at 25. For the following reasons, the Court rejects both arguments.

### 1. Actual Damages

As a preliminary matter, it is important to note that because Morel has (understandably) elected to receive statutory damages, Defendants are challenging the jury's actual damages calculation primarily insofar as it undergirds the jury's $1.2 million statutory damages award. If the Court were to conclude that the jury's statutory damages award was excessive, Defendants appear to concede that as much as $400,000 would be an appropriate award following remittitur—at least in light of the Court's holding that the evidence was sufficient to find that Defendants' infringement was willful. *See* Def. Br. at 31–32 (urging the Court to rely on cases

rewarding between $20,000 and $50,000 in statutory damages per work for willful infringement). One would, of course, expect Morel to elect statutory damages of $400,000 over actual damages of $275,000, so only statutory damages would be relevant even if the Court were to side with Defendants.

But as Defendants point out, actual damages may be relevant even if a plaintiff elects to recover statutory damages. *See Bryant*, 603 F.3d at 144 (listing "the revenue lost by the copyright holder" among the factors to be considered in setting statutory damages). Defendants argue that the jury's inappropriate actual damages calculation "infected" its $1.2 million statutory damages award, thereby furnishing one of several grounds on which the Court should remit that award. Def. Br. at 20. That is because "actual damages is one of the *Bryant* factors, and . . . there must be some correlation between actual damages and statutory damages." Def. Reply at 8. Thus, in Defendants' view, the jury's statutory damages award must be set aside because it is based in part on a faulty actual damages calculation. The Court disagrees.

To begin with, Defendants' premise that an overly speculative actual damages award is a discernible error justifying remittitur is questionable for at least two reasons. First, it is not true that there must be "some correlation" between actual and statutory damages. The Second Circuit recently rejected a defendant's argument that the district court abused its discretion in denying remittitur because the award had no "rational relationship" to the plaintiff's damages. *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 126 (2d Cir. 2014) ("*Psihoyos II*"). The Court noted:

> Although revenue lost is one factor to consider, we have not held that there must be a direct correlation between statutory damages and actual damages. To suggest otherwise is to ignore the various other factors a court may consider and the purposes of statutory damages in the willful infringement context.

*Id.* at 127. The court agreed with the district court that other factors, such as the defendant's profits and a perceived need for deterrence, could have justified the award. *Id.*; *accord Yurman*

*Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 113 (2d Cir. 2001) (upholding jury's statutory damages award that defendant argued bore "little relationship" to actual damages because "even if [defendant's] accounting is correct, statutory damages are not meant to be merely compensatory or restitutionary"); *L.A. Printex Indus., Inc. v. Does 1–10*, 543 F. App'x 110, 111 (2d Cir. 2013); *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 506–07 (1st Cir. 2011). As explained in more detail below, the jury's statutory damages award in this case could have been based on a number of factors, so the Court cannot discern a "quantifiable amount," *Kirsch*, 148 F.3d at 165, by which any mistake in the jury's actual damages calculation might have "infected" its statutory damages award.[6]

Second, even accepting the premise that there must be "some correlation" between actual and statutory damages, Defendants' argument that the actual damages calculation is overly speculative is a questionable basis for attacking a statutory damages award, for reasons that the Court explained in addressing the parties' motions in limine. Because "statutory damages are by definition a substitute for unproven and unprovable damages," *Psihoyos v. John Wiley & Sons, Inc.*, No. 11-cv-1416 (JPO), 2012 WL 5506121, at *3 (S.D.N.Y. Nov. 7, 2012) ("*Psihoyos I*") (quoting *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 909–10 (8th Cir. 2012)), a less stringent standard may govern the consideration of actual damages evidence insofar as that evidence bears only on statutory damages. If that is true, then Defendants' argument regarding

---

[6] Indeed, the First Circuit has approved a district court's instructions that the jury should arrive at statutory damages by considering what was "just," guided by a "set of non-exhaustive factors" similar to the *Bryant* factors. *Tenenbaum*, 660 F.3d at 503–04. That suggests that a jury need not even consider a plaintiff's actual damages at all in setting statutory damages, *see also* 5 Nimmer on Copyright § 14.04[B][1][a] (suggesting that factors guiding statutory damages awards apply "[i]n the absence of a jury trial"), which would further suggest that an erroneous actual damages award is not a discernible error justifying remittitur. The Court's jury instructions in this case were consistent with the First Circuit's analysis in *Tenenbaum*, *see* Court Ex. 3 at 21 (instructing that the jury "may consider any or all" of the *Bryant* factors), and Defendants did not object to them.

speculativeness—which relies on cases involving actual damages qua actual damages, Def. Br. at

21 & n.11—would be inapposite. *Cf. Columbia Pictures Television*, 259 F.3d at 1194 ("A

plaintiff may elect statutory damages 'regardless of the adequacy of the evidence offered as to

his actual damages and the amount of the defendant's profits.'" (quoting 5 Nimmer on Copyright

§ 14.04[A])).  However, just as it was unnecessary to resolve that question earlier, it is also

unnecessary now, because there was sufficient evidence for the jury to conclude that Morel

suffered $275,000 in actual damages.

Defendants base their analysis on the assumption that the jury concluded that Morel

would have sold 1,000 licenses for his photos at an average of $275 per license.  But that is not

necessarily correct.  There was evidence that AFP and Getty licensed the images for up to $1,450

each, *see* Ex. 264C at row 29, and assuming that Morel himself had received the same amount

per license, he would have had to make fewer than 200 sales to have generated $275,000.

Additionally, Morel testified that one offer he received from NBC would have paid him $500 for

a single photograph.  Tr. at 171:13–20, 176:19–177:1 (Morel).

In any case, there was enough evidence for the jury to conclude that Morel would have

made 1,000 sales: that was roughly the number of customers who, the evidence showed, obtained

the images from Defendants. Exs. 137, 138, 264C, 265C; Tr. at 727:16–17, 729:4–732:5

(Calhoun); Tr. at 785:18–791:2 (Tarot).  The Court cannot say that it was irrational to infer that

all of the AFP and Getty customers that downloaded the pictures would have bought them from

other sources.  *See Stevens Linen Assocs., Inc. v. Mastercraft Corp.*, 656 F.2d 11, 15 (2d Cir.

1981) (endorsing damages theory that would calculate damages by assuming defendants'

customers would have bought from plaintiff but for defendant's infringement); *RSO Records,

Inc. v. Peri*, 596 F. Supp. 849, 860 (S.D.N.Y. 1984) ("It would be reasonable to assume that for

24

every counterfeit copy of plaintiffs' copyrighted records and tapes sold by defendants plaintiffs lost a corresponding sale."). The earthquake was a major news event, and there was evidence that pictures from on the ground were difficult to come by in its immediate aftermath. Tr. at 301:3–302:10 (Amalvy). In other words, it would be reasonable to conclude that there would have been demand for Morel's photographs had Defendants not made them widely available to their customers. That is particularly true in light of testimony that NBC reneged on its offer to Morel because it had obtained the image from AFP. Tr. at 171:17–22 (Morel).

Although Defendants point out that the total number of downloads by AFP and Getty customers—roughly 1,000—included "downloads by *both* a la carte customers and subscription customers who purchased their subscriptions long before Morel's photographs even existed," that argument misses the mark. Def. Br. at 24. Initially, it is worth noting that the 1,000-download figure appears to understate the true number of downloads; while there was evidence presented at trial about Getty's subscription downloads, *see* Ex. 265C; Tr. at 728:20–729:1 (Calhoun), Tarot testified that there was no way of knowing which of AFP's subscription (as opposed to a la carte) customers had downloaded the images. Tr. at 787:13–788:2. And the Court's prior holding that fees paid by Defendants' subscribing customers could not be used to calculate Defendants' infringing profits is irrelevant to Morel's actual damages; it was based on the fact that subscribers paid in advance for the right to download images from Defendants' feeds, so revenue generated by those subscriptions could not logically be attributable to the dissemination of Morel's images. That does not imply that Defendants' subscription customers would not have paid Morel—or his agency, Corbis—for the photographs had the photographs not already been made available to them through their AFP or Getty subscriptions. Indeed, at the November 20, 2013 charging conference, the Court agreed with *Defendants'* suggestion that the

value placed on Morel's photographs by subscription customers would be "appropriately considered in calculating actual damages." Tr. at 892:4–7.

Defendants point out that Morel himself received only one offer to buy a photograph, but of course he might have received more had Defendants themselves not made his photographs widely available. And although there is some merit to Defendants' argument that Morel's spotty internet and phone access would have made it difficult for him to close numerous sales after the earthquake, the evidence showed that Corbis was marketing his photos as well. Assuming that all 1,000 sales were made through Corbis,[7] Morel would not have received the entirety of the proceeds from those sales under his existing contract; he received only 50% of Corbis's revenue from sales for "editorial use" and 45% of its revenue from sales for "commercial use." Ex. 303 at 000189; Tr. at 211:4–8 (Morel). But as noted, there was other evidence from which the jury could have concluded that the per-license fee was higher than $275. Assuming that Morel received 50% of the revenues from Corbis's 1,000 sales, those sales would have had to average $550 to generate $275,000 in lost profits. That is just $50 higher than NBC offered Morel, and significantly lower than the $1,450 that Getty received for one sale. Ex. 264C at row 29. There was therefore evidence from which the jury could conclude that Morel lost $275,000 in sales even if all those sales were made through Corbis.[8]

---

[7] Defendants also argue that Corbis would have earned only $29,000 from licensing the photos—the same amount made by Defendants themselves. Def. Br. at 22–23; Def. Reply at 7. But that argument incorrectly assumes that the number of licenses Corbis could have sold would have equaled only the number of a la carte sales that Defendants made. As noted, had Defendants' subscription customers bought the photographs from Corbis, they would not have been able to obtain the photos based on already-paid subscription fees.

[8] Although Defendants do not argue that the jury double counted, it arguably would have been wrong for the jury to include Defendants' a la carte customers in the number of sales Morel or Corbis would have made, because sales to a la carte customers were already accounted for in Defendants' infringing profits; indeed, because the Court precluded the jury from attributing subscription revenues to Defendants' infringement, a la carte fees composed the entirety of those profits. But even if one excludes Defendants' a la carte customers from the total number of sales that Morel or Corbis would have made but for Defendants' infringement, the range of prices at which Defendants

For these reasons, the Court cannot conclude that the jury's actual damages award was impermissibly speculative. As a result, that award also cannot be a basis for remitting the jury's statutory damages award.

### 2. Intrinsic Excessiveness

Apart from the actual damages calculation that Defendants argue "infected" the jury's statutory damages award, Defendants also argue that the Court should remit the $1.2 million award as intrinsically excessive. Although, in general, a damages award may be set aside if it is "so high as to shock the judicial conscience and constitute a denial of justice," this is a "narrow standard." *O'Neill*, 839 F.2d at 13 (quoting *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978)) (internal quotation mark omitted). And in the specific context of statutory damages under the Copyright Act, Congress has placed an upper bound on the damages that a jury can award, which mitigates the risk of a truly untethered award. Defendants concededly cite only one case in which a court has overturned a jury's statutory damages award as excessive where the award is within the statutory guidelines.[9] Def. Reply at 9. It is true that courts setting statutory damages

---

sold the photographs, and the fact that there were likely more than 1,000 downloads in total, was sufficient evidence from which the jury could have concluded that even the total number of sales would have been at a high enough rate to amount to $275,000 in total.

[9] That case, *Capitol Records Inc. v. Thomas-Rasset*, 680 F. Supp. 2d 1045 (D. Minn. 2010), is of limited relevance in any event. The district court conducted three trials. After the first, at which the jury granted $222,000 in damages, the district court concluded that it had erred in instructing the jury on liability and ordered a new trial. At the second trial, the jury awarded the plaintiff $1.92 million in statutory damages, and the court remitted the amount to three times the statutory minimum, *see id.* at 1054–57, but the plaintiff rejected the remitted amount and another trial was held. At that third trial, the jury awarded the plaintiff $1.5 million, and the district court rejected the award as violating due process—rather than on common law remittitur grounds—and again held that three times the statutory minimum was the maximum permissible award. *Capitol Records, Inc. v. Thomas-Rasset*, 799 F. Supp. 2d 999, 1011–14 (D. Minn. 2011) ("*Thomas-Rasset II*"). That decision was vacated by the Eighth Circuit; on appeal, however, the plaintiff sought only the original $222,000 award, and the Eighth Circuit rejected the defendant's argument that that lower award was unconstitutional. *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907–910 (8th Cir. 2012). To the extent that the district court's opinions remain authoritative, they are inapposite here because the case involved "a first-time willful, consumer infringer of limited means who committed illegal song file-sharing for her own personal use." *Thomas-Rasset II*, 799 F. Supp. 2d at 1001.

after bench trials or defaults have often awarded less than the jury did in this case, even where the infringing conduct could be characterized as more culpable. Def. Br. at 28–34. But the question is not what this Court would award were it deciding the question itself; the question is whether the jury's award is so excessive that the Court should intrude on its prerogative to set damages. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 347–55 (1998) (recognizing the right to have a jury determine statutory damages); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488, 496 (4th Cir. 1996) (jury's award is entitled to significant deference); *Psihoyos I*, 2012 WL 5506121, at *1 (because remittitur involves usurping the jury's authority to set damages, it is justified only in limited situations).

As noted, the Second Circuit has rejected the argument that statutory damages must have "a direct correlation" with actual damages. *Psihoyos II*, 748 F.3d at 127. The jury was entitled to consider other factors, including Defendants' state of mind, a perceived need to deter Defendants and third parties, Defendants' "cooperation in providing evidence concerning the value of the infringing material," and the parties' conduct and attitude. *See Bryant*, 603 F.3d at 144. There was evidence from which the jury could have concluded that Defendants' infringement (and particularly AFP's) was not just willful but reflected a gross disregard for the rights of copyright holders. In the light most favorable to Morel, AFP not only took Morel's photographs from Twitter without pausing to consider whether it was infringing the copyright owner's rights, but also continued selling the photographs (with an "AFP" identifier) even after learning of its infringement on the assumption that the only price to pay would be an after-the-fact payment close to what Morel would have earned had Defendants obeyed the law.

Additionally, although Defendants contend that the jury should not have considered deterrence as a meaningful factor in light of evidence that AFP and Getty "have each already

made changes to improve their systems and practices," Def. Br. at 30, "an inclination on the part

of the jury to impose a penalty to deter similar conduct in the future is not erroneous,

notwithstanding the . . . revised policies, given the evidence of reckless conduct in the past."

*Psihoyos I*, 2012 WL 5506121, at *4. And as the Court held in addressing the parties' motions

in limine, it would have been appropriate for the jury to consider the fact that AFP and Getty are

large companies in assessing deterrence. Final Pre-Trial Conf. Tr. at 21:9–19. It also would

have been appropriate, under *Bryant*, to consider the deterrent effect on other potential infringers,

which may not have changed their policies in the way that Defendants here claim to have done.

*See Bryant*, 603 F.3d at 144; *Psihoyos I*, 2012 WL 5506121, at *4. In sum, the Court concludes

that in light of all the considerations that the jury was entitled to consider, remittitur of the $1.2

million statutory damages award is not required.

### III.   Conclusion

For the foregoing reasons, Defendants' motion for judgment as a matter of law, a new trial, and/or remittitur is GRANTED insofar as the Court grants judgment as a matter of law to Getty on Morel's claim under § 1202(b) of the DMCA.  Accordingly, the jury's award is altered such that AFP and Getty continue to be jointly liable for $1,210,000 and AFP is individually liable for the remaining $10,000.  The remainder of Defendants' motion is DENIED.

The parties have stipulated that the deadline for taxing costs and submitting any motions for attorneys' fees is fourteen days from the date of this order.  Dkt. No. 311.  The opposition and reply deadlines for any such motions will be governed by the Federal and Local Rules, unless the parties, within fourteen days, submit for the Court's approval a stipulation setting alternative deadlines.

This resolves Docket No. 313.

SO ORDERED.

Dated:   August 13, 2014
        New York, New York

ALISON J. NATHAN
United States District Judge