BARBARA HOFFMAN (BH 8931)
The Hoffman Law Firm 330 West 72nd Street
New York, New York 10023 Telephone: (212) 873-6200
Facsimile: (212) 974-7245

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

Petition to Fix a Charging Lien          :
                                         :
BARBARA T. HOFFMAN,                       :                    **Civil Action No.**
                                         :
          *Former Attorney of Record for* :                    **10-cv-2730  (AJN)**
          *Defendant Daniel Morel,*        :
                                         :
              v.                          :                    **DECLARATION OF**
                                         :                    **BARBARA T. HOFFMAN**
DANIEL MOREL,                             :                    **IN SUPPORT OF THE MOTION**
                                         :                    **TO FIX THE AMOUNT**
          *Defendant, Counterclaim Plaintiff* :               **OF AND ENFORCE A**
-----------------------------------------------------------X   **CHARGING LIEN UNDER**
**In the Matter of:**                                          **NEW YORK JUDICIARY LAW § 475**
-----------------------------------------------------------X
AGENCE FRANCE PRESSE,                     :
                                         :
          *Plaintiff,*                    :
                                         :
              v.                          :
                                         :
DANIEL MOREL,                             :
                                         :
          *Defendant, Counterclaim Plaintiff* :
                                         :
              v.                          :
                                         :
AGENCE FRANCE PRESSE,                     :
GETTY IMAGES (US)                         :
                                         :
          *Counterclaim Defendants.*      :
-----------------------------------------------------------X

     I, Barbara T. Hoffman, an attorney duly admitted to practice law before this Court, having

personal knowledge of the facts stated below hereby declares the following to be true under

penalty of perjury:

1.      I submit this Declaration in Support of my petition pursuant to the Court's ancillary jurisdiction 28 U.S.C. § 1367, to adjudicate and enforce my "charging lien" under the New York Judiciary Law § 475 ("N.Y.J.L § 475").

<u>**MY PROFESSIONAL BACKGROUND**</u>

2.      I graduated from the Columbia Law School as a Harlan Fiske Stone Scholar in 1971.  Following three years as an attorney with the New York City corporation counsel's office litigating sex and race discrimination cases, I was recruited as a law professor and accepted employment as the first woman faculty member at the University of Puget Sound School of Law (the "Seattle University School of Law").  During my tenure as a professor, I founded and received funding to establish the Washington State Volunteer Lawyers for the Arts and a pro-bono legal assistance clinic run by students and attorneys, for artists at the Seattle University School of Law.  I was also on a panel for the Western District of Washington and in that capacity handled several successful federal cases for indigents against their employers based on their Title VII claims.

3.      Since leaving my position at the Seattle University School of Law in 1984 to return to New York City for family reasons, I have been engaged in the full time practice of law. After a brief period with a prominent New York law firm as a lateral transfer in their intellectual property litigation department, I continued as "of counsel" to two firms.  Since 1997, I have been a sole practitioner.  I have developed a niche practice in the field of art and intellectual property law.  Albeit while providing the same level and quality of service, my *modus operandi* is at the opposite end of the scale from big firm practice.  I work with one legal assistant whose primary function is office administration and word processing.  Because I am a sole practitioner, litigation is often a last resort for both me and my clients, most of whom, but not all are individuals or small start-ups. Notwithstanding, my reputation is built on successful and

aggressive advocacy for those whose intellectual property rights have been infringed and I am not reluctant to engage in court battle when necessary to bring just monetary compensation to my clients.

4.      During my years of practice in New York City, I have litigated several precedent-setting art and copyright cases; including *Ringold v. BET 126 F 3d 70 (2nd Cir 1997); Flack v. The Friends of Queen Catherine Inc.* 139 F. Supp 2d 526 (S.D.N.Y. 2001) and drafted amicus curiae brief on behalf of clients in *Finley v. The NEA and Columbus America Atlantic Mutual Ins. Co.* (1992) 974 F.2d 450, cert. denied, 507 U.S. 1000; both of which were relied on by the courts and specifically cited, in judgments in favor of Finley and Columbus America. I have represented many well-known artists in transactional and litigation matters, and was outside counsel to the College Art Association, a learned academic society of more than 8,500 members, which involved me in numerous and complex copyright matters including representing the "image group" at the USPTO Conference on Fair Use ("CONFU").  As a scholar and frequent author, former Chair of the City Bar Association Committee on Art Law and the International Bar Association Committee on Art Law and Cultural Heritage Law, I am a frequent invited speaker on copyright and art law matters at CLE presentations and at other venues worldwide.

5.      I have been elected by my peers to Super Lawyers, Best Lawyers in America, Best Lawyers in New York, and Best Women Lawyers for all years relevant in this litigation, in the field of intellectual property and intellectual property litigation.

## PROCEDURAL POSTURE OF THE CASE

6.      N.Y.J.L. § 475 permits an attorney who withdraws for good cause to assert an equitable statutory  lien in quantum meruit in this Court based on the reasonable value of the services provided to the  client.

7.      This Court issued its Decision and Memorandum on January 14, 2013, on the cross-motions for summary judgment, granting  partial summary judgment to Morel and finding direct copyright infringement by AFP and Getty Images.  Shortly thereafter, I received an email from Morel as follows:  "Dear  Barbara.  I have decided that effective immediately, the Hoffman Law and you will no longer  serve as my attorneys in the Agence France Presses v. Morel matter." (*See* **Ex. 1.**)

8.      Pursuant to Local Civil Rule 1.4 ("Rule 1.4."), I and the Hoffman Law Firm, counsel of record and lead counsel, filed a motion to withdraw on February 12, 2013, permitting Barbara T. Hoffman and the Hoffman Law Firm ("Hoffman") to withdraw from this matter as counsel for Daniel Morel, Defendant Counterclaim Plaintiff ("Morel"), based on Mr. Morel's discharge of me without cause and my withdrawal for good cause. (Docket No. 203)

9.      As required by Rule 1.4, the Motion provided notice of my intent to enforce a charging lien. Although under New York law, the charging lien attaches from the time of discharge, for both ethical and practical reasons, I determined not to fix the amount of the lien at the  time of my discharge.  Given the status of the matter and the time of my withdrawal, I was of the opinion that any ancillary proceeding on the cusp of trial was ill advised and would not be favorably considered.

10.      On or about February 15 2013, this Court granted my motion to withdraw as counsel without prejudice "to any and all rights Hoffman has to a charging lien in any proceeds of this lawsuit." (Docket No. 207.)  In fact, Morel's current attorney acknowledged in an email to me that Morel intended to honor his obligation to compensate me in *quantum meruit* under N.Y.J.L. § 475 shortly after I was discharged.

11.      On August 13, 2014, this Court issued its Memorandum and Order in *AFP v. Morel*.  (Docket. No. 324), denying defendants Agence France Presse's and Getty Images'

4

(collectively, the "Defendants") motion for reconsideration. Because I was not consulted with respect to the time to move for attorneys fees by either party, with an abundance of caution, I filed the initial motion with little time. I have requested that it be deemed withdrawn.

12.     Coincidentally, after trying to contact Morel's counsel for more than four months on an almost weekly basis via email and telephone to no avail, we  actually met and conferred via telephone one hour prior to my receipt of the decision via E-filing from the Court.

13.     In support of Morel's current attorney's ("Baio" or "Wilkie Farr") " request for fees pursuant to 54(d), I have prepared a Declaration in support of an award of reasonable costs to Morel based on invoices paid by him to my firm in the amount of $76,455.57 for costs and disbursements.  No claim is made in this application for costs, including paralegal costs paid to the firm in accordance with my agreement with Morel.  I am unaware as to whether Wilkie Farr intends to submit the Declaration since although I signed the Declaration, Wilkie Farr has stonewalled me not only on any discussion of the appropriate amount to fix my charging lien but also as to Willkie's intention with respect to file my Declaration in support of the $76,455 in costs (see **Ex. 2 and 3** attached hereto).

14.     The 54(d) application and the N.Y.J.L. § 475  motion serve distinctly  different goals and require different proofs.  It would be unfair to me to adjudicate the amount of my lien in the context of Morel's proceeding against the defendants and force me to do battle with them when I am unrepresented in that action, and because of this proceeding against Morel, his current attorneys have a conflict of interest.

### THE BASIS FOR MY CLAIMED FEES AND EXPENSES

15.     I briefly summarize below the legal services rendered by me in connection with this action.

16.     On or about February 20, 2010, Mr. Morel ("Morel") visited me in my office with his companion, a photographer, Phyllis Galembo ("Ms. Galembo" or "Galembo").

17.     Ms. Galembo was aware of me because of my reputation as a prominent copyright lawyer representing photographers.  On our first meeting of about two hours, in my office, I reviewed with Morel, the thirteen images he claimed were stolen and used by various infringers without authorization (the "Iconic Images") as well as the Twitter TOS.   He told me that the Iconic Images had been posted on Twitter and from Twitter apparently stolen by someone named Lisandro Suero from the Dominican Republic.   I recognized that my professional expertise and skills could assist Morel in bringing justice to him for the "theft of his moment."

18.     Morel wanted to know if I would work on contingency basis since he had virtually no money.  Morel had suffered several traumatic events, including a brain tumor from which he had only recently recovered.  These events had depleted his income and interfered in his successful career as a well known documentary photographer, photojournalist and documentary filmmaker.

19.     After several days, Morel selected me to represent him, in part because of my reputation, in part, because I spoke fluent French and had a longstanding relationship with Haiti and the Haitian people, including a former President and his wife, who was a candidate for President of Haiti in 2010; and finally because under his agreement with Corbis he would be entitled to only 50% of the proceeds recovered by Corbis.  Mr. Morel at the time had an exclusive image representation agreement with Corbis.

20.     I immediately registered Morel's Iconic Images of the Haiti earthquake with the US Copyright Office.  I did the registration on an expedited basis so that we could file suit, if necessary, and to ensure that Morel would fall within the three-month statutory window to

register after creation of the images, in order to obtain attorney's fees and statutory damages even if infringement has occurred prior to registration.

21.     On or about, March 5, 2010 I provided a retainer agreement to Morel.  I had also engaged Ms. Galembo at the request of Morel, as an independent contractor to be paid by Morel, from the proceeds of any judgment or settlement.  In such circumstances, I would receive 33 1/3 percent of any judgment proceeds or settlement, and Morel would pay Galembo from his share.  Alternatively, at Morel's instructions, I would pay Galembo directly from Morel's share.  Morel also agreed to pay all costs and disbursements including word processing and "paralegal fees."  I explained the retainer to Morel and he appeared to understand. Copies of the agreements are attached hereto as **Ex. 4**.

22.     The original AFP v. Morel retainer was amended to reflect the fact the litigation had commenced, confirming my right to 33 1/3% of the proceeds; albeit, if the matter had settled prior to the commencement of litigation, I would have been entitled to only 25% of the settlement proceeds.  Morel paid me 33 1/3% of all prior settlements sums and, as per our retainer, approved and agreed to costs and disbursements.  *See* attached hereto **Ex. 5**.

23.     With the help of, and working in cooperation with Galembo,  I engaged in "Morel-spotting," systematically expending considerable time and effort to search the internet for unauthorized uses of the Iconic Images.  I then began a campaign to have the infringing images removed from the internet, sending cease and desist letters to various infringers many of whom were customers of AFP and Getty Images, including various media, organizations, charities and non-governmental organizations, like the Clinton Foundation and the World Food Program.

24.     I wrote letters to both AFP and Getty Images to request that they cease and desist from all uses of the Iconic Images.  I was directed by Getty Images to AFP, whom it

claimed was responsible for any infringements.  I engaged in several lengthy conversations with

Joshua Kaufman, AFP's counsel.  From the outset, AFP asserted unreasonable and frivolous

claims and defenses, including, but not limited to, commercial defamation, a non-exclusive

Twitter license, flawed copyright registration, and an 11th hour last ditch effort, that Morel

lacked standing, all of which claims and defenses were either withdrawn by AFP or rejected by

the Court.  At the outset, Mr. Kaufman, AFP's counsel, argued that Morel was no more than a

"citizen journalist," although any search would have revealed he was a noted AP photographer,

and that AFP had no right to use, sell, license, and distribute any of his photographs posted on

TwitPic.  The meritless arguments ultimately resulted in thousands of dollars of legal fees

payable by his clients, not to mention an inordinate amount of my time.

25.     To my astonishment, AFP sued Mr. Morel on March 26, 2010, for a declaratory

judgment that it did not infringe Mr. Morel's copyright by the unauthorized use and distribution

of his images and for commercial defamation.

26.     Nonetheless, I continued to write cease and desist letters to AFP and Getty

Images' clients, since I believed that AFP's position was meritless and designed as a tactical

litigation strategy, to frighten Morel and force him to enter into an unreasonable settlement.

27.     After discussion with AFP's counsel, AFP agreed to stipulate to the dismissal of

AFP's claim of commercial defamation with prejudice.

28.     As of April 20, 2010, I was counsel of record and lead counsel for Mr. Morel.  I

filed on his behalf an Answer to AFP's Complaint and Counterclaims against AFP, Getty

Images, CBS Broadcasting, Inc., ABC, Inc., and Turner Broadcasting (collectively, the

"Counterclaim Defendants") for violations of 17 U.S.C. 106, the DMCA § 1202(a) and (b), the

Lanham Act and other claims for secondary liability.

29.     In doing my research on the counterclaims, I thoroughly searched the internet for every unauthorized use of Mr. Morel's photographs.  My research was so extensive on the Internet that the Answer and Counterclaims accurately set forth every image licensed by Getty Images, as was later confirmed in Getty's document production.

30.     In developing my various legal arguments I was guided by my skill as a litigator and my years of teaching copyright law.  Many of the claims were novel and dealt with areas of emerging law.  I made extensive use of Lexis-Nexis for my research to draft the counter-claims, for which Morel was not charged since I used the City Bar Association free Lexis service for members.  The counterclaims raised difficult and thorny issues relating to damages for willful copyright infringement, secondary liability for copyright infringement and issues relating to the DMCA safe harbor provisions as well as statutory damages for "each" violation of the DMCA under § 1202(a) and (b) and the requirements respecting CMI under § 1202(a) and (b).  My § 43a Lanham Act claim argued that the facts of this case fit it within the narrow area to advocate such 43(a) claims after the Supreme Court's decision in *Dastar v. 20th Century Fox,* admitted such claims involving failure to credit with claims of copyright infringement the loss, however, was not fatal as Judge Pauley did permit the DMCA § 1202(a) and (b) claims to survive.

31.     This case involved an intense time commitment and the preclusion of other employment based on my extensive time commitment.  I was on the verge of losing several clients and did lose new referrals.  This case was litigated until January 2013 by me and involved more than fifteen depositions and complex issues of law all of which were developed and litigated solely by me until January 2013.  I was involved in numerous discovery disputes against difficult and obstructive adversaries using big firm tactics to delay and increase Morel's costs.  Moreover, Morel succeeded on almost all claims litigated by me, except the § 43a

Lanham Act claim.  I also succeeded in having all the affirmative defenses of the Defendants AFP and Getty Images dismissed; the majority of which were frivolous and unreasonable lacking in both factual and legal support.

32.     All of the documents on the docket filed on behalf of Morel, until my discharge without cause were exclusively written and drafted by me and word processed by my legal assistants, primarily Hilary Gish through September 2010 and then Shoshannah Richards from June 2011 through July 2012.

33.     It is my practice to hire extraordinarily bright women for no more than two years. They are well paid and I mentor them.  My assistants have often gone on to law school or attained PhDs in related fields.  Most, like Hillary and Shoshannah graduated Barnard at the top of their class. My assistant Adalene Minelli, from March 2013 until May 2014, is currently at Cardozo Law School.

34.     In the interim, unable to find an assistant of the caliber required, I hired full time, long-term temporary assistants from an agency with whom I regularly work.  My work on this matter included, but was not limited to, preparations of a more than the 200-page Answer with Counterclaims and exhibits, preparation of F.R.C.P. 26(a) statement and responses to AFP and Getty Images, review of more than 15,000 documents, "Morel-spotting," document production, discussion and rejection of offers of judgment; an unsuccessful mediation and settlement discussions with AFP corporate offices, and cross-motions for summary judgment. Specifically, I conducted extensive legal research and exclusively drafted the following:

- Answer, Affirmative Defense and Counterclaims, dated April 20, 2010 (amended April 22, 2010; June 22, 2010; and June 13, 2011);

- Rule 26(a) Initial Disclosures, dated June 11, 2010;

- Opposition to Motion to Dismiss, dated Aug. 24, 2010;

- Responses to First Set of Interrogatories and Requests for Production, dated September 10, 2010 (amended on November 17, 2010);

- Motion for Summary Judgment, dated April 27, 2012;

- Declarations of Barbara Hoffman, Phyllis Galembo, Angela Foglesong, Tequilo Minsly, Richard Merse;

- Rule 56-1 Undisputed Facts in Support of Motion for Summary Judgment, dated April 27, 2012;

- Memorandum of Law dated April 27, 2012;

- Declaration of Barbara T. Hoffman May 15, 2012 with exhibits;

- Memorandum in Opposition to AFP and Getty Images' Motions for Summary Judgment, dated May 29, 2012;

- Declaration of Daniel Morel in Opposition May 29, 2012 with exhibits;

- Reply in further support of Motion for Summary Judgment, dated June 12, 2012 with supporting affidavits and exhibits;

- Counter-Statement of Undisputed Facts in Response to AFP and Getty Images;

- Local Rule 56.1 Statement of Undisputed Facts dated June 13, 2012;

- Reply Affidavit of Daniel Morel dated June 12, 2012 with exhibits;

- Reply Affidavit of Barbara T. Hoffman dated June 12, 2012 with exhibits; and

- Reply 56.1 Evidence Memo of Law dated June 14, 2012.

## MANNER OF TIME ALLOCATED TO SPECIFIC PROJECTS SUCH AS ANSWER AND COMPLAINT, COUNTERCLAIMS, MOTION TO DISMISS, DISCOVERY, SUMMARY JUDGMENT, AND CONFERENCES

35.       In calculating the number of hours spent by me related to Morel's benefit, I relied upon contemporary entries on my email database and the documents and letters attached thereto, my computer directory with contemporaneous time-stamped generated documents stored in the computer under Daniel Morel; the transcripts of the 15 depositions, my computer

11

calendar at the date and time for the year 2012 and the contemporaneous time records generated by my legal assistants, primarily Hillary Gish and Shoshannah Richards and the docket sheet.  I am the sole attorney in my office.  These records reflect solely my effort and skill except to those tasks identified as performed by my legal assistants who did not do research, draft documents or invoice for discussion of the case on matters with me.  My legal assistants' document production and non-word processing activities, if any, are indicated on the time sheets maintained by them on a daily basis for each client on whose matter they worked, as was the case for the contemporaneous records maintained for word processing related to each client on a daily basis. (See **Ex. 10** *supra*)

36.     My office has tried unsuccessfully to use "time slips" or other computer programs for billing.  Most of my cases are not contingent fee and my assistants record their time on a daily basis and I record my time weekly.  My assistants often independently track my time spent on conference calls or telephone calls, and costs and disbursements for each client including word processing and Federal Express. In this matter, a combination of entries were used to record my contemporaneous time as contrasted to my legal assistant's record keeping on an hourly/daily basis.  I have used my best efforts to calculate and reconstruct from my contemporaneous records, the services and reasonable hours I provided to Morel during a given time period.  More likely than not, I have underestimated my time.

37.     From February 2010, for the period through June, 2010, my time was spent principally in research, contacting infringers, meeting with clients and press, discussions with opposing counsel.  This period included extensive research to draft the answer and counterclaim as well as preliminary discovery and other matters.  Defendants AFP and CNN represented by Venable and CBS represented by David Wright Tremaine, and Getty Images moved to dismiss Morel's counterclaims. From June, 2010 I was involved in preliminary discovery and opposing

and arguing the motion to dismiss through September 2010.   I was also engaged in settlement discussions with AFP and Getty Counsel and mediation efforts and reviewed and researched several offers of judgment to Morel through 2010.

38.      During the discovery phase of the litigation, primarily 2011, I reviewed the complaint, drafted the answer and served the counterclaims; reviewed more than 15,000 documents and noticed and prepared for all fact witness depositions.  I supervised document production and obtained the third party deposition of TwitPic based in North Carolina and the third party deposition of Twitter in San Francisco coordination with local counsel.  I also generated more than 20 hours in discovery disputes with 3rd party Corbis and review of Corbis documents.   Issues also involved AFP's 11th hour "standing" argument and obtained the right to depose third party CNN related to Morel's secondary liability claim against Getty Images.

39.      I conducted seven of the depositions in this case without the input of any other counsel.  Joseph T. Baio ("Baio") of Willie Farr and Gallagher assisted me in eight depositions. We worked together cooperatively to identify documents and develop questions.  Our work was complementary not redundant.  I attended all depositions except the deposition taken by Baio of Katherine Calhoun in New York, when I was in China for one week.  I had several lengthy conversation with Baio from China with respect to discovery issues. Attached hereto as **Ex. 6** is the list of witnesses deposed, the time, date and location of the deposition.  The reasonable compensation claimed due and owing to me as a result of my participation in the depositions is set forth in the chart attached hereto as **Ex. 7**.

40.      The aggressive tactics of defendants in over designating documents as privileged or confidential and other disputes regarding the admission of expert testimony protective orders, and other issues, involved extensive briefing and motion practice before Magistrate Judge M. H. Dolinger, and several court conferences with appearances.

13

41.      I prevailed on almost all of the motions, and obtained the relief requested including the release of documents classified privileged or confidential, the right to submit expert reposts and the release of other documents classified wrongly as confidential.

42.      I had to engage in or supervise ancillary proceedings against Twitter in San Francisco, Twitpic in North Carolina and Corbis and I engaged a friend and colleague as counsel in the Dominican Republic to obtain permission for the release of Lisandro Suero's records from Twitpic and Twitter.

43.      My time from January 2012 was spent primarily in discovery disputes, the cross-motions for summary judgment, and a search for and preparation of experts and expert reports. I retained two experts for Morel, which I believed necessary to establish the computer time chronology and the reckless behavior of AFP and Getty images relative to other reputable media.

44.      I successfully briefed Morel's cross motion for summary judgment in its entirety.

45.      In connection with the cross motion for summary judgment, I submitted a Local Rule 56.1 Statement of Undisputed Material Facts.  In the extensive research I conducted.  I attempted to prove *inter  alia* that there was no genuine issue of dispute that Getty Images had independently, obtained the Morel Iconic images prior to transmission and from AFP and was therefore independently liable of copyright infringement.  The Court rejected my evidence on this issue in its entirety and as a result of my lengthy number of undisputed facts, changed its Individual Rules of Practice limiting the number of undisputed facts that could be alleged in a summary judgment motion.  I believe that with the exception of the above example, each fact alleged as undisputed was in fact successfully proved at trial.  In any event, although the Court

ultimately rejected my analysis, it was undertaken in due diligence and was in my view necessary.

46.     In connection with the summary judgment motion, I prepared all memoranda of law on the docket sheet and drafted the declarations of Galembo, Daniel Morel, Richard Morse, Tequila Minsky, Hillary Gish, Darvin Valdez and Angela Foglesong and Barbara Hoffman in support of, in opposition to, and in reply.  All, if not most were accompanied by extensive exhibits.

47.     From February 2012 through the filing of the evidence memorandum on June 15, 2012, I worked exclusively on Morel matters, primarily research for discovery motions and motion for summary judgment and drafting the cross-motions for summary judgment. Enormous amounts of time were required to prepare the Declarations, the 56.1 Statement and Counter Statement and the memoranda.  Hours of meetings with the affiants and meetings with the clients were required.  My computer calendar and records reflect that I worked on Morel particularly in April, May and June, almost every day, seven to fifteen hours a day depending on the deadline to meet, including Saturdays and Sundays.  My assistants' time sheets sixteen hour days and work on Saturdays and Sundays.

48.     My contemporaneous entries and calendar indicate that the only time I did not work on Morel were the periods as follows:

(a) India:  the last week of January to attend a New Delhi art fair

(b) Italy:  one week mid-May to speak at a conference

(c) Spoleto Festival: four-day holiday over Memorial Day in conjunction with a play we produced

(d) I was in hospital after fainting in my Pilates class Wednesday February 22, 2012 and remained until 5 pm February 23, 2012; however, I did three hours of work

on the second day.  The next day on February 24, 2012, I flew to Los Angeles

to attend a wedding and returned the following Tuesday, February 28, 2012 in

the evening. Notwithstanding, I logged three hours of work on that Monday and

Tuesday to preapre for status meetings with Magistrate Judge Dollinger and

Judge Nathan.

49.     I attended numerous conferences before the Court with respect to the Motion to

dismiss, settlement discussions, summary judgment and discovery disputes.  Attached hereto as

**Ex. 8**  is a chart of the conferences before the Court and the time allocated to each of the

conferences based on my records and the docket.

## MY RELATIONSHIP WITH WILKIE FARR AND GALLAGHER ("WILKIE") AND JOSEPH T. BAIO ("BAIO")

50.     I did not know Baio prior to this ligation either personally or by reputation.  He

was known to Morel and Galembo as a collector of photography and collected Ms. Galembo

photographs as well as being her friend.

51.     Galembo discussed Morel's case with Baio and my records indicate non-

substantive emails with him as early as 2010.  My records indicate that I did send him the

opposition to the motion to dismiss at Galembo's request, for his review, but it was never

provided.  Sometime in 2011, at Galembo's suggestion, I approached him in connection with the

possible storage of the more than 15,000 digital files produced by Getty in Wilkie Farr's

searchable database.  Infrequently, when I could not locate a document I had previously

reviewed manually, my assistant search the Wilkie-Farr database.

52.     Baio was engaged in preparation of the *Limewire* trial in April of 2011 until

May 13, 2011.  I had asked him to review the CNN settlement agreement to make sure it did not

prejudice Morel's rights to continue against CNN for the CNN/Getty Images joint liability claims.  He did not provide any timely written comments or research that I remember.

53.     Baio covered for me when I was in China in September 2011 and helped in dealing with counsel in several discovery disputes when I was unavailable.  Baio had the experience in dealing with deep pocket clients and big firm litigators who defend copyright infringers against content holders. In fact, he was on that side in *Limewire*.  Thus he could advise me on their tactics.  Such tactics has not been my experience in the copyright bar where adversaries often meet to play tennis and discuss issues at the annual meeting of the Copyright Society. baio was charming, generous and affable.

54.     Baio's major contributions were to advise on practical details on how to deal with  opposing counsel and of course, in his experience in taking the actual depositions.  At some point we discussed the possibility that if for some reason the matter did not settle, or I did not prevail on summary judgment, Baio might join me as trial counsel.

55.     Baio had sent a retainer letter to Morel in May 2011, but by the time Morel received a September bill, from Wilkie Farr for $16,786.34, he had not signed it.  He presented it to me for review and I provided my comments to him.  I explained the differences to him between my retainer and Wilkie Farr's.  Under the Wilkie retainer there was no contingency based on recovery the money was due and payable at the end of the trial.  I assumed that the marked up version would be signed by Morel since he never got back to me, but Baio provided me with no copy nor did he discuss the retainer with me. A copy of the mark-up is attached hereto as **Ex. 8**.

56.     As previously noted, Baio's assistance in taking depositions was invaluable to me.  I attended all the depositions but for Katherine Calhoun while Baio brilliantly asked the questions, I identified what I considered the key issues and most of the key documents to be

introduced. To my knowledge, there was no redundancy or overlap in the services provided by Baio or me so as to reduce my reasonable compensation. Normally Baio and I met for about an hour prior to the deposition or the night before, to discuss the depositions and I provided to him the documents I thought important to introduce including review of my translation of all relevant documents in French. One document I translated included the now famous statement by Eva Hambach: "AFP got caught with its hand in the cookie jar and they have to pay." I did not know nor was I the beneficiary of information obtained for Baio by his associates. I had the impression that it was Baio and me working together. My legal assistant provided the mechanics for depositions and my office paid for all the transcripts and costs which were passed on to Morel for reimbursement.

57.     Baio did not, to my knowledge, review my papers on the motion for summary judgment or provide comment on them. My records show no comments. My records do show that he provided one case to me from his *Limewire* litigation. Baio also provided a black lined version of a letter I submitted to Judge Pauley. Baio's mark-ups were editorial and structural, but very helpful.

58.     I do not recall any substantive intellectual analysis or legal research provided to me by Baio either on damages or any other issue in this case except a two page research memo related to Heather Cameron and evidence. I was mildly surprised when Morel, Galembo and I met with him about whether to accept an AFP settlement offer, he relied exclusively on my research and various damage theories, and did no ever provide to us any research to assist us. (We were all familiar with his success in defeating the *Limewire* damage claim, which is probably why that theory of damages became a focus) As noted, Morel's theory of damages changed for work to "number of violations" for the DMCA based on AFP and Getty's violative acts (See. Ex. 9 *supra)*.

## THE REASONABLENESS OF MY CLAIMED FEES

59.     I believe the hourly rate I have claimed of $665.00 an hour is reasonable.   The rate is not billed to Morel.  The rate also does not reflect the contingency.  Of course since I had entered into a contingency agreement with Morel.

60.     I have claimed that my reasonable hourly rate based on my knowledge of the rates charged "for similar services by lawyers of reasonable comparable skill and experience is $665.00 an hour."  Particularly the complex issues raised by the DMCA, both the safe harbor damage issues need someone of my skill and experience in representing content providers and creators in protecting copyright.

61.     The rate is commensurate with that charged by my colleagues providing similar services with equivalent reputation, credentials and skills.

62.     My rate does not reflect the contingent nature of the case which should be increased by at least 18% to reflect that my recovery was contingent.  In fact, most copyright litigators, to my knowledge, do not work on contingency.

63.     In my professional opinion, my time was reasonably expended to achieve the result obtained for Mr. Morel during my representation of him.  As set forth above, I conducted extensive internet and legal research from the time of meeting Mr. Morel in order to develop the theories and factual information contained in Mr. Morel's counterclaims to AFP's Complaint, as well as in his subsequent motion papers.  My initial factual allegations provided a roadmap for the litigation.  I successfully defended Mr. Morel's claims against a motion to dismiss and, on summary judgment, the Court found AFP liable for copyright infringement.  It similarly found Getty Images liable for infringement, subject only to the resolution of certain issues of fact relating to Getty's affirmative defense, which Getty ultimately withdrew before trial.  My work on this matter directly contributed to Mr. Morel's ultimate success in the litigation.

64.     I do not seek any compensation for my legal assistants time or "paralegal time" which time was paid by Morel.  However, I have relied on the contemporaneous time sheets maintained by them as one of the contemporaneous records on which I have constructed my reasonable number of hours.  Attached hereto as Exhibit 8 are my legal assistants' contemporaneous record of their hours.

65.     My legal assistants' time was almost exclusively dedicated to word processing unless otherwise indicated on their time records.  They did not draft or edit documents or provide  substantive content or corrections.  A limited number of hours was attributed to document organization, searching in databases or document production.  No fees to compensate them are sought herein. My legal assistants" contemporaneous time charges are attached hereto as **Ex. 10**.

66.     The compensation I am claiming does not include time for ABC, CBS, and CNN.  After the Counterclaim- Defendants' motions to dismiss were denied in January 2011. Morel's claims were settled against the media companies.

## <u>ADJUSTMENT OF MY RATE BASED ON</u>
## <u>THE JOHNSON AND NEW YORK FACTORS</u>

67.     In my professional opinion, the novelty and difficulty of the legal issues involved in the case, the skill which I required to perform the legal services properly my preclusion of other litigation and other clients because of the intense time commitment and the difficulty of dealing with large law firm tactics all favor an enhancement of the reasonable rate to be awarded.

68.     Baio may argue that my reasonable counsel compensation should be reduced because Morel was precluded from introducing his DMCA theory of damages based on my failure to comply with my F.R.C.P. 26 obligation monitoring sanctions.  As previously noted,

Baio reviewed the January 6, 2012 letter to Judge Pauley.   To my surprise, particularly in view of his *Limewire* damage defense, he contributed no legal analysis on damages to this letter.

69.       In this connection, AFP's counsel misrepresented my failure to update my F.R. Cir. Proc. Rule 26 statement, adopting misrepresentation  as a trial tactic or litigation strategy to obtain the sanction of preclusion from the Court.  Baio, did not consult with me or offer me the opportunity to respond to AFP's counsel.  Kaufman was aware or should have been aware of the DMCA § 1202(c) theory of damages based on each violation of §1202(a) and (b) based on two letters written by me in 2011.  Attached hereto as **Ex. 9** are the letters written to the Court in 2011 which clearly express the damage theory subsequently expressed on p. 19 of my reply memorandum in support of the motion of summary judgment.  I had not intended to raise that issue on my motion for summary judgment focusing exclusively in the *Limewire* theory of the liability for  copyright damages for copyright infringement of downstream infringes rather than the number of "violations" properly attributed to AFP and Getty for their culpable conduct.

70.       The deposition of Heather Cameron, and Christiane Eisenberg, the declaration of Angela Foglesong of Souls for Souls were intended to support the evidence of Getty Images "each violation" as was the evidence of the Teams posting of the images from the feed provided by AFP  to Getty by Andrea  Gebhard.  AFP knew that I had advocated the damage theory based on each posting and distribution by Getty and I affirm that the failure to update the 26(a) statement was neither stonewalling nor deliberate.  In fact just like there was no update with respect to the 16 images becoming 8, because everyone knew, in my opinion, AFP and Getty also knew that the theory of DMCA damages had changed from "each work" to each violative act if the defendants in posting and distributing the images.  this was the basis of my discovery of Cameron, and Baio's questioning of Calhoun, Eisenberg, and Bernasconi. The letters to Judge Pauley referring to Morel's damage theory under the DMCA are attached hereto as **Ex. 11**.

## <u>REASONABLE TIME</u>

71.     Attached hereto as **Ex. 12** is a billing summary of the reasonable hours I dedicated to this litigation for which I seek compensation based on my review of the "appropriate records."

72.     Based on the reasonable number of hours of 1,250 hours multiplied by the reasonable hourly rate of $665.00. I respectfully request that this Court fix a charging lien in the amount of $831,250.00.

I HEREBY DECLARE and certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements made by me are true and correct.  I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.


<u>/s/ Barbara T. Hoffman</u>


Dated:  October 3, 2014
        New York, New York